# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

BLUE CROSS AND BLUE SHIELD ASSOCIATION NATIONAL EMPLOYEE BENEFITS COMMITTEE,

        Plaintiff,

v.

ALLIANZ GLOBAL INVESTORS U.S. LLC and AON INVESTMENTS USA INC. f/k/a AON HEWITT INVESTMENT CONSULTING, INC.,

        Defendants.

Case No. 20 Civ. 07606

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Blue Cross and Blue Shield Association National Employee Benefits Committee (the "Committee") brings this Complaint against Defendants Allianz Global Investors U.S. LLC ("Allianz") and Aon Investments USA Inc. f/k/a Aon Hewitt Investment Consulting, Inc. ("Aon").

## NATURE OF THE CLAIMS

1.    The National Retirement Trust of the Blue Cross and Blue Shield Association (the "Trust") is a master trust holding the assets of the employee defined benefit pension plans (the "Plans") that participate in the National Retirement Program of the Blue Cross and Blue Shield Association.

2.    Acting in its role as the Plans' named fiduciary, the Committee invested a portion of the Trust's assets in various Structured Alpha funds managed by Allianz. These funds were AllianzGI Structured Alpha Multi-Beta Series LLC I (the "Multi-Beta Series"), AllianzGI

Structured Alpha Emerging Markets Equity 350 LLC ("Emerging Markets Equity 350"), and AllianzGI Structured Alpha 1000 LLC ("Structured Alpha 1000") (collectively, the "Structured Alpha Funds" or the "Funds").  Allianz was the managing member of each of the Funds.

3.     The Committee invested in the Funds and maintained that investment based on assurances from Allianz that "structural risk protections" were the cornerstone of the Structured Alpha strategy.  While the Funds would generate returns through an options trading strategy, Allianz promised that hedges would be in place "at all times" to cap the downside risk of that strategy.  Allianz claimed these hedges would cabin investment losses to a "defined maximum loss," afford "reinsurance" against a market crash, and *eliminate* the risk of a margin call. Allianz also assured the Committee that Structured Alpha's investment strategy was "non-directional" and would "perform whether equity markets are up or down, smooth or volatile."

4.     These claimed protections were critical to the Committee's decision to invest in Structured Alpha and maintain that investment, especially given the risk profile the Committee desired for the Trust.  Allianz knew this to be true, emphasizing these very aspects of its professed investment strategy to allay the Committee's concerns about the potential risk the strategy might pose to the Trust.

5.     Yet when equity markets declined, volatility spiked, and the Funds' option positions were exposed to a heightened risk of loss in February and March 2020, those promised protections were absent.  Unbeknownst to the Committee, and in violation of Allianz's stated investment strategy and the duties it owed as an investment manager and a fiduciary under the Employee Retirement Income Security Act of 1974 ("ERISA"), Allianz had abandoned the hedging strategy that was the supposed "cornerstone" of Structured Alpha, leaving the portfolio almost entirely unhedged against a spike in market volatility.  And to make matters worse,

2

Allianz had placed a directional bet that volatility would remain relatively low, the equivalent of a ticking time bomb if its forecast (one it had promised "never" to make) proved false.

6.      As Allianz has since admitted, it constructed the portfolio to offer no downside protection against the market decline and volatility spike that occurred in February and March 2020.  Contrary to its promise that it would always purchase hedges as "reinsurance" for the options it sold, Allianz had purchased *no* hedges for an entire segment of the portfolio. Meanwhile, the so-called hedges that Allianz did purchase were not the hedges Allianz said it would buy.  Whereas Allianz had said it would buy hedges at a strike price 10% to 25% below the market, the hedges it actually held at the end of February 2020 were as much as 60% below the market.  Given these and other departures from Structured Alpha's purported investment strategy, Allianz had constructed the portfolio not to pursue "risk-managed returns" as it had promised but instead to earn marginal returns selling insurance against market volatility while maintaining no meaningful protection against the downside associated with the large tail risk of a market collapse—a strategy that has been aptly described as picking up pennies in front of a steamroller.

7.      In further derogation of its duties and scrambling to address the fallout from its imprudent management, Allianz added yet more risk to the portfolio in February and March 2020.  Whereas Allianz said it would purchase *and maintain* hedges that would automatically cap the "maximum loss" the Trust could sustain in a market downturn, Allianz *sold* the hedges that could have protected the Trust's investment and then added more risk-bearing positions in an apparent bet that the market would recover.  These new risk-bearing positions were also built without an appropriate hedge in place, exposing the Funds to further, catastrophic losses and ultimately the margin call that Allianz had said could never happen.

8.      Allianz's reckless actions, both in constructing the portfolio to bear excess, undisclosed risk and in restructuring the portfolio to chase returns rather than preserve investor capital, reveal that Allianz placed its own interests in generating performance fees ahead of its duty to safeguard the Plan assets against undue risk.  Allianz committed the same breaches with respect to each of the Funds, which were subject to substantially the same failed options strategy.

9.      The resulting losses to the Trust are staggering.  As of January 31, 2020, the Trust had approximately $2.9 billion invested in the Structured Alpha Funds.  Six weeks later, the Trust faced a margin call, leaving no choice but to liquidate the investment.  The Trust ultimately suffered a realized loss exceeding $2 billion, far beyond what the Trust would have lost had Allianz managed the Funds prudently or had the Trust been invested in the equity markets or in a comparable, prudently managed investment strategy.  As a result of Allianz's breaches, a substantial portion of Plan assets meant to provide retirement security to thousands of employees and their beneficiaries was wiped out.

10.     Aon, the Committee's fiduciary investment adviser, is also to blame.  The Committee delegated to Aon—and Aon accepted—the specific duty to render investment advice regarding Allianz and Structured Alpha.  Aon agreed to conduct "active, ongoing monitoring" of Allianz to "identify any forward-looking" risks "that could impact performance."  Aon undertook further to "inform itself" of any information necessary to discharge its duty to monitor, including information about the actual options positions Allianz had constructed.  The Committee was entitled to rely upon (and did in fact rely upon) Aon's investment advice, including advice Aon offered based on its purported monitoring of Allianz.

11.     Aon violated these duties it undertook as a fiduciary.  Aon repeatedly recommended that the Committee invest the Trust's assets in Structured Alpha, advising the

Committee that the strategy was appropriate in light of the Trust's character and investment aims.  As recently as June 2019, Aon assured the Committee that Structured Alpha remained one of its "highest conviction strategies."  By that time, however, Allianz had strayed from the hedging strategy that should have been in place to protect the Trust's investment—something Aon would have known (and advised the Committee of) had it properly discharged its duties.  A prudent investment adviser entrusted with the duties Aon undertook would have monitored the Funds' *actual* holdings to verify that Allianz was managing the strategy as it said it would.  Aon assured the Committee it did just that.  But Aon never alerted the Committee that Allianz had strayed from the hedging strategy that should have been in place, leaving the portfolio exposed to the risk of catastrophic losses.  Instead, Aon repeatedly (and falsely) described Structured Alpha as operating just as Allianz said it would, assuring the Committee that Structured Alpha added little incremental risk to the Trust's portfolio of investments.

12.    Aon also breached its fiduciary duties when it recommended that the Committee maintain a much greater percentage of pension assets invested in Structured Alpha than Aon's other clients did, despite pointed inquiries from the Committee about whether that concentration might create undue risk in a declining market.  When the Committee raised concerns in 2018 and 2019 about the concentration of Plan assets invested in the Structured Alpha Funds and how the strategy would perform in a market dislocation, Aon falsely advised the Committee that only a small portion of the Plan assets invested in Structured Alpha were at risk and that the strategy contributed little incremental risk to the Trust.  Had Aon informed the Committee of the actual risks posed by Structured Alpha, the Trust would have avoided the staggering losses it sustained in February and March 2020.

13.     Allianz and Aon breached their obligations as ERISA fiduciaries and the duties they otherwise owed to the Committee and the Trust.  Those breaches caused the Trust to suffer devastating losses, which the Committee now seeks to recover on behalf of the Trust.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1332, 1367 and under ERISA § 502(e)(1) (29 U.S.C. § 1132(e)(1)).

15.     Venue in this judicial district is proper under ERISA § 502(e)(2) (29 U.S.C. § 1132(e)(2)) and 28 U.S.C. § 1391(b).

## PARTIES AND OTHER ENTITIES

16.     Plaintiff Blue Cross and Blue Shield Association ("BCBSA") National Employee Benefits Committee is the plan administrator and named fiduciary of the Plans under ERISA §§ 3(16)(A), 402(a)(2) (29 U.S.C. §§ 1002(16)(A), 1102(a)(2)).[1]  The assets of the Plans, which are employee pension benefit plans under ERISA § 3(2)(A) (29 U.S.C. § 1002(2)(A)), were held at all relevant times in the Trust, of which the Committee is also a fiduciary.  BCBSA is an Illinois not-for-profit corporation headquartered in Chicago, Illinois.  It established the Committee to oversee the administration of the Plans as well as other employee benefit plans.  The Committee, in turn, established an Investment Subcommittee (the "Subcommittee") to enhance the Committee's deliberations regarding investment issues.  The Committee's charter vests it with the authority to prosecute any action concerning the Plans.

---

[1] The Plans that suffered losses are those sponsored by BCBSA, Blue Cross Blue Shield of Arizona, Blue Cross and Blue Shield of Florida, Blue Cross and Blue Shield of Kansas City, Blue Cross and Blue Shield of Kansas, Blue Cross & Blue Shield of Mississippi, Blue Cross and Blue Shield of Nebraska, BlueCross and BlueShield of South Carolina, BlueCross BlueShield of Tennessee, Blue Cross and Blue Shield of Vermont, Blue Cross Blue Shield of Wyoming, Excellus BlueCross BlueShield, Hawaii Medical Service Association, NASCO, Triple-S Management Corporation, and BCS Financial Corporation.

17.     Defendant Allianz Global Investors U.S. LLC is a Delaware limited liability company and registered investment adviser under the Investment Advisers Act of 1940 with its principal office in New York, New York.  In 2011, Allianz became a fiduciary investment manager within the meaning of ERISA § 3(21)(A)(i), (38) (29 U.S.C. § 1002(21)(A)(i), (38)) for the Trust's investment in the Structured Alpha Funds.  As of December 31, 2019, Allianz managed more than $140 billion in client assets.  It is a direct, wholly owned subsidiary of Allianz Global Investors U.S. Holdings LLC and part of "Allianz Global Investors," the marketing name for a global asset management business operating through affiliated entities around the world.

18.     Defendant Aon Investments USA Inc.[2] is an Illinois corporation and registered investment adviser under the Investment Advisers Act of 1940 with its principal office in Chicago, Illinois.  Beginning in 2009, the Committee retained Aon—known then as Ennis, Knupp & Associates, Inc. before its acquisition by Aon—to provide investment advice as a fiduciary within the meaning of ERISA § 3(21)(A)(ii) (29 U.S.C. § 1002(21)(A)(ii)).  Aon is a direct, wholly owned subsidiary of Aon Consulting, Inc., which is a New York corporation.

19.     The Blue Cross and Blue Shield Association National Employee Benefits Administration ("NEBA") is a department of BCBSA.  Consistent with its obligations under ERISA, the Committee delegates to NEBA the responsibility for day-to-day administration of the Plans.

---

[2] On March 25, 2020, Aon declared in the "Material Changes" section of its Form ADV Part 2A Brochure filed with the Securities and Exchange Commission that it had changed its name to Aon Investments USA Inc. from Aon Hewitt Investment Consulting, Inc.

## FACTUAL ALLEGATIONS

### Allianz Markets the Structured Alpha Strategy

20.     The Structured Alpha strategy consists of alpha and beta components.  The beta component is intended to provide broad market exposure to a particular asset class through investments in financial products (like an exchange-traded fund ("ETF")) that replicate the performance of a market index (like the S&P 500).  The alpha component is an options trading strategy that Allianz claimed would seek "targeted positive return potential" while nonetheless maintaining "structural risk protections."

