**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLUE CROSS AND BLUE SHIELD ASSOCIATION NATIONAL EMPLOYEE BENEFITS COMMITTEE, *Plaintiff*, v. ALLIANZ GLOBAL INVESTORS U.S. LLC and AON INVESTMENTS USA INC. f/k/a AON HEWITT INVESTMENT CONSULTING, INC., *Defendants*. | Case No. 20 Civ. 07606-KPF |
| AON INVESTMENTS USA INC., *Third-Party Plaintiff*, v. ROBERT KOLODGY, MICHAEL MIZEUR, and JOHN GIBLIN, *Third-Party Defendants*. | Dated: May 13, 2022 |

**AON INVESTMENTS USA INC.'S THIRD-PARTY COMPLAINT**
**AGAINST ROBERT KOLODGY, MICHAEL MIZEUR AND JOHN GIBLIN**

Pursuant to Federal Rule of Civil Procedure 14(a), for its Third-Party Complaint against Third-Party Defendants Robert Kolodgy, Michael Mizeur, and John Giblin (collectively, "Third-Party Defendants"), Defendant/Third-Party Plaintiff Aon Investments USA Inc. ("Aon") states as follows:

**NATURE OF THE ACTION**

1. This Third-Party Complaint arises out of Robert Kolodgy, Michael Mizeur, and John Giblin's breach of their fiduciary duties under ERISA.

1

2.      Plaintiff Blue Cross and Blue Shield Association National Employee Benefits Committee (the "Committee") is a 12-member fiduciary committee of the Board of the Blue Cross and Blue Shield Association ("BCBSA") with discretionary authority and fiduciary responsibility over all investment decisions for the National Retirement Trust (the "Trust").  The Trust, in turn, is funded by numerous Blue Cross defined benefit plans ("Plans," and each, a "Plan"), for whom the Committee serves as a named fiduciary.  The Committee thus assumed primary responsibility for the Trust assets: ████████████████████████████████████████████ ██████████████████████  To help it to discharge these responsibilities, the Committee in turn created the Investment Subcommittee ("ISC"), a five-member committee chaired by the Committee's Vice Chair, and tasked it with making investment recommendations to the Committee and reviewing the performance of investment managers and funds.

3.      Mr. Kolodgy, Mr. Giblin, and Mr. Mizeur were each members of the Committee.

4.      Due to their membership on the Committee, which was responsible for oversight over the Trust's investments, as well as their exercise of discretionary authority over the management of the Trust's assets, each of Mr. Kolodgy, Mr. Giblin, and Mr. Mizeur were "functional fiduciaries" under ERISA.  They thus owed a fiduciary duty to the Trust, which included the duty to act prudently, diversify the Trust's investments to minimize the risk of large losses, avoid conflicts of interest, and exercise independent judgment.

5.      The Committee delegated primary fiduciary responsibilities over the Plans' Trust investments to the National Employee Benefits Administration ("NEBA"), a department of BCBSA.

6.      The Committee's delegation of its fiduciary duties to NEBA, in turn, conferred fiduciary responsibility over the Trust's assets on senior NEBA executives Jamey Sharpe and

Terrence Cooney, each of whom served as the Committee's Assistant Secretary (Mr. Sharpe from 2015 and continuing through all relevant periods and Mr. Cooney from 2015 and continuing through all relevant periods).  However, Mr. Kolodgy, Mr. Giblin, and Mr. Mizeur retained their fiduciary duties to the Trust, including a duty to supervise NEBA's proper management of the Trust's assets.

7.     As NEBA Chief Investment Executive, Mr. Sharpe advised the Committee on asset concentration, risk, and making and terminating investments on behalf of the Trust.  He was also responsible for manager selection, including by performing diligence on and monitoring prospective and then-current outside managers of Trust assets. Mr. Sharpe was central to the Committee's management of the Trust; indeed, the Committee's Charter *required* the Committee to seek NEBA's, and thus Mr. Sharpe's, services and advice.

8.     Mr. Cooney was an even more senior NEBA executive who served as Mr. Sharpe's direct supervisor; he also bore responsibility for managing Trust assets, conducting manager due diligence and monitoring, and advising the Committee.

9.     In 2011, the Committee, acting as the Plans' named fiduciary, invested the Trust assets ultimately belonging to the Plans in Structured Alpha funds managed by Defendant Allianz Global Investors U.S. LLC ("Allianz").  By 2020, at the suggestion of NEBA, the Committee had expanded the Trust's Structured Alpha investment to nearly $3 billion, a majority of the Trust's total assets.  Then, on February 20,  2020, capital markets entered a tailspin, brought on in part by COVID-19, with the S&P 500 dropping over 33% over the next five weeks.  Most equities and fixed income investments eventually recovered.  But Structured Alpha was no more; by the end of March 2020, the Committee had lost more than $2 billion of the Trust's investments managed by Allianz.

10.     Aon served as the Committee's investment consultant between 2009 and 2020 under the Investment Consulting Agreement ("ICA").  Aon's task was to provide investment advice to the Committee and to assist NEBA in monitoring the Trust's investment managers, including Allianz.  The Committee never delegated to Aon any responsibility for making investment decisions on the Committee's behalf.  Rather, under the ICA, the Committee retained for itself the power to make discretionary decisions regarding, among other things, manager selection, asset allocation, and making and/or terminating investments.

11.     On September 16, 2020, the Committee filed its complaint (the "Main Complaint," Dkt. 1) alleging, among other things, that Aon breached its duties as an ERISA fiduciary, thereby causing the Trust's 2020 losses.  The Committee claimed that it did not understand Structured Alpha's risks and that it was unaware that the Trust's concentration of assets in Structured Alpha was excessive.  It also claimed that it was harmed by Allianz's reckless actions, including constructing the portfolio to bear excess, undisclosed risk and restructuring the portfolio to chase returns rather than preserve investor capital, thereby placing its own interests in generating performance fees ahead of its duty to safeguard the Plan assets against undue risk.

12.     Aon denies that it bears any liability, and denies that the Committee is entitled to any of the relief sought against Aon in the Complaint.  Even if Aon is found to have breached its fiduciary duties, Allianz, the investment manager that actually decided how to deploy Trust assets in the market, and Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin, who blindly trusted that manager's process, are more to blame for the catastrophic losses giving rise to this action.

13.     *First,* Allianz, via its negligent, reckless, intentional and altogether wrongful acts, is primarily responsibility for any losses that the Committee may have suffered.  Allianz induced the Committee to invest and remain invested in Structured Alpha with promises that the strategy

would outperform its competition "whether equity markets are up or down, smooth or volatile," while providing "protect[ion] against a market crash." Allianz claimed that Structured Alpha's performance did not depend on "correctly taking a view on the direction of equities, interest rates or any other fundamental factor." Specifically, Allianz promised the Committee that Structured Alpha would "***never make a forecast on the direction of equities or volatility***."

14.     Aon monitored Allianz's management of the Trust's assets, but, like the rest of the investing community, Aon was unable to see what became clear until it was too late: for years, Allianz systematically and regularly exposed investors in Structured Alpha to devastating losses, because Allianz ***was***, in fact, making a directional bet on volatility. At all relevant times, Allianz assumed that high volatility markets would give way to low volatility markets in a relatively short timeframe. When volatility was high, or expected to be high, Allianz realized gains by selling put options to buyers who would suffer losses if expected volatility subsided. The buyer's hypothetical losses would be Allianz's gains; but, if market volatility remained high or increased, then Allianz would be the one sustaining losses. Thus, the success of Structured Alpha, and the benefits it promised to investors like the Committee, depended on Allianz's assumption that any period of volatility would be short-lived. That was not what Allianz told Aon or the Committee.

