## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

BLUE CROSS AND BLUE SHIELD
ASSOCIATION NATIONAL EMPLOYEE
BENEFITS COMMITTEE,

        Plaintiff,

        v.

ALLIANZ GLOBAL INVESTORS U.S.
LLC and AON INVESTMENTS USA INC.
f/k/a AON HEWITT INVESTMENT
CONSULTING, INC.,

        Defendants.

Case No. 20 Civ. 07606-KPF

## DEFENDANT AON INVESTMENTS USA INC.'S ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS TO THE COMPLAINT

Defendant Aon Investments USA Inc. ("Aon" and/or "Defendant"), through its counsel, respectfully submits its Answer, Defenses, and Counterclaims to the Complaint filed by Blue Cross and Blue Shield Association National Employee Benefits Committee ("the Committee" and/or "Plaintiff"). Aon denies each allegation in the Complaint that is not expressly admitted herein, including any allegation contained in any headings and photographs and not otherwise enumerated, and further responds as follows:

### Response to Allegations Contained in "NATURE OF THE CLAIMS"

1. The National Retirement Trust of the Blue Cross and Blue Shield Association (the "Trust") is a master trust holding the assets of the employee defined benefit pension plans (the "Plans") that participate in the National Retirement Program of the Blue Cross and Blue Shield Association.

**ANSWER:** Aon admits the allegations in Paragraph 1.

2. Acting in its role as the Plans' named fiduciary, the Committee invested a portion of the Trust's assets in various Structured Alpha funds managed by Allianz. These funds were AllianzGI Structured Alpha Multi-Beta Series LLC I (the "Multi-Beta Series"), AllianzGI Structured Alpha Emerging Markets Equity 350 LLC ("Emerging Markets Equity 350"), and

AllianzGI Structured Alpha 1000 LLC ("Structured Alpha 1000") (collectively, the "Structured Alpha Funds" or the "Funds"). Allianz was the managing member of each of the Funds.

**ANSWER:** Aon admits the allegations in Paragraph 2.

3.    The Committee invested in the Funds and maintained that investment based on assurances from Allianz that "structural risk protections" were the cornerstone of the Structured Alpha strategy. While the Funds would generate returns through an options trading strategy, Allianz promised that hedges would be in place "at all times" to cap the downside risk of that strategy. Allianz claimed these hedges would cabin investment losses to a "defined maximum loss," afford "reinsurance" against a market crash, and ***eliminate*** the risk of a margin call. Allianz also assured the Committee that Structured Alpha's investment strategy was "non-directional" and would "perform whether equity markets are up or down, smooth or volatile."

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 3, and, accordingly, denies the allegations set forth in Paragraph 3. To the extent the allegations in Paragraph 3 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis as well.

4.    These claimed protections were critical to the Committee's decision to invest in Structured Alpha and maintain that investment, especially given the risk profile the Committee desired for the Trust. Allianz knew this to be true, emphasizing these very aspects of its professed investment strategy to allay the Committee's concerns about the potential risk the strategy might pose to the Trust.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 4, and, accordingly, denies the allegations set forth in Paragraph 4. To the extent the allegations in Paragraph 4 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis as well.

5.    Yet when equity markets declined, volatility spiked, and the Funds' option positions were exposed to a heightened risk of loss in February and March 2020, those promised protections were absent. Unbeknownst to the Committee, and in violation of Allianz's stated investment strategy and the duties it owed as an investment manager and a fiduciary under the Employee Retirement Income Security Act of 1974 ("ERISA"), Allianz had abandoned the hedging strategy that was the supposed "cornerstone" of Structured Alpha, leaving the portfolio almost entirely unhedged against a spike in market volatility. And to make matters worse, Allianz

had placed a directional bet that volatility would remain relatively low, the equivalent of a ticking time bomb if its forecast (one it had promised "never" to make) proved false.

**ANSWER:** Aon admits that equity markets declined and volatility spiked at times in February and March 2020. Aon is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 5, and, accordingly, denies the remaining allegations set forth in Paragraph 5. To the extent the allegations in Paragraph 5 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis as well.

6. As Allianz has since admitted, it constructed the portfolio to offer no downside protection against the market decline and volatility spike that occurred in February and March 2020. Contrary to its promise that it would always purchase hedges as "reinsurance" for the options it sold, Allianz had purchased **no** hedges for an entire segment of the portfolio. Meanwhile, the so-called hedges that Allianz did purchase were not the hedges Allianz said it would buy. Whereas Allianz had said it would buy hedges at a strike price 10% to 25% below the market, the hedges it actually held at the end of February 2020 were as much as 60% below the market. Given these and other departures from Structured Alpha's purported investment strategy, Allianz had constructed the portfolio not to pursue "risk-managed returns" as it had promised but instead to earn marginal returns selling insurance against market volatility while maintaining no meaningful protection against the downside associated with the large tail risk of a market collapse—a strategy that has been aptly described as picking up pennies in front of a steamroller.

**ANSWER:** Aon admits that equity markets declined and volatility spiked at times in February and March 2020. Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 6, and, accordingly, denies the allegations set forth in Paragraph 6. To the extent the allegations in Paragraph 6 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis as well.

7. In further derogation of its duties and scrambling to address the fallout from its imprudent management, Allianz added yet more risk to the portfolio in February and March 2020. Whereas Allianz said it would purchase **and maintain** hedges that would automatically cap the "maximum loss" the Trust could sustain in a market downturn, Allianz **sold** the hedges that could have protected the Trust's investment and then added more risk-bearing positions in an apparent bet that the market would recover. These new risk-bearing positions were also built without an

appropriate hedge in place, exposing the Funds to further, catastrophic losses and ultimately the margin call that Allianz had said could never happen.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 7, and, accordingly, denies the allegations set forth in Paragraph 7. To the extent the allegations in Paragraph 7 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis as well.

8. Allianz's reckless actions, both in constructing the portfolio to bear excess, undisclosed risk and in restructuring the portfolio to chase returns rather than preserve investor capital, reveal that Allianz placed its own interests in generating performance fees ahead of its duty to safeguard the Plan assets against undue risk. Allianz committed the same breaches with respect to each of the Funds, which were subject to substantially the same failed options strategy.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8, and, accordingly, denies the allegations set forth in Paragraph 8.

9. The resulting losses to the Trust are staggering. As of January 31, 2020, the Trust had approximately $2.9 billion invested in the Structured Alpha Funds. Six weeks later, the Trust faced a margin call, leaving no choice but to liquidate the investment. The Trust ultimately suffered a realized loss exceeding $2 billion, far beyond what the Trust would have lost had Allianz managed the Funds prudently or had the Trust been invested in the equity markets or in a comparable, prudently managed investment strategy. As a result of Allianz's breaches, a substantial portion of Plan assets meant to provide retirement security to thousands of employees and their beneficiaries was wiped out.

**ANSWER:** Aon admits that the Trust suffered substantial losses in its investments in Structured Alpha. Aon also admits that the Trust faced a margin call on its Structured Alpha investments in March 2020. Aon is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations contained in Paragraph 9, and, accordingly, denies the remainder of allegations set forth in Paragraph 9.

10. Aon, the Committee's fiduciary investment adviser, is also to blame. The Committee delegated to Aon—and Aon accepted—the specific duty to render investment advice regarding Allianz and Structured Alpha. Aon agreed to conduct "active, ongoing monitoring" of

Allianz to "identify any forward-looking" risks "that could impact performance." Aon undertook further to "inform itself" of any information necessary to discharge its duty to monitor, including information about the actual options positions Allianz had constructed. The Committee was entitled to rely upon (and did in fact rely upon) Aon's investment advice, including advice Aon offered based on its purported monitoring of Allianz.

**ANSWER:** Aon admits that it was an investment advisor to the Committee. Aon otherwise denies the allegations in Paragraph 10. To the extent the allegations in Paragraph 10 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis, as well. To the extent allegations in this Paragraph assert a legal conclusion, no response is required.

11. Aon violated these duties it undertook as a fiduciary. Aon repeatedly recommended that the Committee invest the Trust's assets in Structured Alpha, advising the Committee that the strategy was appropriate in light of the Trust's character and investment aims. As recently as June 2019, Aon assured the Committee that Structured Alpha remained one of its "highest conviction strategies." By that time, however, Allianz had strayed from the hedging strategy that should have been in place to protect the Trust's investment—something Aon would have known (and advised the Committee of) had it properly discharged its duties. A prudent investment adviser entrusted with the duties Aon undertook would have monitored the Funds' *actual* holdings to verify that Allianz was managing the strategy as it said it would. Aon assured the Committee it did just that. But Aon never alerted the Committee that Allianz had strayed from the hedging strategy that should have been in place, leaving the portfolio exposed to the risk of catastrophic losses. Instead, Aon repeatedly (and falsely) described Structured Alpha as operating just as Allianz said it would, assuring the Committee that Structured Alpha added little incremental risk to the Trust's portfolio of investments.

**ANSWER:** Aon admits that in June 2019, it told the Committee that Structured Alpha was one of its highest conviction strategies. To the extent allegations in this Paragraph assert a legal conclusion, no response is required. Aon otherwise denies the allegations in Paragraph 11.

12. Aon also breached its fiduciary duties when it recommended that the Committee maintain a much greater percentage of pension assets invested in Structured Alpha than Aon's other clients did, despite pointed inquiries from the Committee about whether that concentration might create undue risk in a declining market. When the Committee raised concerns in 2018 and 2019 about the concentration of Plan assets invested in the Structured Alpha Funds and how the strategy would perform in a market dislocation, Aon falsely advised the Committee that only a small portion of the Plan assets invested in Structured Alpha were at risk and that the strategy contributed little incremental risk to the Trust. Had Aon informed the Committee of the actual risks posed by Structured Alpha, the Trust would have avoided the staggering losses it sustained in February and March 2020.

**ANSWER:** Aon admits that the Trust suffered substantial losses in its investments in Structured Alpha. To the extent allegations in this Paragraph assert a legal conclusion, no response is required. Aon otherwise denies the allegations in Paragraph 12.

13. Allianz and Aon breached their obligations as ERISA fiduciaries and the duties they otherwise owed to the Committee and the Trust. Those breaches caused the Trust to suffer devastating losses, which the Committee now seeks to recover on behalf of the Trust.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon admits that the Trust suffered substantial losses in its investments in Structured Alpha. Aon denies the remaining allegations in Paragraph 13 as to Aon. Aon is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations contained in Paragraph 13, and, accordingly, denies the remainder of the allegations set forth in Paragraph 13.

### Response to Allegations Contained In "JURISDICTION AND VENUE"

14. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1332, 1367 and under ERISA § 502(e)(1) (29 U.S.C. § 1132(e)(1)).

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

15. Venue in this judicial district is proper under ERISA § 502(e)(2) (29 U.S.C. § 1132(e)(2)) and 28 U.S.C. § 1391(b).

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

### Response to Allegations Contained In "PARTIES AND OTHER ENTITIES"

16. Plaintiff Blue Cross and Blue Shield Association ("BCBSA") National Employee Benefits Committee is the plan administrator and named fiduciary of the Plans under ERISA §§ 3(16)(A), 402(a)(2) (29 U.S.C. §§ 1002(16)(A), 1102(a)(2)).[1] The assets of the Plans, which are

---

[1] The Plans that suffered losses are those sponsored by BCBSA, Blue Cross Blue Shield of Arizona, Blue Cross and Blue Shield of Florida, Blue Cross and Blue Shield of Kansas City, Blue Cross and Blue Shield of Kansas, Blue Cross & Blue Shield of Mississippi, Blue Cross and Blue Shield of Nebraska, BlueCross and BlueShield of South Carolina, BlueCross BlueShield of Tennessee, Blue Cross and Blue Shield of Vermont, Blue Cross Blue Shield of Wyoming, Excellus BlueCross BlueShield, Hawaii Medical Service Association, NASCO, Triple-S Management Corporation, and BCS Financial Corporation.

employee pension benefit plans under ERISA § 3(2)(A) (29 U.S.C. § 1002(2)(A)), were held at all relevant times in the Trust, of which the Committee is also a fiduciary. BCBSA is an Illinois not-for-profit corporation headquartered in Chicago, Illinois. It established the Committee to oversee the administration of the Plans as well as other employee benefit plans. The Committee, in turn, established an Investment Subcommittee (the "Subcommittee") to enhance the Committee's deliberations regarding investment issues. The Committee's charter vests it with the authority to prosecute any action concerning the Plans.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 16, and, accordingly, denies the allegations set forth in Paragraph 16. To the extent allegations in this Paragraph assert a legal conclusion, no response is required.

17. Defendant Allianz Global Investors U.S. LLC is a Delaware limited liability company and registered investment adviser under the Investment Advisers Act of 1940 with its principal office in New York, New York. In 2011, Allianz became a fiduciary investment manager within the meaning of ERISA § 3(21)(A)(i), (38) (29 U.S.C. § 1002(21)(A)(i), (38)) for the Trust's investment in the Structured Alpha Funds. As of December 31, 2019, Allianz managed more than $140 billion in client assets. It is a direct, wholly owned subsidiary of Allianz Global Investors U.S. Holdings LLC and part of "Allianz Global Investors," the marketing name for a global asset management business operating through affiliated entities around the world.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 17, and, accordingly, denies the allegations set forth in Paragraph 17.

18. Defendant Aon Investments USA Inc.[2] is an Illinois corporation and registered investment adviser under the Investment Advisers Act of 1940 with its principal office in Chicago, Illinois. Beginning in 2009, the Committee retained Aon—known then as Ennis, Knupp & Associates, Inc. before its acquisition by Aon—to provide investment advice as a fiduciary within the meaning of ERISA § 3(21)(A)(ii) (29 U.S.C. § 1002(21)(A)(ii)). Aon is a direct, wholly owned subsidiary of Aon Consulting, Inc., which is a New York corporation.

**ANSWER:** Aon admits that Aon is an Illinois corporation and registered investment adviser under the Investment Advisers Act of 1940 with its principal office in Chicago, Illinois.

---

[2] On March 25, 2020, Aon declared in the "Material Changes" section of its Form ADV Part 2A Brochure filed with the Securities and Exchange Commission that it had changed its name to Aon Investments USA Inc. from Aon Hewitt Investment Consulting, Inc.

Aon further admits that beginning in 2009, the Committee retained Aon to provide investment advice. Aon further admits that Aon is a direct, wholly owned subsidiary of Aon Consulting, Inc., which is a New York corporation. As to the remaining allegations, Aon refers the Court to the parties' Investment Consulting Agreement, which outlines Aon's obligations and responsibilities as the Committee's investment advisor. To the extent the allegations in Paragraph 18 seek to paraphrase or characterize the contents of the parties' Investment Consulting Agreement, the Investment Consulting Agreement speak for itself and Aon denies those allegations on this basis.

19. The Blue Cross and Blue Shield Association National Employee Benefits Administration ("NEBA") is a department of BCBSA. Consistent with its obligations under ERISA, the Committee delegates to NEBA the responsibility for day-to-day administration of the Plans.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 19, and, accordingly, denies the allegations set forth in Paragraph 19.

<u>**Response to Allegations Contained In "FACTUAL ALLEGATIONS"**</u>

20. The Structured Alpha strategy consists of alpha and beta components. The beta component is intended to provide broad market exposure to a particular asset class through investments in financial products (like an exchange-traded fund ("ETF")) that replicate the performance of a market index (like the S&P 500). The alpha component is an options trading strategy that Allianz claimed would seek "targeted positive return potential" while nonetheless maintaining "structural risk protections."

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 20, and, accordingly, denies the allegations set forth in Paragraph 20.

21. Allianz described Structured Alpha as consisting of an "option overlay" (*i.e.*, the alpha component) "designed to exhibit low correlation to the underlying equity or fixed income beta exposure."

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 21, and, accordingly, denies the allegations set forth

in Paragraph 21. To the extent the allegations in Paragraph 21 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis as well.

22. The options strategy was largely the same regardless of the Fund or its underlying beta(s). Allianz touted the strategy as "non-directional," meaning it "is not predicated on correctly taking a view on the direction of equities, interest rates or any other fundamental factor." Thus, Allianz represented the alpha strategy would "never make a forecast on the direction of equities or volatility."

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 22, and, accordingly, denies the allegations set forth in Paragraph 22. To the extent the allegations in Paragraph 22 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis as well.

23. As for the "structural risk protections" supposedly inherent in the strategy, Allianz claimed that Structured Alpha would "combine[] both long- and short-volatility positions at all times." While the strategy would "capitalize on the return-generating features of selling options (short volatility)," it would "simultaneously benefit[] from the risk-control attributes associated with buying options (long volatility)," Allianz said.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to  truth of the allegations contained in Paragraph 23, and, accordingly, denies the allegations set forth in Paragraph 23. To the extent the allegations in Paragraph 23 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis as well.

24. The "building blocks" of Allianz's strategy were supposed to be three types of positions: (1) range-bound spreads; (2) directional spreads; and (3) hedging positions.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to  truth of the allegations contained in Paragraph 24, and, accordingly, denies the allegations set forth in Paragraph 24. .  To the extent the allegations in Paragraph 24 seek to paraphrase or characterize

the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis as well.

25.     The range-bound spreads, Allianz represented, are "short-volatility positions" that are "designed to collect option premium and to generate excess returns in normal market conditions." "Based on detailed, proprietary statistical analysis," Allianz explained, "put and call options are sold to create 'profit zones' that have a high probability of success upon expiration of the options." The "profit zones aim to catch the underlying equity index inside their upper and lower bands at expiration." If "the equity index finishes inside the profit zone at expiration, the strategy will profit," according to Allianz. Allianz claimed these range-bound spreads generated roughly two-thirds of the strategy's returns.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 25, and, accordingly, denies the allegations set forth in Paragraph 25. To the extent the allegations in Paragraph 25 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis as well.

26.     The directional spreads, Allianz represented, are "combination long-short volatility positions designed to generate excess returns when equity indexes are rising or declining more than usual over a multi-week period." They "are built by buying and selling options to both the upside and downside to create profit zones several percentage points away from current equity index levels." These spreads "are set up to capture larger equity-market movements" and to "act as portfolio diversifiers." Allianz claimed they accounted for roughly one-third of the strategy's returns.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26, and, accordingly, denies the allegations set forth in Paragraph 26. To the extent the allegations in Paragraph 26 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis as well.

27.     Allianz depicted the range-bound spreads and directional spreads as follows, with the so-called "profit zones" in blue compared to the "loss zones" in gray:



ANSWER: Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27, and, accordingly, denies the allegations set forth in Paragraph 27. To the extent the allegations in Paragraph 27 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis as well.

28. Allianz represented that the hedging positions would be the third component of Structured Alpha and a "cornerstone" of the strategy. These are "long-volatility positions" that Allianz told the Committee are "designed to protect the portfolio in the event of a market crash." Allianz claimed it would purchase the hedges "out of the money at various levels to the downside, and always in a greater quantity than the amount of puts sold for the range-bound positions." Allianz emphasized that the "long puts are in place **at all times**" and "**exclusively** for risk-management purposes."[3]

---

[3] All emphases are added unless otherwise noted.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 28, and, accordingly, denies the allegations set forth in Paragraph 28. To the extent the allegations in Paragraph 28 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis as well.

29. Allianz depicted the long-put hedging positions as follows, illustrating (as Allianz commonly represented) that it would purchase the hedging positions "-10% to -25%" out of the market:



**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 29, and, accordingly, denies the allegations set forth in Paragraph 29. To the extent the allegations in Paragraph 29 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis as well.

30. Allianz regularly analogized Structured Alpha's three-pronged, long-short investment design to selling "insurance" against market volatility (referring to the range-bound and directional components of the strategy) and buying "reinsurance" to protect in the event such volatility was experienced (referring to the hedging component of the strategy).

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 30, and, accordingly, denies the allegations set forth in Paragraph 30. To the extent the allegations in Paragraph 30 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis as well.

31. Allianz explained that the "seller of the option is the insurance company" while the "buyer of the option is the insurance policyholder." Allianz promised to be a "buyer and seller of options at the same time, at all times." "We are always *both* the insurance company and the insurance policyholder," Allianz represented. (Emphasis in original.)

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 31, and, accordingly, denies the allegations set forth in Paragraph 31. To the extent the allegations in Paragraph 31 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis as well.

32. Greg Tournant, Allianz's chief investment officer for U.S. structured products and the architect of Structured Alpha, consistently used the insurance/reinsurance analogy to describe the strategy he developed. In a May 2016 interview, Tournant said that Allianz is "acting like an insurance company" when it "collect[s] premium" by selling options. Although Allianz may have to "pay very much like an insurance company" if a "catastrophic event" occurs, Tournant reassured the audience that Structured Alpha's hedging positions would act as "reinsurance" to "protect the portfolio."

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 32, and, accordingly, denies the allegations set forth in Paragraph 32. To the extent the allegations in Paragraph 32 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis as well.

33.     The Committee received the same message. It was told repeatedly that Structured Alpha was "insurance protection from the world's largest insurance company," a reference to Allianz SE, the ultimate corporate parent of Allianz.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 33, and, accordingly, denies the allegations set forth in Paragraph 33.  To the extent the allegations in Paragraph 33 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis as well.

34.     Allianz promoted the relationship with its parents in marketing Structured Alpha to the Committee. In May 2010, about a year before the Committee first voted to invest in Structured Alpha, Allianz (then known as Allianz Global Investors Capital) advertised Structured Alpha as being backed by Allianz SE, "one of the largest financial institutions in the world":





**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 34, and, accordingly, denies the allegations set forth in Paragraph 34.  To the extent the allegations in Paragraph 34 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis as well.

35.     Likewise, Allianz trumpeted that what makes Structured Alpha "different" from other portable alpha strategies is its "oversight from the parent." Indeed, Allianz claimed, consistent with the unified risk management framework that Allianz SE touts in its annual reports, that risk was "continuously managed and monitored" at the "firm level." Assisting these risk management efforts, Allianz told the Committee, was IDS GmbH, a "wholly-owned subsidiary of Allianz SE," that supposedly provided "a comprehensive range of ongoing and consistent performance and risk analysis reports." Allianz's direct parent, Allianz Global Investors U.S. Holdings LLC, purportedly oversaw Allianz's "day-to-day portfolio management and investment operations," including risk management.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 35, and, accordingly, denies the allegations set forth in Paragraph 35. To the extent the allegations in Paragraph 35 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis as well.

36.     In recommending the strategy to the Committee, Aon highlighted the "benefits" to Structured Alpha of the "deep resources" offered by Allianz's parent companies. Those benefits, according to Aon, included "multiple layers of independent risk management functions within the firm."

**ANSWER:** Aon admits that it recommended an investment in Structured Alpha to the Committee. Aon otherwise denies the allegations in Paragraph 36. To the extent the allegations in Paragraph 36 seek to paraphrase or characterize the contents of documents or communications the documents or communications speak for themselves and Aon denies those allegations on this basis as well.