21.     Allianz described Structured Alpha as consisting of an "option overlay" (*i.e.*, the alpha component) "designed to exhibit low correlation to the underlying equity or fixed income beta exposure."

22.     The options strategy was largely the same regardless of the Fund or its underlying beta(s).  Allianz touted the strategy as "non-directional," meaning it "is not predicated on correctly taking a view on the direction of equities, interest rates or any other fundamental factor."  Thus, Allianz represented the alpha strategy would "never make a forecast on the direction of equities or volatility."

23.     As for the "structural risk protections" supposedly inherent in the strategy, Allianz claimed that Structured Alpha would "combine[] both long- and short-volatility positions at all times."  While the strategy would "capitalize on the return-generating features of selling options (short volatility)," it would "simultaneously benefit[] from the risk-control attributes associated with buying options (long volatility)," Allianz said.

24.     The "building blocks" of Allianz's strategy were supposed to be three types of positions: (1) range-bound spreads; (2) directional spreads; and (3) hedging positions.

25.     The range-bound spreads, Allianz represented, are "short-volatility positions" that are "designed to collect option premium and to generate excess returns in normal market conditions."  "Based on detailed, proprietary statistical analysis," Allianz explained, "put and call options are sold to create 'profit zones' that have a high probability of success upon expiration of the options."  The "profit zones aim to catch the underlying equity index inside their upper and lower bands at expiration."  If "the equity index finishes inside the profit zone at expiration, the strategy will profit," according to Allianz.  Allianz claimed these range-bound spreads generated roughly two-thirds of the strategy's returns.

26.     The directional spreads, Allianz represented, are "combination long-short volatility positions designed to generate excess returns when equity indexes are rising or declining more than usual over a multi-week period."  They "are built by buying and selling options to both the upside and downside to create profit zones several percentage points away from current equity index levels."  These spreads "are set up to capture larger equity-market movements" and to "act as portfolio diversifiers."  Allianz claimed they accounted for roughly one-third of the strategy's returns.

27.     Allianz depicted the range-bound spreads and directional spreads as follows, with the so-called "profit zones" in blue compared to the "loss zones" in gray:





28.     Allianz represented that the hedging positions would be the third component of Structured Alpha and a "cornerstone" of the strategy.  These are "long-volatility positions" that Allianz told the Committee are "designed to protect the portfolio in the event of a market crash." Allianz claimed it would purchase the hedges "out of the money at various levels to the downside, and always in a greater quantity than the amount of puts sold for the range-bound positions."  Allianz emphasized that the "long puts are in place **_at all times_**" and "**_exclusively_** for risk-management purposes."[3]

29.     Allianz depicted the long-put hedging positions as follows, illustrating (as Allianz commonly represented) that it would purchase the hedging positions "-10% to -25%" out of the market:

---

[3] All emphases are added unless otherwise noted.





30.     Allianz regularly analogized Structured Alpha's three-pronged, long-short investment design to selling "insurance" against market volatility (referring to the range-bound and directional components of the strategy) and buying "reinsurance" to protect in the event such volatility was experienced (referring to the hedging component of the strategy).

31.     Allianz explained that the "seller of the option is the insurance company" while the "buyer of the option is the insurance policyholder."  Allianz promised to be a "buyer and seller of options at the same time, at all times."  "We are always *both* the insurance company and the insurance policyholder," Allianz represented.  (Emphasis in original.)

32.     Greg Tournant, Allianz's chief investment officer for U.S. structured products and the architect of Structured Alpha, consistently used the insurance/reinsurance analogy to describe the strategy he developed.  In a May 2016 interview, Tournant said that Allianz is "acting like an

insurance company" when it "collect[s] premium" by selling options.  Although Allianz may have to "pay very much like an insurance company" if a "catastrophic event" occurs, Tournant reassured the audience that Structured Alpha's hedging positions would act as "reinsurance" to "protect the portfolio."

33.     The Committee received the same message.  It was told repeatedly that Structured Alpha was "insurance protection from the world's largest insurance company," a reference to Allianz SE, the ultimate corporate parent of Allianz.

34.     Allianz promoted the relationship with its parents in marketing Structured Alpha to the Committee.  In May 2010, about a year before the Committee first voted to invest in Structured Alpha, Allianz (then known as Allianz Global Investors Capital) advertised Structured Alpha as being backed by Allianz SE, "one of the largest financial institutions in the world":



### Organizational Structure



35.     Likewise, Allianz trumpeted that what makes Structured Alpha "different" from other portable alpha strategies is its "oversight from the parent."  Indeed, Allianz claimed, consistent with the unified risk management framework that Allianz SE touts in its annual reports, that risk was "continuously managed and monitored" at the "firm level."  Assisting these

risk management efforts, Allianz told the Committee, was IDS GmbH, a "wholly-owned subsidiary of Allianz SE," that supposedly provided "a comprehensive range of ongoing and consistent performance and risk analysis reports."  Allianz's direct parent, Allianz Global Investors U.S. Holdings LLC, purportedly oversaw Allianz's "day-to-day portfolio management and investment operations," including risk management.

36.     In recommending the strategy to the Committee, Aon highlighted the "benefits" to Structured Alpha of the "deep resources" offered by Allianz's parent companies.  Those benefits, according to Aon, included "multiple layers of independent risk management functions within the firm."

**Aon Advises the Committee to Invest Trust Assets in Structured Alpha**

37.     In 2009, the Committee retained Aon (then called Ennis Knupp) to provide investment advice regarding the investment of Plan assets held in the Trust.

38.     The Committee's charter authorizes it to enlist the services of professional investment advisers such as Aon to assist the Committee in the selection and oversight of the Trust's investments.  The Committee, according to its charter, "shall be entitled to rely upon" the investment advice of professionals like Aon.

39.     The Trust's Investment Policy Statement—which Aon helped draft as one of the services it provided to the Committee and which features Aon's logo on its cover page—documents Aon's fiduciary role.  It provides that Aon would "advise the Committee on the management of the Trusts' assets."  "The Committee," in turn, would "utilize and rely upon the advice and services" of Aon "in carrying out its responsibilities."  The Investment Policy Statement specifies that Aon would provide investment advice to include "recommending appropriate strategic policy and implementation structure and conducting manager due-diligence,

13

searches and selection," as well as "aid[ing] the Committee and NEBA in adhering to the guidelines of the Investment Policy Statement."

40.     The charter further grants the Committee "the broadest possible authority and discretion to delegate to itself or to any other entity or any other person or persons any of its authority and discretion."  Pursuant to that broad authority, the Committee delegated to Aon specific duties that Aon undertook to fulfill, including a duty to recommend investment managers to the Committee and a duty to monitor those managers that had been entrusted with Plan assets.

41.     In the contract between the Committee and Aon, Aon agreed that it would "recommend the selection of managers or custodians it deems most capable of carrying out the [Trust's] investment objectives."  Once an investment manager was selected, Aon undertook the specific duty to "engage in active, ongoing monitoring" of that manager to "assess evolving strengths, weaknesses and issues" and "identify any forward-looking" risks "that could impact performance."  Aon agreed further to "inform itself" of any information necessary to discharge this duty to monitor, including whatever information Aon needed to properly advise the Committee whether the manager was acting prudently with Plan assets.

42.     Aon undertook to provide additional types of investment advice to the Committee. For example, Aon agreed to give "recommendations to [the Committee] regarding asset allocation" within the Trust, "recommendations to [the Committee] regarding the specific asset allocation and other investment guidelines" for the Trust's investment managers, and advice "regarding the diversification of assets" held in the Trust.

43.     Aon promised to discharge all of these "fiduciary duties with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a

like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims."

44.     Acting in its fiduciary capacity, Aon recommended in 2011 that the Committee invest Plan assets held in the Trust in Structured Alpha.  As part of its recommendation, Aon emphasized that Structured Alpha's "risk management approach" was "deeply embedded into the investment process," giving investors "significant market crash protection."  Aon lauded "the multiple layers of independent risk management functions" and described risk management as "a core element to the strategy."  Aon also assured the Committee that the strategy included "tail protection" against "large market declines."  According to Aon, these long-put hedges were "designed to automatically protect the portfolio" if the market crashed.

45.     In accordance with Aon's recommendation, and understanding the strategy to employ the robust risk management that Aon endorsed, the Committee voted on June 21, 2011, to approve an investment of Trust assets in Structured Alpha.

46.     The Committee's initial investment was in Structured Alpha U.S. Large Cap Core LLC.  This fund, like the Structured Alpha Funds in which the Trust later invested, was organized as a limited liability company for which Allianz was the managing member.  The Trust's investment in each Fund was governed by a Private Placement Memorandum and Limited Liability Company Agreement, as well as the Subscription Agreement by which Trust assets were invested (collectively, the "Fund Documents").

47.     Allianz and the Committee also entered into a separate Investment Management Side Agreement in conjunction with the Trust's investment in Structured Alpha.  The parties updated the contract in May 2014, when they executed the Amended and Restated Investment

Management Side Agreement to reflect Allianz's creation of the new Multi-Beta Series in which the Trust was invested.

48.     Under that agreement, Allianz promised to undertake duties as a fiduciary vested with "full discretion" to manage the Plan assets that the Committee invested in Structured Alpha. For example, Allianz agreed as an "ERISA fiduciary" to "discharge its duties with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  Allianz further assumed the other responsibilities of a fiduciary under ERISA § 404(a) (29 U.S.C. § 1104(a)), including the duty of loyalty, the duty to diversify Plan investments, and the duty to follow Plan documents.

49.     Under the Amended and Restated Investment Management Side Agreement, Allianz also undertook the same fiduciary duty of care "regardless of whether the underlying assets of any Series constitute 'plan assets' within the meaning of Section 3(42) of ERISA." Under this "Contractual Fiduciary Standard of Care," Allianz agreed "that it shall act in good faith and carry out its duties to each Series with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

50.     Should Allianz breach any of these fiduciary duties, it promised to "indemnify and hold harmless the Trust" for, among other things, any losses or damages "directly resulting from" Allianz's breach.

51.     Allianz agreed, moreover, to "act in accordance with" the Investment Policy attached to the contract.  Under that policy, Allianz promised to manage the Trust's investment

pursuant to certain investment objectives, including the establishment of "structural risk protections."

### Allianz and Aon Reassure the Committee About Structured Alpha's Risk-Managed Investment Strategy

52.     By 2018, the Trust's investment in Structured Alpha had expanded.  The Multi-Beta Series now included five Structured Alpha series: U.S. Large Cap Series, U.S. Small Cap Series, International Equity Series, U.S. Fixed Income Series, and U.S. Long Credit Series.  Each had a different index—the S&P 500 for U.S. Large Cap, for instance—whose results Allianz sought to replicate in the beta component and outperform using the alpha component.  The targeted outperformance for each series varied based on the level of the Chicago Board Options Exchange Volatility Index (the "VIX"), an index measuring the market's expectation of volatility, when Allianz was building its option positions.  The lower the VIX, the lower the excess return Allianz was supposed to target.

53.     The Committee had also approved investments in two other Structured Alpha Funds: Emerging Markets Equity 350 and Structured Alpha 1000.

54.     Allianz managed each of the Funds in substantially the same way regardless of the Fund's beta or, in the case of the Multi-Beta Series, regardless of the beta underlying each series.

55.     In February 2018, Structured Alpha underperformed relative to its beta benchmarks.  Those short-term investment losses were recouped in the following months, in accordance with how Allianz and Aon had advised the strategy would work in a market downturn.  Nevertheless, the Committee sought to reevaluate the Structured Alpha strategy and the size of the Trust's investment in it.