15.     Allianz also repeatedly assured the Committee that there were "[m]ultiple layers of risk control" protecting the Plans' invested assets. The Committee would not have invested the Trust's funds in Structured Alpha had it not been for Allianz's promise to maintain a "three-legged stool" of risk management measures: (i) hedging positions that Allianz had in place "at all times," regardless of market conditions, which would limit downside loss if markets dropped 25%; (ii) "[r]eal-time risk monitoring" by Structured Alpha managers; and (iii) risk oversight from independent investment professionals who did not share in Allianz's performance fees. But there

was no stool:  Allianz's claims about its risk controls were as inaccurate as its claims about the safety of the Structured Alpha Strategy writ large.  The hedging positions that Allianz held were essentially worthless.  The risk monitors, both internal and independent, did nothing to prevent Structured Alpha's managers from exposing the Trust to significant downside risks.  Inexplicably, even though Allianz funded many of Structured Alpha's options sales by using equity securities as collateral, Allianz had no method for projecting the risk of margin calls in a down market – including the margin calls that ultimately proved fatal to Structured Alpha.

16.     In this context, Allianz was reckless in representing to Aon and the Committee that the Structured Alpha strategy would perform well in a falling market with rising volatility.  Allianz had no safety net, and it knew that if its assumptions about short-lived volatility were wrong, the risks to the Trust were enormous.  ████████████████████████████████

████████████████████████████████████████████████████

████████████████  ████████████████████████████████

████████████████████████  A light breeze would blow it over.  And a hurricane was on the horizon.

17.     In March 2020 during the market dislocation brought on by COVID-19, Structured Alpha suffered massive losses, received margin calls from several of its prime brokers, and was forced to liquidate several of the funds in which the Committee had invested.  But the fact that the Structured Alpha strategy carried enormous downside risks was nothing new to Allianz.  Structured Alpha's managers had known about the strategy's very real risk of margin calls for nearly a decade by the beginning of 2020; and it had routinely realized gains by taking on leverage to bet on the direction of equities and volatility, rather than by abstaining from directional bets, as it claimed to its investors.  But instead of disclosing the true risks of Structured Alpha to Aon and

the Committee, Allianz shared inaccurate and misleading information, including about the funds'
historical performance, their collateralization rates, and their expected losses in the event of a
market shock.

18.     Under the Investment Consulting Agreement between Aon and the Committee,
Aon was entitled "to reasonably rely on the accuracy and completeness" of those misleading
disclosures.   Therefore Aon cannot be held responsible for Allianz's decision to defraud the
Committee, Aon, and numerous other clients in Structured Alpha by altering information,
concealing risks, and lying to its investors about the true nature of the product.

19.     *Second*, even if Aon is found to have breached its fiduciary duties, Aon is entitled
to recover from the Third-Party Defendants Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin because
they were substantially more at fault for and directly caused the Committee's alleged losses.  As
Committee members, through the Committee's contractual relationship with Allianz, they were in
a better position than Aon to receive and analyze data from Allianz that was necessary to appreciate
the actual risks of the Structured Alpha Strategy.  Even if they were not substantially more at fault
than Aon, their breaches of their fiduciary duties still caused the Committee's alleged losses, and
they must bear their proportionate share of liability for those losses.

20.     Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin each abdicated their responsibility to
independently analyze the Trust's investment in Structured Alpha, instead relying entirely on
NEBA, and specifically, NEBA's Chief Investment Executive, Jamey Sharpe, to tell them what to
do.  Among other things, to the extent that the Committee's concentration of assets in Structured
Alpha was excessive—which the Committee alleges and Aon denies—Mr. Kolodgy, Mr. Mizeur,
and Mr. Giblin are substantially more at fault than Aon.

21.     Neither theory of liability the Committee puts forth in its Complaint as to Aon withstands scrutiny.  As an initial matter, to the extent that the Committee's concentration of assets in Structured Alpha was improper or imprudent—which Aon denies—Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin are substantially more at fault than Aon because they blindly trusted Mr. Sharpe. Mr. Sharpe aggressively promoted the expansion of the Trust's Structured Alpha investments from 4.64% at the end of 2013 to 62.01% by the end of 2016.  He did so at times contrary to Aon's advice or without even seeking it.  He made the Trust's Structured Alpha concentration his responsibility, and publicly took credit for its expansion.  Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin were happy to let Mr. Sharpe take control over the Trust's assets.

22.     Moreover, even putting aside their abdication of responsibility to Mr. Sharpe, each of Mr. Mizeur and Mr. Giblin further breached their fiduciary duties to the Trust.

23.     Mr. Mizeur is the President and Chief Operating Officer of Blue Cross Blue Shield South Carolina ("BCBS South Carolina"), an individual Plan which contributed funds to the Trust. BCBS South Carolina was one of the largest underlying investors in Structured Alpha.  At all relevant times, Mr. Mizeur served as Executive Vice President and Chief Financial Officer of BCBS South Carolina.  Between 2012 and 2020, Mr. Mizeur also served on the Committee and on the Committee's Investment Subcommittee (the "ISC"), a subcommittee ███████████████

███████████████████████████████████████████████████████████████

███████████████████

24.     Mr. Mizeur, who owed fiduciary duties to the Trust, allowed the Trust to maintain its concentration in Structured Alpha *despite* personally ensuring that BCBS South Carolina—of which he was CFO—substantially cut its own investment in Structured Alpha.  If the Committee succeeds in its claim that the Trust's concentration in Structured Alpha was too high, Mr. Mizeur's

failure to remedy or advise others to remedy that overconcentration violated his fiduciary duty to the Trust.

25.     Mr. Giblin is the Executive Vice President and Chief Financial Officer of Blue Cross Blue Shield Tennessee ("BCBS Tennessee"), an individual Plan which contributed funds to the Trust.  He served on the Committee from 2011 to 2020, including as the Committee's vice-chair from 2014 to 2020.  Mr. Giblin also served on the ISC in 2012 and 2014-2020, and presided as its Chair from 2014 to 2020.

26.     During his tenure, Mr. Giblin fell asleep at the wheel.  Despite his long service on the Committee, his chairmanship of the ISC, and the Committee's investment of billions in the Structured Alpha options overlay strategy, ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ That failure extended to the entire Committee because, among other things, ████████████████████████████████████████████████████████Confirming Mr. Giblin's admission, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ And this ignorance was far from harmless; ████████████████████████

d█████████████████████████████████████████████████████

████████████████████████████████████████

27.     Mr. Kolodgy is the former Executive Vice President and Chief Financial Officer of BCBSA.  He also served as a member of the Committee from 2015 to 2020.  In this role, he was tasked with overseeing the Third-Party Defendants Jamey Sharpe and Terrence J. Cooney, whose wrongdoing is described at length in a parallel complaint filed in this case.  His failure to supervise is evident not only from Mr. Sharpe and Mr. Cooney's own breaches, but from the *lack* of evidence that Mr. Kolodgy took concrete steps to make certain that BCBSA, NEBA, Mr. Sharpe, or Mr. Cooney, ensured that the Committee was provided with accurate and updated information on Structured Alpha's operation, strategy, and risks.

28.     Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin's ignorance of the strategy, and their blaming of Aon, is especially inexcusable given the Committee's contractual rights as an investor in Structured Alpha to holdings data, performance monitoring, and risk reports, which Aon could have only obtained with the Committee's express permission.  Mr. Kolodgy, Mr. Giblin, and Mr. Mizeur never questioned any of the numerous Allianz representations about the strategy which later proved false, including:

    a.    That Structured Alpha had the "ability to outperform whether equity markets are up or down, smooth or volatile," while simultaneously providing "protect[ion] against a market crash;"

    b.    That long-term market trends had no impact on the performance of the strategy, because it was "not predicated on correctly taking a view on the direction of equities, interest rates or any other fundamental factor;"

c.    That the Structured Alpha managers would "***never make a forecast on the direction of equities or volatility***;"

d.    That Allianz would always be both a buyer and seller of options, and that Structured Alpha would "always be a net buyer of put options, providing protection against a tail event or market crash;" and

e.    That "[o]nly a small portion of the underlying assets are used to implement the options strategy," meaning the bulk of funds under management remained invested in the stable beta indexes; and

f.    That Structured Alpha did not have margin call risk.