37.     In 2009, the Committee retained Aon (then called Ennis Knupp) to provide investment advice regarding the investment of Plan assets held in the Trust.

**ANSWER:** Aon admits the allegations in Paragraph 37.

38.     The Committee's charter authorizes it to enlist the services of professional investment advisers such as Aon to assist the Committee in the selection and oversight of the Trust's investments. The Committee, according to its charter, "shall be entitled to rely upon" the investment advice of professionals like Aon.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 38, and, accordingly, denies the allegations set forth in Paragraph 38. To the extent the allegations in Paragraph 38 seek to paraphrase or characterize the contents of documents or communications the documents or communications speak for themselves and Aon denies those allegations on this basis as well.

39. The Trust's Investment Policy Statement—which Aon helped draft as one of the services it provided to the Committee and which features Aon's logo on its cover page— documents Aon's fiduciary role. It provides that Aon would "advise the Committee on the management of the Trusts' assets." "The Committee," in turn, would "utilize and rely upon the advice and services" of Aon "in carrying out its responsibilities." The Investment Policy Statement specifies that Aon would provide investment advice to include "recommending appropriate strategic policy and implementation structure and conducting manager due-diligence, searches and selection," as well as "aid[ing] the Committee and NEBA in adhering to the guidelines of the Investment Policy Statement."

**ANSWER:** Aon admits that it helped the Committee draft the Trust's Investment Policy Statement. To the extent the allegations in Paragraph 39 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis as well. Aon otherwise denies the allegations in Paragraph 39.

40. The charter further grants the Committee "the broadest possible authority and discretion to delegate to itself or to any other entity or any other person or persons any of its authority and discretion." Pursuant to that broad authority, the Committee delegated to Aon specific duties that Aon undertook to fulfill, including a duty to recommend investment managers to the Committee and a duty to monitor those managers that had been entrusted with Plan assets.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent the allegations in Paragraph 40 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis as well. Aon otherwise denies the allegations in Paragraph 40.

41.     In the contract between the Committee and Aon, Aon agreed that it would "recommend the selection of managers or custodians it deems most capable of carrying out the [Trust's] investment objectives." Once an investment manager was selected, Aon undertook the specific duty to "engage in active, ongoing monitoring" of that manager to "assess evolving strengths, weaknesses and issues" and "identify any forward-looking" risks "that could impact performance." Aon agreed further to "inform itself" of any information necessary to discharge this duty to monitor, including whatever information Aon needed to properly advise the Committee whether the manager was acting prudently with Plan assets.

**ANSWER:** Aon admits that Aon and the Committee entered into a contract for Aon's investment advisory services. To the extent the allegations in Paragraph 41 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis as well. Aon otherwise denies the allegations in Paragraph 41.

42.     Aon undertook to provide additional types of investment advice to the Committee. For example, Aon agreed to give "recommendations to [the Committee] regarding asset allocation" within the Trust, "recommendations to [the Committee] regarding the specific asset allocation and other investment guidelines" for the Trust's investment managers, and advice "regarding the diversification of assets" held in the Trust.

**ANSWER:** Aon admits that Aon and the Committee entered into a contract for investment advisory services by Aon. To the extent the allegations in Paragraph 42 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis as well.

43.     Aon promised to discharge all of these "fiduciary duties with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims."

**ANSWER:** Aon admits that Aon and the Committee entered into a contract for investment advisory services by Aon. To the extent the allegations in Paragraph 43 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis as well.

44.     Acting in its fiduciary capacity, Aon recommended in 2011 that the Committee invest Plan assets held in the Trust in Structured Alpha. As part of its recommendation, Aon emphasized that Structured Alpha's "risk management approach" was "deeply embedded into the investment process," giving investors "significant market crash protection." Aon lauded "the multiple layers of independent risk management functions" and described risk management as "a core element to the strategy." Aon also assured the Committee that the strategy included "tail protection" against "large market declines." According to Aon, these long-put hedges were "designed to automatically protect the portfolio" if the market crashed.

**ANSWER:** Aon admits that in 2011 it recommended that the Committee invest Plan assets held in the Trust in Structured Alpha. To the extent allegations in this Paragraph assert a legal conclusion, no response is required. To the extent the allegations in Paragraph 44 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well. Aon denies the remaining allegations in Paragraph 44.

45.     In accordance with Aon's recommendation, and understanding the strategy to employ the robust risk management that Aon endorsed, the Committee voted on June 21, 2011, to approve an investment of Trust assets in Structured Alpha.

**ANSWER:** Aon admits that the Committee approved an investment of Trust assets in Structured Alpha. Aon otherwise is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 45, and, accordingly, denies the remaining allegations set forth in Paragraph 45.

46.     The Committee's initial investment was in Structured Alpha U.S. Large Cap Core LLC. This fund, like the Structured Alpha Funds in which the Trust later invested, was organized as a limited liability company for which Allianz was the managing member. The Trust's investment in each Fund was governed by a Private Placement Memorandum and Limited Liability Company Agreement, as well as the Subscription Agreement by which Trust assets were invested (collectively, the "Fund Documents").

**ANSWER:** Aon admits that the Committee's initial investment was in Structured Alpha U.S. Large Cap Core LLC. Aon is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 46, and, accordingly, denies the allegations set forth in Paragraph 46.

47.     Allianz and the Committee also entered into a separate Investment Management Side Agreement in conjunction with the Trust's investment in Structured Alpha. The parties updated the contract in May 2014, when they executed the Amended and Restated Investment Management Side Agreement to reflect Allianz's creation of the new Multi-Beta Series in which the Trust was invested.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 47, and, accordingly, denies the allegations set forth in Paragraph 47.

48.     Under that agreement, Allianz promised to undertake duties as a fiduciary vested with "full discretion" to manage the Plan assets that the Committee invested in Structured Alpha. For example, Allianz agreed as an "ERISA fiduciary" to "discharge its duties with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." Allianz further assumed the other responsibilities of a fiduciary under ERISA § 404(a) (29 U.S.C. § 1104(a)), including the duty of loyalty, the duty to diversify Plan investments, and the duty to follow Plan documents.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 48, and, accordingly, denies the allegations set forth in Paragraph 48. To the extent the allegations in Paragraph 48 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

49.     Under the Amended and Restated Investment Management Side Agreement, Allianz also undertook the same fiduciary duty of care "regardless of whether the underlying assets of any Series constitute 'plan assets' within the meaning of Section 3(42) of ERISA." Under this "Contractual Fiduciary Standard of Care," Allianz agreed "that it shall act in good faith and carry out its duties to each Series with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 49, and, accordingly, denies the allegations set forth in Paragraph 49. To the extent the allegations in Paragraph 49 seek to paraphrase or characterize

the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

50.     Should Allianz breach any of these fiduciary duties, it promised to "indemnify and hold harmless the Trust" for, among other things, any losses or damages "directly resulting from" Allianz's breach.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 50, and, accordingly, denies the allegations set forth in Paragraph 50. To the extent the allegations in Paragraph 50 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

51.     Allianz agreed, moreover, to "act in accordance with" the Investment Policy attached to the contract. Under that policy, Allianz promised to manage the Trust's investment pursuant to certain investment objectives, including the establishment of "structural risk protections."

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 51, and, accordingly, denies the allegations set forth in Paragraph 51. To the extent the allegations in Paragraph 51 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

52.     By 2018, the Trust's investment in Structured Alpha had expanded. The Multi-Beta Series now included five Structured Alpha series: U.S. Large Cap Series, U.S. Small Cap Series, International Equity Series, U.S. Fixed Income Series, and U.S. Long Credit Series. Each had a different index—the S&P 500 for U.S. Large Cap, for instance—whose results Allianz sought to replicate in the beta component and outperform using the alpha component. The targeted outperformance for each series varied based on the level of the Chicago Board Options Exchange Volatility Index (the "VIX"), an index measuring the market's expectation of volatility, when Allianz was building its option positions. The lower the VIX, the lower the excess return Allianz was supposed to target.

**ANSWER:** Aon admits that the Committee's investment in Structured Alpha had expanded by 2018 to include investments in five Multi-Beta Series funds and that each of these

funds had a different beta component. Aon is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 52, and, accordingly, denies the allegations set forth in Paragraph 52.

53. The Committee had also approved investments in two other Structured Alpha Funds: Emerging Markets Equity 350 and Structured Alpha 1000.

**ANSWER:** Aon admits that the Trust invested in Emerging Markets Equity 350 and Structured Alpha 1000.

54. Allianz managed each of the Funds in substantially the same way regardless of the Fund's beta or, in the case of the Multi-Beta Series, regardless of the beta underlying each series.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 54, and, accordingly, denies the allegations set forth in Paragraph 54.

55. In February 2018, Structured Alpha underperformed relative to its beta benchmarks. Those short-term investment losses were recouped in the following months, in accordance with how Allianz and Aon had advised the strategy would work in a market downturn. Nevertheless, the Committee sought to reevaluate the Structured Alpha strategy and the size of the Trust's investment in it.

**ANSWER:** Aon admits that Structured Alpha underperformed relative to its beta benchmarks in February 2018 and that these losses were recouped in subsequent months. Aon is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 55, and, accordingly, denies the remaining allegations set forth in Paragraph 55.

56. In April 2018, the vice chair of the Committee directed NEBA's investment team to have Allianz and Aon explain the worst-case scenario for the strategy. "The key question" the Committee vice chair wanted answered was "how the strategy will perform in a declining market situation." Specifically, if the Trust would "experience substantially higher losses than the market i[n] such a situation," then the Committee would likely "need to wind down our exposure to this strategy to a percentage of the portfolio closer to 10% than 50%."

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 56, and, accordingly, denies the allegations set forth in Paragraph 56. To the extent the allegations in Paragraph 56 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

57. Allianz responded to the Committee's questions with written representations about how Structured Alpha would work and how it would protect against the risk of losses in a declining market. Against the backdrop of the Committee's inquiry about whether Structured Alpha would expose the Trust to "substantially higher losses than the market," Allianz described its hedge positions as the "cornerstone" of the strategy. Allianz represented that these hedges would be "in place at all times, exclusively for risk-management purposes" in order "to protect the portfolio in the event of a market crash." Allianz emphasized that this "tail-risk protection" included "both hedging primarily for a single-day market crash" and "protection in the event of multi-day or multi-week significant declines."

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 57, and, accordingly, denies the allegations set forth in Paragraph 57. To the extent the allegations in Paragraph 57 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

58. But Allianz went even further in describing the hedging positions. According to Allianz's written response to the Committee, Structured Alpha's hedging strategy *eliminated* the risk of an "ill-timed margin call," a common concern among investors in options strategies and a particular concern of the Committee's. "***We do not have this risk***," Allianz touted, because of Structured Alpha's "hedging positions." Allianz claimed further that the lack of margin-call risk was a "key benefit of our hedging positions." These statements were consistent with representations Allianz had made elsewhere about the strategy's supposed immunity to margin calls. For instance, in an April 2017 pamphlet, Allianz proclaimed that "***under no scenario*** can an equity-market decline cause our portfolio to experience a margin call, a crucial differentiator from many option strategies."

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 58, and, accordingly, denies the allegations set forth in Paragraph 58. To the extent the allegations in Paragraph 58 seek to paraphrase or characterize

the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

59.     Allianz's written response contained several other critical representations about how Allianz managed the Structured Alpha Funds. For example, Allianz emphasized that it would need only "between 10% and 20%" of the beta investment for collateral for the alpha component, suggesting that only a small portion of the Trust's investment was potentially at risk in a market decline. Allianz also touted "the proprietary tools and models we have built over many years of research and development" that Allianz claimed allowed it "to stress-test the entire portfolio for *any* market scenario." These tools, Allianz claimed, enabled it to protect the Trust's investment from "two risks: the overnight market crash and the multi-week market correction." And as for the "worst-case drawdown scenario" the Committee had asked about, Allianz represented that its lower-target strategy "could be expected to deliver short-term underperformance of 100 to 300 basis points," *i.e.*, underperformance of only 1% to 3% relative to the benchmark.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 59, and, accordingly, denies the allegations set forth in Paragraph 59. To the extent the allegations in Paragraph 59 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

60.     Elsewhere, Allianz downplayed even that risk by explaining that the period of increased volatility that typically accompanies a market downturn would provide an attractive environment in which to deploy its options strategy. It claimed that any short-term underperformance would be recouped in a rebound once the initial downturn had been weathered. Of course, Allianz's claim assumed that the Funds would in fact survive the market downturn.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 60, and, accordingly, denies the allegations set forth in Paragraph 60. To the extent the allegations in Paragraph 60 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

61.     In the same time frame, the Committee also asked Aon to reevaluate Structured Alpha and provide its investment advice as a fiduciary on whether and to what extent the Committee should remain invested. Aon's advice echoed Allianz's reassuring representations. Because Aon was the fiduciary tasked with the specific duty to monitor Allianz's management of

Plan assets, its advice was also critical to the Committee's decision to maintain the Trust's investment in Structured Alpha.

**ANSWER:** Aon admits that in 2018, the Committee asked Aon to reevaluate the Committee's investment in Structured Alpha. Aon is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 61, and, accordingly, denies the remaining allegations set forth in Paragraph 61.

62. On June 18, 2018, Aon presented its analysis and recommendations to the Committee. Consistent with Allianz's own description of the strategy, Aon advised the Committee that Structured Alpha was "Financial Insurance to the Options Market." The hedging positions, which Aon said were "always in place to protect against a crash scenario," were supposedly the strategy's "Reinsurance."

**ANSWER:** Aon admits that it presented an analysis and recommendations to the Committee on June 18, 2018. To the extent the allegations in Paragraph 62 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis.

63. Aon undertook to answer two specific questions the Committee had posed to it: (i) did the Structured Alpha Funds add incremental risk to the Trust's investment portfolio? And (ii) what is the worst-case scenario that could result from the Trust's investment in those Funds?

**ANSWER:** Aon admits that it presented an analysis and recommendations to the Committee on June 18, 2018. To the extent the allegations in Paragraph 63 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

64. Aon purported to answer the first question by presenting what it claimed was the "active risk" associated with the strategy and assuring the Committee that the risk was not significant. Aon further understated Structured Alpha's risk by repeating Allianz's claim that "only a small portion of the underlying assets are used to implement the options strategy." Aon's representation suggested that only a small amount of the Trust's investment with Allianz was exposed to the options strategy and therefore at risk if the strategy failed. Aon's advice obscured the truth from the Committee that the entire investment could be at risk.

**ANSWER:** Aon admits that it presented its analysis and recommendations to the Committee on June 18, 2018. To the extent the allegations in Paragraph 64 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis.

65. Aon's explanation of its presentation, made orally to the Committee in June 2018, also understated the risks associated with Structured Alpha. Addressing concerns the Committee had raised that there may be an "undue concentration" of the Trust invested with Allianz, Aon falsely advised that "Allianz' alpha seeking transactions only impact a small portion of this beta seeking portfolio."

**ANSWER:** Aon denies the allegations in Paragraph 65. To the extent the allegations in Paragraph 65 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

66. The second question the Committee asked was similar to the one it had posed to Allianz: what is the worst-case scenario for the strategy? To address this question, Aon presented purported stress testing by Allianz, which Aon represented it had reviewed, indicating that Structured Alpha would not only protect against losses but actually generate a positive return in times of severe market dislocation. Although Aon's presentation included in fine print that Allianz was the source of the charts presented, its accompanying remarks to the Committee in June 2018 referenced Aon's own independent "projections." The charts, which were meant to show how Structured Alpha would perform in a variety of market scenarios, suggested that the alpha component of the strategy would perform very well—generating positive returns—even if the equity markets crashed as much as 50% or 90%. Indeed, the charts and Aon's explanation of them indicated that the most the Trust could lose in a worst-case scenario was less than 10%. If there were a scenario in which the Trust could expect to lose more, Aon did not present it:



Allianz Structured Alpha: Risk Management

- Oversight by Allianz's independent, firm-wide risk management effort:
  - Daily / weekly trade activity
  - Stress testing, VaR analysis, Greeks monitoring, GARCH modeling
- Structured Alpha team risk monitoring:
  - Live portfolio analysis with real-time data feeds
  - Market liquidity and trade execution
  - Overnight, multi-pronged stress tests measuring potential P&L changes over various time periods, assuming:
    - Duplicate historical market moves, volatility/skew properties
    - Restructuring existing positions
    - New positions laddered in over time, no harvesting of hedging positions, no changes to directional positions
  - Allianz has adapted over time and made enhancements to the process

Source: Allianz Global Investors
Applies to the options portfolio only with a net return target of 5% per calendar year

Proprietary & Confidential
Investment advice and consulting services provided by Aon Hewitt Investment Consulting, Inc., an Aon Company.

12

**ANSWER:** Aon admits that it presented an analysis and recommendations to the Committee on June 18, 2018. Aon otherwise denies the allegation in Paragraph 66. To the extent the allegations in Paragraph 66 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

67. In presenting these materials, Aon advised the Committee that the "hedging would protect the portfolio in the face of 'black swan' events such as sharp and deep market meltdowns." The hedging positions, Aon advised further, "should permit the strategy to actually produce strong positive returns in the face of such extreme market declines." Aon cited the stress testing charts as evidence "that in the face of a 50 percent market meltdown the strategy should produce a positive return of 10 percent."

**ANSWER:** Aon's admits that it presented an analysis and recommendations to the Committee on June 18, 2018. To the extent the allegations in Paragraph 66 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis.

68.     What Aon did not tell the Committee is that the Allianz stress testing included several assumptions that did not fit the Trust's investment in the Structured Alpha Funds. Aon did not disclose, for example, that the model assumed Treasury Bills were the underlying beta. That omission was problematic for several reasons, including that only one of the Funds had Treasury Bills as its underlying beta. In fact, the U.S. Large Cap Series, which held a much larger portion of the Trust's investment, used S&P 500 ETFs as its beta. Aon did not explain how that series could withstand a 90% decline in its beta component and still collateralize the alpha strategy that Aon claimed would generate positive returns (while maintaining risk protection) in such a severe market dislocation. Aon instead gave the Committee the false impression that the stress testing results it endorsed were applicable to the Trust's entire investment in Structured Alpha, although much of it was collateralized by something other than the Treasury Bills the model assumed.

**ANSWER:** Aon denies the allegations in Paragraph 68.

69.     Aon also advised the Committee that it would in fact be *riskier* to exit the strategy than to remain invested in it. The hedging positions were the main reason why. This "reinsurance," Aon told the Committee, would protect the Plan assets in the face of a market decline and position the portfolio to rebound from any temporary losses. In this regard, Aon's advice echoed the characterization of the strategy that Allianz had provided.

**ANSWER:** Aon admits that it presented an analysis and recommendations to the Committee on June 18, 2018.  To the extent the allegations in Paragraph 69 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis.

70.     A similar review process occurred months later, after the Structured Alpha Funds again underperformed relative to their beta benchmarks. The negative returns in December 2018 were more severe than they had been in February of that year. The losses hit some of the Plan sponsors especially hard because they occurred at the end of the year, leaving them scrambling to revise their balance sheets and identify any unfunded liabilities.

**ANSWER:** Aon admits that the Structured Alpha Funds had negative returns in December 2018 and underperformed relative to their beta benchmarks.  Aon is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 70, and, accordingly, denies the remaining allegations set forth in Paragraph 70.

71.     Those losses were recouped in the ensuing months, as Allianz and Aon had advised could be expected in the event Structured Alpha sustained a loss. But the Committee again directed Aon to reevaluate the Trust's investment in Structured Alpha and to provide advice on whether that investment remained appropriate.

**ANSWER:** Aon admits the allegation in Paragraph 71.

72.     In January 2019, Aon advised that Allianz was implementing a new hedging configuration that Aon claimed would "better protect the options portfolio and guard against costly restructuring when equity markets experience steep declines."

**ANSWER:** Aon admits that it advised the Committee in January 2019 that Allianz was implementing a new hedging configuration.  To the extent the allegations in Paragraph 72 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis.

73.     Aon's presentation on the new hedging configuration mirrored the one Allianz would provide in April 2019. The gist of the "newly developed configuration," as Allianz represented it, was to purchase fewer hedges but buy them closer to the money when building positions in a low-VIX environment. By doing so, Allianz claimed it would "create **self-hedged** range-bound spreads with a ***defined maximum loss***." Thus, rather than restructure short positions, as Allianz had at times done when markets fell in the past, Allianz would now leave the new-configuration positions alone—they would become "hands-free" and require "no intervention."

**ANSWER:**  Aon admits that it advised the Committee in January 2019 that Allianz was implementing a new hedging configuration.  Aon is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 73, and, accordingly, denies the allegations set forth in Paragraph 73.

74.     Allianz included a diagram representing that the "tactical shift" in its hedging positions would create a defined "Max Loss" for the portfolio:







### Range-Bound Spread configuration
A tactical shift in the allocation of our hedging positions

These new "sealed" spreads, Allianz claimed, would "Improve[] the portfolio's ability to navigate difficult V-shaped equity and volatility moves" and "Better equip[] the portfolio to handle sharp moves that begin in low-volatility environments." According to Allianz, the new configuration was the product of "almost two years" of research and development.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 74, and, accordingly, denies the allegations set forth in Paragraph 74. To the extent the allegations in Paragraph 74 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

75.    Allianz's description of a "Max Loss" was consistent with the representations that Aon had made to the Committee in June 2018, when Aon said (using Allianz's stress testing as its basis) that the most the Trust could lose in a worst-case market-crash scenario from Structured Alpha's options strategy was about 10%.

**ANSWER:** Aon denies the allegations in Paragraph 75. To the extent the allegations in Paragraph 75 seek to paraphrase or characterize the contents of documents or communications, the

documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

76.     Allianz made additional representations about Structured Alpha in the April 2019 presentation. For example, Allianz summarized the strategy as pursuing "risk-managed returns." "Risk is continuously managed and monitored," Allianz claimed, "at both the portfolio level by the investment team and the firm level." On the subject of "Leverage," Allianz emphasized that it engaged in "No borrowing." Allianz made that claim even though it was leveraging the Trust's beta investment to collateralize the options strategy. And Allianz repeated aspects of its investment philosophy that it claimed to follow, including the mantras "Never make a forecast on the direction of equities or volatility" and "Prepare for the unexpected; pre-develop plans in anticipation of scenarios in which the portfolio could be at risk for losses":



As Allianz had represented on the subject of "Accountability" in the past, "No excuses – it is our job to pursue the strategy's objectives regardless of the market environment."

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 76, and, accordingly, denies the allegations set forth in Paragraph 76. To the extent the allegations in Paragraph 76 seek to paraphrase or characterize

the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

77. A couple months later, in June 2019, the Committee again had Aon present its recommendation on Structured Alpha. Among the questions the Committee asked Aon to answer were whether "anything changed in the investment strategy to alter our expectations" and whether "anything changed with the market conditions to alter our expectations." In response, Aon repeated many of the themes Allianz had itself used to describe the strategy, again describing Allianz's hedging positions as "reinsurance" that would contain the strategy's risks.