56.     In April 2018, the vice chair of the Committee directed NEBA's investment team to have Allianz and Aon explain the worst-case scenario for the strategy.  "The key question" the Committee vice chair wanted answered was "how the strategy will perform in a declining market situation."  Specifically, if the Trust would "experience substantially higher losses than the market i[n] such a situation," then the Committee would likely "need to wind down our exposure to this strategy to a percentage of the portfolio closer to 10% than 50%."

57.     Allianz responded to the Committee's questions with written representations about how Structured Alpha would work and how it would protect against the risk of losses in a declining market.  Against the backdrop of the Committee's inquiry about whether Structured Alpha would expose the Trust to "substantially higher losses than the market," Allianz described its hedge positions as the "cornerstone" of the strategy.  Allianz represented that these hedges would be "in place at all times, exclusively for risk-management purposes" in order "to protect the portfolio in the event of a market crash."  Allianz emphasized that this "tail-risk protection" included "both hedging primarily for a single-day market crash" and "protection in the event of multi-day or multi-week significant declines."

58.     But Allianz went even further in describing the hedging positions.  According to Allianz's written response to the Committee, Structured Alpha's hedging strategy *eliminated* the risk of an "ill-timed margin call," a common concern among investors in options strategies and a particular concern of the Committee's.  "*We do not have this risk*," Allianz touted, because of Structured Alpha's "hedging positions."  Allianz claimed further that the lack of margin-call risk was a "key benefit of our hedging positions."  These statements were consistent with representations Allianz had made elsewhere about the strategy's supposed immunity to margin calls.  For instance, in an April 2017 pamphlet, Allianz proclaimed that "*under no scenario* can

an equity-market decline cause our portfolio to experience a margin call, a crucial differentiator from many option strategies."

59.     Allianz's written response contained several other critical representations about how Allianz managed the Structured Alpha Funds.  For example, Allianz emphasized that it would need only "between 10% and 20%" of the beta investment for collateral for the alpha component, suggesting that only a small portion of the Trust's investment was potentially at risk in a market decline.  Allianz also touted "the proprietary tools and models we have built over many years of research and development" that Allianz claimed allowed it "to stress-test the entire portfolio for *any* market scenario."  These tools, Allianz claimed, enabled it to protect the Trust's investment from "two risks: the overnight market crash and the multi-week market correction."  And as for the "worst-case drawdown scenario" the Committee had asked about, Allianz represented that its lower-target strategy "could be expected to deliver short-term underperformance of 100 to 300 basis points," *i.e.*, underperformance of only 1% to 3% relative to the benchmark.

60.     Elsewhere, Allianz downplayed even that risk by explaining that the period of increased volatility that typically accompanies a market downturn would provide an attractive environment in which to deploy its options strategy.  It claimed that any short-term underperformance would be recouped in a rebound once the initial downturn had been weathered.  Of course, Allianz's claim assumed that the Funds would in fact survive the market downturn.

61.     In the same time frame, the Committee also asked Aon to reevaluate Structured Alpha and provide its investment advice as a fiduciary on whether and to what extent the Committee should remain invested.  Aon's advice echoed Allianz's reassuring representations.

Because Aon was the fiduciary tasked with the specific duty to monitor Allianz's management of Plan assets, its advice was also critical to the Committee's decision to maintain the Trust's investment in Structured Alpha.

62.    On June 18, 2018, Aon presented its analysis and recommendations to the Committee.  Consistent with Allianz's own description of the strategy, Aon advised the Committee that Structured Alpha was "Financial Insurance to the Options Market."  The hedging positions, which Aon said were "always in place to protect against a crash scenario," were supposedly the strategy's "Reinsurance."

63.    Aon undertook to answer two specific questions the Committee had posed to it: (i) did the Structured Alpha Funds add incremental risk to the Trust's investment portfolio? and (ii) what is the worst-case scenario that could result from the Trust's investment in those Funds?

64.    Aon purported to answer the first question by presenting what it claimed was the "active risk" associated with the strategy and assuring the Committee that the risk was not significant.  Aon further understated Structured Alpha's risk by repeating Allianz's claim that "only a small portion of the underlying assets are used to implement the options strategy."  Aon's representation suggested that only a small amount of the Trust's investment with Allianz was exposed to the options strategy and therefore at risk if the strategy failed.  Aon's advice obscured the truth from the Committee that the entire investment could be at risk.

65.    Aon's explanation of its presentation, made orally to the Committee in June 2018, also understated the risks associated with Structured Alpha.  Addressing concerns the Committee had raised that there may be an "undue concentration" of the Trust invested with Allianz, Aon falsely advised that "Allianz' alpha seeking transactions only impact a small portion of this beta seeking portfolio."

66.     The second question the Committee asked was similar to the one it had posed to Allianz: what is the worst-case scenario for the strategy?  To address this question, Aon presented purported stress testing by Allianz, which Aon represented it had reviewed, indicating that Structured Alpha would not only protect against losses but actually generate a positive return in times of severe market dislocation.  Although Aon's presentation included in fine print that Allianz was the source of the charts presented, its accompanying remarks to the Committee in June 2018 referenced Aon's own independent "projections."  The charts, which were meant to show how Structured Alpha would perform in a variety of market scenarios, suggested that the alpha component of the strategy would perform very well—generating positive returns—even if the equity markets crashed as much as 50% or 90%.  Indeed, the charts and Aon's explanation of them indicated that the most the Trust could lose in a worst-case scenario was less than 10%.  If there were a scenario in which the Trust could expect to lose more, Aon did not present it:



67.     In presenting these materials, Aon advised the Committee that the "hedging would protect the portfolio in the face of 'black swan' events such as sharp and deep market meltdowns." The hedging positions, Aon advised further, "should permit the strategy to actually produce strong positive returns in the face of such extreme market declines." Aon cited the stress testing charts as evidence "that in the face of a 50 percent market meltdown the strategy should produce a positive return of 10 percent."

68.     What Aon did not tell the Committee is that the Allianz stress testing included several assumptions that did not fit the Trust's investment in the Structured Alpha Funds. Aon did not disclose, for example, that the model assumed Treasury Bills were the underlying beta. That omission was problematic for several reasons, including that only one of the Funds had Treasury Bills as its underlying beta. In fact, the U.S. Large Cap Series, which held a much larger portion of the Trust's investment, used S&P 500 ETFs as its beta. Aon did not explain how that series could withstand a 90% decline in its beta component and still collateralize the alpha strategy that Aon claimed would generate positive returns (while maintaining risk protection) in such a severe market dislocation. Aon instead gave the Committee the false impression that the stress testing results it endorsed were applicable to the Trust's entire investment in Structured Alpha, although much of it was collateralized by something other than the Treasury Bills the model assumed.

69.     Aon also advised the Committee that it would in fact be *riskier* to exit the strategy than to remain invested in it. The hedging positions were the main reason why. This "reinsurance," Aon told the Committee, would protect the Plan assets in the face of a market decline and position the portfolio to rebound from any temporary losses. In this regard, Aon's advice echoed the characterization of the strategy that Allianz had provided.

70.     A similar review process occurred months later, after the Structured Alpha Funds again underperformed relative to their beta benchmarks.  The negative returns in December 2018 were more severe than they had been in February of that year.  The losses hit some of the Plan sponsors especially hard because they occurred at the end of the year, leaving them scrambling to revise their balance sheets and identify any unfunded liabilities.

71.     Those losses were recouped in the ensuing months, as Allianz and Aon had advised could be expected in the event Structured Alpha sustained a loss.  But the Committee again directed Aon to reevaluate the Trust's investment in Structured Alpha and to provide advice on whether that investment remained appropriate.

72.     In January 2019, Aon advised that Allianz was implementing a new hedging configuration that Aon claimed would "better protect the options portfolio and guard against costly restructuring when equity markets experience steep declines."

73.     Aon's presentation on the new hedging configuration mirrored the one Allianz would provide in April 2019.  The gist of the "newly developed configuration," as Allianz represented it, was to purchase fewer hedges but buy them closer to the money when building positions in a low-VIX environment.  By doing so, Allianz claimed it would "create ***self-hedged*** range-bound spreads with a ***defined maximum loss***."  Thus, rather than restructure short positions, as Allianz had at times done when markets fell in the past, Allianz would now leave the new-configuration positions alone—they would become "hands-free" and require "no intervention."

74.     Allianz included a diagram representing that the "tactical shift" in its hedging positions would create a defined "Max Loss" for the portfolio:




These new "sealed" spreads, Allianz claimed, would "Improve[] the portfolio's ability to navigate difficult V-shaped equity and volatility moves" and "Better equip[] the portfolio to handle sharp moves that begin in low-volatility environments."  According to Allianz, the new configuration was the product of "almost two years" of research and development.

75.     Allianz's description of a "Max Loss" was consistent with the representations that Aon had made to the Committee in June 2018, when Aon said (using Allianz's stress testing as its basis) that the most the Trust could lose in a worst-case market-crash scenario from Structured Alpha's options strategy was about 10%.

76.     Allianz made additional representations about Structured Alpha in the April 2019 presentation.  For example, Allianz summarized the strategy as pursuing "risk-managed returns." "Risk is continuously managed and monitored," Allianz claimed, "at both the portfolio level by

the investment team and the firm level." On the subject of "Leverage," Allianz emphasized that it engaged in "No borrowing." Allianz made that claim even though it was leveraging the Trust's beta investment to collateralize the options strategy. And Allianz repeated aspects of its investment philosophy that it claimed to follow, including the mantras "Never make a forecast on the direction of equities or volatility" and "Prepare for the unexpected; pre-develop plans in anticipation of scenarios in which the portfolio could be at risk for losses":



As Allianz had represented on the subject of "Accountability" in the past, "No excuses – it is our job to pursue the strategy's objectives regardless of the market environment."

77.    A couple months later, in June 2019, the Committee again had Aon present its recommendation on Structured Alpha. Among the questions the Committee asked Aon to answer were whether "anything changed in the investment strategy to alter our expectations" and

whether "anything changed with the market conditions to alter our expectations."  In response, Aon repeated many of the themes Allianz had itself used to describe the strategy, again describing Allianz's hedging positions as "reinsurance" that would contain the strategy's risks.

78.     Aon also echoed Allianz's representation about there being a "Max Loss" the portfolio could suffer.  To illustrate the concept, Aon provided the Committee a hypothetical in which Allianz had sold a put 10% out of the money.  "In order to protect or hedge risk" in that scenario, Aon said Allianz would "buy a put . . . 15% below market."  "That way," Aon claimed, the "***risk of loss is capped*** at 5%."

79.     Based on Allianz's and Aon's representations, the Committee reasonably understood that Allianz was not selling "naked" options, *i.e.*, options without any corresponding hedge in place.  Rather, Allianz and Aon indicated that for every option Allianz sold, Allianz bought a corresponding hedge as "reinsurance" to limit the risk of loss in case the market dropped.  Both Allianz and Aon gave the Committee the impression that the hedging positions placed to protect against downside losses would be appropriately matched to the risk-bearing positions (*i.e.*, they would "reinsure" the same risk) and that Allianz would never sell any "naked" options.

80.     The Committee also asked Aon whether it still maintained "the same conviction in the strategy."  In response, Aon advised the Committee that it "continues to have a strong conviction that the portable alpha strategy is sound and pointed out that should a market decline persist over a longer period, Allianz' hedging strategy could be expected to produce an even greater rebound in [Trust] performance."  Aon again rated Structured Alpha one of its "highest conviction strategies."

**Allianz Abandons the Risk-Managed Investment Strategy
It and Aon Had Represented to the Committee**

81.     Allianz often touted its supposed fidelity to Structured Alpha's stated investment strategy.  For instance, in one update on the Trust's investment, Allianz congratulated itself for its "willingness to be flexible *without straying from our investment philosophy*," saying this was one of its "biggest strengths," and emphasized that "part of staying true to Structured Alpha's investment philosophy is *maintaining the risk profile of our option portfolio*."  Going further still, Allianz claimed that it managed Structured Alpha to "*preserv[e] our risk objectives even at the expense of performance*."