29.    By utterly failing to test any of these claims or perform any diligence of their own, Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin improperly ceded their authority to Mr. Sharpe, who in turn cultivated a close, direct relationship with Allianz, withheld information from Aon, sought to diminish Aon's due diligence role, and even blocked Aon from trying to save the Trust money by reducing Allianz's fees. ██████████████████████████████████████ The buck stops with Mr. Mizeur, Mr. Giblin, and Mr. Kolodgy for these failures, and the Committee cannot now seek to—in the words of one of NEBA's own senior managers—██████████████████ █████████████████████████

## JURISDICTION AND VENUE

30.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 29 U.S.C. §§ 1132(e)(1) & (f), and 28 U.S.C. § 1367(a).

31.    This Court has personal jurisdiction under 29 U.S.C. § 1132(e)(2) and, in the alternative, under 28 U.S.C. § 1391 because Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin were subject to personal jurisdiction at the time this action was commenced.

32.     Venue is proper because venue in the Action is proper under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b).

## THE PARTIES

### A.     Third-Party Defendants

33.     Mr. Kolodgy is the former Executive Vice President and Chief Financial Officer of BCBSA.  He also served as a member of the Committee from 2015 to 2020.

34.     Mr. Giblin is the Executive Vice President and Chief Financial Officer of BCBS Tennessee.  He served on the Committee from 2011 to 2020, including as the Committee's vice-chair from 2014 to 2020.  Mr. Giblin also served on the ISC in 2012 and 2014-2020, and presided as its Chair from 2014 to 2020.

35.     Mr. Mizeur is the President and Chief Operating Officer of BCBS South Carolina. Before 2021, Mr. Mizeur served as Executive Vice President and Chief Financial Officer of BCBS South Carolina.  Mr. Mizeur also served on the Committee and the ISC between 2012 and 2020.

36.     At all relevant times, Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin each exercised discretionary authority or discretionary control with respect to management and administration of the Trust and management or disposition of the Trust's assets, pursuant to ERISA § 3(21), 29 U.S.C. § 1002(21).

### B.     Plaintiff Blue Cross and Blue Shield Association National Employee Benefits Committee

37.     Plaintiff Blue Cross and Blue Shield Association National Employee Benefits Committee is the plan administrator and named fiduciary of the Plans under ERISA (29 U.S.C. §§ 1002(16)(A), 1102(a)(2)).  The Committee was established in 1953 to manage and oversee the administration and investment of national employee benefits and related programs, including the

Trust.  The BCBSA Board established the Committee as an independent committee on June 20, 2013; prior to that date, the Committee was a standing committee of the BCBSA Board.

**C.     Defendant/Third-Party Plaintiff Aon Investments USA Inc.**

38.     Aon is an Illinois corporation with its principal office in Chicago, Illinois.  Between 2009 and 2020, Aon provided investment advice to the Committee, pursuant to the ICA.

**D.     Relevant Non-Parties**

39.     The Blue Cross and Blue Shield Association is an Illinois corporation headquartered in Chicago, Illinois.  BCBSA controls the Blue Cross and Blue Shield trademarks and names, which it licenses to defined benefit plans across the United States.

40.     The National Employee Benefits Administration is a department of BCBSA.  As described further below, the Committee broadly delegated primary fiduciary responsibilities over the Trust to NEBA and relied on NEBA for investment manager due diligence and investment recommendations.

41.      The Plans are the numerous Blue Cross defined benefit plans that invested their assets in the Trust and entrusted the Committee and NEBA with fiduciary responsibility over those Trust assets.  Sixteen of those Plans allegedly suffered losses.  Main Compl. ¶ 16 n.1.  Senior executives of many of those 16 Plans (and other Plans) served on the Committee between 2009 and 2020.

42.     James "Jamey" R. Sharpe served as Chief Investment Executive of NEBA and Assistant Secretary of the Committee at all times relevant to the Third-Party Complaint.  He stepped down on or about January 7, 2022 after more than 30 years of employment by BCBSA.

43.     Terrence J. Cooney is Vice President, Investments at NEBA and the Assistant Secretary of the Committee.  He was Mr. Sharpe's direct supervisor.

44.     In addition to junior support teams, Mr. Sharpe and Mr. Cooney were supported by more senior NEBA officials, including but not limited to Cara Esser, Mark Polewski, and Leonor DeSouza.

## FACTUAL ALLEGATIONS

### I.     MR. KOLODGY, MR. MIZEUR, AND MR. GIBLIN'S FIDUCIARY RESPONSIBILITIES UNDER THE PLAN DOCUMENTS AND ERISA

#### A.     The NEBC Charter's Provisions

45.     On June 20, 2013, the Committee adopted the Charter of the Blue Cross and Blue Shield Association National Employee Benefits Committee ("NEBC Charter," Dkt. 138-1), attached hereto as **Exhibit A**.  The NEBC Charter establishes the rules and procedures governing the Committee's operations, including its management of the Trust.

##### 1.     The Committee's Authority

46.     The NEBC Charter bestows the Committee with the responsibility of overseeing the Trust's investments.

47.     The NEBC Charter also grants the Committee full authority and broad discretion over managing the Trust and its investments. ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████

48.     The NEBC Charter imposed specific requirements for potential Committee members to ensure that they were capable of making the strategic judgments required to properly manage the Plans' investments. ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

49.     Between 2011 and 2020, the following individuals served as Committee members: Karen Abraham (BCBS Arizona), Matt All (BCBS Kansas), Peter Andruskiewicz (BCBS Rhode Island), Christopher Booth (Excellus BCBS), Bryan Camerlinck (BCBS Louisiana), Andrew Corbin (BCBS Kansas), Henri Cournand (BCBS Kansas City), Tim Crilly (BCBS Wyoming), Chuck Divita (BCBS Florida), R. Chris Doerr (BCBS Florida), Mark El-Tawil (BCBS Arizona), Michael Frank (BCBS Montana), Don C. George (BCBS Vermont), John Giblin (BCBS Tennessee), Michael Gold (BCBS Hawaii), Diane Gore (BCBS Wyoming), Robert Hiam (Hawaii Medical Service Association), Tim Huckle (BCBS North Dakota), Thurman Justice (BCBS Florida), Robert Kolodgy (BCBSA), Robert Leichtle (BCBS South Carolina), Gina Marting (BCBS Hawaii), Mike Mizeur (BCBS South Carolina), Mary O'Hara (Blue Shield of California), Michael Reitz (BCBS Louisiana), Rick Schum (BCBS Wyoming), Scott Serota (BCBSA), David Southwell (Wellmark, Inc.), Mark Stimpson (The Regence Group / Cambia Health Solutions), Michael Stollar (BCBS Hawaii), Erin Stucky (BCBS Kansas City), and Paul von Ebers (BCBS North Dakota).

### 2.     The ISC's Role

50.     To fulfill the NEBC Charter's obligations regarding asset allocation, investment manager selection, and fund selection, the Committee established the ISC.  Chaired by the Committee's Vice-Chair, the ISC was tasked with " ██████████████████████████

███████████████████████████████████████████████████

███████████████   Ex. A § 14(a).  The NEBC Charter tasked the ISC with making recommendations to the Committee concerning the Trust's concentration of assets, including the level of funds allocated to particular investment funds or investment managers, and with respect to the Trust's targets and benchmarks.  It also charged the ISC with reviewing the performance of investment managers and funds.

51.     To ensure that the ISC could fulfill these serious responsibilities, the Committee's chair was required to personally select the members of the ISC based on their experience with financial markets and investment instruments similar to those likely to be chosen for the Trust's investments.  The NEBC Charter also required that the ISC's members educate themselves about the Trust's investments and potential investments.