**ANSWER:** Aon admits that it made a presentation to the Committee in June 2019 regarding the Committee's investment in Structured Alpha. To the extent the allegations in Paragraph 77 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well. Aon denies the remaining allegations in Paragraph 77.

78. Aon also echoed Allianz's representation about there being a "Max Loss" the portfolio could suffer. To illustrate the concept, Aon provided the Committee a hypothetical in which Allianz had sold a put 10% out of the money. "In order to protect or hedge risk" in that scenario, Aon said Allianz would "buy a put . . . 15% below market." "That way," Aon claimed, the "***risk of loss is capped*** at 5%."

**ANSWER:** Aon admits that it made a presentation to the Committee in June 2019. To the extent the allegations in Paragraph 78 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well. Aon denies the remaining allegations in Paragraph 78.

79. Based on Allianz's and Aon's representations, the Committee reasonably understood that Allianz was not selling "naked" options, *i.e.*, options without any corresponding hedge in place. Rather, Allianz and Aon indicated that for every option Allianz sold, Allianz bought a corresponding hedge as "reinsurance" to limit the risk of loss in case the market dropped. Both Allianz and Aon gave the Committee the impression that the hedging positions placed to protect against downside losses would be appropriately matched to the risk-bearing positions (*i.e.*, they would "reinsure" the same risk) and that Allianz would never sell any "naked" options.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 79, and, accordingly, denies the allegations set forth in Paragraph 79.

80.     The Committee also asked Aon whether it still maintained "the same conviction in the strategy." In response, Aon advised the Committee that it "continues to have a strong conviction that the portable alpha strategy is sound and pointed out that should a market decline persist over a longer period, Allianz' hedging strategy could be expected to produce an even greater rebound in [Trust] performance." Aon again rated Structured Alpha one of its "highest conviction strategies."

**ANSWER:** To the extent the allegations in Paragraph 80 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis. Aon denies the remaining allegations in Paragraph 80.

81.     Allianz often touted its supposed fidelity to Structured Alpha's stated investment strategy. For instance, in one update on the Trust's investment, Allianz congratulated itself for its "willingness to be flexible ***without straying from our investment philosophy***," saying this was one of its "biggest strengths," and emphasized that "part of staying true to Structured Alpha's investment philosophy is ***maintaining the risk profile of our option portfolio***." Going further still, Allianz claimed that it managed Structured Alpha to "***preserv[e] our risk objectives even at the expense of performance***."

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 81, and, accordingly, denies the allegations set forth in Paragraph 81. To the extent the allegations in Paragraph 81 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

82.     Yet at least by 2019, Allianz had abandoned the investment strategy it professed to follow. Rather than "maintain[] the risk profile" it knew was critical to the Committee's investment of Trust assets, it was taking imprudent actions that added excess and undisclosed risk to the portfolio—in effect, leaving the portfolio unhedged in certain market scenarios and placing a directional bet against market volatility—in hopes of chasing additional return, all unbeknownst to the Committee.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 82, and, accordingly, denies the allegations set forth in Paragraph 82. To the extent the allegations in Paragraph 82 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

83. Juicing the strategy's returns would increase Allianz's fees. Allianz did not charge a management fee to operate Structured Alpha. Rather, Allianz received 30% of any gains relative to its benchmark index. If Allianz underperformed, it received nothing.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 83 of the Complaint, and, accordingly, denies the allegations set forth in Paragraph 83.

84. Aon touted Allianz's fee structure in advising the Committee to invest in Structured Alpha and to remain invested in it. Aon advised that "the incentive fee-only structure creates a strong alignment of interests" that would benefit the Trust. Aon did not, however, appropriately monitor Allianz in light of that fee structure, which provided Allianz an incentive to take undue risk with Plan assets in hopes of boosting the strategy's returns and thus Allianz's compensation.

**ANSWER:** Aon admits that it advised that "the incentive fee-only structure creates a strong alignment of interests." To the extent the allegations in Paragraph 84 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well. Aon denies the remaining allegations in Paragraph 84.

85. One example of Allianz's imprudence was its decision to purchase hedging puts further out of the money than Allianz had represented to the Committee. Allianz claimed time and again that its long puts would be struck "-10% to -25%" below the market. When Allianz diagramed the hedging component, it depicted a hedge at the bottom end of that range—25% below the market—even in the "original configuration" where (unlike in the "new configuration") the long puts were expected to be further out of the money. Aon reproduced those diagrams in its presentations to the Committee.

**ANSWER:** Aon denies the allegations in Paragraph 85 as to Aon. Aon is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations

contained in Paragraph 85, and, accordingly, denies the remaining allegations set forth in Paragraph 85. To the extent the allegations in Paragraph 85 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

86. In fact, Allianz was purchasing hedging puts that were significantly further out of the money than Allianz had represented they would be. Those puts were cheaper and therefore less of a drag on the fee-generating returns Allianz could hope to produce. By purchasing cheap puts that were far out of the money, Allianz could inflate profits from its range-bound and directional spreads, thereby increasing Allianz's fees, and still claim that it was buying hedges (though those hedges had the potential to be virtually worthless in certain market scenarios when they would be most needed). But the gulf between Allianz's offensive, premium-generating positions and its defensive ones left the portfolio effectively unhedged and exposed the Trust to potential losses far beyond those Allianz and Aon had presented as possible.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 86, and, accordingly, denies the allegations set forth in Paragraph 86.

87. Another example of Allianz's imprudence was its decision to buy hedging puts that expired sooner than the risk-bearing options it sold. Allianz and Aon had represented that the long puts would be of the same or similar duration as the short puts.

**ANSWER:** Aon denies the allegations in Paragraph 87 as to Aon. Aon is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 87, and, accordingly, denies the remaining allegations set forth in Paragraph 87.

88. In reality, the puts Allianz was purchasing as supposed "reinsurance" expired far earlier than many of the puts it was selling, meaning there was, as Allianz later admitted, a "duration mismatch" between the options Allianz was short and those it was long. Allianz bought these shorter-dated puts because, again, they were cheaper. By purchasing less expensive, shorter-dated puts and selling more expensive, longer-dated puts, Allianz essentially bought less "reinsurance" than it had promised. Doing so allowed Allianz to increase the profits from its range-bound and directional spreads, thereby increasing Allianz's fees.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 88, and, accordingly, denies the allegations set forth in Paragraph 88.

89. Again, Allianz departed from the strategy it had represented to the Committee and, in doing so, Allianz layered excess and undisclosed risk on the portfolio. Allianz was apparently betting that it would be able to effectively replace the hedges as they expired, even in a declining market. That bet left the portfolio exposed to the risk that in a deteriorating market Allianz would be unable to backfill the hedges it should have had in place all along.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 89, and, accordingly, denies the allegations set forth in Paragraph 89.

90. Perhaps the most glaring example of Allianz's imprudence, however, was its decision not to acquire any hedges for the return-generating options it sold on volatility indexes. In addition to buying and selling options on an equity index like the S&P 500, Allianz also disclosed that as part of the Structured Alpha strategy it may buy and sell options on volatility indexes such as the VIX or the iPath Series B S&P 500 VIX Short-Term Futures ETN ("VXX"). Because these options would be part of the return-generating portions of the strategy (and introduce risk as a result), they would also need to be appropriately hedged. In the same way that Allianz bought long puts on the S&P 500 to hedge against a decline in the equity markets, it would need long positions on the VIX to hedge properly against a spike in volatility.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 90, and, accordingly, denies the allegations set forth in Paragraph 90.

91. Allianz, however, was taking on the risk of selling VIX options without buying any corresponding hedge. To borrow from Allianz's analogy, it was selling insurance against market volatility without any reinsurance against the risk that entailed. Far from "never" making a forecast on the direction of volatility—a supposed pillar of the Structured Alpha investment philosophy, according to Allianz—Allianz was gambling that the VIX would remain relatively low so its unhedged short positions would not be exposed to catastrophic losses.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 91, and, accordingly, denies the allegations set forth in Paragraph 91.

92.     Allianz was making that bet despite knowing that the VIX was becoming increasingly sensitive to market movements. In a December 2019 quarterly update, Allianz claimed that the recent "sensitivity of the VIX" was "advantageous" for Structured Alpha. A "typical response," Allianz explained, "is for the VIX to rise 10 to 20 times more than the S&P 500 declines." But in early December 2019, Allianz observed a VIX increase "100 times larger than the index move." Even though Allianz had identified that the VIX was becoming prone in late 2019 and early 2020 to sudden, larger-than-expected increases, Allianz continued to short volatility options—betting that the VIX would remain relatively low—without any corresponding long positions to hedge against a spike in the VIX.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 92, and, accordingly, denies the allegations set forth in Paragraph 92.  To the extent the allegations in Paragraph 92 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

93.     In all cases—whether purchasing puts too far out of the money or purchasing puts with shorter expiration dates than the puts it sold or shorting the VIX without any corresponding hedge in place—Allianz's motivation was self-interest, not the best interest of the Plans' participants and beneficiaries. And in all cases, Allianz had departed from the prudent strategy it had represented to the Committee, adding excess and undisclosed risk out of line with the risk parameters that were a predicate for the Committee's decision to invest Trust assets in Structured Alpha.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 93, and, accordingly, denies the allegations set forth in Paragraph 93.

94.     The Committee did not know that, going into the market dislocation of February and March 2020, Allianz had departed from its professed investment strategy and was instead layering excess risk into each of the Funds. The strategy was performing as Allianz and Aon said it would, with any short-term losses being recovered in subsequent months. And Allianz and Aon both represented that the portfolio was, if anything, better positioned to handle a market downturn than it had been in the past.

**ANSWER:** Aon denies the allegations in Paragraph 94 as to Aon.  Aon is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations containing in Paragraph 94, and, accordingly, denies the remaining allegations in Paragraph 94.

95.     As to Allianz, the most significant modification to the Structured Alpha investment strategy that Allianz had brought to the Committee's attention was one that purportedly ***enhanced*** the portfolio's ability to navigate a market decline. In its quarterly strategy updates in 2019 and early 2020, Allianz described one portfolio modification (the "new configuration" hedges), which Allianz said gave the portfolio an "improved ability to navigate sharp market declines that are preceded by low-volatility environments" and "made the option portfolio more resilient." Although it trumpeted this "refinement[]" to the investment strategy, Allianz did not tell the Committee of its other changes to Structured Alpha's investment strategy—namely, that it was making a directional bet that volatility would remain low, selling naked options, and buying hedges much further below the market than it should have under its professed investment strategy.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 95, and, accordingly, denies the allegations set forth in Paragraph 95. To the extent the allegations in Paragraph 95 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies the allegations on this basis as well.

96.     Meanwhile, Allianz continued to make all the same representations it had in the past about Structured Alpha's supposed investment strategy. For instance, when Allianz presented on the strategy in January 2020 to Blue Cross Blue Shield of Arizona, whose chief financial officer also sits on the Committee and Subcommittee, Allianz repeated many of its common representations about Structured Alpha even though, by that time, these representations were untrue. As before, Allianz represented that Structured Alpha seeks "risk-managed" or "risk-controlled" returns; that it was "designed to perform whether equity markets are up or down, smooth or volatile"; that it would "never make a forecast on the direction of equities or volatility"; that it involved "no borrowing"; that it would "pre-develop plans in anticipation of scenarios in which the portfolio could be at risk for losses"; and that its hedging positions would "protect the portfolio in the event of a market crash." Allianz buttressed its confidence by repeating several of its more specific representations about how it would manage the strategy prudently. For example, Allianz again claimed that its long puts were struck "-10% to -25%" from the market, that its short puts and long puts would have roughly the same duration, and that it employed "long VIX calls" as a "helpful complement to long S&P 500 puts" for "hedging purposes." Indeed, Allianz claimed to be "as prepared as ever in the event of a severe market dislocation." None of these representations was true.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 96, and, accordingly, denies the allegations set forth in Paragraph 96. To the extent the allegations in Paragraph 96 seek to paraphrase or characterize

the contents of documents or communications, the documents or communications speak for themselves, and Aon denies the allegations on this basis as well.

97.    Because the Committee relied on Aon to monitor Allianz and to advise the Committee of any risks that could impact performance, the Committee did not uncover Allianz's departure from its professed investment strategy prior to the disastrous events of February and March 2020. Aon could and should have warned the Committee of Allianz's imprudent construction of the portfolio at least by 2019. Yet Aon never sounded the alarm. It never advised the Committee of the excess risk Allianz was layering into the portfolio, it never advised the Committee that Allianz was using the Trust's assets to gamble on the direction of the market and volatility, and it never advised the Committee that Aon's prior advice about Structured Alpha was (at least by 2019) untrue. It failed to bring these risks to the Committee's attention, despite the Committee's specific questions at the time about the continued advisability of investing in the Funds.

**ANSWER:** Aon denies the allegations in Paragraph 97.

98.    Aon either noticed the red flags and failed to inform the Committee of the potentially disastrous risks they posed to the Trust's investment in Structured Alpha, or Aon failed even to appreciate them. Regardless, Aon's failure was in derogation of its fiduciary duties and left the Committee with the false impression that Allianz was managing Plan assets in the manner Allianz and Aon had represented. That failure, along with Allianz's mismanagement, led to the devastating losses the Trust suffered in early 2020.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

To the extent a response is required, Aon denies the allegations in Paragraph 98.

99.    Going into the market turmoil of February and March 2020, Allianz did not have in place appropriate hedging positions to protect the portfolio (as it claimed it would) and then it sold many of the hedges it did have (as it claimed it would not do). As a result, Allianz caused the Trust to suffer catastrophic losses in a matter of weeks.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the

truth of the allegations contained in Paragraph 99, and, accordingly, denies the allegations set forth

in Paragraph 99.

100.    Throughout January and into late February 2020, the VIX remained relatively low and the S&P 500 remained relatively stable before the market began to decline and volatility spiked in the second half of February and March 2020:





**ANSWER:** Aon admits the allegations in Paragraph 100. To the extent the allegations in Paragraph 100 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis.

101. By March 6, the Trust's investment in Structured Alpha had already declined by a double-digit percentage. Yet in communications with NEBA investment staff, Allianz reported optimism about the portfolio's ability to rebound. Although Allianz acknowledged that some restructuring had taken place, it reported that the "cost of these moves was well contained."

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 101, and, accordingly, denies the allegations set forth in Paragraph 101. To the extent the allegations in Paragraph 101 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

102. Contrary to the rosy picture Allianz was painting, the Trust's investment was plummeting. On March 12, Allianz reported on a phone call with NEBA investment staff and Aon

that the hedges—the "reinsurance" that Allianz and Aon had said would be in place "at all times" to protect the portfolio—were "not working." Allianz also reported that the Trust's investment would soon face a margin call, the very risk that Allianz had told the Committee it would never face. ("We do not have this risk," Allianz had represented.)

**ANSWER:** Aon admits that on March 12 Allianz reported that the Trust's investment would soon face a margin call. To the extent the allegations in Paragraph 102 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well. Aon denies the remaining allegations in Paragraph 102.

103.    The next morning, Friday, March 13, Allianz emailed Aon with additional details about the Trust's investment. Those details reveal what Aon, in conducting its specific monitoring duties of Allianz, should have already known: that Allianz had added excess and undisclosed risk to the portfolio in February and March 2020 and that it had been making other imprudent decisions, unbeknownst to the Committee, for some time. Aon waited until Sunday afternoon, March 15, to forward that email to NEBA.

**ANSWER:** Aon admits that it received an email from Allianz with an update on the performance of the Structured Alpha funds on March 13, 2020 and that it forwarded this email to NEBA on March 15, 2020. To the extent the allegations in Paragraph 103 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well. Aon denies the remaining allegations in Paragraph 103.

104.    If Allianz had been managing the portfolio in the manner it claimed it would, Allianz would (among other things) have constructed the hedging positions closer to the market and left those hedges in place to secure the defined "Max Loss" if the market declined. That was the "new configuration" strategy—touted as the product of "almost two years" of research and development—that Allianz had promised to deploy in a low-VIX environment like the one that existed for the first six weeks of 2020.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 104, and, accordingly, denies the allegations set forth in Paragraph 104. To the extent the allegations in Paragraph 104 seek to paraphrase or

characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

105. Yet, as Allianz acknowledged in its March 13 email, it had sold the new-configuration hedges—i.e., the hedges that were supposed to be "hands-free" and locked in to contain potential losses. According to Allianz, it had struck the puts "7% to 9%" out of the money. But when the market declined, these "new-configuration puts were shifted," meaning Allianz sold them and replaced them with long puts much further out of the money. Allianz, as Aon later put it, chose not to "accept modest losses and aim to recover in a reasonable time period," opting instead to gamble that the market would rebound immediately and "expos[ing] the portfolio to further downside risk." "In hindsight," Allianz admitted, "*we should have left those positions as is*."

**ANSWER:** Aon admits that Allianz sent an update on the performance of the Structured Alpha funds on March 13, 2020. To the extent the allegations in Paragraph 105 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis. Aon denies the remaining allegations in Paragraph 105.

106. Allianz would not have sold the new-configuration hedges were it acting in the best interests of the Plans' participants and beneficiaries. Were it doing so, it would have accepted modest losses. Instead, motivated by the fact that it would earn no compensation until those losses were recovered, Allianz removed the hedge that was supposed to protect the Trust's investment and gambled (with the Trust's money) that markets would soon recover. In doing so, Allianz not only abandoned Structured Alpha's supposed hedging strategy but also its purported tenet not to bet on the direction of the market.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 106, and, accordingly, denies the allegations set forth in Paragraph 106.

107. As Allianz acknowledged in its March 13 email, these active management decisions also created a "duration mismatch" between the short and long puts that contributed to the portfolio's losses. This mismatch, Allianz explained, meant that the long puts "couldn't be harvested because they were shorter-dated" and about to expire. The resulting "theta decay reduced their value," and the puts "did not pay out." Another problem was that the cost to replace the expiring long puts increased dramatically as the market declined and volatility spiked. "We are continually rolling into new long puts as they expire," Allianz wrote, "but there still is a duration mismatch that causes a continued equity decline / vol increase to hurt the mark and vice versa." Had Allianz purchased and maintained the proper downside protection that it had represented

would be in place at all times, it would have had no need to replace expiring long puts at the critical time when, as Aon later put it, they became "prohibitively expensive."

**ANSWER:** Aon admits that Allianz sent an update on the performance of the Structured Alpha funds on March 13, 2020. To the extent the allegations in Paragraph 107 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis.

108. In addition to what Allianz admitted to in its March 13 email, at least two other imprudent decisions by Allianz inserted excessive risk into the portfolio and contributed to its collapse.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 108, and, accordingly, denies the allegations set forth in Paragraph 108.

109. First, Allianz had been chasing additional returns by purchasing cheap puts much further out of the money than Allianz had represented. Many of those long puts, Aon reported after the fact, "expired worthless in early March." As Aon told the Committee when asked later why the hedges proved ineffective, "they were too far 'out of the money' to begin with."

**ANSWER:** Aon admits the allegations in Paragraph 109 as to what Aon reported to the Committee. To the extent the allegations in Paragraph 109 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well. Aon is without knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 109, and, accordingly, denies the remaining allegations set forth in Paragraph 109.

110. Second, though Allianz was selling puts and calls on volatility indexes like the VIX, Allianz had purchased *no* long positions on the volatility indexes it was shorting. Allianz left the portfolio at the mercy of a surge in volatility, which is exactly what happened in February and March 2020.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 110, and, accordingly, denies the allegations set forth in Paragraph 110.

111.     Allianz left these short positions "naked" even though it knew that the VIX had been displaying increased "sensitivity" to market moves and was therefore prone to sudden, larger-than-anticipated spikes. The net result was that the portfolio, going into the volatility spikes of February and March 2020, was *short* volatility—reflecting Allianz's gamble that the VIX would remain relatively low. Allianz made this reckless directional bet despite the supposed pillar of its investment strategy that it would "never make a forecast on the direction of equities or volatility."

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 111, and, accordingly, denies the allegations set forth in Paragraph 111.

112.     The combination of these and other imprudent actions by Allianz, which Allianz took with respect to each of the Structured Alpha Funds, caused the Trust's investment in each Fund to suffer staggering losses by the time the market opened on Monday, March 16. After Allianz notified NEBA and Aon that the portfolio was facing a margin call the next day, there was no choice but to liquidate the Trust's investment to protect what was left.

**ANSWER:** Aon admits that on March 16, 2020, Allianz notified NEBA and Aon that the Trust's portfolio was facing a margin call.  Aon admits that NEBA subsequently chose to liquidate the Trust's investment.  Aon is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 112, and, accordingly, denies the remaining allegations set forth in Paragraph 112.

113.     Three of the five series in the Multi-Beta Series—U.S. Large Cap, U.S. Small Cap, and International Equity—each lost about 80% or more in a matter of weeks. Structured Alpha 1000 did even worse. The best-performing Fund, Emerging Markets Equity 350, fell nearly 50%. These losses far exceed those incurred by the strategy's benchmark indexes, the equity markets more generally, and comparable investment strategies in which the Trust could have invested.

**ANSWER:** Aon admits that the Structured Alpha funds into which the Trust invested suffered losses far exceeding those incurred by their benchmark indices and equity markets more generally.  Aon is without knowledge or information sufficient to form a belief as to the truth of

the remainder of the allegations contained in Paragraph 113, and, accordingly, denies the allegations set forth in Paragraph 113.

114. After the Trust's investment in the Structured Alpha Funds was liquidated and redeemed, it received only about $540 million as compared to the nearly $3 billion it had invested in the Funds at the start of the year.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 114, and, accordingly, denies the allegations set forth in Paragraph 114.

115. The Committee was not alone in liquidating its investment. On March 25, Allianz announced that it was liquidating Structured Alpha 1000, which had lost about 90% or more of its value. Allianz also liquidated the Structured Alpha 1000 Plus fund.

**ANSWER:** Aon admits that Allianz announced its plans to liquidate the Structured Alpha 1000 and Structured Alpha 1000 Plus funds. Aon is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 115, and, accordingly, denies the remaining allegations set forth in Paragraph 115.

116. For Aon's part, after years of lauding Allianz's "sound investment philosophy" and "multiple layers of independent risk management functions," endorsing Allianz's claims about the hedges as "reinsurance," and rating Structured Alpha one of its "highest conviction strategies," it has now done an about-face in the wake of the strategy's failure.

**ANSWER:** Aon denies the allegations in Paragraph 116. To the extent the allegations in Paragraph 116 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

117. On March 27, more than ten days after the Trust's investment had collapsed, Aon advised the Committee, for the first time, that Structured Alpha suffered from "flawed portfolio construction" and a "lack of appropriate independent risk controls." Aon, as a fiduciary adviser, should have uncovered these failings and warned the Committee about them at least by 2019, rather than touting Structured Alpha as its highest conviction strategy.