82.     Yet at least by 2019, Allianz had abandoned the investment strategy it professed to follow.  Rather than "maintain[] the risk profile" it knew was critical to the Committee's investment of Trust assets, it was taking imprudent actions that added excess and undisclosed risk to the portfolio—in effect, leaving the portfolio unhedged in certain market scenarios and placing a directional bet against market volatility—in hopes of chasing additional return, all unbeknownst to the Committee.

83.     Juicing the strategy's returns would increase Allianz's fees.  Allianz did not charge a management fee to operate Structured Alpha.  Rather, Allianz received 30% of any gains relative to its benchmark index.  If Allianz underperformed, it received nothing.

84.     Aon touted Allianz's fee structure in advising the Committee to invest in Structured Alpha and to remain invested in it.  Aon advised that "the incentive fee-only structure creates a strong alignment of interests" that would benefit the Trust.  Aon did not, however, appropriately monitor Allianz in light of that fee structure, which provided Allianz an incentive to take undue risk with Plan assets in hopes of boosting the strategy's returns and thus Allianz's compensation.

85.     One example of Allianz's imprudence was its decision to purchase hedging puts further out of the money than Allianz had represented to the Committee.  Allianz claimed time and again that its long puts would be struck "-10% to -25%" below the market.  When Allianz diagramed the hedging component, it depicted a hedge at the bottom end of that range—25% below the market—even in the "original configuration" where (unlike in the "new configuration") the long puts were expected to be further out of the money.  Aon reproduced those diagrams in its presentations to the Committee.

86.     In fact, Allianz was purchasing hedging puts that were significantly further out of the money than Allianz had represented they would be.  Those puts were cheaper and therefore less of a drag on the fee-generating returns Allianz could hope to produce.  By purchasing cheap puts that were far out of the money, Allianz could inflate profits from its range-bound and directional spreads, thereby increasing Allianz's fees, and still claim that it was buying hedges (though those hedges had the potential to be virtually worthless in certain market scenarios when they would be most needed).  But the gulf between Allianz's offensive, premium-generating positions and its defensive ones left the portfolio effectively unhedged and exposed the Trust to potential losses far beyond those Allianz and Aon had presented as possible.

87.     Another example of Allianz's imprudence was its decision to buy hedging puts that expired sooner than the risk-bearing options it sold.  Allianz and Aon had represented that the long puts would be of the same or similar duration as the short puts.

88.     In reality, the puts Allianz was purchasing as supposed "reinsurance" expired far earlier than many of the puts it was selling, meaning there was, as Allianz later admitted, a "duration mismatch" between the options Allianz was short and those it was long.  Allianz bought these shorter-dated puts because, again, they were cheaper.  By purchasing less

expensive, shorter-dated puts and selling more expensive, longer-dated puts, Allianz essentially bought less "reinsurance" than it had promised.  Doing so allowed Allianz to increase the profits from its range-bound and directional spreads, thereby increasing Allianz's fees.

89.     Again, Allianz departed from the strategy it had represented to the Committee and, in doing so, Allianz layered excess and undisclosed risk on the portfolio.  Allianz was apparently betting that it would be able to effectively replace the hedges as they expired, even in a declining market.  That bet left the portfolio exposed to the risk that in a deteriorating market Allianz would be unable to backfill the hedges it should have had in place all along.

90.     Perhaps the most glaring example of Allianz's imprudence, however, was its decision not to acquire any hedges for the return-generating options it sold on volatility indexes. In addition to buying and selling options on an equity index like the S&P 500, Allianz also disclosed that as part of the Structured Alpha strategy it may buy and sell options on volatility indexes such as the VIX or the iPath Series B S&P 500 VIX Short-Term Futures ETN ("VXX"). Because these options would be part of the return-generating portions of the strategy (and introduce risk as a result), they would also need to be appropriately hedged.  In the same way that Allianz bought long puts on the S&P 500 to hedge against a decline in the equity markets, it would need long positions on the VIX to hedge properly against a spike in volatility.

91.     Allianz, however, was taking on the risk of selling VIX options without buying any corresponding hedge.  To borrow from Allianz's analogy, it was selling insurance against market volatility without any reinsurance against the risk that entailed.  Far from "never" making a forecast on the direction of volatility—a supposed pillar of the Structured Alpha investment philosophy, according to Allianz—Allianz was gambling that the VIX would remain relatively low so its unhedged short positions would not be exposed to catastrophic losses.

92.     Allianz was making that bet despite knowing that the VIX was becoming increasingly sensitive to market movements.  In a December 2019 quarterly update, Allianz claimed that the recent "sensitivity of the VIX" was "advantageous" for Structured Alpha.  A "typical response," Allianz explained, "is for the VIX to rise 10 to 20 times more than the S&P 500 declines."  But in early December 2019, Allianz observed a VIX increase "100 times larger than the index move."  Even though Allianz had identified that the VIX was becoming prone in late 2019 and early 2020 to sudden, larger-than-expected increases, Allianz continued to short volatility options—betting that the VIX would remain relatively low—without any corresponding long positions to hedge against a spike in the VIX.

93.     In all cases—whether purchasing puts too far out of the money or purchasing puts with shorter expiration dates than the puts it sold or shorting the VIX without any corresponding hedge in place—Allianz's motivation was self-interest, not the best interest of the Plans' participants and beneficiaries.  And in all cases, Allianz had departed from the prudent strategy it had represented to the Committee, adding excess and undisclosed risk out of line with the risk parameters that were a predicate for the Committee's decision to invest Trust assets in Structured Alpha.

94.     The Committee did not know that, going into the market dislocation of February and March 2020, Allianz had departed from its professed investment strategy and was instead layering excess risk into each of the Funds.  The strategy was performing as Allianz and Aon said it would, with any short-term losses being recovered in subsequent months.  And Allianz and Aon both represented that the portfolio was, if anything, better positioned to handle a market downturn than it had been in the past.

95.     As to Allianz, the most significant modification to the Structured Alpha investment strategy that Allianz had brought to the Committee's attention was one that purportedly ***enhanced*** the portfolio's ability to navigate a market decline.  In its quarterly strategy updates in 2019 and early 2020, Allianz described one portfolio modification (the "new configuration" hedges), which Allianz said gave the portfolio an "improved ability to navigate sharp market declines that are preceded by low-volatility environments" and "made the option portfolio more resilient."  Although it trumpeted this "refinement[]" to the investment strategy, Allianz did not tell the Committee of its other changes to Structured Alpha's investment strategy—namely, that it was making a directional bet that volatility would remain low, selling naked options, and buying hedges much further below the market than it should have under its professed investment strategy.

96.     Meanwhile, Allianz continued to make all the same representations it had in the past about Structured Alpha's supposed investment strategy.  For instance, when Allianz presented on the strategy in January 2020 to Blue Cross Blue Shield of Arizona, whose chief financial officer also sits on the Committee and Subcommittee, Allianz repeated many of its common representations about Structured Alpha even though, by that time, these representations were untrue.  As before, Allianz represented that Structured Alpha seeks "risk-managed" or "risk-controlled" returns; that it was "designed to perform whether equity markets are up or down, smooth or volatile"; that it would "never make a forecast on the direction of equities or volatility"; that it involved "no borrowing"; that it would "pre-develop plans in anticipation of scenarios in which the portfolio could be at risk for losses"; and that its hedging positions would "protect the portfolio in the event of a market crash."  Allianz buttressed its confidence by repeating several of its more specific representations about how it would manage the strategy

prudently.  For example, Allianz again claimed that its long puts were struck "-10% to -25%" from the market, that its short puts and long puts would have roughly the same duration, and that it employed "long VIX calls" as a "helpful complement to long S&P 500 puts" for "hedging purposes."  Indeed, Allianz claimed to be "as prepared as ever in the event of a severe market dislocation."  None of these representations was true.

97.     Because the Committee relied on Aon to monitor Allianz and to advise the Committee of any risks that could impact performance, the Committee did not uncover Allianz's departure from its professed investment strategy prior to the disastrous events of February and March 2020.  Aon could and should have warned the Committee of Allianz's imprudent construction of the portfolio at least by 2019.  Yet Aon never sounded the alarm.  It never advised the Committee of the excess risk Allianz was layering into the portfolio, it never advised the Committee that Allianz was using the Trust's assets to gamble on the direction of the market and volatility, and it never advised the Committee that Aon's prior advice about Structured Alpha was (at least by 2019) untrue.  It failed to bring these risks to the Committee's attention, despite the Committee's specific questions at the time about the continued advisability of investing in the Funds.

98.     Aon either noticed the red flags and failed to inform the Committee of the potentially disastrous risks they posed to the Trust's investment in Structured Alpha, or Aon failed even to appreciate them.  Regardless, Aon's failure was in derogation of its fiduciary duties and left the Committee with the false impression that Allianz was managing Plan assets in the manner Allianz and Aon had represented.  That failure, along with Allianz's mismanagement, led to the devastating losses the Trust suffered in early 2020.

**Allianz's and Aon's Breaches Cause the Trust to Suffer Catastrophic Losses**

99.    Going into the market turmoil of February and March 2020, Allianz did not have in place appropriate hedging positions to protect the portfolio (as it claimed it would) and then it sold many of the hedges it did have (as it claimed it would not do).  As a result, Allianz caused the Trust to suffer catastrophic losses in a matter of weeks.

100.    Throughout January and into late February 2020, the VIX remained relatively low and the S&P 500 remained relatively stable before the market began to decline and volatility spiked in the second half of February and March 2020:





101.    By March 6, the Trust's investment in Structured Alpha had already declined by a double-digit percentage.  Yet in communications with NEBA investment staff, Allianz reported optimism about the portfolio's ability to rebound.  Although Allianz acknowledged that some restructuring had taken place, it reported that the "cost of these moves was well contained."

102.    Contrary to the rosy picture Allianz was painting, the Trust's investment was plummeting.  On March 12, Allianz reported on a phone call with NEBA investment staff and Aon that the hedges—the "reinsurance" that Allianz and Aon had said would be in place "at all times" to protect the portfolio—were "not working."  Allianz also reported that the Trust's investment would soon face a margin call, the very risk that Allianz had told the Committee it would never face.  ("We do not have this risk," Allianz had represented.)

103.    The next morning, Friday, March 13, Allianz emailed Aon with additional details about the Trust's investment.  Those details reveal what Aon, in conducting its specific monitoring duties of Allianz, should have already known: that Allianz had added excess and undisclosed risk to the portfolio in February and March 2020 and that it had been making other imprudent decisions, unbeknownst to the Committee, for some time.  Aon waited until Sunday afternoon, March 15, to forward that email to NEBA.

104.    If Allianz had been managing the portfolio in the manner it claimed it would, Allianz would (among other things) have constructed the hedging positions closer to the market and left those hedges in place to secure the defined "Max Loss" if the market declined.  That was the "new configuration" strategy—touted as the product of "almost two years" of research and development—that Allianz had promised to deploy in a low-VIX environment like the one that existed for the first six weeks of 2020.

105.    Yet, as Allianz acknowledged in its March 13 email, it had sold the new-configuration hedges—*i.e.*, the hedges that were supposed to be "hands-free" and locked in to contain potential losses.  According to Allianz, it had struck the puts "7% to 9%" out of the money.  But when the market declined, these "new-configuration puts were shifted," meaning Allianz sold them and replaced them with long puts much further out of the money.  Allianz, as

Aon later put it, chose not to "accept modest losses and aim to recover in a reasonable time period," opting instead to gamble that the market would rebound immediately and "expos[ing] the portfolio to further downside risk."  "In hindsight," Allianz admitted, "*we should have left those positions as is*."