52.     Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin were members of the Committee during the periods relevant to this Third-Party Complaint.

53.     John Giblin served on the ISC in 2012 and between 2014 and 2020, and chaired the ISC between 2014 and 2020.  Mr. Mizeur also served on the ISC between 2012 and 2020.  Between 2011 and 2020, the following additional Committee members also served on the ISC: Karen Abraham, Bryan Camerlinck; Andrew Corbin (the 2012 chair), Charles "Chuck" Divita, R. Chris Doerr, Paul von Ebers, Mark El-Tawil, Michael Frank (the 2013 chair), Thurman Justice, and Michael Reitz (the 2011 chair).

### 3.     The Committee Remained Responsible For Monitoring NEBA And Any Consultants

54.     Though the NEBC Charter delegates certain responsibilities to NEBA, it also provides that the Committee retains responsibility for its decisions, even if it sought assistance from NEBA and outside consultants.

a. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

b. ████████████████████████████████████

████████████████████████████████████████████

████████████████

c. ████████████████████████████████████

██████████████████████████████████████████

55.     Mr. Sharpe served as NEBA's Chief Investment Executive from 2014 and through all relevant periods.

56.     Mr. Cooney served as NEBA's Vice-President, Investments from 2016 and through all relevant periods, and directly supervised Mr. Sharpe.

57.     Mr. Kolodgy, as BCBSA's Executive Vice President and Chief Financial Officer, supervised both Mr. Cooney and Mr. Sharpe.

**B.     The Investment Consulting Agreement**

58.     Acting as the Trust's named fiduciary, the Committee retained Aon as its investment consultant in 2009.   On June 16, 2009, the Committee and Aon entered into the Investment Consulting Agreement ("ICA"), attached hereto as **<u>Exhibit B</u>**, to define their respective responsibilities.

59.     Section 1.5 of the ICA provides that the Committee retains fiduciary responsibility and authority for any and all decisions regarding Plan matters.

60.     The ICA gave the Committee to discretion to either exercise that investment authority directly, or delegate it to NEBA—and the Committee elected to retain exclusive authority

to make and implement investment decisions.  The Committee also retained the responsibility to decide whether the Trust's investments complied with ERISA's diversification requirements.

61.     Under the ICA, Aon's role was to consult for the Committee and help the Committee acquire the information it required to make prudent fiduciary decisions.  Aon was to provide investment advice concerning investment manager selection and asset allocation and to evaluate and monitor investment managers.

62.     While monitoring the Trust's investment managers, Aon was contractually entitled under the ICA "to reasonably rely on the accuracy and completeness of the information it receives in response to [information] requests" that it posed to Allianz.

63.     Aon had no authority to make investment decisions for the Committee.  Under the ICA, Aon lacked responsibility to manage or direct any of the Trust's investments, and lacked authority to enter into agreements on behalf of—or otherwise bind—the Trust.

64.     At all times, the Committee had the authority to overrule or reject any advice that Aon provided, as well as to act unilaterally without seeking Aon's advice.  To that end, the ICA specifically provided that the Committee retained the ability to reject any recommendation made by Aon.

65.     Further, the ICA provided that Aon could not be held liable for actions directed by the Committee or its delegates.  Section 1.2 provides that Aon could not be held liable for taking any action, or for refraining from taking any action, at the direction of the Committee, any other person acting with respect to the Programs or the Trusts pursuant to actual authority to give such direction, or whom Aon reasonably believed had such authority.

66.     Aon could also not be held liable for the actions, inactions, misrepresentations, or omissions of third parties, including Allianz.

C.       **The Investment Policy Statement's Provisions**

67.     In 2010, the Committee voted to adopt the Investment Policy Statement ("Policy Statement"), attached hereto as **Exhibit C**.  The Policy Statement governed the management of the Trust and defined the respective roles of the Committee, NEBA, and Aon.

68.     Consistent with the NEBC Charter and the ICA, the Policy Statement stated that the Committee retained exclusive decision-making authority over investment selection.  The Policy Statement provided that the Committee was responsible for selecting investments and managers and that the Committee retained discretion to add investments at any time.

69.     The Policy Statement expressly made the Committee responsible for monitoring the Trust's investments.

70.     In the Policy Statement, the Committee delegated primary fiduciary responsibility over investment manager due diligence to NEBA.  The Policy Statement required NEBA to conduct investment manager monitoring and evaluations, an annual on-site meeting with each active manager, and an in-house meeting with that manager at NEBA's offices.  In contrast, the Policy Statement tasked Aon with the secondary fiduciary responsibility of assisting NEBA in monitoring and evaluating investment managers.

71.     Further, the Committee retained exclusive authority over decisions to close or change existing investments, including when necessary to ensure the Trust's investments were properly diversified under ERISA.  ███████████████████████

████████████████████████████████████████████████

The Committee also reserved the right to terminate any investment manager for any reason, including where a change in allocation policy required a shift in investment strategy.

72.     One area over which the Committee retained such authority was its contractual relationship with Allianz, pursuant to an Amended and Restated Investment Management Side

Agreement, dated May 1, 2014. ███████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████

### D.     Third-Party Defendants' Fiduciary Duties

73.     As ERISA fiduciaries with responsibility for the management and administration of the Trust and the management or disposition of the Trust's assets based, in part, on their membership on the Committee, Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin's fiduciary obligations to the Trust were "the highest known to the law."  *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). ████████████████████████████████████████████████████

74.     As fiduciaries, Mr. Kolodgy, Mr. Giblin, and Mr. Mizeur each owed a duty under ERISA § 404(a)(1)(B) (29 U.S.C. § 1104(a)(1)(B)) to act with the care, skill, and prudence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character with like aims.  That duty required them to exercise care, skill, and prudence in connection with at least the following decisions and actions:

> a.     Selecting investment managers responsible for managing the Trust's assets;
>
> b.     Monitoring and evaluating investment managers and their continuing appropriateness, as contemplated in the Policy Statement;
>
> c.     Deciding to invest in, increasing investments in, and maintaining investments in Structured Alpha funds;

      d.      Rendering decisions regarding making, maintaining, and terminating investments in Structured Alpha funds and the appropriate concentration of Structured Alpha investments; and,

      e.      Ensuring that they, their fellow Committee members, and the Plans understood the nature and risks of the Structured Alpha strategy.

75.      As fiduciaries, Mr. Kolodgy, Mr. Giblin, and Mr. Mizeur also owed a duty of loyalty to the Plans invested in the Trust under ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A). That duty required them to act "solely in the interest" of and for the "exclusive purpose of providing benefits" to the Plans.

76.      As ERISA co-fiduciaries with Aon, Mr. Kolodgy, Mr. Giblin, and Mr. Mizeur owed duties under ERISA § 405, 29 U.S.C. § 1105, to provide complete and accurate information to Aon and permit Aon to fulfill its fiduciary responsibilities without interference.

77.      As ERISA fiduciaries, Mr. Kolodgy, Mr. Giblin, and Mr. Mizeur  also owed a duty to follow Plan documents, including the NEBC Charter and the Investment Policy Statement.

78.      Finally, as ERISA fiduciaries, Mr. Kolodgy, Mr. Giblin, and Mr. Mizeur owed a duty to "diversify[] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."  ERISA § 404(a)(1)(C), 29 U.S.C. § 1104(a)(1)(C).

## II.    MR. KOLODGY, MR. MIZEUR, AND MR. GIBLIN'S BREACHES OF THEIR FIDUCIARY DUTIES

79.      The Committee claims that its nearly $3 billion investment in Structured Alpha was imprudent and inconsistent with its investment objective and risk tolerance.  The Committee's Complaint thus attempts to hold Aon responsible for the Committee's alleged lack of knowledge of Structured Alpha's actual level of risk, acceptance of Allianz's assertions about Structured

Alpha, failure to see the warning signs that Allianz's options positions had departed from Allianz's professed investment strategy, overconcentration in Structured Alpha, and failure to follow the Committee's own Plan documents.