**ANSWER:** Aon admits that it advised the Committee on March 27, 2020, that Structured Alpha suffered from "flawed portfolio construction" and a "lack of appropriate independent risk controls." To the extent the allegations in Paragraph 117 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well. Aon denies the remaining allegations in Paragraph 117.

118. Aon claimed after the fact that it had done a "fair amount of stress testing" to determine how Structured Alpha would behave in various market conditions. But Aon never provided any independent stress testing to the Committee. The only stress testing Aon shared was what Allianz had supposedly done based on assumptions that Aon should have known did not apply to the Trust's investment. So either Aon never actually did any of its own stress testing or it did but for some reason never shared the results with the Committee.

**ANSWER:** To the extent the allegations in Paragraph 118 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well. Aon denies the remaining allegations in Paragraph 118.

119. Attempting to defend its oversight of Structured Alpha, Aon also claimed that it had employed a third-party provider, RiskMetrics, to ensure that Allianz was purchasing the hedges it said it would. Aon advised the Committee that it received reports from RiskMetrics on the subject. Moreover, Aon claimed that it had performed "on site" reviews of Structured Alpha's holdings and held "regular discussions" with Allianz regarding the strategy's "positioning." Indeed, Aon's postmortem analysis reflects an apparent understanding of the positions Allianz held in February and March 2020 that led to the strategy's collapse.

**ANSWER:** Aon admits that it retained RiskMetrics, a third-party provider of risk management services, to aid in its monitoring of the Trust's investment in Structured Alpha, and that it received periodic reports from RiskMetrics. To the extent the allegations in Paragraph 119 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well. Aon denies the remaining allegations in Paragraph 119.

120. If Aon had been prudently discharging the duty it undertook to monitor Allianz, it would have discovered the imprudent decisions Allianz had been making. Aon would have found, for example, the duration mismatch Allianz had created, as well as the substantial gap between the range-bound spreads and the deep out-of-the-money puts Allianz had purchased. And if Aon had reviewed Allianz's positional data, as Aon's monitoring duty required it to do, it would have found long before February and March 2020 that Allianz's VIX options were unhedged. Because Aon did none of that, it failed to detect the "flawed portfolio construction" or "lack of appropriate independent risk controls" it belatedly described on March 27 as a basis for divesting from the Structured Alpha Funds. By then it was too late.

**ANSWER:** To the extent the allegations in this Paragraph assert a legal conclusion, no response is required. Aon denies the remaining allegations in Paragraph 120.

121. On July 20, 2020, Allianz published on its website the results of an internal review Allianz claims to have conducted into the "substantial losses" Structured Alpha incurred. The stated purpose of Allianz's review, titled "Structured Alpha March 2020 performance," was "to better understand how the Portfolio's investment and risk management processes operated in the face of the market volatility" experienced at that time.

**ANSWER:** Aon admits that Allianz published an internal review of the losses incurred by the Structured Alpha funds. To the extent the allegations in Paragraph 121 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis.

122. Allianz's account purports to describe certain of its actions in March 2020. "During the eleven days between March 2 and March 16," Allianz says, "there were at least four instances" in which it restructured the short puts on the S&P 500 "by both reducing the strike prices of the put options and by decreasing the number of positions held." "Similarly, the portfolio managers replaced short-term short VIX calls with new longer-term short VIX calls at more distant strike prices. An analogous process occurred for short VXX calls," according to Allianz. But "commencing on March 12, 2020, the Portfolio Management team stopped relaying new short puts on the [S&P 500] and [Nasdaq], and short calls on the VIX and VXX to further reduce the risks in the portfolio."

**ANSWER:** Aon admits that Allianz published an internal review of the losses incurred by the Structured Alpha funds. To the extent the allegations in Paragraph 122 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis.

123.    These details confirm that Allianz was betting on a market rebound by continuing to relayer short positions during the critical time period when Allianz should have been mitigating risk, not compounding it. What is new, however, is Allianz's admission that it was relayering risk-bearing positions all the way until March 12. Only then did Allianz stop exposing the portfolio to further losses by refraining from selling more insurance against an additional market decline.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 123, and, accordingly, denies the allegations set forth in Paragraph 123.

124.    Allianz claims in its July 2020 report that it was "obligat[ed] to investors to pursue returns" in the first half of March 2020 rather than "convert[] to cash." But Allianz was not obligated to layer additional risk into the portfolio so it could bet on a market rebound.  Allianz could have, for example, converted to cash or cash equivalents (as it had discretion to do under the Fund Documents), especially to assist in the preservation of capital on a temporary basis.

**ANSWER:** Aon admits that Allianz published an internal review of the losses incurred by the Structured Alpha funds.  To the extent the allegations in Paragraph 124 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis.

125.    The most jarring aspect of Allianz's July 2020 report is how different the strategy Allianz now describes is compared to the one it had represented to the Committee all along.

**ANSWER:** Aon admits that Allianz published an internal review of the losses incurred by the Structured Alpha funds.  To the extent the allegations in Paragraph 125 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis.

126.    Allianz's report claims that the risks of investing in Structured Alpha were "fully disclosed, including the risk of total loss." That assertion contradicts Allianz's prior representations of how it would manage the portfolio to avoid significant losses. It also contradicts Allianz's specific representation to the Committee that one "key benefit" of the hedges was that they eliminated all risk of a margin call.

**ANSWER:** Aon admits that Allianz published an internal review of the losses incurred by the Structured Alpha funds.  To the extent the allegations in Paragraph 126 seek to paraphrase or

characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis.

127. Allianz's report also claims that the hedges were designed to offer only "some protection" in the event of a market crash. The hedges, Allianz now insists, were "not intended to provide broader protection against all market downturns, particularly downturns that transpire over longer periods of time." Rather, they were "deliberately constructed with options that were both of relatively short expiration and far out of the money" only to "protect against a *one-day market shock*."

**ANSWER:** Aon admits that Allianz published an internal review of the losses incurred by the Structured Alpha funds. To the extent the allegations in Paragraph 127 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis.

128. Allianz never disclosed these limitations. To the contrary, Allianz characterized the hedges as "reinsurance" that would be "in place at all times" in order to "protect the portfolio in the event of a market crash." It emphasized to the Committee that its investment strategy addressed "two risks: the overnight market crash *and the multi-week market correction*." Allianz's "tail-risk protection," it told the Committee, "includes both hedging primarily for a single-day market crash as well as better *protection in the event of multi-day or multi-week significant declines*." Allianz bolstered these claims about protection against multi-week declines with stress testing purporting to show, for instance, that the strategy would yield positive returns during market shocks that took weeks or even months to transpire. Allianz's after-the-fact description of the hedges as a partial backstop—protecting only against a "one-day market shock" but nothing else—is inconsistent with its prior representations to the Committee.

**ANSWER:** Aon admits that Allianz never disclosed the limitations of Structured Alpha to Aon. To the extent the allegations in Paragraph 128 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well. Aon is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 128, and, accordingly, denies the remaining allegations set forth in Paragraph 128.

129. Allianz's July 2020 report claims that because the hedges were constructed to protect only "against a one-day market shock," Allianz properly "mitigated" portfolio risk through restructuring.

**ANSWER:** Aon admits that Allianz published an internal review of the losses incurred by the Structured Alpha funds. To the extent the allegations in Paragraph 129 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis.

130. Yet Allianz told the Committee that when it was building positions in a low-VIX environment (like that which existed at the start of 2020), the new-configuration hedges would not only protect against a market decline but predefine a set "maximum loss." According to Allianz, these new-configuration hedges were supposed to create "hands-free spreads" that would need ***no restructuring*** during "the life of the position." Allianz's postmortem omits any mention of the new-configuration hedges that should have been locked in place to define a "Max Loss."

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 130, and, accordingly, denies the allegations set forth in Paragraph 130. To the extent the allegations in Paragraph 130 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

131. Allianz's July 2020 report claims further that Allianz's "Enterprise Risk Management function" stress tested the portfolio against "***single day*** scenarios" only.

**ANSWER:** Aon admits that Allianz published an internal review of the losses incurred by the Structured Alpha funds. To the extent the allegations in Paragraph 131 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis.

132. If single-day stress testing were all Allianz was doing, its imprudence speaks for itself: such testing would not permit Allianz to evaluate, let alone manage, risk in a multi-day or multi-week market decline. Contrary to Allianz's July 2020 report, Allianz had previously assured the Committee that the same "Enterprise Risk Management" team was responsible for "weekly risk profiles" and that Allianz's "proprietary tools and models" enabled it to "stress-test the entire portfolio for ***any*** market scenario"—models Allianz claimed were "integral to the successful day-to-day management of Structured Alpha." And when the Committee had asked about potential worst-case scenarios, Allianz responded:

> We continually focus on two risks: the overnight market crash and the multi-week market correction. Our ongoing objective is to protect the profit/loss profile of the

> option portfolio across a broad set of stress-test parameters. We manage the option portfolio for its ability to withstand and navigate as wide a range of potential market scenarios as possible.

Again, Allianz's postmortem is inconsistent with the risk profile of Structured Alpha that Allianz disclosed to the Committee.

**ANSWER:** To the extent the allegations in Paragraph 132 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis as well. Aon is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 132, and, accordingly, denies the remaining allegations set forth in Paragraph 132.

133. Allianz also included in its July 2020 report a graph providing a "representative depiction of a portion of the composition of the Structured Alpha 1000 fund" as of "February 2020":



Example of payoffs by strategy in the Structured Alpha 1000 Fund for S&P 500 options
February 2020

**ANSWER:** Aon admits that Allianz published an internal review of the losses incurred by the Structured Alpha funds in July 2020. To the extent the allegations in Paragraph 133 seek to

paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis.

134. This graph depicts an investment strategy that is inconsistent with the one Allianz assured the Committee it would follow to pursue "risk-managed returns." Allianz never disclosed this graph—or anything like it—to the Committee before Structured Alpha's disastrous results in 2020. If it had, the Committee would not have maintained the Trust's significant investment in Structured Alpha.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 134, and, accordingly, denies the allegations set forth in Paragraph 134. To the extent the allegations in Paragraph 134 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

135. Allianz's July 2020 graph illustrates that Allianz bought downside hedges well beneath the strike price (*i.e.*, "-10% to -25%" below-the-market level) at which it said it would buy hedges. While Allianz inexplicably claims this was "deliberate[]," its failure to buy the hedges it said it would added excess risk to the portfolio, leaving the Funds exposed to the catastrophic losses that occurred in February and March 2020.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 135, and, accordingly, denies the allegations set forth in Paragraph 135. To the extent the allegations in Paragraph 135 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

136. Allianz's July 2020 graph also illustrates the absence of any new-configuration hedges, *i.e.*, the hedges that Allianz said it would buy closer to market levels in order to lock in a "Max Loss" in the case of a market decline. These are nowhere to be found in Allianz's graph (just as all discussion of them is missing from Allianz's commentary), although Allianz had said it had deployed this "refinement" to its investment strategy to make the portfolio "more resilient" to market declines.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 136, and, accordingly, denies the allegations set

forth in Paragraph 136. To the extent the allegations in Paragraph 136 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

137. Allianz's July 2020 graph also shows that potential returns from the options strategy (illustrated in blue in the annotated version of Allianz's graph below) came at the cost of potentially massive, unhedged losses (illustrated in red below) if the market declined. The downside exposure depicted in Allianz's July 2020 chart is contrary to Allianz's description of Structured Alpha's investment strategy to the Committee, including its representation that the hedging positions eliminated all risk of a margin call.



**Example of payoffs by strategy in the Structured Alpha 1000 Fund for S&P 500 options**
February 2020



**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 137 of the Complaint, and, accordingly, denies the allegations set forth in Paragraph 137. To the extent the allegations in Paragraph 137 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

138. Importantly, Allianz's graph depicts only equity index options on the S&P 500. In its July 2020 report, Allianz chose not to illustrate the "strategy payoffs" from the short volatility options it sold on the VIX and VXX in violation of its promise "never" to make a bet on the

direction of volatility. Had it included a graph of that strategy, it would show the potential for limited, modest payoffs if Allianz bet correctly and **unlimited** losses if it did not. Allianz has offered no explanation for why it made that wager with the Trust's money or how the disastrous losses it caused the Trust as a result were consistent with the investment strategy Allianz claimed to pursue.

**ANSWER:** Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 138, and, accordingly, denies the allegations set forth in Paragraph 138. To the extent the allegations in Paragraph 138 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

## COUNT I: BREACH OF FIDUCIARY DUTY – ERISA § 404
## (AGAINST ALLIANZ)

139. The Committee restates and realleges Paragraphs 1-138 as though fully set forth herein.

**ANSWER:** Aon restates all its responses as if fully set forth in response.

140. The Committee brings this Count under ERISA §§ 502(a)(2), (a)(3), and 409(a) (29 U.S.C. §§ 1132(a)(2), (a)(3), and 1109(a)). The Committee has the authority to bring this Count under these provisions because it is a fiduciary under ERISA of the Plans whose assets are held in the Trust. The Committee's charter, which the Plan sponsors have adopted, further authorizes the Committee to bring this Count.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 140, and, accordingly, denies the allegations in Paragraph 140.

141. At all relevant times, Allianz was a fiduciary within the meaning of ERISA § 3(21)(A)(i) (29 U.S.C. § 1002(21)(A)(i)) because it exercised authority or control with respect to the management or disposition of Plan assets held in the Trust.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon is without knowledge or information sufficient to form

a belief as to the truth of the allegations contained in Paragraph 141, and, accordingly, denies the allegations in Paragraph 141.

142.    At all relevant times, Allianz was also an investment manager within the meaning of ERISA § 3(38) (29 U.S.C. § 1002(38)). Allianz was a fiduciary with the power to manage or dispose of Plan assets held in the Trust. Allianz was a registered investment adviser under the Investment Advisers Act of 1940. And Allianz acknowledged in writing that it was a fiduciary with respect to the Plans whose assets are held in the Trust. Allianz did so, for example, in its contracts with the Committee, including the Amended and Restated Investment Management Side Agreement that Allianz signed in May 2014 and in various of the Funds' Limited Liability Company Agreements and Private Placement Memoranda.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

To the extent a response is required, Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 142, and, accordingly, denies the allegations in Paragraph 142.

143.    By executing the contracts establishing Allianz as an investment manager within the meaning of ERISA, the Committee appointed Allianz to manage Plan assets under ERISA § 402(c)(3) (29 U.S.C. § 1102(c)(3)). That appointment entitles the Committee to the benefits and protections of ERISA § 405(d)(1) (29 U.S.C. § 1105(d)(1)).

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

To the extent a response is required, Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 143, and, accordingly, denies the allegations in Paragraph 143.

144.    At all relevant times, the Structured Alpha Funds were "plan assets" under ERISA § 3(42) (29 U.S.C. § 1002(42)) because 25% or more of the total value of each class of equity interest was held by benefit plan investors within the meaning of ERISA and its implementing regulations. Substantially all of the equity interests in the Multi-Beta Series and in Emerging Market Equity 350 were held by benefit plan investors. Aside from Allianz's own holdings as the managing member, the Trust held all or substantially all of the members' capital and equity interests in the five series comprising the Multi-Beta Series—U.S. Large Cap, U.S. Small Cap, International Equity, U.S. Fixed Income, and U.S. Long Credit—as well as in Emerging Markets Equity 350. Likewise, on information and belief, more than 25% of the total value of each class of equity interest in Structured Alpha 1000 was held by benefit plan investors at all relevant times.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

To the extent a response is required, is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 144, and, accordingly, denies the allegations in Paragraph 144.

145.     At all relevant times, Allianz was managing the Structured Alpha Funds holding or containing Plan assets and acting in a fiduciary capacity.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

To the extent a response is required, is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 145, and, accordingly, denies the allegations in Paragraph 145.

146.     As a fiduciary, Allianz owed a duty of care under ERISA § 404(a)(1)(B) (29 U.S.C. § 1104(a)(1)(B)). That duty required Allianz to manage Plan assets "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

To the extent a response is required, is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 146, and, accordingly, denies the allegations in Paragraph 146.

147.     As a fiduciary, Allianz owed a duty of loyalty under ERISA § 404(a)(1)(A) (29 U.S.C. § 1104(a)(1)(A)). That duty required Allianz to manage Plan assets "solely in the interest" of and for the "exclusive purpose of providing benefits" to the participants and beneficiaries of the Plans whose assets are held in the Trust. The duty of loyalty also required Allianz to not mislead the Committee about Structured Alpha or Allianz's management of the strategy and to disclose material facts whose omission would create a false impression about the strategy or Allianz's management of it.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

To the extent a response is required, is without knowledge or information sufficient to form a belief

as to the truth of the allegations contained in Paragraph 147, and, accordingly, denies the allegations in Paragraph 147.

148. As a fiduciary, Allianz owed a duty of diversification under ERISA § 404(a)(1)(C) (29 U.S.C. § 1104(a)(1)(C)). That duty required Allianz to ensure the Trust's investments were adequately diversified "so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 148, and, accordingly, denies the allegations in Paragraph 148.

149. And as a fiduciary, Allianz owed a duty to follow Plan documents under ERISA § 404(a)(1)(D) (29 U.S.C. § 1104(a)(1)(D)). That duty required Allianz to manage Plan assets "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with" ERISA.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 149, and, accordingly, denies the allegations in Paragraph 149.

150. The fiduciary duties under ERISA are "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

151. Allianz breached its fiduciary duties. Allianz's breaches include, without limitation, the following:

(a) Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it did not put the appropriate hedges in place to protect the assets during a market decline. This failure added excess and undisclosed risk and was contrary to the representations Allianz had made to the Committee and others that the hedges would be in place "at all times" as "reinsurance" for the Trust's portfolio.

(b) Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it sold the

new-configuration hedges and took on new risk-bearing positions starting in late-February 2020. These discretionary restructurings exposed the Trust's investments to further downside risk and were contrary to Allianz's representations, including that it would not sell the new-configuration hedges that should have been locked in to safeguard the Plan assets.

(c)     Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it represented that it had constructed the portfolio in a way that would ensure a defined "Max Loss" and then managed the strategy in a way that exposed the Trust to unlimited losses.

(d)     Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it either failed to have adequate risk management measures in place or abandoned such measures.

(e)     Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it represented that it would manage the Structured Alpha strategy in such a way to eliminate the risk of margin calls yet implemented a strategy in which that very risk materialized.

(f)     Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it, unbeknownst to the Committee, decided to purchase puts that were further out of the money than the maximum range Allianz had disclosed, thus adding excess and undisclosed risk to the Trust's portfolio, in an apparent effort to increase Allianz's fees.

(g)     Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it, unbeknownst to the Committee, decided to purchase puts that expired sooner than the puts it sold. This practice was contrary to Allianz's representations that its short and long positions would be of relatively equal duration and added excess and undisclosed risk to the Trust's portfolio. Allianz created this "duration mismatch" not because it was in the best interests of the Plans' participants and beneficiaries, but because doing so allowed Allianz to enhance its fees.

(h)     Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it, unbeknownst to the Committee, decided to sell volatility index options without buying any corresponding hedge, adding excess and undisclosed risk to the Trust's portfolio, again in an apparent effort to enhance its fees.

(i)     Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it caused the Committee to believe that Structured Alpha's risk profile was consistent with Allianz's stated investment strategy rather than the actual risk profile, either by making false or misleading representations about Structured Alpha or failing to disclose information necessary to correct prior representations that were inconsistent with how Allianz was actually managing the strategy.

(j)     Allianz breached its duty to ensure the Trust's investments were prudently diversified when it operated a strategy that was unduly weighted towards being short volatility in

February and March 2020 (contrary to its pledge not to make directional bets) and created excess and undisclosed correlated risks across the Structured Alpha Funds.

(k)     Allianz breached its duty to prudently manage the Plan assets or manage them in accordance with the Plan documents when it acted contrary to the Trust's Investment Policy Statement, which reflects the character and aims of the Trust. The Investment Policy Statement provides, for example, that Plan assets held in the Trust "shall be invested" consistent with the duties of care, loyalty, and diversification listed in ERISA § 404(a)(1)(A)-(C) (29 U.S.C. § 1104(a)(1)(A)-(C)). Allianz violated those duties for at least the reasons stated above. "Investment fund managers" like Allianz, the Investment Policy Statement continues, "have the responsibility for managing the underlying assets by making reasonable investment decisions consistent with its stated approach and reporting investment results." Allianz did not meet that responsibility, either, for at least the reasons stated above.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

To the extent a response is required, Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 151, and, accordingly, denies the allegations in Paragraph 151.

152.    As a direct and proximate result of Allianz's breaches of fiduciary duty, the Plans suffered devastating losses, with the exact amount to be proven at trial. Allianz's breaches, including actions taken in its own self-interest, also caused it to earn substantial fees and profits.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

To the extent a response is required, Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 152, and, accordingly, denies the allegations in Paragraph 152.

### COUNT II: BREACH OF FIDUCIARY DUTY – ERISA § 404
### (AGAINST AON)

153.    The Committee restates and realleges Paragraphs 1-152 as though fully set forth herein.

**ANSWER:** Aon restates all its responses as if fully set forth in response.

154.    The Committee brings this Count under ERISA §§ 502(a)(2), (a)(3), and 409(a) (29 U.S.C. §§ 1132(a)(2), (a)(3), and 1109(a)). The Committee has the authority to bring this Count under these provisions because it is a fiduciary under ERISA of the Plans whose assets are held in the Trust. The Committee's charter, which the Plan sponsors have adopted, further authorizes the Committee to bring this Count.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

To the extent a response is required, Aon denies the allegations in Paragraph 154.

155.    At all relevant times, Aon was a fiduciary within the meaning of ERISA § 3(21)(A)(ii) (29 U.S.C. § 1002(21)(A)(ii)) because it was rendering or had the authority or responsibility to render "investment advice for a fee" to the Committee with respect to Plan assets held in the Trust.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

To the extent a response is required, Aon denies the allegations in Paragraph 155.

156.    The individualized investment advice Aon provided the Committee was based on Aon's knowledge of the Trust's particular needs and overall investment portfolio and included, without limitation, "mak[ing] recommendations as to the advisability of investing in, purchasing, or selling securities," with the mutual understanding that the Committee would and did rely primarily on such recommendations. 29 C.F.R. § 2510.3-21(c)(i). For example, Aon recommended in June 2011 that the Committee invest Plan assets held in the Trust in Structured Alpha, and in the ensuing years Aon regularly recommended that the Committee make and maintain additional investments in Structured Alpha. The Committed relied on Aon's advice in implementing Aon's recommendations, and Aon knew the Committee was so relying.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

To the extent a response is required, Aon denies the allegations in Paragraph 156.