106.    Allianz would not have sold the new-configuration hedges were it acting in the best interests of the Plans' participants and beneficiaries.  Were it doing so, it would have accepted modest losses.  Instead, motivated by the fact that it would earn no compensation until those losses were recovered, Allianz removed the hedge that was supposed to protect the Trust's investment and gambled (with the Trust's money) that markets would soon recover.  In doing so, Allianz not only abandoned Structured Alpha's supposed hedging strategy but also its purported tenet not to bet on the direction of the market.

107.    As Allianz acknowledged in its March 13 email, these active management decisions also created a "duration mismatch" between the short and long puts that contributed to the portfolio's losses.  This mismatch, Allianz explained, meant that the long puts "couldn't be harvested because they were shorter-dated" and about to expire.  The resulting "theta decay reduced their value," and the puts "did not pay out."  Another problem was that the cost to replace the expiring long puts increased dramatically as the market declined and volatility spiked.  "We are continually rolling into new long puts as they expire," Allianz wrote, "but there still is a duration mismatch that causes a continued equity decline / vol increase to hurt the mark and vice versa."  Had Allianz purchased and maintained the proper downside protection that it had represented would be in place at all times, it would have had no need to replace expiring long puts at the critical time when, as Aon later put it, they became "prohibitively expensive."

108.     In addition to what Allianz admitted to in its March 13 email, at least two other imprudent decisions by Allianz inserted excessive risk into the portfolio and contributed to its collapse.

109.     First, Allianz had been chasing additional returns by purchasing cheap puts much further out of the money than Allianz had represented.  Many of those long puts, Aon reported after the fact, "expired worthless in early March."  As Aon told the Committee when asked later why the hedges proved ineffective, "they were too far 'out of the money' to begin with."

110.     Second, though Allianz was selling puts and calls on volatility indexes like the VIX, Allianz had purchased *no* long positions on the volatility indexes it was shorting.  Allianz left the portfolio at the mercy of a surge in volatility, which is exactly what happened in February and March 2020.

111.     Allianz left these short positions "naked" even though it knew that the VIX had been displaying increased "sensitivity" to market moves and was therefore prone to sudden, larger-than-anticipated spikes.  The net result was that the portfolio, going into the volatility spikes of February and March 2020, was *short* volatility—reflecting Allianz's gamble that the VIX would remain relatively low.  Allianz made this reckless directional bet despite the supposed pillar of its investment strategy that it would "never make a forecast on the direction of equities or volatility."

112.     The combination of these and other imprudent actions by Allianz, which Allianz took with respect to each of the Structured Alpha Funds, caused the Trust's investment in each Fund to suffer staggering losses by the time the market opened on Monday, March 16.  After Allianz notified NEBA and Aon that the portfolio was facing a margin call the next day, there was no choice but to liquidate the Trust's investment to protect what was left.

113.    Three of the five series in the Multi-Beta Series—U.S. Large Cap, U.S. Small Cap, and International Equity—each lost about 80% or more in a matter of weeks.  Structured Alpha 1000 did even worse.  The best-performing Fund, Emerging Markets Equity 350, fell nearly 50%.  These losses far exceed those incurred by the strategy's benchmark indexes, the equity markets more generally, and comparable investment strategies in which the Trust could have invested.

114.    After the Trust's investment in the Structured Alpha Funds was liquidated and redeemed, it received only about $540 million as compared to the nearly $3 billion it had invested in the Funds at the start of the year.

115.    The Committee was not alone in liquidating its investment.  On March 25, Allianz announced that it was liquidating Structured Alpha 1000, which had lost about 90% or more of its value.  Allianz also liquidated the Structured Alpha 1000 Plus fund.

116.    For Aon's part, after years of lauding Allianz's "sound investment philosophy" and "multiple layers of independent risk management functions," endorsing Allianz's claims about the hedges as "reinsurance," and rating Structured Alpha one of its "highest conviction strategies," it has now done an about-face in the wake of the strategy's failure.

117.    On March 27, more than ten days after the Trust's investment had collapsed, Aon advised the Committee, for the first time, that Structured Alpha suffered from "flawed portfolio construction" and a "lack of appropriate independent risk controls."  Aon, as a fiduciary adviser, should have uncovered these failings and warned the Committee about them at least by 2019, rather than touting Structured Alpha as its highest conviction strategy.

118.    Aon claimed after the fact that it had done a "fair amount of stress testing" to determine how Structured Alpha would behave in various market conditions.  But Aon never

provided any independent stress testing to the Committee.  The only stress testing Aon shared was what Allianz had supposedly done based on assumptions that Aon should have known did not apply to the Trust's investment.  So either Aon never actually did any of its own stress testing or it did but for some reason never shared the results with the Committee.

119.    Attempting to defend its oversight of Structured Alpha, Aon also claimed that it had employed a third-party provider, RiskMetrics, to ensure that Allianz was purchasing the hedges it said it would.  Aon advised the Committee that it received reports from RiskMetrics on the subject.  Moreover, Aon claimed that it had performed "on site" reviews of Structured Alpha's holdings and held "regular discussions" with Allianz regarding the strategy's "positioning."  Indeed, Aon's postmortem analysis reflects an apparent understanding of the positions Allianz held in February and March 2020 that led to the strategy's collapse.

120.    If Aon had been prudently discharging the duty it undertook to monitor Allianz, it would have discovered the imprudent decisions Allianz had been making.  Aon would have found, for example, the duration mismatch Allianz had created, as well as the substantial gap between the range-bound spreads and the deep out-of-the-money puts Allianz had purchased.  And if Aon had reviewed Allianz's positional data, as Aon's monitoring duty required it to do, it would have found long before February and March 2020 that Allianz's VIX options were unhedged.  Because Aon did none of that, it failed to detect the "flawed portfolio construction" or "lack of appropriate independent risk controls" it belatedly described on March 27 as a basis for divesting from the Structured Alpha Funds.  By then it was too late.

**Allianz Attempts to Whitewash Its Breaches**

121.    On July 20, 2020, Allianz published on its website the results of an internal review Allianz claims to have conducted into the "substantial losses" Structured Alpha incurred. The stated purpose of Allianz's review, titled "Structured Alpha March 2020 performance," was "to better understand how the Portfolio's investment and risk management processes operated in the face of the market volatility" experienced at that time.

122.    Allianz's account purports to describe certain of its actions in March 2020. "During the eleven trading days between March 2 and March 16," Allianz says, "there were at least four instances" in which it restructured the short puts on the S&P 500 "by both reducing the strike prices of the put options and by decreasing the number of positions held."  "Similarly, the portfolio managers replaced short-term short VIX calls with new longer-term short VIX calls at more distant strike prices.  An analogous process occurred for short VXX calls," according to Allianz.  But "commencing on March 12, 2020, the Portfolio Management team stopped relayering new short puts on the [S&P 500] and [Nasdaq], and short calls on the VIX and VXX to further reduce the risks in the portfolio."

123.    These details confirm that Allianz was betting on a market rebound by continuing to relayer short positions during the critical time period when Allianz should have been mitigating risk, not compounding it.  What is new, however, is Allianz's admission that it was relayering risk-bearing positions all the way until March 12.  Only then did Allianz stop exposing the portfolio to further losses by refraining from selling more insurance against an additional market decline.

124.    Allianz claims in its July 2020 report that it was "obligat[ed] to investors to pursue returns" in the first half of March 2020 rather than "convert[] to cash."  But Allianz was not obligated to layer additional risk into the portfolio so it could bet on a market rebound.

Allianz could have, for example, converted to cash or cash equivalents (as it had discretion to do under the Fund Documents), especially to assist in the preservation of capital on a temporary basis.

125.    The most jarring aspect of Allianz's July 2020 report is how different the strategy Allianz now describes is compared to the one it had represented to the Committee all along.

126.    Allianz's report claims that the risks of investing in Structured Alpha were "fully disclosed, including the risk of total loss." That assertion contradicts Allianz's prior representations of how it would manage the portfolio to avoid significant losses. It also contradicts Allianz's specific representation to the Committee that one "key benefit" of the hedges was that they eliminated all risk of a margin call.

127.    Allianz's report also claims that the hedges were designed to offer only "some protection" in the event of a market crash. The hedges, Allianz now insists, were "not intended to provide broader protection against all market downturns, particularly downturns that transpire over longer periods of time." Rather, they were "deliberately constructed with options that were both of relatively short expiration and far out of the money" only to "protect against a ***one-day market shock***."

128.    Allianz never disclosed these limitations. To the contrary, Allianz characterized the hedges as "reinsurance" that would be "in place at all times" in order to "protect the portfolio in the event of a market crash." It emphasized to the Committee that its investment strategy addressed "two risks: the overnight market crash ***and the multi-week market correction***." Allianz's "tail-risk protection," it told the Committee, "includes both hedging primarily for a single-day market crash as well as better ***protection in the event of multi-day or multi-week significant declines***." Allianz bolstered these claims about protection against multi-week

declines with stress testing purporting to show, for instance, that the strategy would yield
positive returns during market shocks that took weeks or even months to transpire.  Allianz's
after-the-fact description of the hedges as a partial backstop—protecting only against a "one-day
market shock" but nothing else—is inconsistent with its prior representations to the Committee.

129.    Allianz's July 2020 report claims that because the hedges were constructed to
protect only "against a one-day market shock," Allianz properly "mitigated" portfolio risk
through restructuring.

130.    Yet Allianz told the Committee that when it was building positions in a low-VIX
environment (like that which existed at the start of 2020), the new-configuration hedges would
not only protect against a market decline but predefine a set "maximum loss."  According to
Allianz, these new-configuration hedges were supposed to create "hands-free spreads" that
would need ***no restructuring*** during "the life of the position."  Allianz's postmortem omits any
mention of the new-configuration hedges that should have been locked in place to define a "Max
Loss."

131.    Allianz's July 2020 report claims further that Allianz's "Enterprise Risk
Management function" stress tested the portfolio against "***single day*** scenarios" only.

132.    If single-day stress testing were all Allianz was doing, its imprudence speaks for
itself: such testing would not permit Allianz to evaluate, let alone manage, risk in a multi-day or
multi-week market decline.  Contrary to Allianz's July 2020 report, Allianz had previously
assured the Committee that the same "Enterprise Risk Management" team was responsible for
"weekly risk profiles" and that Allianz's "proprietary tools and models" enabled it to "stress-test
the entire portfolio for ***any*** market scenario"—models Allianz claimed were "integral to the

successful day-to-day management of Structured Alpha."  And when the Committee had asked

about potential worst-case scenarios, Allianz responded:

> We **continually focus** on two risks: the overnight market crash and **the multi-week market correction**.  Our ongoing **objective is to protect the profit/loss profile of the option portfolio across a broad set of stress-test parameters**.  We manage the option portfolio for its ability to withstand and **navigate as wide a range of potential market scenarios** as possible.

Again, Allianz's postmortem is inconsistent with the risk profile of Structured Alpha that Allianz

disclosed to the Committee.

133.    Allianz also included in its July 2020 report a graph providing a "representative

depiction of a portion of the composition of the Structured Alpha 1000 fund" as of "February

2020":



134.    This graph depicts an investment strategy that is inconsistent with the one Allianz

assured the Committee it would follow to pursue "risk-managed returns."  Allianz never

disclosed this graph—or anything like it—to the Committee before Structured Alpha's disastrous

results in 2020.  If it had, the Committee would not have maintained the Trust's significant investment in Structured Alpha.

135.    Allianz's July 2020 graph illustrates that Allianz bought downside hedges well beneath the strike price (*i.e.*, "-10% to -25%" below-the-market level) at which it said it would buy hedges.  While Allianz inexplicably claims this was "deliberate[]," its failure to buy the hedges it said it would added excess risk to the portfolio, leaving the Funds exposed to the catastrophic losses that occurred in February and March 2020.

136.    Allianz's July 2020 graph also illustrates the absence of any new-configuration hedges, *i.e.*, the hedges that Allianz said it would buy closer to market levels in order to lock in a "Max Loss" in the case of a market decline.  These are nowhere to be found in Allianz's graph (just as all discussion of them is missing from Allianz's commentary), although Allianz had said it had deployed this "refinement" to its investment strategy to make the portfolio "more resilient" to market declines.