80.    Aon denies all such allegations and contends that discovery in this action will continue to demonstrate that Aon committed no wrongdoing.

81.    But even if the Committee's allegations were established, in whole or in part, they sharply underscore the Committee's own failings, and the failings of Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin to discharge their fiduciary duties.  If the Committee is correct, then each of them allowed Jamey Sharpe, NEBA's Chief Investment Executive, to invest and maintain more than half of its assets—nearly $3 billion—in a strategy whose risks they did not fully understand and in violation of ERISA's diversification requirements and the Committee's own Plan documents.

82.    Mr. Kolodgy, as Mr. Sharpe's supervisor, was obligated under ERISA to ensure that Mr. Sharpe was not putting the Trust's assets at an unacceptable risk.  Mr. Kolodgy failed to do so.

83.    Mr. Giblin and Mr. Mizeur, as members of the  Committee, were also charged with a fiduciary duty.  They were obligated to oversee the Trust's investments and ensure that they were not placed at an unacceptable risk.   Much like Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin improperly relinquished their responsibility to Mr. Sharpe.

84.    Mr. Giblin and Mr. Mizeur also directly breached their fiduciary duties through their own actions.  Specifically, Mr. Giblin entirely failed to educate himself as to Structured Alpha's goals and methods.  And Mr. Mizeur, after acting in a manner which demonstrated that he was concerned about high concentration of assets in Structured Alpha, took no action with

respect to any Plans other than BCBS South Carolina, the Plan he served on as Executive Vice President and Chief Financial Officer.

85. ███████████████████████████████████████████████████████

As Mr. Kolodgy, Mr. Giblin, and Mr. Mizeur committed primary and active breaches of their respective fiduciary duties, they are substantially more at fault than Aon for any alleged losses to the Trust.

## A. Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin Allowed Mr. Sharpe To Expand The Trust's Structured Alpha Investments To Levels The Committee Now Complains Of

86. The Committee claims that *Aon* caused it "to invest and maintain a majority of the Trust in Structured Alpha—a much higher percentage than Aon's other clients had invested in the strategy." Main Compl. ¶ 164(d). It alleges that the "expan[sion]" of the Trust's Structured Alpha investments occurred between the Committee's initial 2011 investment and 2018. *Id*. ¶¶ 44, 52.

87. But the Committee's attribution of responsibility for this expansion is inaccurate. If the Committee's concentration of the Trust's assets in Structured Alpha is found to be a violation of ERISA, Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin—through their abdication of their oversight responsibilities to Mr. Sharpe—are primarily responsible and are substantially more at fault than Aon. They, not Aon, caused the Trust's Structured Alpha concentration to climb from 4.64% at the end of 2013 to 62.01% by the end of 2016.

### 1. Mr. Sharpe's Actions Were Undertaken With Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin's Blessing

(a) Mr. Sharpe Increased The Trust's Structured Alpha Concentration

88. Prior to the market crash in March 2020, Jamey Sharpe was not shy about his responsibility for increasing the Trust's concentration of assets in Structured Alpha. In a 2016 interview with Institutional Investor magazine, attached hereto as **Exhibit D**, he disclosed that he

made a "bet" on portable alpha strategies, "shift[ing] to an 80% allocation to portable alpha strategies" in 2014, principally Structured Alpha.  Ex. D at -150-51.

89.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████

90.    Mr. Sharpe's bet caused the Trust's Structured Alpha concentration to climb at an annual clip of nearly twenty percentage points in the years 2014-2016.  The increases he directed caused that concentration to increase from 4.64% in 2013, to 23.78% by 2014, 41.95% by 2015, and 62.01% by 2016.

91.    Throughout this period, Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin were members of the Committee charged with overseeing the investment of the Trust's assets.  They signed off on this increase, allowing the Trust's assets to face more exposure—and thus more risk—from Structured Alpha.

92.    Mr. Sharpe increased concentration because he was obsessed with high performance rates and publicly relished the praise he was receiving for them.  He boasted to Institutional Investor magazine that the Trust had "beaten [its] benchmark[s]" between 2014-2016 and attributed "90% of the credit for that … to the portable alpha strategy."  Ex. D at -151. ████

████████████████████████████████████████████████████████████

████████████████████████████████████████

93.    At that point in 2015, Mr. Giblin and Mr. Mizeur were serving on the ISC.

94.    Mr. Sharpe's preoccupation with performance caused him to terminate certain of the Committee's existing investment managers and shift the assets previously under their management to Structured Alpha.

95.     Importantly, Mr. Sharpe—with the Committee's rubber-stamp—did so against
Aon's advice. ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████

96.     ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

97.     ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████████

98.     ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████████ Unlike Mr. Sharpe,
Aon was not entirely won over by Allianz's representations of tail risk protection in the form of
hedging positions, continuous internal risk tracking, and external risk monitoring.  Aon understood
that, no matter how many times Allianz claimed that Structured Alpha was immune from margin
call risk, trading derivatives on margin necessarily exposes some percentage of the principal.  And
Aon tailored its advice accordingly, even without knowing at the time that neither of Allianz's risk

reporting functions accounted for the potential of a margin call—the equivalent of saying "the coast is clear" with one's eyes closed.

99.     In contrast, Mr. Sharpe, in discussions with Allianz and trusting them wholeheartedly, recognized that he was rejecting Aon's advice— ████████████████████ ████████████████████

100.    But the Committee and the ISC—including Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin—sided with Mr. Sharpe over Aon, thus prioritizing the high returns that Allianz offered over the risk mitigation that Aon suggested.

101.    ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████

102.    ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

(b)     <u>Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin Signed Off On Mr. Sharpe's Interference With Aon's Performance Of Its Fiduciary Duties</u>

103.    Compounding his disregard of Aon's advice, Mr. Sharpe sometimes did not even bother informing Aon of his decisions to terminate non-Structured Alpha investments and/or shift assets to Structured Alpha.  For instance, in spring 2014, Mr. Sharpe met with Allianz to create new Multi-Beta Structured Alpha funds with a greater return objective solely for the Trust's use.

104.    Mr. Sharpe did not invite Aon to these meetings, nor did he inform Aon of the new funds or that their creation increased the Trust's Structured Alpha investments from $185 million to $490 million.  Instead, Aon only learned about these decisions after the fact from Allianz.  ███

███████████████████████████████████████████████████████████████

███████████████████████████████████  Mr. Sharpe's unilateral actions prevented Aon from conducting an analysis or preparing a recommendation to the Committee before Mr. Sharpe invested Trust funds in the Multi-Beta Structured Alpha funds.

105.    Similarly, in December 2014, Mr. Sharpe unilaterally closed out non-Structured Alpha Trust investments and transferred $90 million of those assets to Structured Alpha.  Mr. Sharpe never informed Aon of his decision or sought Aon's advice in advance, and Aon personnel only learned of his decision the month after it was made.

106.    The Committee, however—including members Mr. Kolodgy, Mr. Giblin, and Mr. Mizeur—permitted and signed off on Mr. Sharpe's actions.

107.    Mr. Sharpe's failure to provide timely and accurate information about his intended moves interfered with Aon's ability to advise him and the Committee before they made decisions. His actions were contrary to the Committee's own professed "understanding" with Aon that the Committee "would endeavor to make major investment decisions only after receiving Aon's analysis and recommendation."  Main Compl. ¶ 158.

108.    Compounding his failure to inform Aon of his intended moves in advance, Mr. Sharpe actively interfered with Aon's attempts to discharge its duty to monitor the Trust's Structured Alpha investments.  Mr. Sharpe had little time for Aon's monitoring efforts because he thought that monitoring was *his* job.