157.    Aon provided this individualized investment advice to the Committee with respect to Plan assets held in the Trust on a regular basis and pursuant to a mutual agreement, arrangement, or understanding that the advice, which Aon rendered for a fee, would serve as a primary basis for the Committee's investment decisions. On several occasions, including in March 2011, April 2013, and June 2018, Aon provided the Committee written analysis giving Structured Alpha a "buy" rating. Aon attended the quarterly meetings of the Committee and Subcommittee and provided those bodies its recommendations to invest initially in Structured Alpha, to expand that investment into new Funds, to remain invested to the same degree the Trust had been even after the strategy underperformed its benchmarks in February and December 2018, and to classify the investments according to each Fund's underlying beta(s) for purposes of conforming with the Trust's Investment Policy Statement. Aon provided this regular investment advice pursuant to a written contract between it and the Committee, another fiduciary, which contract details many of Aon's duties related to its provision of investment advice to the Committee with respect to Plan assets held in the Trust. For example, Aon agreed to provide "recommendations to [the Committee] regarding asset allocation" within the Trust, "recommendations to [the Committee] regarding the specific asset allocation and other investment guidelines" for the Trust's investment managers such as Allianz, and advice "regarding the diversification of assets" held in the Trust. The Committee relied on this advice in implementing Aon's recommendations, and Aon knew the Committee was so relying. In exchange for Aon's investment advice regarding the Trust specifically, the Committee agreed to pay Aon a fixed fee per quarter from Plan assets.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon admits that it attended some of the Committee and Subcommittee's meetings and that it provided investment advice pursuant to a written contract between it and the Committee. To the extent the allegations in Paragraph 157 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well. Aon denies the remaining allegations in Paragraph 157.

158. Aon also provided investment advice pursuant to an understanding that the Committee would endeavor to make major investment decisions only after receiving Aon's analysis and recommendation. The Committee's practice, recorded in its meeting minutes, reflected this understanding that Aon's advice was a primary basis for the Committee's investment decisions. So did the Trust's Investment Policy Statement, which Aon helped draft and endorsed by placing its logo on the cover page. According to that document, Aon had a duty to "advise the Committee on the management of the Trusts' assets." That duty "includes, but is not limited to, recommending appropriate strategic policy and implementation structure and conducting manager due-diligence, searches and selection." The Committee was "entitled to utilize and rely upon the advice" of Aon.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon admits that it helped draft the Trust's Investment Policy Statement. To the extent the allegations in Paragraph 158 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis as well. Aon denies the remaining allegations in Paragraph 158.

159. At all relevant times, Aon was providing or had the responsibility to provide investment advice to the Committee with respect to Plan assets held in the Trust and was therefore acting in a fiduciary capacity.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon denies the allegations in Paragraph 159.

160. As a fiduciary, Aon owed a duty of care under ERISA § 404(a)(1)(B) (29 U.S.C. § 1104(a)(1)(B)). That duty required Aon to advise the Committee regarding the Plans or Plan assets

held in the Trust "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." Because Aon provided investment advice to the Committee about diversification of the Trust's investments, the duty of care also required Aon to render that advice prudently "so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." ERISA § 404(a)(1)(C) (29 U.S.C. § 1104(a)(1)(C)).

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

To the extent a response is required, Aon denies the allegations in Paragraph 160.

161.    As a fiduciary, Aon owed a duty of loyalty under ERISA § 404(a)(1)(A) (29 U.S.C. § 1104(a)(1)(A)). That duty required Aon to advise the Committee regarding the Plans or Plan assets held in the Trust "solely in the interest" of and for the "exclusive purpose of providing benefits" to the Plans' participants and beneficiaries. The duty also required Aon to not mislead the Committee about Structured Alpha or Allianz's management of the strategy and to disclose material facts whose omission would create a false impression about the strategy or Allianz's management of it.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

To the extent a response is required, Aon denies the allegations in Paragraph 161.

162.    And as a fiduciary, Aon owed a duty to follow Plan documents under ERISA § 404(a)(1)(D) (29 U.S.C. § 1104(a)(1)(D)). That duty required Aon to advise the Committee regarding the Plans or Plan assets held in the Trust "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with" ERISA.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

To the extent a response is required, Aon denies the allegations in Paragraph 162.

163.    The fiduciary duties under ERISA are "the highest known to the law." *Donovan*, 680 F.2d at 272 n.8.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

164.    Aon breached its fiduciary duties. Aon's breaches include, without limitation, the following:

(a)    Aon breached its duties to prudently advise the Committee regarding the Trust's investment in the Structured Alpha Funds or advise the Committee according to the best interests of the Plans' participants and beneficiaries when it misinformed the Committee of the actual level of risk Structured Alpha presented to the Plan assets held in the Trust. Aon routinely gave the Committee the false impression that the strategy was relatively low risk and indeed, a risk

management strategy, despite red flags that should have alerted Aon that Structured Alpha was anything but. Aon likewise misstated Structured Alpha's risk by repeatedly advising the Committee that only a small amount of the Trust's investment with Allianz was exposed to the options strategy and therefore at risk in case the strategy failed.

(b)     Aon breached its duties to prudently advise the Committee regarding the Trust's investment in the Structured Alpha Funds or advise the Committee according to the best interests of the Plans' participants and beneficiaries when it repeated Allianz's assertions about the operation of the Structured Alpha strategy and how it would perform in various market declines, including in a worst-case scenario, without adequately investigating whether those assertions were accurate and complete or presenting independent stress testing of its own.

(c)     Aon breached its duties to prudently advise the Committee regarding the Trust or advise the Committee according to the best interests of the Plans' participants and beneficiaries when it did not appropriately monitor the options positions Allianz had been constructing. If Aon had engaged in "active, ongoing monitoring" of Allianz, as Aon's fiduciary obligations and its contract with the Committee required—and as was essential given the incentives created by Allianz's fee structure—it would have noticed that Allianz had departed from the professed investment strategy and advised the Committee accordingly. The warning signs Aon should have found include, for example, that Allianz was purchasing puts too far out of the money, that Allianz was creating a duration mismatch by buying puts that expired before the ones it sold, and that Allianz was shorting the VIX without corresponding hedges. Each of these red flags, which Aon should have seen, contributed to the catastrophic losses the Plans suffered in February and March 2020. Aon was either not examining the proper data that would have revealed the warning signs or Aon saw the right data but chose not to advise the Committee of these red flags. Aon violated its duties regardless.

(d)     Aon breached its duty to prudently advise the Committee regarding the diversification of the Plan investments when it encouraged the Committee to invest and maintain a majority of the Trust in Structured Alpha—a much higher percentage than Aon's other clients had invested in the strategy. Although Aon undertook to provide investment advice regarding the diversification and allocation of Plan assets held in the Trust, it failed to prudently discharge that duty. Most notably, in response to questions the Committee had asked about whether having a majority of the Trust invested with Allianz was an undue concentration, Aon indicated that the Trust was properly diversified because the Trust's investment in Structured Alpha consisted of multiple beta components, while disregarding (and failing to inform the Committee of) the diversification risk associated with the same or substantially the same alpha strategy overlaying the Trust's entire investment in the Structured Alpha Funds.

(e)     Aon breached its duty to prudently advise the Committee in accordance with the Plan documents when it acted contrary to the Trust's Investment Policy Statement, which reflects the character and aims of the Trust. Aon's duties under the Investment Policy Statement include "recommending appropriate strategic policy and implementation structure and conducting manager due-diligence, searches and selection" and ensuring the Committee was "adhering to the guidelines of the Investment Policy Statement and making recommendations regarding changes should they need to be made." Aon failed to meet these obligations for at least the reasons stated above.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

. To the extent the allegations in Paragraph 164 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves and Aon denies those allegations on this basis as well. Aon denies the remaining allegations in Paragraph 164.

165. As a direct and proximate result of Aon's breaches of fiduciary duty, the Plans suffered devastating losses, with the exact amount to be proven at trial. Aon earned substantial fees and profits in connection with the imprudent investment advice it provided.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

To the extent a response is required, Aon denies the allegations in Paragraph 165.

## COUNT III: BREACH OF CO-FIDUCIARY DUTY – ERISA § 405
## (AGAINST ALLIANZ)

166. The Committee restates and realleges Paragraphs 1-165 as though fully set forth herein.

**ANSWER:** Aon restates all its responses as if fully set forth in response.

167. The Committee brings this Count under ERISA §§ 502(a)(2), (a)(3), and 409(a) (29 U.S.C. §§ 1132(a)(2), (a)(3), and 1109(a)). The Committee has the authority to bring this Count under these provisions because it is a fiduciary under ERISA of the Plans whose assets are held in the Trust. The Committee's charter, which the Plan sponsors have adopted, further authorizes the Committee to bring this Count.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

To the extent a response is required, Aon is without knowledge or information sufficient to form

a belief as to the truth of the allegations contained in Paragraph 167, and, accordingly, denies the

allegations in Paragraph 167.

168. In addition to any liability a fiduciary may otherwise have under ERISA, a fiduciary "shall be liable" under ERISA § 405(a) (29 U.S.C. § 1105(a)) "for a breach of fiduciary responsibility of another fiduciary" in certain circumstances. Those circumstances include where a fiduciary, by failing to comply with ERISA § 404(a)(1) (29 U.S.C. § 1104(a)(1)), "has enabled such other fiduciary to commit a breach."

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

169.     Allianz is liable under ERISA § 405(a) (29 U.S.C. § 1105(a)), including because through its own breaches of fiduciary duty under ERISA § 404(a)(1) (29 U.S.C. § 1104(a)(1)), Allianz enabled Aon to commit breaches. For example, Allianz's presentations included incomplete and inaccurate information regarding the Structured Alpha strategy that enabled Aon's breaches in providing imprudent investment advice to the Committee regarding the strategy.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

To the extent a response is required, Aon denies the allegations in Paragraph 169.

170.     As a direct and proximate result of Allianz's breaches as a co-fiduciary, the Plans suffered devastating losses, with the exact amount to be proven at trial. Allianz's co-fiduciary breaches also caused it to earn substantial fees and profits.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

To the extent a response is required, Aon is without knowledge or information sufficient to form

a belief as to the truth of the allegations contained in Paragraph 170, and, accordingly, denies the

allegations in Paragraph 170.

## COUNT IV: BREACH OF CO-FIDUCIARY DUTY – ERISA § 405
## (AGAINST AON)

171.     The Committee restates and realleges Paragraphs 1-170 as though fully set forth herein.

**ANSWER:** Aon restates all its responses as if fully set forth in response.

172.     The Committee brings this Count under ERISA §§ 502(a)(2), (a)(3), and 409(a) (29 U.S.C. §§ 1132(a)(2), (a)(3), and 1109(a)). The Committee has the authority to bring this Count under these provisions because it is a fiduciary under ERISA of the Plans whose assets are held in the Trust. The Committee's charter, which the Plan sponsors have adopted, further authorizes the Committee to bring this Count.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

To the extent a response is required, Aon is without knowledge or information sufficient to form

a belief as to the truth of the allegations contained in Paragraph 172, and, accordingly, denies the

allegations in Paragraph 172.

173.     In addition to any liability a fiduciary may otherwise have under ERISA, a fiduciary "shall be liable" under ERISA § 405(a) (29 U.S.C. § 1105(a)) "for a breach of fiduciary responsibility of another fiduciary" in certain circumstances. Those circumstances include where

a fiduciary, by failing to comply with ERISA § 404(a)(1) (29 U.S.C. § 1104(a)(1)), "has enabled such other fiduciary to commit a breach."

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

174.    Aon is liable under ERISA § 405(a) (29 U.S.C. § 1105(a)), including because through its own breaches of fiduciary duty under ERISA § 404(a)(1) (29 U.S.C. § 1104(a)(1)), Aon enabled Allianz to commit breaches. For instance, Aon's failure to monitor the Structured Alpha portfolio construction enabled Allianz to continue making imprudent decisions that exposed the Trust's investment to excess and undisclosed risk. If Aon had been properly monitoring Structured Alpha, as Aon said it would, it would have seen several red flags indicating that Allianz was managing a riskier strategy than what had been disclosed to the Committee. Aon would have found that Allianz was purchasing ineffective puts that were too deep out of the money, that Allianz was buying puts that expired sooner than those it sold, and that Allianz was leaving its VIX options unhedged. As a consequence of Aon's imprudent failure to monitor, Allianz was able to breach (and continue breaching) its own obligations by managing the strategy to add excess and undisclosed risk to the Trust's portfolio in violation of its fiduciary duties. Each of the imprudent actions Aon failed to discover contributed to the catastrophic losses the Plans suffered in February and March 2020.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

To the extent a response is required, Aon denies the allegations in Paragraph 174.

175.    As a direct and proximate result of Aon's breaches as a co-fiduciary, the Plans suffered devastating losses, with the exact amount to be proven at trial. Aon earned substantial fees and profits in connection with the imprudent investment advice it provided.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

To the extent a response is required, Aon denies the allegations in Paragraph 175.

## COUNT V: PROHIBITED TRANSACTION – ERISA § 406
## (AGAINST ALLIANZ)

176.    The Committee restates and realleges Paragraphs 1-175 as though fully set forth herein.

**ANSWER:** Aon restates all its responses as if fully set forth in response.

177.    The Committee brings this Count under ERISA §§ 502(a)(2), (a)(3), and 409(a) (29 U.S.C. §§ 1132(a)(2), (a)(3), and 1109(a)). The Committee has the authority to bring this Count under these provisions because it is a fiduciary under ERISA of the Plans whose assets are held in the Trust. The Committee's charter, which the Plan sponsors have adopted, further authorizes the Committee to bring this Count.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 177, and, accordingly, denies the allegations in Paragraph 177.

178. A fiduciary may not engage in certain prohibited transactions under ERISA § 406(b) (29 U.S.C. § 1106(b)). For instance, a fiduciary "shall not deal with the assets of the plan in his own interest or for his own account."

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

179. Allianz violated ERISA § 406(b) (29 U.S.C. § 1106(b)), including by managing the Plan assets in its own self-interest and not for the exclusive purpose of providing benefits to the Plans' participants and beneficiaries. Allianz managed the Structured Alpha Funds to maximize its own fees—adding excess and undisclosed risk to the portfolio in the process— rather than for the sole interest of safeguarding the Trust's investment. Allianz did so at least by constructing the portfolio to be largely unhedged in the January and February 2020 timeframe and then, when the market declined in February and March 2020, adding more risk to the portfolio to chase return (and thus fees) rather than safeguarding the Trust's investment.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 179, and, accordingly, denies the allegations in Paragraph 179.

180. As a direct and proximate result of Allianz's violations of ERISA § 406(b) (29 U.S.C. § 1106(b)), the Plans suffered devastating losses, with the exact amount to be proven at trial. Allianz's violations also caused it to earn substantial fees and profits.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 180, and, accordingly, denies the allegations in Paragraph 180.

## COUNT VI: BREACH OF CONTRACT
## (AGAINST ALLIANZ)

181.     The Committee restates and realleges Paragraphs 1-180 as though fully set forth herein.

**ANSWER:** Aon restates all its responses as if fully set forth in response.

182.     In connection with the Trust's investment in the Structured Alpha Funds, the Committee and Allianz entered an Amended and Restated Investment Management Side Agreement (the "Investment Management Agreement"). The Trust is a third-party beneficiary of the Investment Management Agreement, including because certain obligations Allianz owes under this agreement are owed "to the Trust."

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

To the extent a response is required, Aon is without knowledge or information sufficient to form

a belief as to the truth of the allegations contained in Paragraph 182, and, accordingly, denies the

allegations in Paragraph 182.

183.     The Trust's investment in the Structured Alpha Funds was also governed by the Fund Documents—i.e., the Limited Liability Company Agreement, Private Placement Memorandum, and Subscription Agreement by which Trust assets were invested in each Fund (together with the Investment Management Agreement, the "Allianz Agreements").

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

To the extent a response is required, Aon is without knowledge or information sufficient to form

a belief as to the truth of the allegations contained in Paragraph 183, and, accordingly, denies the

allegations in Paragraph 183.  To the extent the allegations in Paragraph 183 seek to paraphrase or

characterize the contents of documents or communications, the documents or communications

speak for themselves, and Aon denies those allegations on this basis as well.

184.     The Allianz Agreements are valid and enforceable contracts.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

To the extent a response is required, Aon is without knowledge or information sufficient to form

a belief as to the truth of the allegations contained in Paragraph 184, and, accordingly, denies the

allegations in Paragraph 184. To the extent the allegations in Paragraph 184 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

185. The Committee and the Trust have performed their obligations under the Allianz Agreements.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 185, and, accordingly, denies the allegations in Paragraph 185. To the extent the allegations in Paragraph 185 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

186. Allianz breached its obligations under the Allianz Agreements.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 186, and, accordingly, denies the allegations in Paragraph 186. To the extent the allegations in Paragraph 186 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

187. Allianz promised in the Investment Management Agreement that it would manage the Trust's investments "in good faith" and with "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." Allianz agreed it would uphold this "Contractual Fiduciary Standard of Care" regardless of whether the underlying assets it was managing were "plan assets" within the meaning of ERISA.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 187, and, accordingly, denies the

allegations in Paragraph 187.  To the extent the allegations in Paragraph 187 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

188.    In certain of the Funds' Limited Liability Company Agreements and Private Placement Memoranda, Allianz likewise undertook to comply with the standard of care imposed on ERISA fiduciaries, regardless of whether the underlying assets of the Funds were "plan assets" within the meaning of ERISA.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 188, and, accordingly, denies the allegations in Paragraph 188.  To the extent the allegations in Paragraph 188 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

189.    Allianz breached its contractual duty to manage the Funds in a professional manner and with the care, skill, prudence, and diligence of a professional investment manager responsible for the investment of employee benefit plan assets.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 189, and, accordingly, denies the allegations in Paragraph 189.

190.    Allianz's breaches include, without limitation, the following:

(a)    Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it did not put the appropriate hedges in place to protect the assets during a market decline. This failure added excess and undisclosed risk and was contrary to the representations Allianz had made to the Committee and others that the hedges would be in place "at all times" as "reinsurance" for the Trust's portfolio.

(b)    Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it sold the new-configuration hedges and took on new risk-bearing positions starting in late-February 2020.

These discretionary restructurings exposed the Trust's investments to further downside risk and were contrary to Allianz's representations, including that it would not sell the new-configuration hedges that should have been locked in to safeguard the Plan assets.

(c)     Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it represented that it had constructed the portfolio in a way that would ensure a defined "Max Loss" and then managed the strategy in a way that exposed the Trust to unlimited losses.

(d)     Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it either failed to have adequate risk management measures in place or abandoned such measures.

(e)     Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it represented that it would manage the Structured Alpha strategy in such a way to eliminate the risk of margin calls yet implemented a strategy in which that very risk materialized.

(f)     Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it, unbeknownst to the Committee, decided to purchase puts that were further out of the money than the maximum range Allianz had disclosed, thus adding excess and undisclosed risk to the Trust's portfolio, in an apparent effort to increase Allianz's fees.

(g)     Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it, unbeknownst to the Committee, decided to purchase puts that expired sooner than the puts it sold. This practice was contrary to Allianz's representations that its short and long positions would be of relatively equal duration and added excess and undisclosed risk to the Trust's portfolio. Allianz created this "duration mismatch" not because it was in the best interests of the Plans' participants and beneficiaries, but because doing so allowed Allianz to enhance its fees.

(h)     Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it, unbeknownst to the Committee, decided to sell volatility index options without buying any corresponding hedge, adding excess and undisclosed risk to the Trust's portfolio, again in an apparent effort to enhance its fees.

(i)     Allianz breached its duties to prudently manage the Plan assets or manage them according to the best interests of the Plans' participants and beneficiaries when it caused the Committee to believe that Structured Alpha's risk profile was consistent with Allianz's stated investment strategy rather than the actual risk profile, either by making false or misleading representations about Structured Alpha or failing to disclose information necessary to correct prior representations that were inconsistent with how Allianz was actually managing the strategy.

(j)     Allianz breached its duty to ensure the Trust's investments were prudently diversified when it operated a strategy that was unduly weighted towards being short volatility in

February and March 2020 (contrary to its pledge not to make directional bets) and created excess and undisclosed correlated risks across the Structured Alpha Funds.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 190, and, accordingly, denies the allegations in Paragraph 190. To the extent the allegations in Paragraph 190 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

191. Allianz also agreed to abide by the Investment Policy attached to the Investment Management Agreement that governed the Trust's investment in Structured Alpha and to manage the Funds according to the Fund Documents, under which Allianz agreed to have "structural risk protections" in place as a component of the Structured Alpha strategy.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 191, and, accordingly, denies the allegations in Paragraph 191. To the extent the allegations in Paragraph 191 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

192. Allianz breached its obligation to have such structural risk protections in place, including because it failed to purchase and maintain hedges that would afford such protection to the portfolio.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 192, and, accordingly, denies the allegations in Paragraph 192.

193. Allianz agreed to provide advance notice of any material adverse amendment to the Funds' Limited Liability Company Agreements, which Allianz recognized required advance notice to the Trust of changes to the Funds' investment strategy.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 193, and, accordingly, denies the allegations in Paragraph 193.

194.     Allianz breached its duty to provide advance notice of changes to the Funds' investment strategy (and to obtain the Trust's consent to the same) when it altered the Funds' investment strategies to add excess and undisclosed risk without advance notice to the Committee or the Trust.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 194, and, accordingly, denies the allegations in Paragraph 194.

195.     The Allianz Agreements recognize that Allianz may be liable to the Trust for losses resulting from the Funds' investments where Allianz acted in bad faith or where its action or inaction constitutes negligence or willful misconduct. Allianz's conduct was at least negligent.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 195, and, accordingly, denies the allegations in Paragraph 195.  To the extent the allegations in Paragraph 195 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

196.     The Investment Management Agreement provides further that Allianz "shall indemnify and hold harmless the Trust from and against any and all claims, losses, costs, expenses (including, without limitation, attorneys' fees and court costs), damages, actions or causes of action directly resulting from a breach" by Allianz of its "fiduciary duties" delegated to it under this agreement.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon is without knowledge or information sufficient to form

a belief as to the truth of the allegations contained in Paragraph 196, and, accordingly, denies the allegations in Paragraph 196. To the extent the allegations in Paragraph 196 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

197.     As a direct and proximate result of Allianz's breaches of the Allianz Agreements, the Trust sustained actual damages, with the exact amount to be proven at trial.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

## COUNT VII: BREACH OF CONTRACT
### (AGAINST AON)

198.     The Committee restates and realleges Paragraphs 1-197 as though fully set forth herein.

**ANSWER:** Aon restates its responses to Paragraphs 1-197 as fully restated herein.

199.     The Committee and Aon entered an Investment Consulting Agreement, under which the Committee appointed Ennis, Knupp & Associates, Inc. (now known as Aon Investments USA Inc.) as an investment adviser with respect to the Plan assets held in the Trust (the "Aon Agreement").