137.    Allianz's July 2020 graph also shows that potential returns from the options strategy (illustrated in blue in the annotated version of Allianz's graph below) came at the cost of potentially massive, unhedged losses (illustrated in red below) if the market declined.  The downside exposure depicted in Allianz's July 2020 chart is contrary to Allianz's description of Structured Alpha's investment strategy to the Committee, including its representation that the hedging positions eliminated all risk of a margin call.





138.    Importantly, Allianz's graph depicts only equity index options on the S&P 500. In its July 2020 report, Allianz chose not to illustrate the "strategy payoffs" from the short volatility options it sold on the VIX and VXX in violation of its promise "never" to make a bet on the direction of volatility.  Had it included a graph of that strategy, it would show the potential for limited, modest payoffs if Allianz bet correctly and ***unlimited*** losses if it did not.  Allianz has offered no explanation for why it made that wager with the Trust's money or how the disastrous losses it caused the Trust as a result were consistent with the investment strategy Allianz claimed to pursue.

## COUNT I: BREACH OF FIDUCIARY DUTY – ERISA § 404
## (AGAINST ALLIANZ)

139.    The Committee restates and realleges paragraphs 1-138 as though fully set forth herein.

140.    The Committee brings this Count under ERISA §§ 502(a)(2), (a)(3), and 409(a) (29 U.S.C. §§ 1132(a)(2), (a)(3), and 1109(a)).  The Committee has the authority to bring this Count under these provisions because it is a fiduciary under ERISA of the Plans whose assets are held in the Trust.  The Committee's charter, which the Plan sponsors have adopted, further authorizes the Committee to bring this Count.

141.    At all relevant times, Allianz was a fiduciary within the meaning of ERISA § 3(21)(A)(i) (29 U.S.C. § 1002(21)(A)(i)) because it exercised authority or control with respect to the management or disposition of Plan assets held in the Trust.

142.    At all relevant times, Allianz was also an investment manager within the meaning of ERISA § 3(38) (29 U.S.C. § 1002(38)).  Allianz was a fiduciary with the power to manage or dispose of Plan assets held in the Trust.  Allianz was a registered investment adviser under the Investment Advisers Act of 1940.  And Allianz acknowledged in writing that it was a fiduciary with respect to the Plans whose assets are held in the Trust.  Allianz did so, for example, in its contracts with the Committee, including the Amended and Restated Investment Management Side Agreement that Allianz signed in May 2014 and in various of the Funds' Limited Liability Company Agreements and Private Placement Memoranda.

143.    By executing the contracts establishing Allianz as an investment manager within the meaning of ERISA, the Committee appointed Allianz to manage Plan assets under ERISA § 402(c)(3) (29 U.S.C. § 1102(c)(3)).  That appointment entitles the Committee to the benefits and protections of ERISA § 405(d)(1) (29 U.S.C. § 1105(d)(1)).

144.    At all relevant times, the Structured Alpha Funds were "plan assets" under ERISA § 3(42) (29 U.S.C. § 1002(42)) because 25% or more of the total value of each class of equity interest was held by benefit plan investors within the meaning of ERISA and its implementing regulations.  Substantially all of the equity interests in the Multi-Beta Series and in Emerging Market Equity 350 were held by benefit plan investors.  Aside from Allianz's own holdings as the managing member, the Trust held all or substantially all of the members' capital and equity interests in the five series comprising the Multi-Beta Series—U.S. Large Cap, U.S. Small Cap, International Equity, U.S. Fixed Income, and U.S. Long Credit—as well as in Emerging Markets Equity 350.  Likewise, on information and belief, more than 25% of the total value of each class of equity interest in Structured Alpha 1000 was held by benefit plan investors at all relevant times.

145.    At all relevant times, Allianz was managing the Structured Alpha Funds holding or containing Plan assets and acting in a fiduciary capacity.

146.    As a fiduciary, Allianz owed a duty of care under ERISA § 404(a)(1)(B) (29 U.S.C. § 1104(a)(1)(B)).  That duty required Allianz to manage Plan assets "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

147.    As a fiduciary, Allianz owed a duty of loyalty under ERISA § 404(a)(1)(A) (29 U.S.C. § 1104(a)(1)(A)).  That duty required Allianz to manage Plan assets "solely in the interest" of and for the "exclusive purpose of providing benefits" to the participants and beneficiaries of the Plans whose assets are held in the Trust.  The duty of loyalty also required Allianz to not mislead the Committee about Structured Alpha or Allianz's management of the

strategy and to disclose material facts whose omission would create a false impression about the strategy or Allianz's management of it.

148.    As a fiduciary, Allianz owed a duty of diversification under ERISA § 404(a)(1)(C) (29 U.S.C. § 1104(a)(1)(C)).  That duty required Allianz to ensure the Trust's investments were adequately diversified "so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."

149.    And as a fiduciary, Allianz owed a duty to follow Plan documents under ERISA § 404(a)(1)(D) (29 U.S.C. § 1104(a)(1)(D)).  That duty required Allianz to manage Plan assets "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with" ERISA.

150.    The fiduciary duties under ERISA are "the highest known to the law."  *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

151.    Allianz breached its fiduciary duties.  Allianz's breaches include, without limitation, the following:

(a)    Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it did not put the appropriate hedges in place to protect the assets during a market decline.  This failure added excess and undisclosed risk and was contrary to the representations Allianz had made to the Committee and others that the hedges would be in place "at all times" as "reinsurance" for the Trust's portfolio.

(b)    Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it sold the new-configuration hedges and took on new risk-bearing positions starting in late-February 2020.

These discretionary restructurings exposed the Trust's investments to further downside risk and were contrary to Allianz's representations, including that it would not sell the new-configuration hedges that should have been locked in to safeguard the Plan assets.

(c)    Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it represented that it had constructed the portfolio in a way that would ensure a defined "Max Loss" and then managed the strategy in a way that exposed the Trust to unlimited losses.

(d)    Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it either failed to have adequate risk management measures in place or abandoned such measures.

(e)    Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it represented that it would manage the Structured Alpha strategy in such a way to eliminate the risk of margin calls yet implemented a strategy in which that very risk materialized.

(f)    Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it, unbeknownst to the Committee, decided to purchase puts that were further out of the money than the maximum range Allianz had disclosed, thus adding excess and undisclosed risk to the Trust's portfolio, in an apparent effort to increase Allianz's fees.

(g)    Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it, unbeknownst to the Committee, decided to purchase puts that expired sooner than the puts it sold.  This practice was contrary to Allianz's representations that its short and long positions

would be of relatively equal duration and added excess and undisclosed risk to the Trust's portfolio. Allianz created this "duration mismatch" not because it was in the best interests of the Plans' participants and beneficiaries, but because doing so allowed Allianz to enhance its fees.

(h)     Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it, unbeknownst to the Committee, decided to sell volatility index options without buying any corresponding hedge, adding excess and undisclosed risk to the Trust's portfolio, again in an apparent effort to enhance its fees.

(i)     Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it caused the Committee to believe that Structured Alpha's risk profile was consistent with Allianz's stated investment strategy rather than the actual risk profile, either by making false or misleading representations about Structured Alpha or failing to disclose information necessary to correct prior representations that were inconsistent with how Allianz was actually managing the strategy.

(j)     Allianz breached its duty to ensure the Trust's investments were prudently diversified when it operated a strategy that was unduly weighted towards being short volatility in February and March 2020 (contrary to its pledge not to make directional bets) and created excess and undisclosed correlated risks across the Structured Alpha Funds.

(k)     Allianz breached its duty to prudently manage the Plan assets or manage them in accordance with the Plan documents when it acted contrary to the Trust's Investment Policy Statement, which reflects the character and aims of the Trust. The Investment Policy Statement provides, for example, that Plan assets held in the Trust "shall be invested" consistent with the duties of care, loyalty, and diversification listed in ERISA § 404(a)(1)(A)-(C) (29

U.S.C. § 1104(a)(1)(A)-(C)).  Allianz violated those duties for at least the reasons stated above. "Investment fund managers" like Allianz, the Investment Policy Statement continues, "have the responsibility for managing the underlying assets by making reasonable investment decisions consistent with its stated approach and reporting investment results."  Allianz did not meet that responsibility, either, for at least the reasons stated above.

152.    As a direct and proximate result of Allianz's breaches of fiduciary duty, the Plans suffered devastating losses, with the exact amount to be proven at trial.  Allianz's breaches, including actions taken in its own self-interest, also caused it to earn substantial fees and profits.

## COUNT II: BREACH OF FIDUCIARY DUTY – ERISA § 404
## (AGAINST AON)

153.    The Committee restates and realleges paragraphs 1-152 as though fully set forth herein.

154.    The Committee brings this Count under ERISA §§ 502(a)(2), (a)(3), and 409(a) (29 U.S.C. §§ 1132(a)(2), (a)(3), and 1109(a)).  The Committee has the authority to bring this Count under these provisions because it is a fiduciary under ERISA of the Plans whose assets are held in the Trust.  The Committee's charter, which the Plan sponsors have adopted, further authorizes the Committee to bring this Count.

155.    At all relevant times, Aon was a fiduciary within the meaning of ERISA § 3(21)(A)(ii) (29 U.S.C. § 1002(21)(A)(ii)) because it was rendering or had the authority to render "investment advice for a fee" to the Committee with respect to Plan assets held in the Trust.

156.    The individualized investment advice Aon provided the Committee was based on Aon's knowledge of the Trust's particular needs and overall investment portfolio and included, without limitation, "mak[ing] recommendations as to the advisability of investing in, purchasing,

or selling securities," with the mutual understanding that the Committee would and did rely primarily on such recommendations.  29 C.F.R. § 2510.3-21(c)(i).  For example, Aon recommended in June 2011 that the Committee invest Plan assets held in the Trust in Structured Alpha, and in the ensuing years Aon regularly recommended that the Committee make and maintain additional investments in Structured Alpha.  The Committed relied on Aon's advice in implementing Aon's recommendations, and Aon knew the Committee was so relying.

157.    Aon provided this individualized investment advice to the Committee with respect to Plan assets held in the Trust on a regular basis and pursuant to a mutual agreement, arrangement, or understanding that the advice, which Aon rendered for a fee, would serve as a primary basis for the Committee's investment decisions.  On several occasions, including in March 2011, April 2013, and June 2018, Aon provided the Committee written analysis giving Structured Alpha a "buy" rating.  Aon attended the quarterly meetings of the Committee and Subcommittee and provided those bodies its recommendations to invest initially in Structured Alpha, to expand that investment into new Funds, to remain invested to the same degree the Trust had been even after the strategy underperformed its benchmarks in February and December 2018, and to classify the investments according to each Fund's underlying beta(s) for purposes of conforming with the Trust's Investment Policy Statement.  Aon provided this regular investment advice pursuant to a written contract between it and the Committee, another fiduciary, which contract details many of Aon's duties related to its provision of investment advice to the Committee with respect to Plan assets held in the Trust.  For example, Aon agreed to provide "recommendations to [the Committee] regarding asset allocation" within the Trust, "recommendations to [the Committee] regarding the specific asset allocation and other investment guidelines" for the Trust's investment managers such as Allianz, and advice

"regarding the diversification of assets" held in the Trust.  The Committee relied on this advice

in implementing Aon's recommendations, and Aon knew the Committee was so relying.  In

exchange for Aon's investment advice regarding the Trust specifically, the Committee agreed to

pay Aon a fixed fee per quarter from Plan assets.