109.    And the Committee, by failing to conduct oversight over Mr. Sharpe, apparently agreed with him.

110.    To further take control—and to minimize Aon's ability to provide pertinent advice—Mr. Sharpe orchestrated an internal coup to minimize Aon's influence and, in his own words, ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████

111.    Mr. Sharpe executed that plan by, among other measures, starving Aon of information. ██████████████████████████████████████

████████████████████████████████████

112.    ███████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████ Mr. Sharpe's actions inhibited Aon's ability to actively track the Trust's allocations across the asset classes the Investment Policy Statement established.

113.    Indeed, Mr. Sharpe consistently sought to freeze out Aon. ███████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████

114. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

115. █████████████████████████████████████████████████████

███████—it was part and parcel of a persistent pattern of behavior by Mr. Sharpe to disregard

Aon's advice, fail to provide Aon with advance notice of his decisions, and to starve Aon of

information.

116.    And the Committee did nothing to stop Mr. Sharpe from freezing Aon out.  The

Committee and its members, including Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin, were happy to

let Mr. Sharpe draw power to himself.

**B.    Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin's Breaches During The 2018-2019 Decisions To Stay Invested In Structured Alpha**

117.    The Committee has alleged that Aon breached its duties between 2018 and 2019 by

failing to advise the Committee to terminate or substantially reduce the Trust's Structured Alpha

investments.  According to the Committee, if it had properly understood the nature and risks of the

Structured Alpha strategy, it would have terminated its Structured Alpha investments by no later

than December 31, 2019.  The Committee is calculating its damages on this basis.[1]

118.    If the Committee's decision to stay invested in Structured Alpha during the 2018-

2019 period is found to be a violation of ERISA—and Aon contends it was not—Mr. Kolodgy,

Mr. Giblin, and Mr. Mizeur should be held to be substantially more at fault due to their membership

in the Committee—and via their abdication of their responsibility to Mr. Sharpe.  They, not Aon,

caused the Trust to maintain its Structured Alpha investments.

---

[1] *See* 2021.08.13 NEBC Verified Amended Answer & Objections to Aon's Interrogatory 14 at 3.

1.      **Mr. Sharpe's Actions Were Taken With The Committee's Sign-Off**

119.    In early 2018, Allianz became concerned that the Committee might reduce the Trust's exposure to Structured Alpha, but recognized that it had an ally in Jamey Sharpe. ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

(a)     <u>Mr. Sharpe Convinced The Committee And The Plans To Stay Invested In Structured Alpha</u>

120.    By 2018, Mr. Sharpe had presided over the expansion of the Trust's Structured Alpha investments to more than 60% of the Trust's total assets. ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

121.    So when the Committee's members had questions about Structured Alpha after it underperformed relative to its beta benchmarks in February 2018, the first person they turned to was Mr. Sharpe, not Aon. ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████ In some sense, Mr. Giblin was right on both counts, but he never

followed up directly with Allianz about either suspicion.

122.   ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

Mr. Sharpe could have run Mr. Giblin's concerns to ground, at which point he may have realized

what Aon had been telling the Committee all along: that there was no maximum percentage of

collateral that Allianz was permitted to draw from, and that, ████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████ due to the limited information rights that the Committee had negotiated with

Allianz.  Rather, the Committee's protection from downside exposure lay in the much-vaunted

hedging positions, which it could have reviewed on a monthly basis but elected not to.  But Mr.

Sharpe did not bother to dig in so deeply so as to actually understand how the risk controls that

Allianz purported to offer investors in Structured Alpha worked.

123.   Instead, Mr. Sharpe told Mr. Kolodgy and Mr. Giblin to trust him, and, by

extension, Allianz.  ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████

124.    ████████████████████████████████

████████████████████████████████████████

████████████████

125.    The ISC similarly bowed to Mr. Sharpe's will at its meetings.   ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████

126.    ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████

127.    ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████

128. ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████

129. ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

130.    The cycle repeated itself when Structured Alpha underperformed in late 2018 and Committee members and Plans again raised questions. ████████████████████ ████████ Nonetheless, Mr. Sharpe again gave a swift and strong defense of Structured Alpha.

131. ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████

132. ████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████

133.   ███████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████

134.   The ISC again took Mr. Sharpe's advice.   ████████████████████████

████████████████████████████████████████████

135.   During each of the above periods, Mr. Giblin and Mr. Mizeur were members of the ISC.  And each of Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin were members of the Committee. But instead of exercising their independent judgment and questioning Mr. Sharpe, they let him steamroll them. █████████████████████████████████████████████

███████████████████████████████████████████████████ **Exhibit M** at -440. Mr. Mizeur, Mr. Kolodgy, and the rest of the Committee did the same.

136.   Indeed, while the Committee alleges that *Aon* provided deficient advice in 2018-2019, *Mr. Sharpe* in fact gave that advice.

137.   While the Committee alleges that Aon's advice was deficient because it (1) "gave the Committee the false impression that the strategy was relatively low risk and indeed, a risk management strategy," Main Compl. ¶ 164(a), █████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████

138.    The Committee also alleges that Aon's advice was deficient because it "repeated Allianz's assertions about the operation of the Structured Alpha strategy … without adequately investigating whether those assertions were accurate or complete."  Main Compl. ¶ 164(b).  But it was Mr. Sharpe that assuaged Mr. Kolodgy's concerns by parroting talking points from an Allianz deck to him.

139.    The Committee further alleges that Aon's advice was deficient because it failed to determine that "Allianz was shorting the VIX without corresponding hedges."   Main Compl. ¶ 164(c).  ██████████████████████████████████████

████████████████████████████████████████████████

And it was Mr. Sharpe and the Committee—including Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin— who could have reviewed the monthly position data, or asked Aon to review it with their permission, but chose not to.

140.    The Committee also alleges that Aon's advice was deficient because it "indicated that the Trust was properly diversified because the Trust's investment in Structured Alpha consisted of multiple beta components."  Main Compl. ¶ 164(d).  ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████  Ex. L at -475.

141.    But the Committee—and Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin—cannot sacrifice Mr. Sharpe at the altar.  They each had a fiduciary obligation to individually understand the risks of Structured Alpha and to exercise their independent judgment.  It was insufficient, and a violation of their fiduciary duties, to merely rely on Mr. Sharpe to do so simply because he and

other senior NEBA staff ███████████████████████████████████████████

██████████████████████████████

**C.   The Committee—And Mr. Kolodgy, Mr. Giblin, And Mr. Mizeur—
Abdicated Their Fiduciary Responsibility Over Concentration To The Plans
Based On Jamey Sharpe's Advice**

142.   After Structured Alpha's 2018 underperformance, Mr. Sharpe sought to take a

hands-off approach to the Plans' investments in Structured Alpha. ████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████

143.   ███████████████████████████████████████████████████████

████████████████████████████████████

144.   ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

145.   Mr. Sharpe's proposal to abdicate his, NEBA's, and the Committee's fiduciary

responsibilities to the Plans was not without critics.  A senior NEBA employee who had been

handpicked to succeed Mr. Sharpe as Chief Investment Executive disagreed with his approach.

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████

146.    That same senior NEBA employee challenged Mr. Sharpe's efforts to actively withhold information about Structured Alpha's performance from the Plans. ████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ He preferred withholding material information to having to address the Plans' concerns, and was prepared to disregard and overrule his senior staff's objections to do so.

147.    Rather than reconsider his position on concentration or his refusal to share material information with the Plans based on the advice of his handpicked successor, Mr. Sharpe fired her.

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████ Mr. Sharpe tried to justify his decision by claiming that ████████████

██████████████████████████████████████████ But those remarks were at odds with ███

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ The only

thing that changed between 2018 and 2019 was that the senior NEBA employee had made what Mr. Sharpe deemed a fatal mistake—challenging his authority over Structured Alpha decision-making.