**ANSWER:** Aon admits the allegations in Paragraph 199.

200.     The Aon Agreement is a valid and enforceable contract.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

201.     The Trust is a third-party beneficiary of the Aon Agreement, including because the Aon Agreement provides that "this Agreement and each and every provision thereof is for the exclusive benefit of" the Committee and "the Trusts," among others.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon denies the allegations in Paragraph 201. To the extent the allegations in Paragraph 201 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

202.     The Committee has performed its obligations under the Aon Agreement.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required.

203.     Under the Aon Agreement, Aon promised to provide various investment consulting and advisory services to the Committee regarding the Trust.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon denies the allegations in Paragraph 203. To the extent the allegations in Paragraph 203 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

204.     Aon agreed to "adher[e]" to and to "provide its advice to [the Committee] pursuant to" various professional standards, including those contained in *Prudent Investment Practices: A Handbook for Investment Fiduciaries* and *Prudent Practices for Investment Advisors*.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon denies the allegations in Paragraph 204. To the extent the allegations in Paragraph 204 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

205.     Aon also agreed to exercise the "skill," "proficiency," and "experience" it claimed to have as a professional investment adviser in performing its duties under the contract.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon denies the allegations in Paragraph 205. To the extent the allegations in Paragraph 205 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

206.     Aon breached its obligation to perform its duties under the contract in a professional manner and according to professional standards applicable to an investment adviser providing investment advice concerning employee benefit plan assets.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon denies the allegations in Paragraph 206. To the extent the allegations in Paragraph 206 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

207.    For instance, the Aon Agreement obligates Aon to engage in "active, ongoing monitoring" of Allianz to "assess evolving strengths, weaknesses and issues" and "identify any forward-looking issues that could impact performance." Aon breached that obligation by, among other things, (i) failing to monitor and inform the Committee of the nature (and inadequacy) of the Structured Alpha hedging strategy, (ii) failing to monitor and inform the Committee of breakdowns in Allianz's risk management protocols, learning only after the catastrophic events of March 2020 that Allianz had inadequate risk management protocols in place; and (iii) failing to monitor and inform the Committee of the level of unhedged risk that Allianz was undertaking to drive returns.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon denies the allegations in Paragraph 207. To the extent the allegations in Paragraph 207 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

208.    Likewise, the Aon Agreement obligated Aon to apply the proficiency and skill it claimed to have as an experienced investment adviser in its monitoring of Allianz. Aon breached that obligation by, among other things, (i) failing to apply its own purported skill, proficiency, or experience in its monitoring of Structured Alpha and instead passing off Allianz marketing materials as the result of its own analysis and evaluation, despite the fact that the Allianz marketing materials recycled by Aon often did not describe the particular Structured Alpha Funds in which the Trust had invested; (ii) providing incomplete and inaccurate characterizations of the risks presented by Structured Alpha; and (iii) failing to discover the breakdowns in Allianz's risk management protocols that it would have uncovered had it exercised the care, skill, or proficiency of an experienced professional investment adviser.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon denies the allegations in Paragraph 208. To the extent the allegations in Paragraph 208 seek to paraphrase or characterize the contents of documents or

communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

209. The Aon Agreement also required Aon to "inform itself" of any information necessary to discharge its duties, including its obligation to engage in ongoing monitoring and evaluation of Allianz. Aon breached that obligation by, among other things, either not obtaining or disregarding details of the actual hedging positions that Allianz was purchasing as supposed "reinsurance." Had Aon informed itself of the actual hedges Allianz was purchasing—and thus learned of the complete absence of hedges for much of the Trust's portfolio and plainly ineffective hedges for the rest—it never could have described Structured Alpha as including a "reinsurance" component or recommended that the Trust maintain its investment in the strategy.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon denies the allegations in Paragraph 209. To the extent the allegations in Paragraph 209 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

210. The Aon Agreement also required Aon to evaluate the Trust's Investment Policy Statement and to make at least annual recommendations concerning the appropriate investment policy for the Trust. Among the factors Aon was to consider in making such recommendations was "the risk tolerance" of the Trust and the Committee. Aon breached that obligation by, among other things, not recommending appropriate revisions to the Investment Policy Statement to ensure that the Trust's investment in Structured Alpha was appropriate for the risk tolerance of the Trust and the Committee, as expressed in the Investment Policy Statement.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon denies the allegations in Paragraph 210. To the extent the allegations in Paragraph 210 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

211. Likewise, Aon promised to advise the Committee regarding asset allocation and diversification of the Plan investments such that the "planned asset allocation" could be "expected." Aon breached that duty by, among other things, improperly advising the Committee about the effect of Structured Alpha on the Trust's planned asset allocation and diversification. For instance, while Aon advised the Committee that Structured Alpha could be classified in the

Trust's overall asset allocation according to the underlying beta component, that advice departed from the "planned asset allocation" and led the Trust to take on more risk than expected or desired.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon denies the allegations in Paragraph 211. To the extent the allegations in Paragraph 211 seek to paraphrase or characterize the contents of documents or communications, the documents or communications speak for themselves, and Aon denies those allegations on this basis as well.

212.    As a direct and proximate result of Aon's breaches of the Aon Agreement, the Trust sustained actual damages, with the exact amount to be proven at trial.

**ANSWER:** To the extent this allegation asserts a legal conclusion, no response is required. To the extent a response is required, Aon denies the allegations in Paragraph 212.

## AFFIRMATIVE DEFENSES

Aon sets forth the following affirmative defenses, which incorporate and in part rely on the allegations in Aon's Counterclaim Against Blue Cross and Blue Shield National Employee Benefits Committee.  In asserting these affirmative defenses, Aon is not assuming the burden to establish any fact or proposition where that burden is properly imposed on Plaintiff.  Aon reserves the right to assert additional affirmative defenses based on facts revealed during discovery.

## FIRST AFFIRMATIVE DEFENSE

### (*In pari delicto*)

Plaintiff, as compared to Aon, bears at least substantially equal responsibility for the wrong Plaintiff seeks to redress; and preclusion of the suit would not interfere with the purposes of the underlying law or otherwise contravene the public interest.

## SECOND AFFIRMATIVE DEFENSE

### (Comparative Fault/Negligence)

Plaintiff did not exercise ordinary care, caution and prudence in connection with the transactions and events that are alleged in the complaint; Plaintiff's lack of care, caution and prudence were independent and unrelated to the actions, if any, taken by Aon.  Moreover, Plaintiff directed, ordered, approved and/or ratified the alleged wrongful acts set forth in the complaint. Plaintiff is therefore barred from recovery against Aon, or, alternatively, Plaintiff's recovery, if any, should be proportionately reduced.

## THIRD AFFIRMATIVE DEFENSE

### (Lack of Proximate Causation)

To the extent Plaintiff suffered injury arising from the loss of its investments in Structured Alpha, that injury was not proximately caused by Aon.  Plaintiff is thus barred from recovery from Aon, in that any damage proven to have been sustained by Plaintiff was caused by the intervening

action or actions of Plaintiff and/or other persons or parties that were a superseding cause of their damages and not due to any act or omission on the part of Aon.

## FOURTH AFFIRMATIVE DEFENSE

### (Set Off and Recoupment)

Without conceding that any act of Aon caused damage to Plaintiff or any other person in any respect, Aon is entitled to offset and recoup against any judgment that may be entered against it all obligations of Plaintiff owing to Aon. Offset and recoupment are appropriate by reason of Plaintiff's breach of duty as alleged in the counterclaim.

## FIFTH AFFIRMATIVE DEFENSE

### (Indemnity)

If Aon is found in some manner responsible to Plaintiff for the matters alleged in the Complaint, any such injury, damage, or other costs were proximately caused and contributed to by the negligence, fault, acts or omissions of other individuals or entities for whose conduct Aon is not responsible. Thus, Aon requests a Court declaration of its right to be indemnified and held harmless by those persons or entities.

## SIXTH AFFIRMATIVE DEFENSE

### (Failure to State a Cause of Action)

Plaintiff's claims fail to state a cause of action because, *inter alia*, (i) Aon has fulfilled all of its duties and obligations under the parties' agreements and under ERISA; and (ii) Plaintiffs has received more that its full measure of damages through its settlement with Allianz.

## SEVENTH AFFIRMATIVE DEFENSE

### (Prevention of Performance)

Plaintiff breached the contract with Aon by failing timely, fully, and adequately to perform the terms and conditions therein, thereby preventing Aon's performance and discharging any obligation on the part of Aon.

## EIGHTH AFFIRMATIVE DEFENSE

### (Estoppel)

Plaintiff's claims are barred, in whole or in part, by the equitable doctrine of estoppel.

## NINTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate Damages)

Plaintiff has failed to take reasonable, necessary, appropriate, and feasible steps to mitigate or attempt to mitigate damages, if in fact any damages have been sustained, and to the extent of such failure to mitigate, any recovery by Plaintiff must be diminished or barred by reason thereof.

## TENTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

Plaintiff's claims are barred in whole or in part by the equitable doctrine of unclean hands.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Assumption of the Risk)

Knowing that there was a risk of the same sort of injury that Plaintiff actually suffered, Plaintiff voluntarily took on that danger and is therefore barred from recovery on its claims.

**AON INVESTMENTS USA INC.'S COUNTERCLAIM AGAINST BLUE CROSS AND
BLUE SHIELD NATIONAL EMPLOYEE BENEFITS COMMITTEE**

Pursuant to Federal Rule of Civil Procedure 13(a)(1), for its Counterclaim against Plaintiff Blue Shield Association National Employee Benefits Committee (the "Committee"), Defendant/Counterclaim Plaintiff Aon Investments USA Inc. ("Aon") states as follows:

## NATURE OF THE COUNTERCLAIM

1.      This Counterclaim arises out of the Committee's breaches of its fiduciary duties under ERISA, imputed to it via the actions (and inactions) of its members, particularly Robert Kolodgy, Michael Mizeur, and John Giblin.  By this Counterclaim, Aon brings these claims for contribution against Plaintiff-Counterclaim Defendant the Committee.[4]

2.      The Committee is a 12-member fiduciary committee of the Board of the Blue Cross and Blue Shield Association ("BCBSA"), with discretionary authority and responsibility over all investment decisions for the National Retirement Trust (the "Trust").  The Trust, in turn, is funded by numerous Blue Cross defined benefit plans ("Plans," and each, a "Plan"), for whom the Committee serves as a named fiduciary.  The Committee thus assumed primary responsibility for the Trust assets: ███████████████████████████████████████████████ ██████████  To help it to discharge these responsibilities, the Committee in turn created the Investment Subcommittee ("ISC"), a five-member committee chaired by the Committee's Vice Chair, and tasked it with making investment recommendations to the Committee and reviewing the performance of investment managers and funds.  Beginning in approximately 2010, the

---

[4]   Aon's third-party complaints against James R. Sharpe, Terrence J. Cooney, Robert J. Kolodgy, John Giblin, and Michael Mizeur are being filed concurrently with this Answer and Counterclaim.

Committee delegated day-to-day fiduciary responsibility over the Plans' Trust investments to the National Employee Benefits Administration ("NEBA"), a department of the BCBSA

3.     The Committee's delegation of its fiduciary duties to NEBA, in turn, conferred fiduciary responsibility over the Trust's assets on senior NEBA executives Jamey Sharpe and Terrence Cooney, each of whom served as the Committee's Assistant Secretary (Mr. Sharpe from 2015 and continuing through all relevant periods and Mr. Cooney from 2015 and continuing through all relevant periods). However, the Committee retained its fiduciary duties to the Trust, including a duty supervise NEBA's proper management of the Trust's assets.

4.     As NEBA Chief Investment Executive, Mr. Sharpe advised the Committee on asset concentration, risk, and making and terminating investments on behalf of the Trust. He was also responsible for manager selection, including by performing diligence on and monitoring prospective and then-current outside managers of Trust assets. Mr. Sharpe was central to the Committee's management of the Trust; indeed, the Committee's Charter *required* the Committee to seek NEBA's, and thus Mr. Sharpe's, services and advice.

5.     Mr. Cooney was an even more senior NEBA executive who served as Mr. Sharpe's direct supervisor; he also bore responsibility for managing Trust assets, conducting manager due diligence and monitoring, and advising the Committee.

6.     In 2011, the Committee, acting as the Plans' named fiduciary, invested the Trust assets ultimately belonging to the Plans in Structured Alpha funds managed by Defendant Allianz Global Investors U.S. LLC ("Allianz"). By 2020, at the suggestion of NEBA, the Committee had expanded the Trust's Structured Alpha investment to nearly $3 billion, a majority of the Trust's total assets. Then, on February 20, 2020, capital markets entered a tailspin, brought on in part by COVID-19, with the S&P 500 dropping over 33% over the next five weeks. Most equities and

fixed income investments eventually recovered. But Structured Alpha was no more; by the end of March 2020, the Committee had lost more than $2 billion of the Trust's investments managed by Allianz.

7. Aon served as the Committee's investment consultant between 2009 and 2020 under the Investment Consulting Agreement ("ICA"). Aon's task was to provide investment advice to the Committee and to assist NEBA in monitoring the Trust's investment managers, including Allianz. The Committee *never* delegated to Aon any responsibility for making investment decisions on the Committee's behalf. Rather, under the ICA, the Committee retained for itself the power to make discretionary decisions regarding, among other things, manager selection, asset allocation, and making and/or terminating investments.

8. On September 16, 2020, Plaintiff filed its complaint in this Action (the "Complaint," Dkt. 1) alleging, among other things, that Aon breached its duties as an ERISA fiduciary, thereby causing the Trust's 2020 losses. The Committee claimed that it did not understand Structured Alpha's risks and that it was unaware that the Trust's concentration of assets in Structured Alpha was excessive. It also claimed that it was harmed by Allianz's reckless actions, including constructing the portfolio to bear excess, undisclosed risk; and restructuring the portfolio to chase returns rather than preserve investor capital, thereby placing its own interests in generating performance fees ahead of its duty to safeguard the Plan assets against undue risk.

9. Aon denies that it bears any liability, and denies that the Committee is entitled to any of the relief sought against Aon in the Complaint. Even if Aon is found to have breached its fiduciary duties, the other two parties – Allianz, the investment manager that actually decided how to deploy Trust assets in the market; and the Committee, which blindly trusted that manager's process – are more to blame for the catastrophic losses giving rise to this action.

10.     ***First,*** Allianz, via its negligent, reckless, intentional and altogether wrongful acts, is primarily responsibility for any losses that the Committee may have suffered.  Allianz induced the Committee to invest and remain invested in Structured Alpha with promises that the strategy would outperform its competition "whether equity markets are up or down, smooth or volatile," while providing "protect[ion] against a market crash."  Allianz claimed that Structured Alpha's performance did not depend on "correctly taking a view on the direction of equities, interest rates or any other fundamental factor."  Specifically, Allianz promised the Committee that Structured Alpha would "***never make a forecast on the direction of equities or volatility***."

11.     Aon monitored Allianz's management of the Trust's assets, but, like the rest of the investing community, Aon was unable to see what became clear until it was too late:  for years, Allianz systematically and regularly exposed investors in Structured Alpha to devastating losses, because Allianz ***was***, in fact, making a directional bet on volatility.  At all relevant times, Allianz assumed that high volatility markets would give way to low volatility markets in a relatively short timeframe.  When volatility was high, or expected to be high, Allianz realized gains by selling put options to buyers who would suffer losses if expected volatility subsided.  The buyer's hypothetical losses would be Allianz's gains; but, if market volatility remained high or increased, then Allianz would be the one sustaining losses.  Thus, the success of Structured Alpha, and the benefits it promised to investors like the Committee, depended on Allianz's assumption that any period of volatility would be short-lived.  That was not what Allianz told Aon or the Committee.

12.     Allianz also repeatedly assured the Committee that there were "[m]ultiple layers of risk control" protecting the Plans' invested assets.  The Committee would not have invested the Trust's funds in Structured Alpha had it not been for Allianz's promise to maintain a "three-legged stool" of risk management measures: (i) hedging positions that Allianz had in place "at all times,"

regardless of market conditions, which would limit downside loss if markets dropped 25%; (ii) "[r]eal-time risk monitoring" by Structured Alpha managers; and (iii) risk oversight from independent investment professionals who did not share in Allianz's performance fees. But there was no stool: Allianz's claims about its risk controls were as inaccurate as its claims about the safety of the Structured Alpha Strategy writ large. The hedging positions that Allianz held were essentially worthless. The risk monitors, both internal and independent, did nothing to prevent Structured Alpha's managers from exposing the Trust to significant downside risks. Inexplicably, even though Allianz funded many of Structured Alpha's options sales by using equity securities as collateral, Allianz had no method for projecting the risk of margin calls in a down market – including the margin calls that ultimately proved fatal to Structured Alpha.

13.     In this context, Allianz was reckless in representing to Aon and the Committee that the Structured Alpha strategy would perform well in a falling market with rising volatility. Allianz had no safety net, and it knew that if its assumptions about short-lived volatility were wrong, the risks to the Trust were enormous. ████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████ ████████████████████████████████ ████████████████████████████████ A light breeze would blow it over. And a hurricane was on the horizon.

14.     In March 2020, during the market dislocation brought on by COVID-19, Structured Alpha suffered massive losses, received margin calls from several of its prime brokers, and was forced to liquidate several of the funds in which the Committee had invested. But the fact that the Structured Alpha strategy carried enormous downside risks was nothing new to Allianz. Structured Alpha's managers had known about the strategy's very real risk of margin calls for

nearly a decade by the beginning of 2020; and it had routinely realized gains by taking on leverage to bet on the direction of equities and volatility, rather than by abstaining from directional bets, as it claimed to its investors. But instead of disclosing the true risks of Structured Alpha to Aon and the Committee, Allianz shared inaccurate and misleading information, including about the funds' historical performance, their collateralization rates, and their expected losses in the event of a market shock.

15. ███████████████████████████████████████████

████████████████████████████████████████████████████

███████████ Therefore Aon cannot be held responsible for Allianz's decision to defraud the Committee, Aon, and numerous other clients in Structured Alpha by altering information, concealing risks, and lying to its investors about the true nature of the product.

16. ***Second***, the Committee cannot recover from Aon because the Committee is substantially more at fault for and directly caused any alleged losses. The Committee, through its contractual relationship with Allianz, was in a better position than Aon to receive and analyze data from Allianz that was necessary to appreciate the actual risks of the Structured Alpha Strategy. Even if the Committee was not substantially more at fault than Aon, its breaches of its fiduciary duties still caused any alleged losses, and it thus must bear its proportionate share of liability for those losses. The Committee abdicated its responsibility to independently analyze the Trust's investment in Structured Alpha, instead relying entirely on NEBA, and specifically NEBA's Chief Investment Executive, Jamey Sharpe, to tell it what to do. Among other things, to the extent that the Committee's concentration of assets in Structured Alpha was excessive—which the Committee alleges and Aon denies—the Committee is substantially more at fault than Aon.

17. Neither theory of liability the Committee puts forth in its Complaint as to Aon withstands scrutiny. As an initial matter, to the extent that the Committee's concentration of assets in Structured Alpha was improper or imprudent—which Aon denies—the Committee is substantially more at fault than Aon because it blindly trusted Mr. Sharpe. Mr. Sharpe aggressively promoted the expansion of the Trust's Structured Alpha investments from 4.64% at the end of 2013 to 62.01% by the end of 2016. He did so at times contrary to Aon's advice or without even seeking it. He made the Trust's Structured Alpha concentration his responsibility, and publicly took credit for its expansion. The Committee was happy to let Mr. Sharpe take control over the Trust's assets.

18. And to the extent the Committee asserts that it did not properly understand the risks of Structured Alpha and would have acted differently had it understood such risks, the Committee and its members are at fault for failing to take proper steps to understand Structured Alpha. For example, despite Mr. Giblin's nine years of service on the Committee, his chairmanship of the ISC, and the Committee's investment of billions in the Structured Alpha options overlay strategy,

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████ That failure extends to the entire Committee, because, among other things, ███████████████████████

██████████████████████████████████ Confirming Mr. Giblin's admission, ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ And this ignorance

was far from harmless; ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████

19.     The Committee's ignorance of the strategy, and its blaming of Aon, is especially inexcusable given its contractual rights as an investor in Structured Alpha to holdings data, performance monitoring, and risk reports, which Aon could have only obtained with the Committee's express permission.  The Committee never questioned any of the numerous Allianz representations about the strategy which later proved false, including:

a.     That Structured Alpha had the "ability to outperform whether equity markets are up or down, smooth or volatile," while simultaneously providing "protect[ion] against a market crash;"

b.     That long-term market trends had no impact on the performance of the strategy, because it was "not predicated on correctly taking a view on the direction of equities, interest rates or any other fundamental factor;"

c.     That the Structured Alpha managers would "***never make a forecast on the direction of equities or volatility***;"

d.     That Allianz would always be both a buyer and seller of options, and that Structured Alpha would "always be a net buyer of put options, providing protection against a tail event or market crash;" and

e.     That "[o]nly a small portion of the underlying assets are used to implement the options strategy," meaning the bulk of funds under management remained invested in the stable beta indexes; and

f.     That Structured Alpha did not have margin call risk.

20.     By utterly failing to test any of these claims or perform any diligence of its own, the Committee abdicated its responsibility under ERISA, improperly ceded its authority to Mr. Sharpe, who in turn cultivated a close, direct relationship with Allianz, withheld information from Aon, sought to diminish Aon's due diligence role, and even blocked Aon from trying to save the Trust money by reducing Allianz's fees. ███████████████████████████ ████████████████████████████████████████████████████ The buck stops with the Committee for these failures, and the Committee cannot now seek to—in the words of one of NEBA's own senior managers—███████████████████ and their own.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 29 U.S.C. §§ 1132(e)(1) & (f), and 28 U.S.C. § 1367(a).

22.     This Court has personal jurisdiction under 29 U.S.C. § 1132(e)(2) and, in the alternative, under 28 U.S.C. § 1391 because Plaintiff/Counterclaim Defendant was subject to personal jurisdiction at the time this action was commenced.

23.     Venue is proper because venue in the Action is proper under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b).

## THE PARTIES

### A. Plaintiff/Counterclaim Defendant Blue Cross and Blue Shield Association National Employee Benefits Committee

24.     The Committee is the plan administrator and named fiduciary of the Plans under ERISA (29 U.S.C. §§ 1002(16)(A), 1102(a)(2)).  The Committee was established in 1953 to manage and oversee the administration and investment of national employee benefits and related programs, including the Trust.  The BCBSA Board established the Committee as an independent committee on June 20, 2013; prior to that date, the Committee was a standing committee of the BCBSA Board.

### B. Defendant/Counterclaim Plaintiff Aon Investments USA Inc.

25.     Aon is an Illinois corporation with its principal office in Chicago, Illinois.  Between 2009 and 2020, Aon provided investment advice to the Committee, pursuant to the ICA.

### C. Relevant Non-Parties

26.     The Blue Cross and Blue Shield Association is an Illinois corporation headquartered in Chicago, Illinois.  BCBSA controls the Blue Cross and Blue Shield trademarks and names, which it licenses to defined benefit plans across the United States.