158.    Aon also provided investment advice pursuant to an understanding that the

Committee would endeavor to make major investment decisions only after receiving Aon's

analysis and recommendation.  The Committee's practice, recorded in its meeting minutes,

reflected this understanding that Aon's advice was a primary basis for the Committee's

investment decisions.  So did the Trust's Investment Policy Statement, which Aon helped draft

and endorsed by placing its logo on the cover page.  According to that document, Aon had a duty

to "advise the Committee on the management of the Trusts' assets."  That duty "includes, but is

not limited to, recommending appropriate strategic policy and implementation structure and

conducting manager due-diligence, searches and selection."  The Committee was "entitled to

utilize and rely upon the advice" of Aon.

159.    At all relevant times, Aon was providing or had the responsibility to provide

investment advice to the Committee with respect to Plan assets held in the Trust and was

therefore acting in a fiduciary capacity.

160.    As a fiduciary, Aon owed a duty of care under ERISA § 404(a)(1)(B) (29 U.S.C.

§ 1104(a)(1)(B)).  That duty required Aon to advise the Committee regarding the Plans or Plan

assets held in the Trust "with the care, skill, prudence, and diligence under the circumstances

then prevailing that a prudent man acting in a like capacity and familiar with such matters would

use in the conduct of an enterprise of a like character and with like aims."  Because Aon

provided investment advice to the Committee about diversification of the Trust's investments,

the duty of care also required Aon to render that advice prudently "so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."  ERISA § 404(a)(1)(C) (29 U.S.C. § 1104(a)(1)(C)).

161.    As a fiduciary, Aon owed a duty of loyalty under ERISA § 404(a)(1)(A) (29 U.S.C. § 1104(a)(1)(A)).  That duty required Aon to advise the Committee regarding the Plans or Plan assets held in the Trust "solely in the interest" of and for the "exclusive purpose of providing benefits" to the Plans' participants and beneficiaries.  The duty also required Aon to not mislead the Committee about Structured Alpha or Allianz's management of the strategy and to disclose material facts whose omission would create a false impression about the strategy or Allianz's management of it.

162.    And as a fiduciary, Aon owed a duty to follow Plan documents under ERISA § 404(a)(1)(D) (29 U.S.C. § 1104(a)(1)(D)).  That duty required Aon to advise the Committee regarding the Plans or Plan assets held in the Trust "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with" ERISA.

163.    The fiduciary duties under ERISA are "the highest known to the law."  *Donovan*, 680 F.2d at 272 n.8.

164.    Aon breached its fiduciary duties.  Aon's breaches include, without limitation, the following:

(a)    Aon breached its duties to prudently advise the Committee regarding the Trust's investment in the Structured Alpha Funds or advise the Committee according to the best interests of the Plans' participants and beneficiaries when it misinformed the Committee of the actual level of risk Structured Alpha presented to the Plan assets held in the Trust.  Aon routinely

gave the Committee the false impression that the strategy was relatively low risk and indeed, a risk management strategy, despite red flags that should have alerted Aon that Structured Alpha was anything but.  Aon likewise misstated Structured Alpha's risk by repeatedly advising the Committee that only a small amount of the Trust's investment with Allianz was exposed to the options strategy and therefore at risk in case the strategy failed.

(b)     Aon breached its duties to prudently advise the Committee regarding the Trust's investment in the Structured Alpha Funds or advise the Committee according to the best interests of the Plans' participants and beneficiaries when it repeated Allianz's assertions about the operation of the Structured Alpha strategy and how it would perform in various market declines, including in a worst-case scenario, without adequately investigating whether those assertions were accurate and complete or presenting independent stress testing of its own.

(c)     Aon breached its duties to prudently advise the Committee regarding the Trust or advise the Committee according to the best interests of the Plans' participants and beneficiaries when it did not appropriately monitor the options positions Allianz had been constructing.  If Aon had engaged in "active, ongoing monitoring" of Allianz, as Aon's fiduciary obligations and its contract with the Committee required—and as was essential given the incentives created by Allianz's fee structure—it would have noticed that Allianz had departed from the professed investment strategy and advised the Committee accordingly.  The warning signs Aon should have found include, for example, that Allianz was purchasing puts too far out of the money, that Allianz was creating a duration mismatch by buying puts that expired before the ones it sold, and that Allianz was shorting the VIX without corresponding hedges.  Each of these red flags, which Aon should have seen, contributed to the catastrophic losses the Plans suffered in February and March 2020.  Aon was either not examining the proper data that would

have revealed the warning signs or Aon saw the right data but chose not to advise the Committee of these red flags.  Aon violated its duties regardless.

(d)     Aon breached its duty to prudently advise the Committee regarding the diversification of the Plan investments when it encouraged the Committee to invest and maintain a majority of the Trust in Structured Alpha—a much higher percentage than Aon's other clients had invested in the strategy.  Although Aon undertook to provide investment advice regarding the diversification and allocation of Plan assets held in the Trust, it failed to prudently discharge that duty.  Most notably, in response to questions the Committee had asked about whether having a majority of the Trust invested with Allianz was an undue concentration, Aon indicated that the Trust was properly diversified because the Trust's investment in Structured Alpha consisted of multiple beta components, while disregarding (and failing to inform the Committee of) the diversification risk associated with the same or substantially the same alpha strategy overlaying the Trust's entire investment in the Structured Alpha Funds.

(e)     Aon breached its duty to prudently advise the Committee in accordance with the Plan documents when it acted contrary to the Trust's Investment Policy Statement, which reflects the character and aims of the Trust.  Aon's duties under the Investment Policy Statement include "recommending appropriate strategic policy and implementation structure and conducting manager due-diligence, searches and selection" and ensuring the Committee was "adhering to the guidelines of the Investment Policy Statement and making recommendations regarding changes should they need to be made."  Aon failed to meet these obligations for at least the reasons stated above.

165.    As a direct and proximate result of Aon's breaches of fiduciary duty, the Plans suffered devastating losses, with the exact amount to be proven at trial.  Aon earned substantial fees and profits in connection with the imprudent investment advice it provided.

## COUNT III: BREACH OF CO-FIDUCIARY DUTY – ERISA § 405
## (AGAINST ALLIANZ)

166.    The Committee restates and realleges paragraphs 1-165 as though fully set forth herein.

167.    The Committee brings this Count under ERISA §§ 502(a)(2), (a)(3), and 409(a) (29 U.S.C. §§ 1132(a)(2), (a)(3), and 1109(a)).  The Committee has the authority to bring this Count under these provisions because it is a fiduciary under ERISA of the Plans whose assets are held in the Trust.  The Committee's charter, which the Plan sponsors have adopted, further authorizes the Committee to bring this Count.

168.    In addition to any liability a fiduciary may otherwise have under ERISA, a fiduciary "shall be liable" under ERISA § 405(a) (29 U.S.C. § 1105(a)) "for a breach of fiduciary responsibility of another fiduciary" in certain circumstances.  Those circumstances include where a fiduciary, by failing to comply with ERISA § 404(a)(1) (29 U.S.C. § 1104(a)(1)), "has enabled such other fiduciary to commit a breach."

169.    Allianz is liable under ERISA § 405(a) (29 U.S.C. § 1105(a)), including because through its own breaches of fiduciary duty under ERISA § 404(a)(1) (29 U.S.C. § 1104(a)(1)), Allianz enabled Aon to commit breaches.  For example, Allianz's presentations included incomplete and inaccurate information regarding the Structured Alpha strategy that enabled Aon's breaches in providing imprudent investment advice to the Committee regarding the strategy.

170.     As a direct and proximate result of Allianz's breaches as a co-fiduciary, the Plans

suffered devastating losses, with the exact amount to be proven at trial.  Allianz's co-fiduciary

breaches also caused it to earn substantial fees and profits.

### COUNT IV: BREACH OF CO-FIDUCIARY DUTY – ERISA § 405
### (AGAINST AON)

171.     The Committee restates and realleges paragraphs 1-170 as though fully set forth

herein.

172.     The Committee brings this Count under ERISA §§ 502(a)(2), (a)(3), and 409(a)

(29 U.S.C. §§ 1132(a)(2), (a)(3), and 1109(a)).  The Committee has the authority to bring this

Count under these provisions because it is a fiduciary under ERISA of the Plans whose assets are

held in the Trust.  The Committee's charter, which the Plan sponsors have adopted, further

authorizes the Committee to bring this Count.

173.     In addition to any liability a fiduciary may otherwise have under ERISA, a

fiduciary "shall be liable" under ERISA § 405(a) (29 U.S.C. § 1105(a)) "for a breach of fiduciary

responsibility of another fiduciary" in certain circumstances.  Those circumstances include where

a fiduciary, by failing to comply with ERISA § 404(a)(1) (29 U.S.C. § 1104(a)(1)), "has enabled

such other fiduciary to commit a breach."

174.     Aon is liable under ERISA § 405(a) (29 U.S.C. § 1105(a)), including because

through its own breaches of fiduciary duty under ERISA § 404(a)(1) (29 U.S.C. § 1104(a)(1)),

Aon enabled Allianz to commit breaches.  For instance, Aon's failure to monitor the Structured

Alpha portfolio construction enabled Allianz to continue making imprudent decisions that

exposed the Trust's investment to excess and undisclosed risk.  If Aon had been properly

monitoring Structured Alpha, as Aon said it would, it would have seen several red flags

indicating that Allianz was managing a riskier strategy than what had been disclosed to the

Committee.  Aon would have found that Allianz was purchasing ineffective puts that were too deep out of the money, that Allianz was buying puts that expired sooner than those it sold, and that Allianz was leaving its VIX options unhedged.  As a consequence of Aon's imprudent failure to monitor, Allianz was able to breach (and continue breaching) its own obligations by managing the strategy to add excess and undisclosed risk to the Trust's portfolio in violation of its fiduciary duties.  Each of the imprudent actions Aon failed to discover contributed to the catastrophic losses the Plans suffered in February and March 2020.

175.    As a direct and proximate result of Aon's breaches as a co-fiduciary, the Plans suffered devastating losses, with the exact amount to be proven at trial.  Aon earned substantial fees and profits in connection with the imprudent investment advice it provided.

## COUNT V: PROHIBITED TRANSACTION – ERISA § 406
## (AGAINST ALLIANZ)

176.    The Committee restates and realleges paragraphs 1-175 as though fully set forth herein.

177.    The Committee brings this Count under ERISA §§ 502(a)(2), (a)(3), and 409(a) (29 U.S.C. §§ 1132(a)(2), (a)(3), and 1109(a)).  The Committee has the authority to bring this Count under these provisions because it is a fiduciary under ERISA of the Plans whose assets are held in the Trust.  The Committee's charter, which the Plan sponsors have adopted, further authorizes the Committee to bring this Count.

178.    A fiduciary may not engage in certain prohibited transactions under ERISA § 406(b) (29 U.S.C. § 1106(b)).  For instance, a fiduciary "shall not deal with the assets of the plan in his own interest or for his own account."

179.    Allianz violated ERISA § 406(b) (29 U.S.C. § 1106(b)), including by managing the Plan assets in its own self-interest and not for the exclusive purpose of providing benefits to

the Plans' participants and beneficiaries.  Allianz managed the Structured Alpha Funds to maximize its own fees—adding excess and undisclosed risk to the portfolio in the process— rather than for the sole interest of safeguarding the Trust's investment.  Allianz did so at least by constructing the portfolio to be largely unhedged in the January and February 2020 timeframe and then, when the market declined in February and March 2020, adding more risk to the portfolio to chase return (and thus fees) rather than safeguarding the Trust's investment.

180.     As a direct and proximate result of Allianz's violations of ERISA § 406(b) (29 U.S.C. § 1106(b)), the Plans suffered devastating losses, with the exact amount to be proven at trial.  Allianz's violations also caused it to earn substantial fees and profits.

## COUNT VI: BREACH OF CONTRACT
## (AGAINST ALLIANZ)

181.     The Committee restates and realleges paragraphs 1-180 as though fully set forth herein.

182.     In connection with the Trust's investment in the Structured Alpha Funds, the Committee and Allianz entered an Amended and Restated Investment Management Side Agreement (the "Investment Management Agreement").  The Trust is a third-party beneficiary of the Investment Management Agreement, including because certain obligations Allianz owes under this  agreement are owed "to the Trust."