148.    Mr. Kolodgy, despite receiving the communication regarding these concerns about concentration, allowed Mr. Sharpe to summarily dismiss this employee.  Mr. Kolodgy did not question Mr. Sharpe's rule and instead accepted at face-value ███████████████████████

███████████████████████████████████████

### D. Mr. Giblin and Mr. Mizeur Breached Their Fiduciary Duties Independently Of Their Sign-Off Of Mr. Sharpe's Breaches.

149.    Each of Mr. Kolodgy, Mr. Giblin, and Mr. Mizeur breached their fiduciary duties by abdicating their responsibility to independently evaluate the Trust's investments in Structured Alpha to Mr. Sharpe.  However, Mr. Giblin and Mr. Mizeur each individually breached their fiduciary duties independently of their relationship to Mr. Sharpe.

#### 1. Mr. Giblin Breached His Fiduciary Duties By Failing To Educate Himself Regarding Structured Alpha Despite The Trust's Substantial Exposure To The Strategy.

150.    As the ISC's Chair, Mr. Giblin was expected under the NEBC Charter to understand investment instruments that were likely to be considered for the Trust's investments.  Ex. A § 14(a)(i).

151.    ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████

152.    O████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████

153.   ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

154.   This fact bears repeating: ████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

155.   ████████████████████████████████████████

███████████████████████████████████

156.   But the ultimate objective of the Structured Alpha strategy was not the only component that Mr. Giblin—███████████████████████████████—did not understand.   ████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

157.   ██████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

158.   ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████

159.   ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

160.   ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████   Like Mr. Giblin, he was expected to be knowledgeable and familiar with the financial products the Trust invested its funds in.

161.   He was anything but.  Structured Alpha is a portable alpha strategy, an investment strategy which, as Aon advised Mr. El-Tawil and his fellow ISC members in June 2019, attempts to generate alpha by separating beta exposure from active management.  ██████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

162.   Mr. Giblin's failure to educate himself and his fellow Committee members regarding the goals and methods of Structured Alpha was a breach of his fiduciary duties.

> **2.     Mr. Mizeur Breached His Fiduciary Duties By Declining To Take Any Action With Respect To Plans Other Than BCBS South Carolina Despite Plainly Being Concerned About Over-Concentration In Structured Alpha**

163.   After Structured Alpha's negative returns in late 2018, Mr. Mizeur took a fresh look at BCBS South Carolina's investments in Structured Alpha.

164.   BCBS South Carolina was one of the largest underlying investors in Structured Alpha.

165.   Mr. Mizeur hired an outside advisor, Rocaton, to analyze BCBS South Carolina's investment in Structured Alpha.

166.   ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

167.   With respect to his Plan—BCBS South Carolina—Mr. Mizeur took this advice, reducing BCBS South Carolina's investment in Structured Alpha from 85% to 20%.

168.   But with respect to the rest of the Plans in the Trust, to which Mr. Mizeur also owed fiduciary duties, he did nothing to lower the concentration.

169.   To the extent NEBC alleges that concentration concerns with respect to one investor may impact the appropriateness of another investor's concentration, *see* Main Compl. ¶¶

12, 164(d), Mr. Mizeur's concern for BCBS South Carolina's concentration, but his complete failure to act or investigate further with respect to the Trust's overall concentration, was a breach of his fiduciary duty.

### III.    DUE TO THEIR BREACHES OF FIDUCIARY DUTY, MR. KOLODGY, MR. MIZEUR, AND MR. GIBLIN WERE CAUGHT TOTALLY OFF-GUARD BY THE EFFECTS OF THE MARCH 2020 MARKET IMPLOSION.

170.    In late February 2020, U.S. equity markets began to experience increased volatility as a result of growing concerns about the impact of COVID-19 on the global economy.  After closing at prices of roughly 15-18 in January and early February 2020, beginning on approximately February 24, the VIX began to rise, and eventually closed at 82.69 on March 16, 2020—an increase of over 400 percent.  Rising volatility impacts options prices; with investors expecting asset prices to swing in wide arcs, sellers of risk insurance such as S&P 500 index puts can demand a higher premium in issuing new short options. As a result, Structured Alpha had historically been more profitable in high volatility environments.  Aon advertised that wider spreads mean greater potential inefficiencies to exploit—when volatility rises, the market's view of volatility sprints ahead of reality.

171.    But rising volatility and a falling index price can also (1) drive up the value of liabilities associated with existing short index options due to the increased probability that the index options will expire in the money and need to be settled in cash, and (2) drive up the liabilities associated with short VIX call options as the probability that they will settle in the money increases—effectively, a "payout" of the insurance policy.  This same risk also increases the risk of a devastating margin call—a risk which both Allianz and the Committee had ignored for the duration of the NRT's investment.

172.    As the VIX rose during February and March 2020, the S&P 500 was falling due to COVID-19's significant impact.    At all relevant times, Allianz pledged the funds' beta

components, comprising shares of index funds, as collateral for its options positions.  As a result, beginning in February 2020, when the S&P first faltered in response to COVID-19, the Structured Alpha funds suffered significant losses due to: (i) the decreasing value of the S&P index fund positions; and (ii) Allianz's mounting obligations to the holders of short puts that Allianz had assumed it would never have to pay.  This downward spiral was directly contrary to the scenario analyses and stress tests performed regularly by Allianz, and presented to both BCBS and Aon, which had predicted that the value of the Structured Alpha funds would be down slightly, if at all, in this scenario and would recover any losses quickly.  During that time, the value of the beta collateral declined significantly just as the risk of a devastating margin call rose significantly.

173.    ███████████████████████████████████████

████████████████████████████████████████████████

Aon did not know the extent of Allianz's risk management and disclosure failures yet.  It did, however, notice that  the performance of the Structured Alpha 1000 fund was down 25 percent from the prediction in the most recent risk report Aon had received from Allianz only 2 months earlier.  ███████████████████████████████████████

███████████████████████████

174.    Aon was shocked to learn that Allianz had not held its advertised hedging positions *for years*.  ██████████████████████████████████████████████

██████████████████████████████    It might have been able to detect those issues earlier had the Committee ensured that its consultant received all the information that the Committee was entitled to under the Side Agreement.

175.    On March 16, 2020, Allianz told the Committee and Aon that the portfolio was facing a devastating margin call the next day.  On March 27, 2020, Allianz announced the

liquidation of its two funds where losses were the greatest, Structured Alpha 1000 and Structured Alpha 1000 Plus.

## IV.   MR. KOLODGY, MR. MIZEUR, AND MR. GIBLIN ARE SUBSTANTIALLY MORE AT FAULT THAN AON FOR THE COMMITTEE'S ALLEGED LOSSES

176.   Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin—by virtue of their membership on the Committee—were charged with fiduciary duties to protect the Trust's investments. ██████ ███████████████████████████████████████████████████████ It was impermissible for Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin to delegate all responsibility and oversight to Mr. Sharpe.  And yet that is exactly what they did.

177.   Mr. Sharpe—with the Committee's rubber-stamp—caused the Trust's Structured Alpha investments to expand from 4.64% at the end of 2013 to 62.01% by the end of 2016. ███ ████████████████████████████████████████████████████ ████████████   Ex. E at -601.  In some cases, he made those decisions to increase the Trust's Structured Alpha concentration either against Aon's advice or without seeking Aon's advice or even informing Aon.  And the Committee, including Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin, was happy to let him do so.

178.   Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin also approved of the decision to maintain the Trust's Structured Alpha investments. ████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████   By all measures—other than the Trust's returns—Mr. Sharpe succeeded at this goal.

179.     Mr. Sharpe told the Committee to trust his ███████████ in Structured Alpha's continued high performance and risk controls.  In fact, Mr. Sharpe told members of the Committee that they were concerned only because they ████████████████████████ Ex. I at -751.  In response, when they should have sought to educate themselves, they simply took Mr. Sharpe's word that Structured Alpha was safe.