27.     The National Employee Benefits Administration ("NEBA") is a department of BCBSA.  As described further below, the Committee broadly delegated primary fiduciary responsibilities over the Trust to NEBA and relied on NEBA for investment manager due diligence and investment recommendations.

28.     The Plans are the numerous Blue Cross defined benefit plans that invested their assets in the Trust and entrusted the Committee and NEBA with fiduciary responsibility over those Trust assets.  Sixteen of those Plans allegedly suffered losses.  Compl. ¶ 16 n.1.  Senior executives of many of those 16 Plans (and other Plans) served on the Committee between 2009 and 2020.

29.     James "Jamey" R. Sharpe served as Chief Investment Executive of NEBA and Assistant Secretary of the Committee at all times relevant to the Third-Party Complaint.  He stepped down on or about January 7, 2022 after more than 30 years of employment by BCBSA.

30.     Terrence J. Cooney is Vice President, Investments at NEBA and the Assistant Secretary of the Committee.  He was Mr. Sharpe's direct supervisor.

31.     In addition to junior support teams, Mr. Sharpe and Mr. Cooney were supported by more senior NEBA officials, including but not limited to Cara Esser, Mark Polewski, and Leonor DeSouza.

32.     Robert Kolodgy is the Executive Vice President and Chief Financial Officer of BCBSA.  He also served as a member of the Committee from 2015 to 2020.

33.     John Giblin is the Executive Vice President and Chief Financial Officer of BCBS Tennessee.  He served on the Committee from 2011 to 2020, including as the Committee's vice-chair from 2014 to 2020.  Mr. Giblin also served on the ISC in 2012 and 2014-2020—and presided as its Chair from 2014 to 2020.

34.     Michael Mizeur is the President and Chief Operating Officer Blue Cross Blue Shield South Carolina.  Mr. Mizeur also served on the Committee and the ISC between 2012 and 2020.

## FACTUAL ALLEGATIONS

I.     **THE COMMITTEE'S FIDUCIARY RESPONSIBILITIES UNDER THE PLAN DOCUMENTS AND ERISA**

A.     **The NEBC Charter's Provisions**

35.     On June 20, 2013, the Committee adopted the Charter of the Blue Cross and Blue Shield Association National Employee Benefits Committee ("NEBC Charter," Dkt. 138-1),

attached hereto as **Exhibit A**.  The NEBC Charter establishes the rules and procedures governing the Committee's operations, including its management of the Trust.

### 1. The Committee's Authority

36.　　The NEBC Charter bestows the Committee with the responsibility of overseeing the Trust's investments.

37.　　The NEBC Charter also grants the Committee full authority and broad discretion over managing the Trust and its investments. ████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████

38.　　The NEBC Charter imposes specific requirements on potential Committee members to ensure that they were capable of making the strategic judgments required to properly manage the Plans' investments. ████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████

39.　　Between 2011 and 2020, the following individuals served as Committee members: Karen Abraham (BCBS Arizona), Matt All (BCBS Kansas), Peter Andruskiewicz (BCBS Rhode Island), Christopher Booth (Excellus BCBS), Bryan Camerlinck (BCBS Louisiana), Andrew Corbin (BCBS Kansas), Henri Cournand (BCBS Kansas City), Tim Crilly (BCBS Wyoming),

Chuck Divita (BCBS Florida), R. Chris Doerr (BCBS Florida), Mark El-Tawil (BCBS Arizona), Michael Frank (BCBS Montana), Don C. George (BCBS Vermont), John Giblin (BCBS Tennessee), Michael Gold (BCBS Hawaii), Diane Gore (BCBS Wyoming), Robert Hiam (Hawaii Medical Service Association), Tim Huckle (BCBS North Dakota), Thurman Justice (BCBS Florida), Robert Kolodgy (BCBSA), Robert Leichtle (BCBS South Carolina), Gina Marting (BCBS Hawaii), Mike Mizeur (BCBS South Carolina), Mary O'Hara (Blue Shield of California), Michael Reitz (BCBS Louisiana), Rick Schum (BCBS Wyoming), Scott Serota (BCBSA), David Southwell (Wellmark, Inc.), Mark Stimpson (The Regence Group / Cambia Health Solutions), Michael Stollar (BCBS Hawaii), Erin Stucky (BCBS Kansas City), and Paul von Ebers (BCBS North Dakota).

### 2. The ISC's Role

40.     To fulfill the NEBC Charter's obligations regarding asset allocation, investment manager selection, and fund selection, the Committee established the ISC. Chaired by the Committee's Vice-Chair, the ISC was tasked with ███████████████████████ ████████████████████████████████████████████████████████ ██████████████████ Ex. A § 14(a). The NEBC Charter tasked the ISC with making recommendations to the Committee concerning the Trust's concentration of assets, including the level of funds allocated to particular investment funds or investment managers, and with respect to the Trust's targets and benchmarks. It also charged the ISC with reviewing the performance of investment managers and funds.

41.     To ensure that the ISC could fulfill these serious responsibilities, the Committee's chair was required to personally select the members of the ISC based on their experiences with financial markets as well as investment instruments similar to those likely to be chosen for the

Trust's investments. The NEBC Charter also required that the ISC's members educate themselves about the Trust's investments and potential investments.

42. Mr. Sharpe and Mr. Cooney both served as Committee Assistant Secretary and attended ISC meetings at all times relevant to this Counterclaim.

43. John Giblin chaired the ISC between 2014 and 2020. Between 2011 and 2020, the following Committee members also served on the ISC: Karen Abraham, Bryan Camerlinck; Andrew Corbin (the 2012 chair), Charles "Chuck" Divita, R. Chris Doerr, Paul von Ebers; Mark El-Tawil, Michael Frank (the 2013 chair); Thurman Justice; Mike Mizeur; and Michael Reitz (the 2011 chair).

### 3. The Committee Remained Ultimately Responsible For Monitoring NEBA And Any Consultants

44. Though the NEBC Charter delegates certain responsibilities to NEBA, it also provides that the Committee retains responsibility for its decisions, even if it sought assistance from NEBA and outside consultants.

45. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████

46. ████████████████████████████████████
████████████████████████████████

47. ████████████████████████████████████
██████████████████████████████

48. Mr. Sharpe served as NEBA's Chief Investment Executive from 2014 and through all relevant periods.

49.    Mr. Cooney served as NEBA's Vice-President, Investments from 2016 and through all relevant periods, and directly supervised Mr. Sharpe.

**B.    The Investment Consulting Agreement**

50.    Acting as the Trust's named fiduciary, the Committee retained Aon as its investment consultant in 2009.  On June 16, 2009, the Committee and Aon entered into the Investment Consulting Agreement ("ICA"), attached hereto as **<u>Exhibit B</u>**, to define their respective responsibilities.

51.    Section 1.5 of the ICA provides that the Committee retains fiduciary responsibility and authority for any and all decisions regarding Plan matters.

52.    The ICA gave the Committee discretion to either exercise that investment authority directly, or delegate it to NEBA—and the Committee elected to retain exclusive authority to make and implement investment decisions.  The Committee also retained the responsibility to decide whether the Trust's investments complied with ERISA's diversification requirements.

53.    Under the ICA, Aon's role was to consult for the Committee and help the Committee acquire the information it required to make prudent fiduciary decisions.  As part of that role, Aon was to provide investment advice concerning investment manager selection and asset allocation, and to evaluate and monitor investment managers.

54.    While monitoring the Trust's investment managers, Aon was contractually entitled under the ICA "to reasonably rely on the accuracy and completeness of the information it receives in response to [information] requests" that it posed to Allianz.

55.    Aon had no authority to make investment decisions for the Committee.  Under the ICA, Aon lacked responsibility to manage or direct any of the Trust's investments, and lacked authority to enter into agreements on behalf of—or otherwise bind—the Trust.

56. At all times, the Committee had the authority to overrule or reject any advice that Aon provided, as well as to act unilaterally without seeking Aon's advice. To that end, the ICA specifically provided that the Committee retained the ability to reject any recommendation made by Aon.

57. Further, the ICA provided that Aon could not be held liable for actions directed by the Committee or its delegates. Section 1.2 provides that Aon could not be held liable for taking any action, or for refraining from taking any action, at the direction of the Committee, any other person acting with respect to the Programs or the Trusts pursuant to actual authority to give such direction, or whom Aon reasonably believed had such authority.

58. Aon could also not be held liable for the actions, inactions, misrepresentations, or omissions of third parties, including Allianz.

**C.    The Investment Policy Statement's Provisions**

59. In 2010, the Committee voted to adopt the Investment Policy Statement ("Policy Statement"), attached hereto as **<u>Exhibit C</u>**. The Policy Statement governs the management of the Trust and defines the respective roles of the Committee, NEBA, and Aon.

60. Consistent with the NEBC Charter and the ICA, the Policy Statement stated that the Committee retained exclusive decision-making authority over investment selection. The Policy Statement provided that the Committee was responsible for selecting investments and managers, and that the Committee retained discretion to add investments at any time.

61. The Policy Statement expressly made the Committee responsible for monitoring the Trust's investments.

62. In the Policy Statement, the Committee delegated primary fiduciary responsibility over investment manager due diligence to NEBA. The Policy Statement required NEBA to conduct investment manager monitoring and evaluations, an annual on-site meeting with each

active manager, and an in-house meeting with that manager at NEBA's offices. In contrast, the Policy Statement tasked Aon with the secondary fiduciary responsibility of assisting NEBA in monitoring and evaluating investment managers.

63.     Further, the Committee retained exclusive authority over decisions to close or change existing investments, including when necessary to ensure the Trust's investments were properly diversified under ERISA. ███████████████

███████████████████████████████████████████

The Committee also reserved the right to terminate any investment manager for any reason, including because of a change in allocation policy which requires a shift in investment strategy.

64.     One area over which the Committee retained such authority was its contractual relationship with Allianz, pursuant to an Amended and Restated Investment Management Side Agreement, dated May 1, 2014. █████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████

### D.     The Committee's Fiduciary Duties

65.     As a named ERISA fiduciary with the responsibility for the management and administration of the Trust and the management or disposition of the Trust's assets, the Committee's fiduciary obligations to the Trust were "the highest known to the law."  *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). ████████████████████

████████████████████

66.     As a fiduciary, the Committee owed a duty under ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), to act with the care, skill, prudence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character with like aims.  That duty required the Committee to exercise care, skill, and prudence in connection with at least the following decisions and actions:

1) Selecting investment managers responsible for managing the Trust's assets;

2) Monitoring and evaluating investment managers and their continuing appropriateness, as contemplated in the Policy Statement;

3) Deciding to invest in, increasing investments in, and maintaining investments in Structured Alpha funds;

4) Rendering decisions regarding making, maintaining, and terminating investments in Structured Alpha funds and the appropriate concentration of Structured Alpha investments; and,

5) Ensuring that it and the Plans understood the nature and risks of the Structured Alpha strategy.

67.     As a fiduciary, the Committee also owed a duty of loyalty to the Plans invested in the Trust under ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).  That duty required the Committee to act "solely in the interest" of and for the "exclusive purpose of providing benefits" to the Plans.

68.     As an ERISA co-fiduciary with Aon, the Committee owed duties under ERISA § 405, 29 U.S.C. § 1105, to provide complete and accurate information to Aon and permit Aon to fulfill its fiduciary responsibilities without interference.

69.     As an ERISA fiduciary, the Committee also owed a duty to follow Plan documents, including the NEBC Charter and the Investment Policy Statement.

70.     Finally, as an ERISA fiduciary, the Committee owed a duty to "diversify[] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."  ERISA § 404(a)(1)(C), 29 U.S.C. § 1104(a)(1)(C).

## II.     THE COMMITTEE'S BREACH OF ITS FIDUCIARY DUTIES

71.     The Committee claims that its nearly $3 billion investment in Structured Alpha was imprudent and inconsistent with its investment objective and risk tolerance.  The Committee's Complaint thus attempts to hold Aon responsible for the Committee's alleged lack of knowledge of Structured Alpha's actual level of risk, acceptance of Allianz's assertions about Structured Alpha, failure to see the warning signs that Allianz's options positions had departed from Allianz's professed investment strategy, overconcentration in Structured Alpha, and failure to follow the Committee's own Plan documents.

72.     Aon denies all such allegations and contends that discovery in this action will continue to demonstrate that Aon committed no wrongdoing.

73.     But even if the Committee's allegations were established, in whole or in part, they sharply underscore the Committee's own failings to discharge its fiduciary duties.  If the Committee is correct, it—acting through its members—allowed Jamey Sharpe, NEBA's Chief Investment Executive, to invest and maintain more than half of its assets—nearly $3 billion—in a strategy whose risks it did not fully understand, in violation of ERISA's diversification requirements and the Committee's own Plan documents.

74.     The Committee was obligated, under ERISA, to ensure that Mr. Sharpe was not putting the Trust's assets at an unacceptable risk.  The Committee failed to do so, and the buck stops with the Committee for that failure.

### A. The Committee Allowed Mr. Sharpe To Expand The Trust's Structured Alpha Investments To Levels It Now Complains Of

75. The Committee claims that **_Aon_** caused it "to invest and maintain a majority of the Trust in Structured Alpha—a much higher percentage than Aon's other clients had invested in the strategy." Compl. ¶ 164(d). It alleges that the "expan[sion]" of the Trust's Structured Alpha investments occurred between the Committee's initial 2011 investment and 2018. *Id.* ¶¶ 44, 52.

76. But the Committee's attribution of responsibility for this expansion is inaccurate. If the Committee's concentration of the Trust's assets in Structured Alpha is found to be a violation of ERISA, the Committee—through its abdication of its oversight responsibilities to Mr. Sharpe—is primarily responsible and substantially more at fault than Aon. The Committee, not Aon, caused the Trust's Structured Alpha concentration to climb from 4.64% at the end of 2013 to 62.01% by the end of 2016.

### 1. Mr. Sharpe's Actions Were Undertaken With The Committee's Blessing

#### (a) *The Committee, Following Mr. Sharpe's Lead, Increased The Trust's Structured Alpha Concentration*

77. Prior to the market crash in March 2020, Jamey Sharpe was not shy about his responsibility for the Trust's concentration of assets in Structured Alpha increasing. In a 2016 interview with Institutional Investor magazine, attached hereto as **Exhibit D**, he disclosed that he made a "bet" on portable alpha strategies, "shift[ing] to an 80% allocation to portable alpha strategies" in 2014, principally Structured Alpha. Ex. D at -150-51.

78. And Allianz employees were aware that Mr. Sharpe was betting on them, ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Exhibit E** at -601.

79.     Mr. Sharpe's bet caused the Trust's Structured Alpha concentration to climb at an annual clip of nearly twenty percentage points in the years 2014-2016.  The increases he directed caused that concentration to increase from 4.64% in 2013, to 23.78% by 2014, 41.95% by 2015, and 62.01% by 2016.

80.     Throughout this period, the Committee signed off on this increase, allowing the Trust's assets to face more exposure—and thus more risk—from Structured Alpha.

81.     Mr. Sharpe increased concentration because he was obsessed with high performance rates and publicly relished the praise he was receiving for them.  He boasted to Institutional Investor magazine that the Trust had "beaten [its] benchmark[s]" between 2014-2016 and attributed "90% of the credit for that … to the portable alpha strategy."  Ex. D at -151.  ████

████████████████████████████████████████████████████████████

████████████████████████████████████

82.     Mr. Sharpe's preoccupation with performance caused him to terminate certain of the Committee's existing investment managers and shift the assets previously under their management to Structured Alpha.

83.     Importantly, Mr. Sharpe—with the Committee's rubber-stamp—did so against Aon's advice.  ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████

84. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

85. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

86. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ Unlike Mr. Sharpe, Aon was not entirely won over by Allianz's representations of tail risk protection in the form of hedging positions, continuous internal risk tracking, and external risk monitoring. Aon understood that, no matter how many times Allianz claimed that Structured Alpha was immune from margin call risk, trading derivatives on margin necessarily exposes some percentage of the principal. And Aon tailored its advice accordingly, even without knowing at the time that neither of Allianz's risk reporting functions accounted for the potential of a margin call – the equivalent of saying "the coast is clear" with one's eyes closed.

87. In contrast, Mr. Sharpe, in discussions with Allianz and trusting them wholeheartedly, recognized that he was rejecting Aon's advice—████████████████████ ██████████████████████

88. But the Committee and the ISC sided with Mr. Sharpe over Aon, thus prioritizing the high returns that Allianz offered over the risk mitigation that Aon suggested.

89.     ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

90.     ████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

(b)     *The ISC's Failure To Supervise Jamey Sharpe*

91.     The Committee has alleged that Aon "breached its duty to prudently advise the Committee" by "indicat[ing] that the Trust was properly diversified because the Trust's investment in Structured Alpha consisted of multiple beta components."  Compl. ¶ 164(d).

92.     Assuming this allegation is true—which Aon denies—the Committee cannot seek to shift blame onto Aon; Mr. Sharpe provided that same advice to the Committee as early as 2015, which accepted it.

93.     ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ But what Sharpe never asked – and what Allianz took special care to never disclose until it was too late – was what percentage of those underlying beta investments was pledged as collateral to prime brokers who provided the loans that allowed Allianz to run the options overlay.

94.     The ISC was unconcerned because that was what Mr. Sharpe told it—and the ISC, much like its parent, the Committee, was in the habit of accepting what Mr. Sharpe told it unquestioningly. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ Mr. Sharpe believed that the Trust's expanded Structured Alpha concentration was consistent with the Trust's past practice of investing substantial sums with a single asset manager because the assets were spread across different underlying betas. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████

95.     The Committee has also alleged that Aon breached its duty of prudent advice by failing to ensure that the Committee was "adhering to the guidelines of the Investment Policy Statement" concerning asset allocation.  Compl. ¶ 164(e).  ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

96.     Assuming this allegation regarding compliance with the Investment Policy Statement is true—which Aon denies—the Committee is also at fault because it never suggested that the Trust's Structured Alpha investments violated the asset allocation guidelines, ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

[REDACTED] Committee members accepted Mr. Sharpe's repeated statements that the Trust's allocation complied with the Investment Policy Statement, and cannot hold Aon responsible for Mr. Sharpe's actions and their reliance on the same.

(c) *The Committee's Failure To Fully Understand The Investment In Structured Alpha*

97. The Committee has also alleged that Aon breached its duty of prudent advice by failing to ensure that the Committee "understood" the nature and risks of the Structured Alpha strategy. Compl. ¶ 79.

98. Assuming this allegation is true—which Aon denies—it merely underscores the Committee's own failure to take necessary steps to understand the investments to which they entrusted the Trust's assets.

99. [REDACTED]

100.    As the ISC's Chair, Mr. Giblin was expected under the NEBC Charter to be knowledgeable and familiar with the financial products the Trust invested its funds in.  Ex. A § 14(a)(i). ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████

101.    ██████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████

102.    This fact bears repeating: ████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████

103. ██████████████████████████████████████████████████
████████████████████████████████████████ Ex. F at -055.

104. ██████████████████████████████████████████████████
████████████████████████████████████████████████████ Mr.
Giblin also admitted that he did not have a complete grasp of options trading, despite it being a
key pillar of the Structured Alpha strategy. ████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████

105. ██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████

106. ██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████

107. ██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████

108. ██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

██████████████████████████████████ And as the Chief Financial Officer of Blue Cross and Blue Shield of Arizona, a Plan that had invested several hundred million in the Trust's Structured Alpha investments, he had every incentive to acquire such knowledge promptly if he did not already possess it when he joined the Committee in early 2019. The resources to acquire such knowledge were at his disposal. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

109. ██████████████████████████████████████████████

██████████████████ Structured Alpha is a portable alpha strategy, an investment strategy which, █████████████████████████████████████ attempts to generate alpha by separating beta exposure from active management. Mr. Sharpe himself claimed that portable alpha strategies were ████████████████████████████████ Ex. D at -153.

████████████████████████████████████████

110. ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████

111. Mr. El-Tawil also failed to understand the risks of the Structured Alpha strategy that Aon advised the ISC about. █████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████ To be sure,
Allianz's chart was inaccurate and grossly understated the actual exposure of the NRT's investments, but no version of this chart would have meant much to Mr. El-Tawil, ██████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

112.     ███████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████

(d)     *The Committee's Failure to Properly Advise The Plans*

113.    To the extent that the underlying investors in the Trust—the 16 Blue Cross Plans that the Committee alleges suffered losses from Structured Alpha (*see* Compl. ¶ 16 n.1)—were not aware of the risks of Structured Alpha, the Committee is also at fault for abdicating responsibility to Mr. Sharpe and allowing him to keep the Plans in the dark about their investments.

114.    Mr. Sharpe understood that the Plans were the beneficiaries of the Trust and had their own risk profiles and a measure of control over their investments in the Trust.  As he told *Institutional Investor* magazine in 2016, the Trust was a collection of "20 separate $250 million pension funds," each with its "own risk profile." Ex. D at -152.  And as *Institutional Investor* reported, "each individual Blue Cross Blue Shield plan has the option to either choose its own strategic allocation across [the Trust's asset] pools or leave it up to Sharpe's team." *Id.*

115.    Notwithstanding each Plan's nominal control over its Trust investments, Mr. Sharpe made it his mission to see that the Plans left their Trust asset allocation up to him and his team.  ███████████████████████████████████████████████████ ████████████████████████████████████████████ (AllianzGIUS-SA-00254888).  **Exhibit H**.  And rather than educate them, Mr. Sharpe told the Plans to trust him. After all, he had determined that the buck stopped with him for concentration ████████ ███████████████████████████████████████████████████ ██████████ **Exhibit I** at -063, and he did not want the Plans getting in the way. ████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████ **Exhibit J** at -569.

116.    Indeed, Mr. Sharpe appears to have conceptualized his role in relation to the Plans as that of a salesman for Structured Alpha rather than a trusted fiduciary. ████████████

117. To increase his influence over the Plans and ensure they deferred to his preferences concerning Structured Alpha, Mr. Sharpe actively prevented Aon from advising the Plans on concentration. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

118. Mr. Sharpe also prevented his own NEBA staff from sharing information about Structured Alpha's performance with the Plans to preserve their blind trust in him. ████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████████ He preferred

withholding material information to having to address the Plans' concerns.

119.    Senior NEBA employees later suggested that Mr. Sharpe's failure to properly

advise the Plans may have had grave consequences. ████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

120.    The Committee, having delegated responsibilities to NEBA, was obligated to

ensure that NEBA—and Jamey Sharpe—did not act in a way that would put the Plans' assets at

risk.  Despite Mr. Sharpe's actions, the Committee failed to ensure that the Plans understood their

investments, or the risks being undertaken.