183.     The Trust's investment in the Structured Alpha Funds was also governed by the Fund Documents—*i.e.*, the Limited Liability Company Agreement, Private Placement Memorandum, and Subscription Agreement by which Trust assets were invested in each Fund (together with the Investment Management Agreement, the "Allianz Agreements").

184.     The Allianz Agreements are valid and enforceable contracts.

185.    The Committee and the Trust have performed their obligations under the Allianz Agreements.

186.    Allianz breached its obligations under the Allianz Agreements.

187.    Allianz promised in the Investment Management Agreement that it would manage the Trust's investments "in good faith" and with "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." Allianz agreed it would uphold this "Contractual Fiduciary Standard of Care" regardless of whether the underlying assets it was managing were "plan assets" within the meaning of ERISA.

188.    In certain of the Funds' Limited Liability Company Agreements and Private Placement Memoranda, Allianz likewise undertook to comply with the standard of care imposed on ERISA fiduciaries, regardless of whether the underlying assets of the Funds were "plan assets" within the meaning of ERISA.

189.    Allianz breached its contractual duty to manage the Funds in a professional manner and with the care, skill, prudence, and diligence of a professional investment manager responsible for the investment of employee benefit plan assets.

190.    Allianz's breaches include, without limitation, the following:

(a)    Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it did not put the appropriate hedges in place to protect the assets during a market decline.  This failure added excess and undisclosed risk and was contrary to the representations Allianz had made to the Committee and others that the hedges would be in place "at all times" as "reinsurance" for the Trust's portfolio.

(b)     Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it sold the new-configuration hedges and took on new risk-bearing positions starting in late-February 2020. These discretionary restructurings exposed the Trust's investments to further downside risk and were contrary to Allianz's representations, including that it would not sell the new-configuration hedges that should have been locked in to safeguard the Plan assets.

(c)     Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it represented that it had constructed the portfolio in a way that would ensure a defined "Max Loss" and then managed the strategy in a way that exposed the Trust to unlimited losses.

(d)     Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it either failed to have adequate risk management measures in place or abandoned such measures.

(e)     Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it represented that it would manage the Structured Alpha strategy in such a way to eliminate the risk of margin calls yet implemented a strategy in which that very risk materialized.

(f)     Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it, unbeknownst to the Committee, decided to purchase puts that were further out of the money than the maximum range Allianz had disclosed, thus adding excess and undisclosed risk to the Trust's portfolio, in an apparent effort to increase Allianz's fees.

(g)     Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it, unbeknownst to the Committee, decided to purchase puts that expired sooner than the puts it sold.  This practice was contrary to Allianz's representations that its short and long positions would be of relatively equal duration and added excess and undisclosed risk to the Trust's portfolio.  Allianz created this "duration mismatch" not because it was in the best interests of the Plans' participants and beneficiaries, but because doing so allowed Allianz to enhance its fees.

(h)     Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it, unbeknownst to the Committee, decided to sell volatility index options without buying any corresponding hedge, adding excess and undisclosed risk to the Trust's portfolio, again in an apparent effort to enhance its fees.

(i)     Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it caused the Committee to believe that Structured Alpha's risk profile was consistent with Allianz's stated investment strategy rather than the actual risk profile, either by making false or misleading representations about Structured Alpha or failing to disclose information necessary to correct prior representations that were inconsistent with how Allianz was actually managing the strategy.

(j)     Allianz breached its duty to ensure the Trust's investments were prudently diversified when it operated a strategy that was unduly weighted towards being short volatility in February and March 2020 (contrary to its pledge not to make directional bets) and created excess and undisclosed correlated risks across the Structured Alpha Funds.

191.   Allianz also agreed to abide by the Investment Policy attached to the Investment Management Agreement that governed the Trust's investment in Structured Alpha and to manage the Funds according to the Fund Documents, under which Allianz agreed to have "structural risk protections" in place as a component of the Structured Alpha strategy.

192.   Allianz breached its obligation to have such structural risk protections in place, including because it failed to purchase and maintain hedges that would afford such protection to the portfolio.

193.   Allianz agreed to provide advance notice of any material adverse amendment to the Funds' Limited Liability Company Agreements, which Allianz recognized required advance notice to the Trust of changes to the Funds' investment strategy.

194.   Allianz breached its duty to provide advance notice of changes to the Funds' investment strategy (and to obtain the Trust's consent to the same) when it altered the Funds' investment strategies to add excess and undisclosed risk without advance notice to the Committee or the Trust.

195.   The Allianz Agreements recognize that Allianz may be liable to the Trust for losses resulting from the Funds' investments where Allianz acted in bad faith or where its action or inaction constitutes negligence or willful misconduct.  Allianz's conduct was at least negligent.

196.   The Investment Management Agreement provides further that Allianz "shall indemnify and hold harmless the Trust from and against any and all claims, losses, costs, expenses (including, without limitation, attorneys' fees and court costs), damages, actions or causes of action directly resulting from a breach" by Allianz of its "fiduciary duties" delegated to it under this agreement.

197.    As a direct and proximate result of Allianz's breaches of the Allianz Agreements, the Trust sustained actual damages, with the exact amount to be proven at trial.

## COUNT VII: BREACH OF CONTRACT
### (AGAINST AON)

198.    The Committee restates and realleges paragraphs 1-197 as though fully set forth herein.

199.    The Committee and Aon entered an Investment Consulting Agreement, under which the Committee appointed Ennis, Knupp & Associates, Inc. (now known as Aon Investments USA Inc.) as an investment adviser with respect to the Plan assets held in the Trust (the "Aon Agreement").

200.    The Aon Agreement is a valid and enforceable contract.

201.    The Trust is a third-party beneficiary of the Aon Agreement, including because the Aon Agreement provides that "this Agreement and each and every provision thereof is for the exclusive benefit of" the Committee and "the Trusts," among others.

202.    The Committee has performed its obligations under the Aon Agreement.

203.    Under the Aon Agreement, Aon promised to provide various investment consulting and advisory services to the Committee regarding the Trust.

204.    Aon agreed to "adher[e]" to and to "provide its advice to [the Committee] pursuant to" various professional standards, including those contained in *Prudent Investment Practices: A Handbook for Investment Fiduciaries* and *Prudent Practices for Investment Advisors*.

205.    Aon also agreed to exercise the "skill," "proficiency," and "experience" it claimed to have as a professional investment adviser in performing its duties under the contract.

206.     Aon breached its obligation to perform its duties under the contract in a professional manner and according to professional standards applicable to an investment adviser providing investment advice concerning employee benefit plan assets.

207.     For instance, the Aon Agreement obligates Aon to engage in "active, ongoing monitoring" of Allianz to "assess evolving strengths, weaknesses and issues" and "identify any forward-looking issues that could impact performance."  Aon breached that obligation by, among other things, (i) failing to monitor and inform the Committee of the nature (and inadequacy) of the Structured Alpha hedging strategy, (ii) failing to monitor and inform the Committee of breakdowns in Allianz's risk management protocols, learning only after the catastrophic events of March 2020 that Allianz had inadequate risk management protocols in place; and (iii) failing to monitor and inform the Committee of the level of unhedged risk that Allianz was undertaking to drive returns.

208.     Likewise, the Aon Agreement obligated Aon to apply the proficiency and skill it claimed to have as an experienced investment adviser in its monitoring of Allianz.  Aon breached that obligation by, among other things, (i) failing to apply its own purported skill, proficiency, or experience in its monitoring of Structured Alpha and instead passing off Allianz marketing materials as the result of its own analysis and evaluation, despite the fact that the Allianz marketing materials recycled by Aon often did not describe the particular Structured Alpha Funds in which the Trust had invested; (ii) providing incomplete and inaccurate characterizations of the risks presented by Structured Alpha; and (iii) failing to discover the breakdowns in Allianz's risk management protocols that it would have uncovered had it exercised the care, skill, or proficiency of an experienced professional investment adviser.

209.    The Aon Agreement also required Aon to "inform itself" of any information necessary to discharge its duties, including its obligation to engage in ongoing monitoring and evaluation of Allianz.  Aon breached that obligation by, among other things, either not obtaining or disregarding details of the actual hedging positions that Allianz was purchasing as supposed "reinsurance."  Had Aon informed itself of the actual hedges Allianz was purchasing—and thus learned of the complete absence of hedges for much of the Trust's portfolio and plainly ineffective hedges for the rest—it never could have described Structured Alpha as including a "reinsurance" component or recommended that the Trust maintain its investment in the strategy.

210.    The Aon Agreement also required Aon to evaluate the Trust's Investment Policy Statement and to make at least annual recommendations concerning the appropriate investment policy for the Trust.  Among the factors Aon was to consider in making such recommendations was "the risk tolerance" of the Trust and the Committee.  Aon breached that obligation by, among other things, not recommending appropriate revisions to the Investment Policy Statement to ensure that the Trust's investment in Structured Alpha was appropriate for the risk tolerance of the Trust and the Committee, as expressed in the Investment Policy Statement.

211.    Likewise, Aon promised to advise the Committee regarding asset allocation and diversification of the Plan investments such that the "planned asset allocation" could be "expected."  Aon breached that duty by, among other things, improperly advising the Committee about the effect of Structured Alpha on the Trust's planned asset allocation and diversification. For instance, while Aon advised the Committee that Structured Alpha could be classified in the Trust's overall asset allocation according to the underlying beta component, that advice departed from the "planned asset allocation" and led the Trust to take on more risk than expected or desired.

212.     As a direct and proximate result of Aon's breaches of the Aon Agreement, the Trust sustained actual damages, with the exact amount to be proven at trial.

## PRAYER FOR RELIEF

The Committee requests that the Court enter judgment in its favor against all Defendants, jointly and severally, and an Order granting the following relief:

A.     Restoration of all losses, in an amount to be proven at trial, resulting from the foregoing breaches and violations of ERISA, together with prejudgment interest running from the dates such losses occurred;

B.     Accounting and disgorgement of fees and profits, in an amount to be proven at trial, together with prejudgment interest running from the dates such fees and profits were received;

C.     Actual damages, in an amount to be proven at trial, resulting from the foregoing contractual breaches, together with prejudgment interest running from the dates such damages occurred;

D.     Attorney's fees and costs under ERISA § 502(g) (29 U.S.C. § 1132(g)); and

E.     Any such other legal and equitable relief as this Court may deem just and proper.

## JURY DEMAND

The Committee demands a jury trial on all issues so triable.  *See* Fed. R. Civ. P. 38(b).

Dated: September 16, 2020                Respectfully Submitted,

                                         By:  /s/ *Daniel Z. Goldman*

                                         Daniel Z. Goldman
                                         PETRILLO KLEIN & BOXER LLP
                                         655 Third Avenue, 22nd Floor
                                         New York, NY 10017
                                         Phone: (212) 370-0330
                                         dgoldman@pkbllp.com

                                         By:  /s/ *Sean W. Gallagher*

                                         Sean W. Gallagher (*pro hac vice forthcoming*)
                                         Adam L. Hoeflich (*pro hac vice forthcoming*)
                                         Mark S. Ouweleen (*pro hac vice forthcoming*)
                                         Abby M. Mollen (*pro hac vice forthcoming*)
                                         Nicolas L. Martinez (*pro hac vice forthcoming*)
                                         BARTLIT BECK LLP
                                         54 West Hubbard Street, Suite 300
                                         Chicago, IL 60654
                                         Phone: (312) 494-4400
                                         sean.gallagher@bartlitbeck.com
                                         adam.hoeflich@bartlitbeck.com
                                         mark.ouweleen@bartlitbeck.com
                                         abby.mollen@bartlitbeck.com
                                         nicolas.martinez@bartlitbeck.com

                                         *Attorneys for Plaintiff Blue Cross and Blue Shield*
                                         *Association National Employee Benefits Committee*