180.     It was Mr. Sharpe, not Aon, who advised the Committee, the ISC, and the Plans to stay the course.  And the Committee—including Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin—followed Mr. Sharpe's advice without question.

181.     When Mr. Sharpe suggested that they further abdicate their responsibility to the Plans, Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin were happy to do so.

182.     Instead of educating themselves and independently exercising their judgment, as ERISA requires, Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin sought to absolve themselves of any responsibility.  ████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████

183.     ████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████

184.    But Mr. Giblin's ignorance was not isolated. ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ Ex. Q at

-569.  Nor did Mr. Sharpe contain his efforts at withholding information from the Plans. ███

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████ Mr. Sharpe  even terminated a senior

NEBA employee for challenging his authority over Structured Alpha and replaced her with more

junior subordinates whom he kept in the dark about Structured Alpha and its risks.

185.    Rather than accept responsibility, Mr. Sharpe, Mr. Kolodgy, Mr. Mizeur, and Mr.

Giblin—as well as other members of the Committee—sought to blame Aon for their own fiduciary

failings. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████

186.    But Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin's efforts to blame-shift are in vain

because, ███████████████████████████████████████████████████████████

ERISA's contribution and indemnification rules exist precisely to prevent one fiduciary from making another take the fall for other fiduciaries' misbehavior. *See Chemung Canal Tr. Co. v. Sovran Bank/Maryland*, 939 F.2d 12, 16 (2d Cir. 1991) ("Full [fiduciary] responsibility should not depend on the fortuity of which fiduciary a plaintiff elects to sue."). Mr. Kolodgy, Mr. Giblin, and Mr. Mizeur cannot escape their own failures, and Aon is entitled to complete indemnity for any liability in connection with the claims asserted in the Complaint.

## CAUSES OF ACTION

### CONTRIBUTION & INDEMNIFICATION UNDER ERISA

187.    Aon hereby repeats and realleges as if fully set forth herein each of the allegations contained in paragraphs 1 through 186.

188.    Aon denies the material allegations of the Complaint. Nevertheless, if there is any finding that Aon is liable to the Committee, or any award of restitution by Aon to the Committee for any of the Committee's alleged damages, then, under the facts alleged herein, Aon was not substantially more at fault than Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin. To the contrary, their violations of fiduciary duty make them substantially more at fault than Aon for any harm to the Trust and the Plans that invested their assets in it.

189.    At all relevant times Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin were fiduciaries of the Plans under ERISA.

190.    As fiduciaries, Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin owed a duty to the Plans to act with the care, skill, and prudence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character with like aims. That duty required them to exercise care, skill, and prudence in connection with at least the following decisions:

    a.   Monitoring and evaluating investment managers and their continuing appropriateness, as contemplated in the Investment Policy Statement;

    b.   Deciding to invest, increasing investments in, and maintaining investments in Structured Alpha funds;

    c.   Rendering decisions regarding making, maintaining, and terminating investments in Structured Alpha funds and the appropriate concentration of Structured Alpha investments; and,

    d.   Ensuring that they, and the Plans, understood the nature and risks of the Structured Alpha strategy

191.    As fiduciaries, Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin also owed a duty to follow Plan documents and to "diversify[] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." ERISA § 404(a)(1)(C), 29 U.S.C. § 1104(a)(1)(C).

192.    As fiduciaries, Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin were further obligated to exercise independent judgment and not to abdicate all responsibility to Jamey Sharpe, who then himself acted in such a manner as to breach his fiduciary duties.

193.    Mr. Sharpe breached his duty of care—with the approval and sign-off of Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin—in at least the following ways:

    a.   Advising the Plans to expand the Trust's Structured Alpha investments and stay invested in Structured Alpha, including by

        i.   assuring the Plans that Structured Alpha was a low risk "risk management" strategy rather than a source of risk;

      ii.      repeating Allianz's assertions about the operation of the Structured Alpha strategy without adequately investigating them;

      iii.     assuring them that Allianz was employing hedges to protect Structured Alpha against steep declines;

      iv.     assuring them that the diversification of the Structured Alpha beta investments protected against risk;

      v.      assuring them that the Trust's Structured Alpha concentration complied with the Investment Policy Statement's guidelines;

      vi.     assuring the Committee and the ISC that leaving it to the Plans to choose their exposure to Structured Alpha would address any concentration risk; and

      vii.    failing to ensure that the Plans understood the nature and risks of the Structured Alpha strategy.

    b.    Failing to ensure that the Plans understood the nature and risks of the Structured Alpha strategy;

194. Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin also breached their fiduciary duty by signing off on the decision to leave it to each Plan to determine how much Structured Alpha exposure it wanted.

195. Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin breached their co-fiduciary duty by signing off on Mr. Sharpe's interference with Aon's performance of its fiduciary duties and failing to provide complete and accurate information to Aon.

196.    Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin also breached their duty of diversification by expanding the Trust's concentration of investments in Structured Alpha and maintaining that concentration at its expanded level.

197.    Mr. Giblin further breached his fiduciary duty by failing to educate himself regarding the goal and methods of Structured Alpha, despite the Trust's substantial investment in the strategy. ████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

198.    Mr. Mizeur further breached his fiduciary duty by failing to exercise the same care for the other Plans in the Trust that he exercised for his Plan, BCBS South Carolina.  When he became concerned, ██████████████████████████████████████████████

██████████████████████████████████████reducing BCBS South Carolina's concentration from 85% to 20%.  But he did not do so for the other Plans, leaving them in a position which he plainly felt held substantial and unnecessary risk.

199.    Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin breached their duty to follow Plan documents for at least the reasons stated above.

200.    As a direct result of Mr. Kolodgy, Mr. Giblin, and Mr. Mizeur's breaches, the Trust sustained investment losses for which Aon is not substantially more at fault, but rather for which Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin are primarily responsible.

201.    Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin are therefore liable to Aon for complete indemnification for any liability, including fees and costs, suffered by Aon in connection with the claims asserted in the Complaint.

202.    Even if Aon and Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin are jointly liable by virtue of their status as fiduciaries within the meaning of ERISA, both Aon and Mr. Kolodgy, Mr. Giblin, and Mr. Mizeur are obligated to contribute to the payment or repayment of any damages or restitution according to their respective shares of fault, and Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin were substantially more at fault than Aon.  Accordingly, Aon will suffer harm to the extent it is required to pay more than its proportionate share of liability on the claims asserted in the Complaint.

203.    Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin are liable to Aon for contribution and/or indemnification in the amount of any payment by Aon in excess of its share of liability, including fees and costs, on the claims asserted in the Complaint.

## PRAYER FOR RELIEF

Wherefore, Aon respectfully prays for judgment as follows:

a.    An order finding that Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin breached their respective fiduciary duties under ERISA to the Plans;

b.    An order that any injuries or damages sustained by the Trust were proximately caused, in whole or in part, by the acts or omissions of Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin;

c.    An order that (a) Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin are obligated to completely indemnify Aon for any judgment or award of damages or restitution resulting from the Complaint, or (b) of the amount that Mr. Kolodgy, Mr. Mizeur, and Mr. Giblin are obligated to contribute if Aon is compelled to pay any sum as a result of any judgment or award of damages or restitution resulting from the Complaint, and payment of such amounts;

d.    Reasonable attorneys' fees and costs; and

e.    Such other and further relief as the Court deems just and proper.

Respectfully submitted this 13th day of May, 2022.

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

*Richard I. Werder, Jr.*
Richard I. Werder, Jr.
Renita Sharma
Julia Beskin
Sascha Rand
51 Madison Avenue, 22nd Floor,
New York, New York 10010
(212) 849-7000

Michael Liftik
1300 I St NW #900,
Washington, DC 20005
Telephone: (202) 538-8000

*Attorneys for Defendant/Third-Party*
*Plaintiff Aon Investments USA Inc.*