> (e)    *The Committee Signed Off On Mr. Sharpe's Interference With*
> *Aon's Performance Of Its Fiduciary Duties*

121.    Compounding his disregard of Aon's advice, Mr. Sharpe sometimes did not even

bother informing Aon of his decisions to terminate non-Structured Alpha investments and/or shift

assets to Structured Alpha.  For instance, in spring 2014, Mr. Sharpe met with Allianz to create

new Multi-Beta Structured Alpha funds with a greater return objective solely for the Trust's use.

122.    Mr. Sharpe did not invite Aon to these meetings, nor did he inform Aon of the new

funds or that their creation increased the Trust's Structured Alpha investments from $185 million

to $490 million.  Instead, Aon only learned about these decisions after the fact from Allianz. ████

████████████████████████████████████████████████████████████████████

████████████████████████████ Mr. Sharpe's unilateral actions prevented Aon from conducting an analysis or preparing a recommendation to the Committee before Mr. Sharpe invested Trust funds in the Multi-Beta Structured Alpha funds.

123.    Similarly, in December 2014, Mr. Sharpe unilaterally closed out non-Structured Alpha Trust investments and transferred $90 million of those assets to Structured Alpha.  Mr. Sharpe  never informed Aon of his decision or sought its advice in advance, and Aon personnel only learned of his decision the month after it was made.

124.    The Committee, however, signed off on Mr. Sharpe's actions.

125.    Mr. Sharpe's failure to provide timely and accurate information about his intended moves interfered with Aon's ability to advise him and the Committee before they made decisions. His actions were contrary to the Committee's own professed "understanding" with Aon that the Committee "would endeavor to make major investment decisions only after receiving Aon's analysis and recommendation."  Compl. ¶ 158.

126.    Compounding his failure to inform Aon of his intended moves in advance, Mr. Sharpe actively interfered with Aon's attempts to discharge its duty to monitor the Trust's Structured Alpha investments.  Mr. Sharpe had little time for Aon's monitoring efforts because he thought that monitoring was *his* job.

127.    And the Committee, by failing to conduct oversight over Mr. Sharpe, apparently agreed with him.

128.    To further take control—and to minimize Aon's ability to provide pertinent advice—Mr. Sharpe orchestrated an internal coup to minimize Aon's influence and, in his own words, ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████

129.    Mr. Sharpe executed that plan by, among other measures, starving Aon of information. ██████████████████████████████████████████

████████████████████████████████████████████████

███████████

130.    █████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████    Mr. Sharpe's actions inhibited Aon's ability to actively track the Trust's allocations across the asset classes the Investment Policy Statement established.

131.    Indeed, Mr. Sharpe consistently sought to freeze out Aon. ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

132.    █████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

133.    █████████████████████████████████████████

███████—it was part and parcel of a persistent pattern of behavior by Mr. Sharpe to disregard

Aon's advice, fail to provide Aon with advance notice of his decisions, and to starve Aon of information.

134.     And the Committee did nothing to stop Mr. Sharpe from freezing Aon out.  The Committee was happy to let Mr. Sharpe draw power to himself.

**B.     Defendants' Breaches During The 2018-2019 Decisions To Stay Invested In Structured Alpha**

135.     The Committee has alleged that Aon breached its duties between 2018 and 2019 by failing to advise the Committee to terminate or substantially reduce the Trust's Structured Alpha investments.  According to the Committee, if it had properly understood the nature and risks of the Structured Alpha strategy, it would have terminated its Structured Alpha investments by no later than December 31, 2019.  The Committee is calculating its damages on this basis.

136.     If the Committee's decision to stay invested in Structured Alpha during the 2018-2019 period is found to be a violation of ERISA—and Aon contends it was not—the Committee is substantially more at fault due to its abdication of responsibility to Mr. Sharpe.  They, not Aon, caused the Trust to maintain its Structured Alpha investments.

**1.     Mr. Sharpe's Actions Were Taken With The Committee's Sign-Off**

137.     In early 2018, Allianz became concerned that the Committee might reduce the Trust's exposure to Structured Alpha, but recognized that it had an ally in Jamey Sharpe.  ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

(a) *Mr. Sharpe Convinced The Committee And The Plans To Stay Invested In Structured Alpha*

138. By 2018, Mr. Sharpe had presided over the expansion of the Trust's Structured Alpha investments to more than 60% of the Trust's total assets. ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

139. So when the Committee's members had questions about Structured Alpha after it underperformed relative to its beta benchmarks in February 2018, the first person they turned to was Mr. Sharpe. ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████

140. Mr. Sharpe's response—and defense of Allianz—was swift. ████████████

████████████████████████████████████████████

141. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



In some sense, Mr. Giblin was right on both counts, but he never followed up directly with Allianz about either suspicion.

142.

Mr. Sharpe could have run Mr. Giblin's concerns to ground, at which point he may have realized what Aon had been telling the Committee all along: that there was no maximum percentage of collateral that Allianz was permitted to draw from, and that, ▮▮▮▮▮▮

▮▮▮▮▮ – due to the limited information rights that the Committee had negotiated with Allianz. Rather, the Committee's protection from downside exposure lay in the much-vaunted hedging positions, which it could have reviewed on a monthly basis but elected not to. But Mr. Sharpe did not bother to dig in so deeply so as to actually understand how the risk controls that Allianz purported to offer investors in Structured Alpha worked.

143. Instead, Mr. Sharpe told Mr. Giblin to trust him, and, by extension, Allianz. ▮▮

144. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

145. The ISC similarly bowed to Mr. Sharpe's will at its meetings. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

146. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

147. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

148. ████████████████████████████████████████████████

████████████████████████████████████████████████

149.     The ISC and the Committee's reliance on Mr. Sharpe's advice was swift. ███

150.     The cycle repeated itself when Structured Alpha underperformed in late 2018 and Committee members and Plans again raised questions. ████████████████████

███ Nonetheless, Mr. Sharpe again gave a swift and strong defense of Structured Alpha.

151.     ████████████████████████████████████████████████████████████

152.     ████████████████████████████████████████████████████████████

153. ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

154. The ISC again took Mr. Sharpe's advice. ██████████████████

██████████████████████████████████████

155. During each of the above periods, Mr. Giblin and Mr. Mizeur were members of the ISC. And each of Mr. Kolodgy, Mr. Giblin, and Mr. Mizeur were members of the Committee. But instead of exercising their independent judgment and questioning Mr. Sharpe, they let him steamroll them; in Mr. Giblin's words, h██████████████████████████████████ ████████████████████████████████ Ex. G at -440. The rest of the Committee did the same.

156. Indeed, while the Committee alleges that *Aon* provided deficient advice in 2018-2019, *Mr. Sharpe* in fact gave that advice.

157. While the Committee alleges that Aon's advice was deficient because it (1) "gave the Committee the false impression that the strategy was relatively low risk and indeed, a risk management strategy," Main Compl. ¶ 164(a), ████████████████████████ ████████████████████████████████████████ █████████████████████ *See* Ex. G at -440.

158. The Committee also alleges that Aon's advice was deficient because it "repeated Allianz's assertions about the operation of the Structured Alpha strategy … without adequately investigating whether those assertions were accurate or complete." Main Compl. ¶ 164(b). But it

was Mr. Sharpe that assuaged Mr. Kolodgy's concerns by parroting talking points from an Allianz deck to him.

159.     The Committee further alleges that Aon's advice was deficient because it failed to determine that "Allianz was shorting the VIX without corresponding hedges."  Main Compl. ¶ 164(c).  ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

And it was Mr. Sharpe and the Committee who could have reviewed the monthly position data, or asked Aon to review it with their permission, but chose not to.

160.     The Committee also alleges that Aon's advice was deficient because it "indicated that the Trust was properly diversified because the Trust's investment in Structured Alpha consisted of multiple beta components."  Compl. ¶ 164(d).  ██████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

161.     But the Committee cannot sacrifice Mr. Sharpe at the altar.  It had a fiduciary obligation to individually understand the risks of Structured Alpha and to exercise its independent judgment.  It was insufficient, and a violation of the Committee's fiduciary duties, to merely rely on Mr. Sharpe to do so simply because he and other senior NEBA staff ████████████████

██████████████████████████████████████████████████████████

(b)     *The Committee Abdicates Its Fiduciary Responsibility Over*
        *Concentration To The Plans Based On Jamey Sharpe's Advice*

162.     After Structured Alpha's 2018 underperformance, Mr. Sharpe sought to take a hands-off approach to the Plans' investments in Structured Alpha.  ███████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

163. ████████████████████████████████████████████

████████████████████████████████

164. ████████████████████████████████████████████

████████████████████████████████████████████████

165.     Mr. Sharpe's proposal to abdicate his, NEBA's, and the Committee's fiduciary responsibilities to the Plans was not without critics.  A senior NEBA employee who had been handpicked to succeed Mr. Sharpe as Chief Investment Executive disagreed with his approach.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████

166.     Rather than reconsider his position based on the advice of his handpicked successor, Mr. Sharpe fired her.  The senior NEBA employee departed in August 2019 ████████████████ ███████████████████████████████ Mr. Sharpe tried to justify his decision by claiming that she ████████████████████████████████████████ But those remarks were at odds with ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████ The only thing that changed between 2018 and 2019 was that the senior NEBA employee had made what Mr. Sharpe deemed a fatal mistake—challenging his authority over Structured Alpha decision-making.

167.     Mr. Kolodgy, despite receiving the communication regarding these concerns, allowed Mr. Sharpe to summarily dismiss this employee. Mr. Kolodgy did not question Mr. Sharpe's rule and instead accepted at face-value ████████████████████████████████

████████████████████████████

### 2.     A Member of the Committee, Concerned About Structured Alpha Concentration, Took Action Only With Respect To One Plan

168.     After Structured Alpha's negative return in late 2018, Mr. Mizeur—a member of the Committee at that time and the President and Chief Operating Officer of Blue Cross Blue Shield South Carolina ("BCBS S. Carolina")—determined to take a fresh look at BCBS S. Carolina's investments in Structured Alpha.

169.     BCBS S. Carolina was one of the largest underlying investors in Structured Alpha.

170.     Mr. Mizeur hired an outside advisor, Rocaton, to analyze BCBS S. Carolina's investment in Structured Alpha.

171.     ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

172.     With respect to his Plan—BCBS S. Carolina—Mr. Mizeur took this advice, reducing BCBS S. Carolina's investment in Structured Alpha from 85% to 20%.

173.     But with respect to the rest of the Plans in the Trust, to which Mr. Mizeur also owed fiduciary duties, he did nothing to lower the concentration.

174.     To the extent the Committee alleges that concentration concerns with respect to one investor may impact the appropriateness of another investor's concentration, *see* Main Compl. ¶¶ 12, 164(d), Mr. Mizeur's concern for BCBS S. Carolina's concentration, but his complete failure to act or investigate further with respect to the Trust's overall concentration, was a breach of his fiduciary duty.  As a member of the Committee, which can only act through its agents, Mr. Mizeur's breach of his fiduciary duty was also a breach by the Committee of its fiduciary duty to the other Plans.

## III.     DUE TO ITS BREACHES OF FIDUCIARY DUTY, THE COMMITTEE WAS CAUGHT TOTALLY OFF-GUARD BY THE EFFECTS OF THE MARCH 2020 MARKET IMPLOSION.

### A.     Global uncertainty in February and March 2020 posed a unique threat to Structured Alpha.

175.     In late February 2020, U.S. equity markets began to experience increased volatility as a result of growing concerns about the impact of COVID-19 on the global economy.  After closing at prices of roughly 15-18 in January and early February 2020, beginning on approximately February 24, the VIX began to rise, and eventually closed at 82.69 on March 16, 2020—an increase of over 400 percent.  Rising volatility impacts options prices; with investors expecting asset prices to swing in wide arcs, sellers of risk insurance such as S&P 500 index puts can demand a higher premium in issuing new short options. As a result, when actual volatility subsequently fell rapidly, Structured Alpha had historically been more profitable in high volatility environments.  Aon

advertised that wider spreads mean greater potential inefficiencies to exploit – when volatility rises, the market's view of volatility sprints ahead of reality.

176.     But rising volatility and a falling index price can also (1) drive up the value of liabilities associated with existing short index options due to the increased probability that the index options will expire in the money and need to be settled in cash, and (2) drive up the liabilities associated with short VIX call options as the probability that they will settle in the money increases – effectively, a "payout" of the insurance policy.   This same risk also increases the risk of a devastating margin call – a risk which both Allianz and the Committee had ignored for the duration of the NRT's investment.

177.     As the VIX rose during February and March 2020, the S&P 500 was falling as it became evident that COVID-19's would have a significant impact.  At all relevant times, Allianz pledged the funds' beta components, comprising shares of index funds, as collateral for its options positions.  As a result, beginning in February 2020 when the S&P first faltered in response to COVID-19, the Structured Alpha funds began to suffer significant losses due to: (i) the decreasing value of the S&P index fund positions; and (ii) Allianz's mounting obligations to the holders of short puts that Allianz had assumed it would never have to pay.   This downward spiral was directly contrary to the scenario analyses and stress tests performed regularly by Allianz, and presented to both BCBS and Aon, which had predicted that the value of the Structured Alpha funds would be down slightly, if at all, in this scenario and would recover any losses quickly.  During that time, the value of the beta collateral declined significantly just as the risk of a devastating margin call rose significantly.

178.     ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

Aon did not know the extent of Allianz's risk management and disclosure failures yet. It did, however, notice that the performance of the Structured Alpha 1000 fund was down 25 percent from the prediction in the most recent risk report Aon had received from Allianz only 2 months earlier. ███████████████████████████████████████████████████████

██████████████████████████████████

179. Aon was shocked to learn that Allianz had not held its advertised hedging positions *for years*. ████████████████████████████████████████████████████████

████████████████████████████████████ It might have been able to detect those issues earlier had the Committee ensured that its consultant received all the information that the Committee was entitled to under the Side Agreement.

180. On March 16, 2020, Allianz told the Committee and Aon that the portfolio was facing a devastating margin call the next day. On March 27, 2020, Allianz announced the liquidation of its two funds where losses were the greatest, Structured Alpha 1000 and Structured Alpha 1000 Plus.

## IV. THE COMMITTEE IS SUBSTANTIALLY MORE AT FAULT THAN AON FOR THE COMMITTEE'S ALLEGED LOSSES

181. The Committee—as the named fiduciary of the Plans—was charged with fiduciary duties to protect the Trust's investments. ██████████████████████████████████████

████████ It was impermissible for the Committee to delegate all responsibility and oversight to Mr. Sharpe. And yet that is exactly what it did.

182. Mr. Sharpe—with the Committee's rubber-stamp—caused the Trust's Structured Alpha investments to expand from 4.64% at the end of 2013 to 62.01% by the end of 2016. ████

████████████████████████████████████████████████████████████

████████████████████████ In some cases, he made those decisions to increase the Trust's

Structured Alpha concentration either against Aon's advice or without seeking Aon's advice or even informing Aon. And the Committee was happy to let him do so.

183. The Committee also approved of the decision to maintain the Trust's Structured Alpha investments. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████ By all measures—other than the Trust's returns—Mr. Sharpe succeeded at this goal.

184. Mr. Sharpe told the Committee to trust his ████████████ in Structured Alpha's continued high performance and risk controls. In fact, Mr. Sharpe told members of the Committee that they were concerned only because they ██████████████████████ Ex. L at -751. In response, when the members of the Committee should have sought to educate themselves, they simply took Mr. Sharpe's word for it that Structured Alpha was safe.

185. It was Mr. Sharpe, not Aon, who advised the Committee, the ISC, and the Plans to stay the course. And the Committee followed Mr. Sharpe's advice without question.

186. And when Mr. Sharpe suggested that they further abdicate their responsibility to the Plans, the Committee was happy to do so.

187. Instead of educating themselves and independently exercising their judgment, as ERISA requires, the members of the Committee sought to absolve themselves of any responsibility. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

188. ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████

189. But Mr. Giblin's ignorance was not isolated. ████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████ That ignorance was partly by

design, and not solely by carelessness: A████████████████████████████

████████████████████████████████████████████ Ex. J at -569.

Nor did Mr. Sharpe contain his efforts at withholding information from the Plans. ████████

██████████████████████████████████████████████████ Ex. E

at -601, and he filtered Aon's presentations to the Committee and the ISC. █████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████ Mr. Sharpe even terminated a senior NEBA

employee for challenging his authority over Structured Alpha and replaced her with more junior

subordinates whom he kept in the dark about Structured Alpha and its risks.

190. Rather than accept responsibility, Mr. Sharpe and the Committee sought to blame

Aon for their own fiduciary failings. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

191.     But the Committee's efforts to blame-shift are in vain because, ████████████████

███████████████████████████████████████████ ERISA's

contribution and indemnification rules exist precisely to prevent one fiduciary from making

another take the fall for the other fiduciaries' misbehavior. *See Chemung Canal Tr. Co. v. Sovran*

*Bank/Maryland*, 939 F.2d 12, 16 (2d Cir. 1991) ("Full [fiduciary] responsibility should not depend

on the fortuity of which fiduciary a plaintiff elects to sue.").  The Committee cannot escape its own

failures and Aon is entitled to complete indemnity for any liability in connection with the claims

asserted in the Complaint.

## COUNTERCLAIM CAUSE OF ACTION

## CONTRIBUTION & INDEMNIFICATION UNDER ERISA

192.     Aon hereby repeats and realleges as if fully set forth herein each of the allegations

contained in paragraphs 1 through 191.

193.     Aon denies the material allegations of the Complaint.  Nevertheless, if there is any

finding that Aon is liable to the Committee, or any award of restitution by Aon to the Committee

for any of the Committee's alleged damages, then, under the facts alleged herein, Aon was not

substantially more at fault than the Committee.  To the contrary, the Committee's violations of its

fiduciary duty makes it substantially more at fault than Aon for any harm to the Trust and the Plans

that invested their assets in it.

194.     As a named fiduciary of the Plans, the Committee is a fiduciary under ERISA.

195.    As a fiduciary, the Committee owed a duty to the Plans to act with the care, skill, and prudence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character with like aims.    That duty required the Committee to exercise care, skill, and prudence in connection with at least the following decisions:

    a.    Monitoring and evaluating investment managers and their continuing appropriateness, as contemplated in the Investment Policy Statement;

    b.    Deciding to invest, increasing investments in, and maintaining investments in Structured Alpha funds;

    c.    Rendering decisions regarding making, maintaining, and terminating investments in Structured Alpha funds and the appropriate concentration of Structured Alpha investments; and,

    d.    Ensuring that it, and the Plans, understood the nature and risks of the Structured Alpha strategy.

196.    The Committee also owed a duty to follow Plan documents and to "diversify[] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."  ERISA § 404(a)(1)(C), 29 U.S.C. § 1104(a)(1)(C).

197.    The Committee was further obligated to exercise independent judgment and not to abdicate all responsibility to Jamey Sharpe, who then himself acted in such a manner as to breach his fiduciary duties.

198.    Mr. Sharpe breached his duty of care—with the approval and sign-off of Mr. the Committee—in at least the following ways:

a. Advising the Plans to expand the Trust's Structured Alpha investments and stay invested in Structured Alpha, including by (a) assuring the Plans that Structured Alpha was a low risk "risk management" strategy rather than a source of risk; (b) repeating Allianz's assertions about the operation of the Structured Alpha strategy without adequately investigating them; (c) assuring them that Allianz was employing hedges to protect Structured Alpha against steep declines; (d) assuring them that the diversification of the Structured Alpha beta investments protected against risk; (e) assuring them that the Trust's Structured Alpha concentration complied with the Investment Policy Statement's guidelines; (f) assuring the Committee and the ISC that leaving it to the Plans to choose their exposure to Structured Alpha would address any concentration risk; and (g) failing to ensure that the Plans understood the nature and risks of the Structured Alpha strategy.

199. The Committee also breached its fiduciary duty by signing off on the decision to leave it to each Plan to determine how much Structured Alpha exposure it wanted.

200. The Committee breached its co-fiduciary duty by signing off on Mr. Sharpe's interference with Aon's performance of its fiduciary duties and failing to provide complete and accurate information to Aon.

201. The Committee also breached its duty of diversification by expanding the Trust's concentration of investments in Structured Alpha and maintaining that concentration at its expanded level.

202. The Committee also breached its fiduciary duty because its members failed to educate themselves regarding the goal and methods of Structured Alpha, despite the Trust's

substantial investment in the strategy. ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████

203.     Mr. Mizeur—a member of the Committee—breached his fiduciary duty by failing to exercise the same care for the other Plans in the Trust that he exercised for his Plan, BCBS S. Carolina.   When he became concerned ███████████████████████████████████

███████████████████████████████████████████████████ reducing BCBS S. Carolina's concentration from 85% to 20%.   But he did not do so for the other Plans, leaving them in a position which he plainly felt held substantial and unnecessary risk.

204.     As a member of the Committee, Mr. Mizeur's breach is imputed to the Committee.

205.     The Committee breached its duty to follow Plan documents for at least the reasons stated above.

206.     As a direct result of the Committee's breaches, the Trust sustained investment losses for which Aon is not substantially more at fault, but rather for which the Committee is primarily responsible.

207.     The Committee is therefore liable to Aon for complete indemnification for any liability, including fees and costs, suffered by Aon in connection with the claims asserted in the Complaint.

208.     Even if Aon and the Committee are jointly liable by virtue of their status as fiduciaries within the meaning of ERISA, both Aon and the Committee are obligated to contribute to the payment or repayment of any damages or restitution according to their respective shares of fault, and the Committee was substantially more at fault than Aon.   Accordingly, Aon will suffer

harm to the extent it is required to pay more than its proportionate share of liability on the claims asserted in the Complaint.

209.    The Committee is liable to Aon for contribution and/or indemnification in the amount of any payment by Aon in excess of its share of liability, including fees and costs, on the claims asserted in the Complaint.

## PRAYER FOR RELIEF

Wherefore, Aon respectfully prays for judgment as follows:

a.    An order finding that the Committee breached its fiduciary duties under ERISA to the Plans;

b.    An order that any injuries or damages sustained by the Trust were proximately caused, in whole or in part, by the acts or omissions of the Committee;

c.    An order that (a) the Committee is obligated to completely indemnify Aon for any judgment or award of damages or restitution resulting from the Complaint, or (b) of the amount that the Committee is obligated to contribute if Aon is compelled to pay any sum as a result of any judgment or award of damages or restitution resulting from the Complaint, and payment of such amounts;

d.    Reasonable attorneys' fees and costs; and

e.    Such other and further relief as the Court deems just and proper.

Respectfully submitted this 13th day of May, 2022.


QUINN EMANUEL URQUHART & SULLIVAN, LLP

/s/ Richard I. Werder, Jr.
Richard I. Werder, Jr.
Renita Sharma
Julia Beskin

Sascha Rand
51 Madison Avenue, 22nd Floor,
New York, New York 10010
(212) 849-7000

Michael Liftik
1300 I St NW #900,
Washington, DC 20005

*Attorneys for Defendant/Third-Party
Plaintiff Aon Investments USA Inc.*