## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BLUE CROSS AND BLUE SHIELD ASSOCIATION NATIONAL EMPLOYEE BENEFITS COMMITTEE, <br><br> *Plaintiff*, <br><br> v. <br><br> ALLIANZ GLOBAL INVESTORS U.S. LLC and AON INVESTMENTS USA INC. f/k/a AON HEWITT INVESTMENT CONSULTING, INC., <br><br> *Defendants*. | Case No. 20 Civ. 07606-KPF |
| AON INVESTMENTS USA INC., <br><br> *Third-Party Plaintiff*, <br><br> v. <br><br> JAMES R. SHARPE and TERRENCE J. COONEY, <br><br> *Third-Party Defendants*. | Dated: May 13, 2022 |

## AON INVESTMENTS USA INC.'S THIRD-PARTY COMPLAINT AGAINST JAMES R. SHARPE AND TERRENCE J. COONEY

Pursuant to Federal Rule of Civil Procedure 14(a), for its Third-Party Complaint against Third-Party Defendants James ("Jamey") R. Sharpe and Terrence J. Cooney, Defendant/Third-Party Plaintiff Aon Investments USA Inc. ("Aon") states as follows:

## NATURE OF THE ACTION

1.     This Third-Party Complaint arises out of Jamey Sharpe's and Terrence Cooney's breach of their fiduciary duties under ERISA and their attempt, along with Plaintiff Blue Cross and Blue Shield Association National Employee Benefits Committee (the "Committee"), to make Aon the patsy for those breaches.

1

2.     The Committee is an independent committee of the Board of the Blue Cross and Blue Shield Association ("BCBSA").  The Committee is a 12-member fiduciary committee with discretionary authority and responsibility over all investment decisions for the National Retirement Trust (the "Trust"), a trust funded by numerous Blue Cross defined benefit plans ("Plans," and each, a "Plan"), for whom the Committee serves as a named fiduciary.  The Committee thus assumed primary responsibility for the Trust assets: ███████████████████████████ ███████████████████████████████ To help it to discharge these responsibilities, the Committee in turn created the Investment Subcommittee ("ISC"), a five-member committee chaired by the Committee's Vice Chair, and tasked it with making investment recommendations to the Committee and reviewing the performance of investment managers and funds.

3.     Since at least 2010, the Committee delegated day-to-day fiduciary responsibility over the Plans' Trust investments to the National Employee Benefits Administration ("NEBA"), a department of BCBSA.

4.     That delegation conferred fiduciary responsibility over the Trust's assets on senior NEBA executives Mr. Sharpe and Mr. Cooney, each of whom served as the Committee's Assistant Secretary (Mr. Sharpe from 2015 and continuing through all relevant periods and Mr. Cooney from 2015 and continuing through all relevant periods).

5.     As NEBA's Chief Investment Executive, Mr. Sharpe was responsible for advising the Committee on asset concentration, risk, and the making and termination of investments with respect to the Trust's assets.  He was also responsible for manager selection, including by performing diligence on and monitoring prospective and then-current outside managers of Trust

assets. Mr. Sharpe was central to the Committee's management of the Trust; indeed, the Committee's Charter *required* it to seek NEBA's, and thus Mr. Sharpe's, services and advice.

6.     Mr. Cooney was an even more senior NEBA executive who served as Mr. Sharpe's direct supervisor and also bore responsibility for managing Trust assets, conducting manager due diligence and monitoring, and advising the Committee.

7.     In 2011, the Committee, acting as the Plans' named fiduciary, invested the Trust assets ultimately belonging to the Plans in Structured Alpha funds managed by Defendant Allianz Global Investors U.S. LLC ("Allianz"). By 2020, at the suggestion of NEBA, the Committee had expanded the Trust's Structured Alpha investment to nearly $3 billion, a majority of the Trust's total assets. Then, on February 20, 2020, capital markets entered a tailspin, brought on in part by COVID-19, with the S&P 500 dropping over 33% over the next five weeks. Most equities and fixed income investments eventually recovered. But Structured Alpha was no more; by the end of March 2020, the Committee had lost more than $2 billion of the Trust's investments managed by Allianz.

8.     Aon served as the Committee's investment consultant between 2009 and 2020 under the Investment Consulting Agreement ("ICA"). Aon's task was to provide investment advice to the Committee and to assist NEBA. At no time did the Committee delegate to Aon any responsibility for making investment decisions on the Committee's behalf. Rather, under the ICA, the Committee retained for itself the power to make discretionary decisions regarding, among other things, manager selection, asset allocation, and making and/or terminating investments.

9.     On September 16, 2020, the Committee filed a complaint (the "Main Complaint," Dkt. 1) alleging, among other things, that Aon breached its duties as an ERISA fiduciary, thereby causing the Trust's 2020 losses. The Committee claimed that it did not understand Structured

Alpha's risks and that it was unaware that the Trust's concentration of assets in Structured Alpha was excessive. It also claimed that it was harmed by Allianz's reckless actions, including constructing the portfolio to bear excess, undisclosed risk; and restructuring the portfolio to chase returns rather than preserve investor capital, thereby placing its own interests in generating performance fees ahead of its duty to safeguard the Plan assets against undue risk.

10. Aon denies that it bears any liability, and denies that the Committee is entitled to any of the relief sought against Aon in the Complaint. Even if Aon is found to have breached its fiduciary duties, Allianz, the investment manager that actually decided how to deploy Trust assets in the market, and Mr. Sharpe and Mr. Cooney, who blindly trusted that manager's process, are more to blame for the catastrophic losses giving rise to this action.

11. ***First,*** Allianz, via its negligent, reckless, intentional and altogether wrongful acts, is primarily responsibility for any losses that the Committee may have suffered. Allianz induced the Committee to invest and remain invested in Structured Alpha with promises that the strategy would outperform its competition "whether equity markets are up or down, smooth or volatile," while providing "protect[ion] against a market crash." Allianz claimed that Structured Alpha's performance did not depend on "correctly taking a view on the direction of equities, interest rates or any other fundamental factor." Specifically, Allianz promised the Committee that Structured Alpha would "***never make a forecast on the direction of equities or volatility***."

12. Aon monitored Allianz's management of the Trust's assets, but, like the rest of the investing community, Aon was unable to see what became clear until it was too late: for years, Allianz systematically and regularly exposed investors in Structured Alpha to devastating losses, because Allianz ***was***, in fact, making a directional bet on volatility. At all relevant times, Allianz assumed that high volatility markets would give way to low volatility markets in a relatively short

4

timeframe. When volatility was high, or expected to be high, Allianz realized gains by selling put options to buyers who would suffer losses if expected volatility subsided. The buyer's hypothetical losses would be Allianz's gains; but, if market volatility remained high or increased, then Allianz would be the one sustaining losses. Thus, the success of Structured Alpha, and the benefits it promised to investors like the Committee, depended on Allianz's assumption that any period of volatility would be short-lived. That was not what Allianz told Aon or the Committee.

13.     Allianz also repeatedly assured the Committee that there were "[m]ultiple layers of risk control" protecting the Plans' invested assets. The Committee would not have invested the Trust's funds in Structured Alpha had it not been for Allianz's promise to maintain a "three-legged stool" of risk management measures: (i) hedging positions that Allianz had in place "at all times," regardless of market conditions, which would limit downside loss if markets dropped 25%; (ii) "[r]eal-time risk monitoring" by Structured Alpha managers; and (iii) risk oversight from independent investment professionals who did not share in Allianz's performance fees. But there was no stool: Allianz's claims about its risk controls were as inaccurate as its claims about the safety of the Structured Alpha Strategy writ large. The hedging positions that Allianz held were essentially worthless. The risk monitors, both internal and independent, did nothing to prevent Structured Alpha's managers from exposing the Trust to significant downside risks. Inexplicably, even though Allianz funded many of Structured Alpha's options sales by using equity securities as collateral, Allianz had no method for projecting the risk of margin calls in a down market – including the margin calls that ultimately proved fatal to Structured Alpha.

14.     In this context, Allianz was reckless in representing to Aon and the Committee that the Structured Alpha strategy would perform well in a falling market with rising volatility. Allianz had no safety net, and it knew that if its assumptions about short-lived volatility were wrong, the

risks to the Trust were enormous.  By the beginning of February 2020, ██████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████  A light breeze would blow it over.   And a hurricane was on the horizon.

15.     In March 2020, during the market dislocation brought on by COVID-19, Structured Alpha suffered massive losses, received margin calls from several of its prime brokers, and was forced to liquidate several of the funds in which the Committee had invested.  But the fact that the Structured Alpha strategy carried enormous downside risks was nothing new to Allianz. Structured Alpha's managers had known about the strategy's very real risk of margin calls for nearly a decade by the beginning of 2020; and it had routinely realized gains by taking on leverage to bet on the direction of equities and volatility, rather than by abstaining from directional bets, as it claimed to its investors.  But instead of disclosing the true risks of Structured Alpha to Aon and the Committee, Allianz shared inaccurate and misleading information, including about the funds' historical performance, their collateralization rates, and their expected losses in the event of a market shock.

16.     Under the Investment Consulting Agreement between Aon and the Committee, Aon was entitled "to reasonably rely on the accuracy and completeness" of those misleading disclosures.   Therefore Aon cannot be held responsible for Allianz's decision to defraud the Committee, Aon, and numerous other clients in Structured Alpha by altering information, concealing risks, and lying to its investors about the true nature of the product.

17.     ***Second***, to the extent that Aon is found liable to the Committee for any or all such relief, Aon is entitled to recover from Mr. Sharpe and Mr. Cooney for any such liability because

they, and not Aon, are substantially more at fault for and directly caused the Committee's alleged losses. Even if they were not substantially more at fault than Aon, their breaches still caused the Committee's alleged losses and they must still bear their proportionate share of liability for those losses.

18. To the extent that the Committee's concentration of assets in Structured Alpha was improper or imprudent—which Aon denies—Mr. Sharpe is substantially more at fault and directly caused the Committee's alleged losses. Mr. Sharpe masterminded and aggressively promoted the expansion of the Trust's Structured Alpha investments from 4.64% at the end of 2013 to 62.01% by the end of 2016. He often did so contrary to Aon's advice or without even seeking it. He made the Trust's Structured Alpha concentration his responsibility, and publicly took credit for its expansion. And when Committee members raised questions in 2018 and 2019, he made it his goal to make the Committee comfortable with the Trust's concentration. He succeeded: the Committee relied on his advice that the Trust's concentration was appropriate and any reductions could be left to the Plans' discretion. █████████████████████████████

19. Further, to the extent the Committee did not properly understand the risks of Structured Alpha and would have acted differently had it understood such risks, Mr. Sharpe is substantially more at fault and directly caused the Committee's alleged losses. He cultivated a close, direct relationship with Allianz, withheld information from Aon, minimized Aon's investment advice and due diligence role, and even blocked Aon from trying to save the Trust money by reducing Allianz's fees. ████████████████████████████

████████████████████████ Mr. Sharpe actively withheld information from the Committee's members and the Plans and interfered with Aon's attempts to advise both the Committee and the

Plans about Structured Alpha.  He is responsible for the Committee and the Plans' decision to stay invested with Allianz and at such levels.

20.     If the Trust's Structured Alpha concentration was excessive and/or the Committee did not properly understand the risks of Structured Alpha, Mr. Cooney is also substantially more at fault and directly caused the Committee's alleged losses because, as Mr. Sharpe remarked, Mr. Sharpe's control of the Trust's Structured Alpha investment decision-making could not have occurred without Mr. Cooney's help.  Mr. Cooney breached his fiduciary duty by failing to effectively supervise Mr. Sharpe.  Instead of questioning the Trust's concentration in Structured Alpha or Mr. Sharpe's confidence that Structured Alpha's risks were minimal or urging Mr. Sharpe to educate the Committee and the Plans about Structured Alpha's risks, Mr. Cooney functioned as a cheerleader and praised Mr. Sharpe for generating high performance that kept the Committee and the Plans satisfied.

21.     Mr. Cooney actively supported Mr. Sharpe's breaches and committed his own independent breaches.  He supported Mr. Sharpe's efforts to interfere with Aon's performance of its fiduciary duties, joined Mr. Sharpe's recommendations to expand the Trust's concentration against Aon's advice and to maintain that concentration, and backed Mr. Sharpe's assurances to the Committee that the underlying beta investments would protect against excessive concentration risk and that any needed concentration reductions could be achieved by the Plans' independent decisions.  ████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████

22.     If anyone violated ERISA—besides Allianz—it was Mr. Sharpe and Mr. Cooney The Committee and NEBA came to the same conclusion.  ████████████████████████████

8

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████

23.     Rather than hold Mr. Sharpe and Mr. Cooney accountable or accept responsibility for its own fiduciary failings, however, the Committee elected to focus on Aon.  But under ERISA's common law of contribution and indemnification, "[f]ull [fiduciary] responsibility should not"—and does not—"depend on the fortuity of which fiduciary a plaintiff elects to sue." *Chemung Canal Tr. Co. v. Sovran Bank/Maryland*, 939 F.2d 12, 16 (2d Cir. 1991).

24.     Aon brings this Third-Party Complaint for contribution and indemnification against Mr. Sharpe and Mr. Cooney to allocate any remaining blame where it belongs—with the individuals who masterminded the expansion of the Trust's Structured Alpha concentration, assured the Committee that the concentration was appropriate, failed to inform the Committee of Structured Alpha's risks, convinced them to stay invested, and interfered with Aon's performance of its fiduciary duties.  As senior investment executives of the Committee's primary fiduciary, NEBA, Mr. Sharpe and Mr. Cooney bear substantially more responsibility than Aon, if not all

responsibility, for the Committee's alleged investment losses. Under ERISA, Mr. Sharpe and Mr. Cooney must therefore contribute to or indemnify Aon for any damages awarded to the Committee arising from these investment losses.

## JURISDICTION AND VENUE

25. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. §§ 1132(e)(1) & (f).

26. This Court has personal jurisdiction under 29 U.S.C. § 1132(e)(2) and, in the alternative, under 28 U.S.C. § 1391 because Third-Party Defendants were subject to personal jurisdiction at the time this action was commenced.

27. Venue is proper because venue in the Action is proper under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b).

## THE PARTIES

**A.      Third-Party Defendants**

28. James "Jamey" R. Sharpe served as Chief Investment Executive of NEBA and Assistant Secretary of the Committee at all times relevant to the Third-Party Complaint. He stepped down on or about January 7, 2022 after more than 30 years of employment by BCBSA.

29. Terrence J. Cooney is Vice President, Investments at NEBA and the Assistant Secretary of the Committee. He was Mr. Sharpe's direct supervisor.

30. At all times relevant to the Third-Party Complaint, Defendants Sharpe and Cooney were ERISA fiduciaries because they exercised discretionary authority or discretionary control with respect to management and administration of the Trust and management or disposition of the Trust's assets, pursuant to 29 U.S.C. § 1002(21)(a)(i) & (iii).

**B. Third-Party Plaintiff**

31.     Aon Investments USA Inc. is an Illinois corporation with its principal office in Chicago, Illinois. Aon provided investment advice to the Committee pursuant to the ICA between 2009 and 2020.

**C. Other Parties And Entities**

32.     The Blue Cross and Blue Shield Association is an Illinois corporation headquartered in Chicago, Illinois. BCBSA controls the Blue Cross and Blue Shield trademarks and names, which it licenses to defined benefit plans across the United States.

33.     Plaintiff Blue Cross and Blue Shield Association National Employee Benefits Committee is the plan administrator and named fiduciary of the Plans under ERISA (29 U.S.C. §§ 1002(16)(A), 1102(a)(2)). The Committee was established in 1953 to manage and oversee the administration and investment of national employee benefits and related programs, including the Trust. The BCBSA Board established the Committee as an independent committee on June 20, 2013; prior to that date, the Committee was a standing committee of the BCBSA Board.

34.     The National Employee Benefits Administration is a department of BCBSA. As described further below, the Committee broadly delegated primary fiduciary responsibilities over the Trust to NEBA and relied on NEBA for investment manager due diligence and investment recommendations. In addition to junior support teams, Mr. Sharpe and Mr. Cooney were supported by more senior NEBA officials, including, but not limited to, Cara Esser, Mark Polewski, and Leonor DeSouza.

35.     The Plans are the numerous Blue Cross defined benefit plans that invested their assets in the Trust and entrusted the Committee and NEBA with fiduciary responsibility over those Trust assets. Sixteen of those Plans allegedly suffered losses. Main Compl. ¶ 16 n.1. Senior

executives of many of those 16 Plans (and other Plans) served on the Committee between 2009 and 2020.

## FACTUAL ALLEGATIONS

### I. MR. SHARPE AND MR. COONEY'S FIDUCIARY RESPONSIBILITIES UNDER THE PLAN DOCUMENTS AND ERISA

#### A. The Committee Charter's Provisions

36. On June 20, 2013, the Committee adopted the Charter of the Blue Cross and Blue Shield Association National Employee Benefits Committee ("NEBC Charter," Dkt. 138-1), attached hereto as **Exhibit A**. The NEBC Charter establishes the rules and procedures governing the Committee's operations, including its management of the Trust.

##### 1. The Committee's Authority

37. The NEBC Charter bestows the Committee with the responsibility of overseeing the Trust's investments.

38. The NEBC Charter also grants the Committee full authority and broad discretion over managing the Trust and its investments. ██████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████

39. The NEBC Charter imposed specific requirements for potential Committee members to ensure that they were capable of making the strategic judgments required to properly manage the Plans' investments. ██████████████████████████████████ ████████████████████████████████████████████████████████

40. Between 2011 and 2020, the following individuals served as Committee members: Karen Abraham (BCBS Arizona), Matt All (BCBS Kansas), Peter Andruskiewicz (BCBS Rhode Island), Christopher Booth (Excellus BCBS), Bryan Camerlinck (BCBS Louisiana), Andrew Corbin (BCBS Kansas), Henri Cournand (BCBS Kansas City), Tim Crilly (BCBS Wyoming), Chuck Divita (BCBS Florida), R. Chris Doerr (BCBS Florida), Mark El-Tawil (BCBS Arizona), Michael Frank (BCBS Montana), Don C. George (BCBS Vermont), John Giblin (BCBS Tennessee), Michael Gold (BCBS Hawaii), Diane Gore (BCBS Wyoming), Robert Hiam (Hawaii Medical Service Association), Tim Huckle (BCBS North Dakota), Thurman Justice (BCBS Florida), Robert Kolodgy (BCBSA), Robert Leichtle (BCBS South Carolina), Gina Marting (BCBS Hawaii), Mike Mizeur (BCBS South Carolina), Mary O'Hara (Blue Shield of California), Michael Reitz (BCBS Louisiana), Rick Schum (BCBS Wyoming), Scott Serota (BCBSA), David Southwell (Wellmark, Inc.), Mark Stimpson (The Regence Group / Cambia Health Solutions), Michael Stollar (BCBS Hawaii), Erin Stucky (BCBS Kansas City), and Paul von Ebers (BCBS North Dakota).

### 2. The ISC's Role

41. To fulfill the NEBC Charter's obligations regarding asset allocation, investment manager selection, and fund selection, the Committee established the ISC. Chaired by the Committee's Vice-Chair, the ISC was tasked with ███████████████████████████ ███████████████████████████████████████████████████████████████ █████████████████████████████ The NEBC Charter tasked the ISC with making

recommendations to the Committee concerning the Trust's concentration of assets, including the level of funds allocated to particular investment funds or investment managers, and with respect to the Trust's targets and benchmarks. It also charged the ISC with reviewing the performance of investment managers and funds.

42.     To ensure that the ISC could fulfill these serious responsibilities, the Committee's chair was required to personally select the members of the ISC based on their experiences with financial markets and investment instruments similar to those likely to be chosen for the Trust's investments. The NEBC Charter also required that the ISC's members educate themselves about the Trust's investments and potential investments. Mr. Cooney and Mr. Sharpe both served as Committee Assistant Secretary and attended ISC meetings at all relevant times to the Third-Party Complaint.

43.     John Giblin chaired the ISC between 2014 and 2020. Between 2011 and 2020, the following Committee members also served on the ISC: Karen Abraham, Bryan Camerlinck; Andrew Corbin (the 2012 chair), Charles "Chuck" Divita, R. Chris Doerr, Paul von Ebers, Mark El-Tawil, Michael Frank (the 2013 chair), Thurman Justice; Mike Mizeur, and Michael Reitz (the 2011 chair).

### 3.     The Committee Broadly Delegated Authority To NEBA

44.     Under the Charter, the Committee broadly delegated its fiduciary responsibilities to NEBA.

45.     Specifically, the Charter contemplated that the Committee would rely on NEBA's due diligence and advice in investing the Trust's assets, and actually required the Committee to utilize the services of NEBA's investment staff, including in connection with investment

recommendations. ████████████████████████████

████████████████████████████████████

46.     The Committee also delegated fiduciary responsibilities over the Trust's administration to NEBA.

47.     Third-Party Defendant Mr. Sharpe served as NEBA's Chief Investment Executive from 2014 and through all relevant periods.  Third-Party Defendant Mr. Cooney served as NEBA's Vice-President, Investments from 2016 and through all relevant periods, and directly supervised Mr. Sharpe.

**B.      The Investment Consulting Agreement's Provisions**

48.     Acting as the Trust's named fiduciary, the Committee retained Aon as its investment consultant in 2009.  On June 16, 2009, the Committee and Aon entered into the Investment Consulting Agreement ("ICA"), attached hereto as **Exhibit B**, to define their respective responsibilities.

49.     Section 1.5 of the ICA provides that the Committee retains fiduciary responsibility and authority for any and all decisions regarding Plan matters.

50.     The ICA gave the Committee discretion to either exercise that investment authority directly, or delegate it to NEBA—and the Committee elected to retain exclusive authority to make and implement investment decisions.  The Committee also retained the responsibility to decide whether the Trust's investments complied with ERISA's diversification requirements.

51.     Under the ICA, Aon's role was to consult for the Committee and help the Committee acquire the information it required to make prudent fiduciary decisions.  Aon was to provide investment advice concerning investment manager selection and asset allocation, and to evaluate and monitor investment managers.

52.     While monitoring the Trust's investment managers, Aon was contractually entitled under the ICA "to reasonably rely on the accuracy and completeness of the information it receives in response to [information] requests" that it posed to Allianz.

53.     Aon had no authority to make investment decisions for the Committee. Under the ICA, Aon lacked responsibility to manage or direct any of the Trust's investments, and lacked authority to enter into agreements on behalf of—or otherwise bind—the Trust.

54.     At all times, the Committee had the authority to overrule or reject any advice that Aon provided, as well as to act unilaterally without seeking Aon's advice. To that end, the ICA specifically provided that the Committee retained the ability to reject any recommendation made by Aon.

55.     Further, the ICA provided that Aon could not be held liable for actions directed by the Committee or its delegates. Section 1.2 provides that Aon could not be held liable for taking any action, or for refraining from taking any action, at the direction of the Committee, any other person acting with respect to the Programs or the Trusts pursuant to actual authority to give such direction, or whom Aon reasonably believed had such authority.

56.     Aon could also not be held liable for the actions, inactions, misrepresentations, or omissions of third parties, including Allianz.

**C.     The Investment Policy Statement's Provisions**

57.     In 2010, the Committee voted to adopt the Investment Policy Statement ("Policy Statement"), attached hereto as **Exhibit C**. The Policy Statement governed the management of the Trust and defined the respective roles of the Committee, NEBA, and Aon.

58.     Consistent with the NEBC Charter and the ICA, the Policy Statement stated that the Committee retained exclusive decision-making authority over investment selection. The

Policy Statement provided that the Committee was responsible for selecting investments and managers, and that the Committee retained discretion to add investments at any time.

59. The Policy Statement expressly made the Committee responsible for monitoring the Trust's investments.

60. In the Policy Statement, the Committee delegated primary fiduciary responsibility over investment manager due diligence to NEBA. The Policy Statement required NEBA to conduct investment manager monitoring and evaluations, an annual on-site meeting with each active manager, and an in-house meeting with that manager at NEBA's offices. In contrast, the Policy Statement tasked Aon with the secondary fiduciary responsibility of assisting NEBA in monitoring and evaluating investment managers.

61. Further, the Committee retained exclusive authority over decisions to close or change existing investments, including when necessary to ensure the Trust's investments were properly diversified under ERISA. ████████████████████████

████████████████████████████████████████████

The Committee also reserved the right to terminate any investment manager for any reason, including where a change in allocation policy required a shift in investment strategy.

62. One area over which the Committee retained such authority was its contractual relationship with Allianz, pursuant to an Amended and Restated Investment Management Side Agreement, dated May 1, 2014. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

███████████

### D.     Third-Party Defendants' Fiduciary Duties

63.     Both Mr. Sharpe and Mr. Cooney were fiduciaries because the Committee entrusted them with the discretionary control over the administration and management of the Trust and the management and disposition of its assets.  The Charter and the IPS required the Committee to seek NEBA's advice on manager selection and asset allocation and to rely on NEBA to monitor and evaluate investment managers.  Because Mr. Sharpe and Mr. Cooney were NEBA's most senior investment executives, they were the persons the Committee turned to and charged with fulfilling these core fiduciary responsibilities.  Both men, especially Mr. Sharpe, in fact exercised control over the management and disposition of the Trust's assets, including, but not limited to, by exercising their authority to increase the Trust's Structured Alpha investments as long as they satisfied the Committee's asset allocation policy guidelines.  And both men cultivated the Committee's trust by serving as its Assistant Secretary and regularly providing investment advice at ISC meetings.

64.     As ERISA fiduciaries, Mr. Sharpe and Mr. Cooney's fiduciary obligations to the Trust were "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).  Mr. Sharpe and Mr. Cooney's duties were especially heightened because NEBA served as the primary fiduciary relative to Aon and even the Committee itself.  Presentations to the Plans confirm that the Committee delegated primary fiduciary responsibility to NEBA and placed Aon in a secondary role as NEBA's advisor.  The Policy Statement itself records that NEBA was charged with investment manager monitoring and evaluation and that Aon's role was to help NEBA perform these tasks.

65. Mr. Sharpe's duties were especially heightened because he held himself out as the expert on Structured Alpha and took responsibility for all major decisions concerning Structured Alpha. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ He cultivated a close and direct relationship with Allianz and told the Committee, Aon, and Mr. Cooney that he knew Structured Alpha best: ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

66. Because he considered himself the expert on Structured Alpha, Mr. Sharpe assumed responsibility for all key decisions concerning Structured Alpha investments, including the creation of new Structured Alpha funds, the expansion of the Trust's Structured Alpha investments, and the concentration of the Trust's Structured Alpha investment. He determined that the buck stopped with him for Structured Alpha concentration—████████████████████

████████████████████████████████████████████████

███—and told Aon so. And both Aon and Allianz understood that, ████████████████████ Mr. Sharpe was the ISC's leader and drove its Structured Alpha concentration decisions. Ex. D at -601. By holding himself out as a trusted advisor who was the expert on Structured Alpha, Mr. Sharpe cultivated a fiduciary relationship of trust with the Committee.

67. As ERISA fiduciaries, Mr. Sharpe and Mr. Cooney each owed a duty under 29 U.S.C. § 1104(a)(1)(B) to act with the care, skill, and prudence under the circumstances then

prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character with like aims. That duty required them to exercise care, skill, and prudence in connection with at least the following decisions and actions:

a. The recommendation of investment managers to the Committee and the ISC, as contemplated in Section 13(b) of the Charter;

b. Monitoring and evaluating investment managers and their continuing appropriateness, as contemplated in the Investment Policy Statement;

c. Deciding to invest, increasing investments in, and maintaining investments in Structured Alpha funds;

d. Advising the Committee and the ISC concerning making, maintaining, and terminating investments in Structured Alpha funds and the appropriate concentration of Structured Alpha investments; and,

e. Ensuring that the Committee, the ISC, and the Plans understood the nature and risks of the Structured Alpha strategy.

68. As ERISA fiduciaries, Mr. Sharpe and Mr. Cooney also owed a duty of loyalty to the Plans invested in the Trust under 29 U.S.C. § 1104(a)(1)(A). That duty required Mr. Sharpe and Mr. Cooney to act "solely in the interest" of and for the "exclusive purpose of providing benefits" to those Plans.

69. As ERISA co-fiduciaries of Aon, Mr. Sharpe and Mr. Cooney owed duties under 29 U.S.C. § 1105, to provide complete and accurate information to Aon and permit Aon to fulfill its fiduciary responsibilities without interference.

70.     As ERISA fiduciaries, Mr. Sharpe and Mr. Cooney also owed a duty under 29 U.S.C. 1104(a)(1)(D) to follow Plan documents, including the Charter and the Investment Policy Statement.

71.     Finally, as ERISA fiduciaries, Mr. Sharpe and Mr. Cooney owed a duty to "diversify[] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."  29 U.S.C. § 1104(a)(1)(C).

## II.     MR. SHARPE AND MR. COONEY'S BREACH OF THEIR FIDUCIARY DUTIES

72.     In the Main Complaint, the Committee claims that the Trust's nearly $3 billion investment in Structured Alpha was imprudent and inconsistent with its investment objective and risk tolerance.   The Committee's Complaint thus attempts to hold Aon responsible for the Committee's alleged lack of knowledge of Structured Alpha's actual level of risk, acceptance of Allianz's assertions about Structured Alpha, failure to see the warning signs that Allianz's options positions had departed from Allianz's professed investment strategy, overconcentration in Structured Alpha, and failure to follow the Committee's own Plan documents.

73.     Aon denies all such allegations and contends that discovery in this action will continue to demonstrate that Aon committed no wrongdoing.

74.     But if those allegations are established, in whole or in part, they sharply underscore Mr. Sharpe's and Mr. Cooney's own fiduciary failings.  NEBA's Chief Investment Executive and his direct supervisor encouraged, advised, and directed the Committee to invest and maintain more than half of the Trust's assets—nearly $3 billion—in a strategy whose risks they took active steps to ensure the Committee did not understand.   Mr. Sharpe and Mr. Cooney committed active breaches of fiduciary duty and are substantially more at fault than Aon for any alleged losses to the Trust.

### A. Defendants' Breaches During The Pre-2018 Expansion Of The Trust's Structured Alpha Investments

75. The Committee claims that Aon caused it "to invest and maintain a majority of the Trust in Structured Alpha—a much higher percentage than Aon's other clients had invested in the strategy." Main Compl. ¶ 164(d). It further alleges that the "expan[sion]" of the Trust's Structured Alpha investments occurred between the Committee's initial 2011 investment and 2018. *Id.* ¶¶ 44, 52.

76. But the Committee's attribution of responsibility for this expansion is inaccurate. If the Committee's concentration of the Trust's assets in Structured Alpha is found to be a violation of ERISA, Mr. Sharpe and Mr. Cooney are primarily responsible and are substantially more at fault than Aon. They, not Aon, caused the Trust's Structured Alpha concentration to climb from 4.64% at the end of 2013 to 62.01% by the end of 2016, and they, not Aon, actively resisted any effort to diversify away from that investment.

#### 1. Mr. Sharpe's Breaches

##### (a) Mr. Sharpe Increased The Trust's Structured Alpha Concentration

77. Prior to the market crash in March 2020, Jamey Sharpe was not shy about his responsibility for increasing the Trust's concentration of assets in Structured Alpha. In a 2016 interview with Institutional Investor magazine, attached hereto as **Exhibit H**, he disclosed that he made a "bet" on portable alpha strategies, "shift[ing] to an 80% allocation to portable alpha strategies" in 2014, principally Structured Alpha. Ex. H at -150-51.

78. Allianz employees were also aware that Mr. Sharpe was betting on them, ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮

79.     Mr. Sharpe's bet caused the Trust's Structured Alpha concentration to climb at an annual clip of nearly twenty percentage points in the years 2014-2016.  The increases he directed caused that concentration to increase from 4.64% in 2013, to 23.78% by 2014, 41.95% by 2015, and 62.01% by 2016.

80.     Mr. Sharpe increased concentration because he was obsessed with high performance rates and publicly relished the praise he was receiving for them.  He boasted to Institutional Investor magazine that the Trust had "beaten [its] benchmark[s]" between 2014-2016 and attributed "90% of the credit for that … to the portable alpha strategy."  Ex. H at -151.  ██

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████

81.     Mr. Sharpe's preoccupation with performance caused him to terminate certain of the Committee's existing investment managers and shift the assets previously under their management to Structured Alpha.

82.     Importantly, Mr. Sharpe—with the Committee's rubber-stamp—did so against Aon's advice.  In December 2014, Aon advised the Committee to consider a separate investment in global funds at a time when Allianz did not offer Structured Alpha funds in the global category.  Mr. Sharpe disregarded Aon's advice to invest with existing global managers.  █████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████

83.     Mr. Sharpe then recommended, against Aon's advice, that the Committee terminate its existing global managers and shift the assets under their management to Structured Alpha.  ██

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

84. Aon disagreed with Mr. Sharpe's recommendation because it would increase risk to the Trust's portfolio and advised the ISC of that disagreement. ████████████ ████████████████████████████████

85. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ Unlike Mr. Sharpe, Aon was not entirely won over by Allianz's representations of tail risk protection in the form of hedging positions, continuous internal risk tracking, and external risk monitoring. Aon understood that, no matter how many times Allianz claimed that Structured Alpha was immune from margin call risk, trading derivatives on margin necessarily exposes some percentage of the principal. And Aon tailored its advice accordingly, even without knowing at the time that neither of Allianz's risk reporting functions accounted for the potential of a margin call—the equivalent of saying "the coast is clear" with one's eyes closed.

86. In contrast, Mr. Sharpe, in discussions with Allianz and trusting them wholeheartedly, recognized that he was rejecting Aon's advice— ████████████████████ ████████████████████

87. But the Committee and the ISC sided with Mr. Sharpe over Aon, thus prioritizing the high returns that Allianz offered over the risk mitigation that Aon suggested.

88. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

[REDACTED]

89. [REDACTED]

[REDACTED]

[REDACTED]

90.     In short, Mr. Sharpe, not Aon, publicly claimed credit for and in fact is substantially responsible for increasing the Trust's Structured Alpha concentration to the level that Committee now claims was excessive.

        (b)    <u>Mr. Sharpe Failed To Properly Advise The Committee And The ISC</u>

91.     If the Committee did not understand Structured Alpha's risks, Mr. Sharpe is primarily at fault because he failed to properly advise the Committee and the ISC about the nature of the Structured Alpha strategy and its risks.

92.     For instance, the Committee has alleged that Aon "breached its duty to prudently advise the Committee" by "indicat[ing] that the Trust was properly diversified because the Trust's investment in Structured Alpha consisted of multiple beta components."  Main Compl. ¶ 164(d).

93.     Assuming this allegation is true—which Aon denies—the Committee cannot seek to shift blame onto Aon; Mr. Sharpe is also at fault because he provided that same advice to the Committee as early as 2015, which accepted it.

94. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] But what Sharpe never asked – and what

Allianz took special care to never disclose until it was too late – was what percentage of those underlying beta investments was pledged as collateral to prime brokers who provided the loans that allowed Allianz to run the options overlay.

95.     The ISC was unconcerned because that was what Mr. Sharpe told it—and the ISC, much like its parent, the Committee, was in the habit of accepting what Mr. Sharpe told it unquestioningly. ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████ Mr. Sharpe believed that the Trust's expanded Structured Alpha concentration was consistent with the Trust's past practice of investing substantial sums with a single asset manager because the assets were spread across different underlying betas. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████

96.     The Committee has also alleged that Aon breached its duty of prudent advice by failing to ensure that the Committee was "adhering to the guidelines of the Investment Policy Statement" concerning asset allocation.  Main Compl. ¶ 164(e). ████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████

97.     Assuming this allegation regarding compliance with the Investment Policy Statement is true—which Aon denies—Mr. Sharpe is also at fault because he actively promoted, instigated, and publicly took credit for the expansion of the Trust's Structured Alpha concentration,

and reassured the Committee that the expansion complied with the asset allocation guidelines,

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ By the November 4, 2016 ISC meeting,

Structured Alpha concentration had climbed to at least 56.85% of the Trust's total assets. ███████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████ Committee members accepted Mr. Sharpe's repeated statements that the Trust's allocation complied with the Investment Policy Statement, and cannot hold Aon responsible for Mr. Sharpe's actions and their reliance on the same.

98.     The Committee has also alleged that Aon breached its duty of prudent advice by failing to ensure that the Committee "understood" the nature and risks of the Structured Alpha strategy.  Main Compl. ¶ 79.

99.     Assuming this allegation is true—which Aon denies—Mr. Sharpe is at fault because he failed to educate his own board about the nature and risks of the Structured Alpha strategy prior to 2018.  Mr. Sharpe boasted publicly in 2016 that portable alpha strategies, of which Structured Alpha was one, "are very transparent and relatively easy to explain to boards."  Ex. H

at -153.  Mr. Sharpe either underestimated the difficulty of explaining Structured Alpha to the Committee or the ISC or failed to devote himself to what, by his own admission, was an easy task. In either event, he breached his fiduciary duty.

100. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ As the ISC's Chair, Mr. Giblin was expected under the NEBC Charter to be knowledgeable and familiar with the financial products the Trust invested its funds in.  *See* Ex. A § 14(a)(i).  ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

101.    Mr. Giblin blamed Mr. Sharpe for his and the Committee's failure to evaluate the strategy until 2017-2018.  ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



102. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

103. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████ But it was Mr. Sharpe's job to inform the Committee and the ISC about Structured Alpha.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

104.    As NEBA's Chief Investment Executive, and as required under the Charter, Mr. Sharpe bore responsibility for advising Mr. Giblin and the rest of the Committee of the Structured Alpha strategy's nature and risks. If the Committee did not in fact understand the overlay nature of the strategy, the different products under the Structured Alpha umbrella, the Structured Alpha fee structure, and any associated risk, Mr. Sharpe is at fault for failing to properly advise the Committee.

105.    Mr. Sharpe's subsequent actions confirm that, to the extent the Committee members did not understand the nature and risks of Structured Alpha during the pre-2018 period,

Mr. Sharpe is at fault. As of 2018, four of the ISC's five members had been serving on it for years: Mr. Giblin, Mr. Mizeur, and Ms. Abraham since 2012, and Mr. Divita since 2015. Mr. Sharpe failed to provide them with the advice necessary for them to understand portable alpha strategies generally, and Structured Alpha in particular, either before or for years after they approved the expansion of the Trust's Structured Alpha investments from 4.64% at the end of 2013 to 62.01% by the end of 2016. Were this not the case, there would have been no need for Mr. Sharpe to state

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

106. Mr. Sharpe may have failed to educate the Committee concerning Structured Alpha's risks in part because he himself had an inadequate understanding of those risks before at least 2018. Structured Alpha had three basic types of options positions: range-bound spreads, directional spreads and hedging positions. Allianz represented that the first two positions were intended to generate profits by selling "insurance" against market volatility, while the hedging positions purchased, in effect, "reinsurance" in the event of a sharp downward market dislocation.

███████████████████████████████████████████████████████████

████████████████████████████████████████ Employing hedges in the range-bound spreads would have added an additional layer of protection that would have reduced the downside risks of Structured Alpha. Thus Mr. Sharpe's misconception may have caused him to advise the Committee that Structured Alpha was less risky than it actually was.

107. Worse, during the same period of 2018 when the Committee was reviewing its investment in Structured Alpha, Mr. Sharpe revealed further ignorance ████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████ Mr. Sharpe summarized the downturn in performance the way one would describe month-to-month fluctuations in an equities investment, even though he was not summarizing the effects of a general market downturn, but, rather, the additional exposure Structured Alpha took on when it had to restructure its positions during and after a volatility surge. But the risk of an investment vehicle that trades on margin is not as simple as valuing the current contents of the portfolio; there is also the risk of a margin call that comes with underwriting newly-restructured positions with collateral drawn from the fund itself. That Mr. Sharpe apparently did not appreciate that aspect of options trading explains why he never pressed Allianz about it.

108.   To the extent Mr. Sharpe was operating under that false assumption when he advised the Committee that Structured Alpha was low risk or failed to advise the Committee about Structured Alpha's risks at all before 2018, Mr. Sharpe is to blame.

(c)    Mr. Sharpe Failed To Properly Advise The Plans

109.   To the extent that the underlying investors in the Trust—the 16 Blue Cross Plans that the Committee alleges suffered losses from Structured Alpha (*see* Main Compl. ¶ 16 n.1)— were not aware of the risks of Structured Alpha, Mr. Sharpe is also at fault because he failed to properly advise them about the Structured Alpha strategy and its risks.

110.   Mr. Sharpe understood that the Plans were the beneficiaries of the Trust and had their own risk profiles and a measure of control over their investments in the Trust. As he told Institutional Investor magazine in 2016, the Trust was a collection of "20 separate $250 million

pension funds," each with its "own risk profile". Ex. H at -152. And as Institutional Investor reported, "each individual Blue Cross Blue Shield plan has the option to either choose its own strategic allocation across [the Trust's asset] pools or leave it up to Sharpe's team." *Id*.

111. Notwithstanding each Plan's nominal control over its Trust investments, Mr. Sharpe made it his mission to see that the Plans left their Trust asset allocation up to him and his team. ███████████████████████████████████████████████████████ ███████████████████████████████████████████████ And rather than educate them, Mr. Sharpe told the Plans to trust him. After all, he had determined that the buck stopped with him for concentration ████████████████████████████████ ███████████████████████████████████████████████████████ and he did not want the Plans getting in the way. ███████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████

112. Indeed, Mr. Sharpe appears to have conceptualized his role in relation to the Plans as that of a salesman for Structured Alpha rather than a trusted fiduciary. ████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████

113. To increase his influence over the Plans and ensure they deferred to his preferences concerning Structured Alpha, Mr. Sharpe actively prevented Aon from advising the Plans on

concentration. ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

114.    Mr. Sharpe also directed his NEBA staff to actively withhold information about Structured Alpha's performance from the Plans to preserve their blind trust in him.   ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

115.    Senior NEBA employees and Mr. Giblin later suggested that Mr. Sharpe's failure to properly advise the Plans may have had grave consequences.   █████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ To the extent that the Plans did not understand the nature and risks of Structured Alpha and would have reduced and/or terminated the exposure of their Trust investments to Structured Alpha if they had so understood, Mr. Sharpe is at fault.

### 2. Mr. Cooney's Breaches

116. As NEBA's Vice President, Investments, Mr. Cooney was Mr. Sharpe's direct supervisor. His duty of prudence required him to exercise judgment in the tasks he entrusted to Mr. Sharpe and to monitor Mr. Sharpe's performance of those tasks.

117. Instead of discharging those responsibilities, Mr. Cooney enabled Mr. Sharpe's breaches of fiduciary duty. ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ Because Mr. Cooney thought that Mr. Sharpe was more sophisticated than he was, he followed Mr. Sharpe's lead and, ████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████And Mr. Cooney did permit Mr. Sharpe to lead NEBA and the Committee in the absence of any proper supervision or correction. Instead of discharging his responsibility to supervise Mr. Sharpe, he gave Mr. Sharpe his full support and actively worked with him to convince the Committee and the Plans to do the same.

(a)  Mr. Cooney Approved The Expansion Of The Trust's Structured Alpha Investments

118. To the extent that the Committee could have avoided its alleged losses by avoiding concentrating a majority of Trust assets in Structured Alpha—which Aon denies—Mr. Cooney is at fault because he supported Mr. Sharpe's decisions to increase that concentration and recommended that the Committee follow Mr. Sharpe's advice.

119. Throughout the 2014-2016 period when the Trust's Structured Alpha concentration expanded, Mr. Cooney unquestioningly supported Mr. Sharpe rather than asking critical questions about that expansion and its potential risks. ████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

120.     Moreover, Mr. Cooney actively supported Mr. Sharpe's efforts to increase the Trust's concentration. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████ That statement was not mere puffery. ████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

(b)     Mr. Cooney Failed To Properly Advise The Committee, The ISC, Or The Plans

121.     To the extent that the Committee did not understand the risks of Structured Alpha and/or of the Trust's concentration of Structured Alpha assets—which Aon denies—Mr. Cooney is also at fault because he supported Mr. Sharpe's advice to the Committee, joined Mr. Sharpe in advising the Committee to increase its concentration, and assured the Committee that the risk level was appropriate.

122.     Rather than effectively supervising Mr. Sharpe to ensure that the Trust was protected against overconcentration and the risk of loss, Mr. Cooney congratulated him for keeping the ISC happy. ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

Mr. Cooney prioritized keeping the ISC happy over ensuring that Mr. Sharpe was protecting the Trust investments the ISC oversaw from excessive risk.

123.    But Mr. Cooney's support of Mr. Sharpe went well-beyond mere back-slapping.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

124.    Instead of expressing concern about the expansion of the Trust's Structured Alpha concentration, Mr. Cooney, like Mr. Sharpe, assured the  Committee that the Trust was not exposed to undue risk.  By the time of the ISC's September 15, 2016 meeting, the Trust's Structured Alpha concentration had expanded to at least 48.20%.  █████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████

125.    Further, Mr. Cooney deferred to Mr. Sharpe's decision to withhold information from the Plans about the nature and risks of Structured Alpha.  Instead of warning Mr. Sharpe to ensure that the Plans understood the nature and risks of Structured Alpha, Mr. Cooney prioritized Structured Alpha's performance and the Plans' satisfaction with that performance.  ████████████

███████████████████████████████████████████████████████

126.     Moreover, to the extent that the Committee did not understand the nature and risks of Structured Alpha, Mr. Cooney is at fault for failing to educate its members, including, but not limited to, during the pre-2018 period. ████████████████████████████████

**B.     Defendants' Breaches During The 2018-2019 Decisions To Stay Invested In Structured Alpha**

127.     The Committee has alleged that Aon breached its duties between 2018 and 2019 by failing to advise the Committee to terminate or substantially reduce the Trust's Structured Alpha investments.  According to the Committee, if it had properly understood the nature and risks of the Structured Alpha strategy, it would have terminated its Structured Alpha investments by no later than December 31, 2019.

128.     To the extent the Committee could have avoided its alleged losses by exiting Structured Alpha in 2018-2019, the Committee's claim that Aon is responsible for its decision not to do so is misplaced.  Mr. Sharpe and Mr. Cooney are primarily responsible and are substantially more at fault.  They, not Aon, caused the Trust to maintain its Structured Alpha investments.

### 1.    Mr. Sharpe's Breaches

129.    In early 2018, Allianz became concerned that the Committee might reduce the Trust's exposure to Structured Alpha, but recognized that it had an ally in Jamey Sharpe. ███

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████

(a)    <u>Mr. Sharpe Convinced The Committee And The Plans To Stay Invested In Structured Alpha</u>

130.    The advice that the Committee attributes to Aon and alleges was deficient is a near picture-perfect snapshot of the advice that Mr. Sharpe gave the Committee in 2018 and 2019.  The Committee alleges that Aon's advice was deficient because it (1) "gave the Committee the false impression that the strategy was relatively low risk and indeed, a risk management strategy," (2) "repeated Allianz's assertions about the operation of the Structured Alpha strategy … without adequately investigating whether those assertions were accurate or complete" or conducting proper due diligence, (3) failed to determine that "Allianz was shorting the VIX without corresponding hedges," and (4) "indicated that the Trust was properly diversified because the Trust's investment in Structured Alpha consisted of multiple beta components."  Main Compl. ¶ 164.

131.    Assuming those allegations are true, they are damning for Mr. Sharpe.  It was Mr. Sharpe who told the ISC that Structured Alpha was a strategy that managed risk rather than a source of risk.  It was Mr. Sharpe who assuaged Mr. Kolodgy's concerns by parroting talking points from an Allianz deck to him.  It was Mr. Sharpe who assured the Committee that Allianz had protected against steep declines by buying hedges to limit their impact.  And it was Mr. Sharpe who told the ISC, as he had advised it since at least 2015, that it should not be concerned about

concentration because the beta investments were diversified—██████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████

132.     By 2018, Mr. Sharpe had presided over the expansion of the Trust's Structured Alpha investments to more than 60% and, as Aon and Allianz both recognized, had assumed responsibility for the Trust's Structured Alpha concentration.   The high performance of those investments brought him accolades in the industry.   ████████████████████████████████

██████████████████████████████████████████████ and Mr. Sharpe convinced himself that he knew Structured Alpha best:   ████████████████████████████

██████

133.     So when the Committee's members had questions about Structured Alpha after it underperformed relative to its beta benchmarks in February 2018, the first person they turned to was Mr. Sharpe.   ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████

134. ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████

135. ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

136. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

137.    At the June 18, 2018 ISC meeting, Mr. Sharpe—not Aon—told the ISC to stay the course. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

138.    The ISC and the Committee's reliance on Mr. Sharpe's advice was swift. [REDACTED]

[REDACTED]

[REDACTED]

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

139.     The cycle repeated itself when Structured Alpha again underperformed in late 2018.

███████████████████████████████████████████     Nonetheless, Mr. Sharpe again gave a swift

and strong defense of Structured Alpha.

140.     ████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

141.     ████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

142.     ████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████

143.     The ISC again took Mr. Sharpe's advice.     ██████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

144.     Mr. Sharpe was telling the Plans the same thing—to stay invested because Allianz had taken steps to ensure Structured Alpha would rebound from any declines. ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

145.     Further, Mr. Sharpe is primarily responsible for any due diligence failure that contributed to the Committee's losses, including, but not limited to, the alleged failures to adequately investigate Allianz's assertions and determine that the hedges Allianz claimed would protect against loss were illusory.  Main Compl. ¶ 164.  That is because, as Mr. Sharpe repeatedly insisted, due diligence was his responsibility.  The Committee's Charter and the IPS already tasked Mr. Sharpe and NEBA with substantial due diligence responsibilities.  And since at least 2014, he had striven to minimize Aon's due diligence role and bring ever-increasing amounts of due diligence in-house at NEBA.

146.     Because Mr. Sharpe viewed due diligence as his responsibility, he took charge of due diligence meetings with Allianz.  He engaged in numerous due diligence meetings with Allianz, many of which Aon was not even invited to. ████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ And Mr. Sharpe advised the Committee to rely on his own due diligence and his close and direct relationship with Allianz because he knew Allianz best—████████████████████████████████

███████████████████████████████████████████████████

██████

       (b)    <u>Mr. Sharpe Failed Again To Educate The Committee And The ISC About Structured Alpha's Risks</u>

147.    By mid-2018, Mr. Sharpe knew that he had failed to teach the ISC to understand Structured Alpha and that he needed to correct his failure.  Were this not the case, ████████

███████████████████████████████████████████████████

████████████████████████████████ Mr. Sharpe evidently failed to achieve that goal and correct his failure, because Mr. Giblin still did not understand Structured Alpha and its risks in 2020, and neither did Mr. El-Tawil or other ISC members.

148.    ██████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████

149.    This fact bears repeating: Mr. Giblin was unaware of the ***objective of one of the principal funds in the strategy which comprised over 60% of the Trust's investment.***

150.    ██████████████████████████████████████████████

█████████████████████████████████████████████████

151.    ██████████████████████████████████████████████

████████████████████████████████████████████████████ reinforces both the depths of the other the Committee members' ignorance and the reason for that ignorance— Mr. Sharpe's failure to perform his fiduciary duty.

152.     Mr. Giblin's failure was not isolated in 2018-2020, just as it had not been isolated before 2018.  ████████████████████████████████████████████████████████

████████████████████████████

153.     Mr. El-Tawil's deposition testimony confirms that Mr. Giblin had reason to be concerned about his fellow ISC members' lack of understanding of Structured Alpha.  Mr. El-Tawil joined the ISC in early 2019 and, like Mr. Giblin, was expected under the NEBC Charter to be knowledgeable and familiar with the financial products the Trust invested its funds in.  Ex. A § 14(a)(i). And as the Chief Financial Officer of Blue Cross and Blue Shield of Arizona, a Plan that had invested several hundred million in the Trust's Structured Alpha investments, he had every incentive to acquire such knowledge promptly if he did not already possess it when he joined the Committee in early 2019.

154.     As Chief Investment Executive, it was Mr. Sharpe's responsibility to educate Mr. El-Tawil and other new ISC members about Structured Alpha and its risks.  Mr. Sharpe believed this was an easy task, and was on record as stating that portable alpha strategies like Structured Alpha ████████████████████████████████████████  Ex. H at -153.  As Mr. El-Tawil acknowledged, Mr. Sharpe ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

155.     Mr. Sharpe evidently failed to discharge that ██████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████

156.     Mr. Sharpe also failed to communicate to Mr. El-Tawil how Structured Alpha operated. ████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

157.     Similarly, Mr. Sharpe failed to educate Mr. El-Tawil about Structured Alpha's risks. ██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████

158.     As NEBA's Chief Investment Executive, and as required under the Charter, Mr. Sharpe bore responsibility for advising Mr. Giblin, Mr. El-Tawil, and the rest of the Committee regarding the Structured Alpha strategy's nature and risks.  If the Committee did not in fact understand what portable alpha strategies like Structured Alpha were, how Structured Alpha made money, margin risk, what factors stress tests depended on, or the Committee's ability to seek

monthly holdings data from Allianz if it so decided, Mr. Sharpe is at fault for failing to properly advise the Committee.

159.     Indeed, Mr. El-Tawil himself blamed Mr. Sharpe for the Trust's purported losses.

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

(c)     <u>Mr. Sharpe Abdicated His Fiduciary Responsibility Over Concentration To The Plans And Failed To Properly Advise The Plans</u>

160.     After Structured Alpha's 2018 underperformance, Mr. Sharpe sought to take a hands-off approach to the Plans' investments in Structured Alpha. ███████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

161.     ███████████████████████████████████████████████████████████

████████████████████████████████████

162.     ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████.

163.     Mr. Sharpe's decision to abdicate his and the Committee's fiduciary responsibilities over concentration to the Plans was stunning, for multiple reasons.  It directly

48

contradicted Mr. Sharpe's repeated claims that Structured Alpha concentration was his responsibility. And it placed decision-making authority in the hands of Plans that Mr. Sharpe considered uninformed about Structured Alpha's risks (at his own insistence). ██████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████

164.    But Mr. Sharpe assured the Committee and NEBA that this laissez-faire approach would reduce Structured Alpha's risks. ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████ Ex. O at -683. The ISC in fact did rely on that advice in approving Mr. Sharpe's laissez-faire approach and deciding to take no other steps to reduce the Trust's concentration. To the extent that the Trust's Structured Alpha concentration is found to be excessive and the Committee relied on Mr. Sharpe's advice that no other steps to reduce concentration were required to maintain its Structured Alpha investments, Mr. Sharpe is at fault.

(d)  Mr. Sharpe Created An Echo Chamber Within NEBA And Kept His Own Senior Team In The Dark About Structured Alpha's Risks

165. Mr. Sharpe's proposal to abdicate his, NEBA's and the Committee's fiduciary responsibilities to the Plans was not without critics. A senior NEBA employee who had been handpicked to succeed Mr. Sharpe as Chief Investment Executive disagreed with his approach. She communicated that disagreement to Mr. Sharpe's superiors, Mr. Kolodgy and Mr. Cooney.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████

166. Rather than reconsider his position based on the advice of his handpicked successor, Mr. Sharpe fired her. The senior NEBA employee departed in August 2019 ████████████ ███████████████████████████████████████ Mr. Sharpe tried to justify his decision by claiming that she █████████████████████████████████████████ But those remarks were at odds with the ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ The only thing that changed between 2018 and 2019 was that the senior NEBA employee had made what Mr. Sharpe deemed a fatal mistake—challenging his authority over Structured Alpha decision-making.

167. Following the senior NEBA employee's termination, Mr. Sharpe consolidated his control of NEBA and took steps to ensure that control would go unchallenged. ████████████ ████████████████████████████████████████████████████████████

██████████ And he kept senior NEBA employees, including his chief subordinate, Ms. Esser, in the dark about Structured Alpha and its risks. ████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████

## 2. Mr. Cooney's Breaches

168. As alleged above, Allianz became concerned in spring 2018 ██████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████ Ex. L. It need not have worried about Mr. Cooney. To the extent there was a battle, Mr. Cooney joined it squarely on Mr. Sharpe's side. As he had done between 2014 and 2017 when the Trust's Structured Alpha concentration expanded, he backed Mr. Sharpe, deferred to him, and actively advocated for the Trust to stay invested in Structured Alpha. To the extent the Committee could have avoided its alleged losses by exiting Structured Alpha in 2018-2019, Mr. Cooney is at fault for the Committee's decision not to do so.

(a) Mr. Cooney Convinced The Committee And The Plans To Stay Invested In Structured Alpha

169. During the 2018-2019 period, Mr. Cooney did not question Mr. Sharpe's determination to stay invested in Structured Alpha. Instead, he failed to effectively supervise Mr. Sharpe and continued his pattern of back-slapping Mr. Sharpe for his purportedly great work.

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████ Rather than question Mr. Sharpe or urge him to do more to help the Committee and the Plans understand the risks of Structured Alpha, Mr. Cooney tried to take credit for Mr. Sharpe's supposed achievements. ████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

170.    Mr. Cooney also actively supported Mr. Sharpe's efforts to convince the Committee to stay invested. ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████

 (b) <u>Mr. Cooney Failed Again To Educate The Committee And The ISC About Structured Alpha's Risks</u>

171.    As he had done before 2018, Mr. Cooney failed again to educate the Committee and the ISC about Structured Alpha's risks in 2018-2019.  Indeed, Mr. Giblin specifically faulted Mr. Cooney for failing to inform him of the objective of one of the principal funds in the strategy prior to the strategy's purported losses in March 2020.  In 2013, Allianz created the SA 750 series Structured Alpha investments with a 7.5% alpha target at the Committee's request. ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████  To the extent that

Mr. Giblin's representation was truthful, Mr. Cooney failed to advise the Committee such that its

Vice-Chair and the ISC's Chair misunderstood even the most basic facts about the Structured

Alpha strategy.

172.  Similarly, Mr. Cooney bears at least some responsibility for Mr. El-Tawil's failure

to understand Structured Alpha and its risks.  ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████  Mr. Cooney evidently failed to discharge this responsibility,  ███████████

███████████████████████████████████████

(c)    Mr. Cooney Also Abdicated His Fiduciary Responsibility Over
Concentration

173.  Mr. Cooney also worked with Mr. Sharpe to advance and implement Mr. Sharpe's

proposal to abdicate NEBA and the Committee's fiduciary responsibility over the Trust's asset

concentration to the Plans.  ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

174.    Further, Mr. Cooney joined Mr. Sharpe in assuring the ISC that letting the Plans choose would ensure that the Trust's concentration was appropriate. █████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

(d)    Mr. Cooney Worked Hand-In-Glove With Mr. Sharpe To Create An Echo Chamber Within NEBA

175.    Because he saw his own interests as linked to those of Mr. Sharpe, Mr. Cooney also supported Mr. Sharpe's efforts to create an echo chamber within NEBA. █████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████

176.    Once he and Mr. Sharpe had forced the senior NEBA employee out, Mr. Cooney supported Mr. Sharpe's consolidation of his control. ████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████

**C.    Defendants' Interference With Aon's Performance Of Its Fiduciary Duties**

177.    Mr. Sharpe and Mr. Cooney are also substantially more at fault because Mr. Sharpe actively interfered with Aon's performance of its fiduciary duties, and Mr. Cooney supported him.

178.    Mr. Sharpe frequently denied Aon the opportunity to provide advice to the Committee by not telling Aon of his decisions to terminate non-Structured Alpha investments

and/or shift assets to Structured Alpha before investments were made. For instance, in spring 2014, Mr. Sharpe met with Allianz to create new Multi-Beta series Structured Alpha funds solely for the Trust, bearing a greater return objective than the Trust's previous Structured Alpha investments. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████ Mr. Sharpe's unilateral actions prevented Aon from conducting an analysis or preparing a recommendation to the Committee before Mr. Sharpe invested Trust funds in the Multi-Beta Structured Alpha funds.

179. Similarly, in December 2014, Mr. Sharpe unilaterally closed out a non-Structured Alpha Trust investment and transferred $90 million of those assets to Structured Alpha. He never informed Aon or sought its advice in advance, and Aon personnel only learned of his decision the month after it was made.

180. Mr. Sharpe's failure to provide timely and accurate information about his intended moves interfered with Aon's ability to advise him and the Committee before they made decisions. His actions were contrary to the Committee's own professed "understanding" with Aon that the Committee "would endeavor to make major investment decisions only after receiving Aon's analysis and recommendation." Main Compl. ¶ 158.

181. Mr. Sharpe also actively interfered with Aon's attempts to discharge its duty to monitor the Trust's Structured Alpha investments. Mr. Sharpe had little time for Aon's monitoring

efforts because he thought that monitoring was his job, not Aon's. To enhance his and NEBA's control over Structured Alpha monitoring, advice, and decision-making, Mr. Sharpe sought to minimize Aon's influence and, notwithstanding the language of the ICA, have NEBA assume Aon's responsibilities—███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

182.    Mr. Sharpe executed that plan by, among other measures, starving Aon of information.  ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████

183.    Mr. Sharpe's actions inhibited Aon's ability to actively track the Trust's allocations across the asset classes the Investment Policy Statement established.  But instead of expressing concern that Mr. Sharpe's actions might interfere with Aon's performance of its fiduciary duties—

and the Committee's receipt of complete information—Mr. Cooney supported Mr. Sharpe's plan.

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

184.    Mr. Sharpe also blocked Aon's attempts to discharge its fiduciary duty by monitoring Allianz's fees. ████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████

185.    Mr. Sharpe further interfered with Aon's performance of its fiduciary duties by pre-reviewing Aon's presentations to the Committee in an attempt to twist Aon's advice to suit his own preferences. █████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

186.    While Aon provided Mr. Sharpe with its presentations and incorporated his feedback where proper and in accordance with Aon's obligations under the ICA, Aon always presented its perspective and recommendations, regardless of whether it was aligned with what Mr. Sharpe believed should be recommended.

187.    Mr. Sharpe also interfered with Aon's duty to assist the Plans to analyze the risks of the concentration of their Trust assets.  Because the Plans had their own risk profiles and retained some responsibility for asset allocation, Aon's contract with NEBA required it to provide the Plans with asset allocation risk forecasting software. ███████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ █████████████████████████████████████████████ By interfering with Aon's performance of its fiduciary duties, Mr. Sharpe sought to deprive his own Plans of information

rather than risk any erosion of his own control over the advice they received, or any reduction of the Plans' Structured Alpha concentration.

188.    Mr. Sharpe also failed to provide complete and accurate information to Aon by misinforming Aon about the level of sophistication of the Committee's own members. ███

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████ Mr. Sharpe materially

interfered with Aon's ability to discharge its duty to advise Mr. Giblin and the ISC by misinforming Aon about Mr. Giblin's level of sophistication.

## III. DUE TO THEIR BREACHES OF FIDUCIARY DUTY, MR. SHARPE AND MR. COONEY WERE CAUGHT TOTALLY OFF-GUARD BY THE EFFECTS OF THE MARCH 2020 MARKET IMPLOSION.

189.    In late February 2020, U.S. equity markets began to experience increased volatility as a result of growing concerns about the impact of COVID-19 on the global economy.  After closing at prices of roughly 15-18 in January and early February 2020, beginning on approximately February 24, the VIX began to rise, and eventually closed at 82.69 on March 16, 2020—an increase of over 400 percent.  Rising volatility impacts options prices; with investors expecting asset prices to swing in wide arcs, sellers of risk insurance such as S&P 500 index puts can demand a higher premium in issuing new short options.  As a result, Structured Alpha had historically been more profitable in high volatility environments.  Aon advertised that wider spreads mean greater potential inefficiencies to exploit—when volatility rises, the market's view of volatility sprints ahead of reality.

190.    But rising volatility and a falling index price can also (1) drive up the value of liabilities associated with existing short index options due to the increased probability that the index options will expire in the money and need to be settled in cash, and (2) drive up the liabilities associated with short VIX call options as the probability that they will settle in the money increases—effectively, a "payout" of the insurance policy.  This same risk also increases the risk of a devastating margin call—a risk which both Allianz and the Committee had ignored for the duration of the NRT's investment.

191.    As the VIX rose during February and March 2020, the S&P 500 was falling due to COVID-19's significant impact.  At all relevant times, Allianz pledged the funds' beta components, comprising shares of index funds, as collateral for its options positions.  As a result,

beginning in February 2020 when the S&P first faltered in response to COVID-19, the Structured Alpha funds suffered significant losses due to: (i) the decreasing value of the S&P index fund positions; and (ii) Allianz's mounting obligations to the holders of short puts that Allianz had assumed it would never have to pay. This downward spiral was directly contrary to the scenario analyses and stress tests performed regularly by Allianz, and presented to both BCBS and Aon, which had predicted that the value of the Structured Alpha funds would be down slightly, if at all, in this scenario and would recover any losses quickly. During that time, the value of the beta collateral declined significantly just as the risk of a devastating margin call rose significantly.

192. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

Aon did not know the extent of Allianz's risk management and disclosure failures yet. It did, however, notice that the performance of the Structured Alpha 1000 fund was down 25% from the prediction in the most recent risk report Aon had received from Allianz only 2 months earlier. ████

████████████████████████████████████████████████████████████████

████████████████████████████

193. Aon was shocked to learn that Allianz had not held its advertised hedging positions *for years*. ████████████████████████████████████████████████████████

████████████████████████████████ It might have been able to detect those issues earlier had the Committee ensured that its consultant received all the information that the Committee was entitled to under the Side Agreement.

194. On March 16, 2020, Allianz told the Committee and Aon that the portfolio was facing a devastating margin call the next day. On March 27, 2020, Allianz announced the

liquidation of its two funds where losses were the greatest, Structured Alpha 1000 and Structured Alpha 1000 Plus.

## IV. MR. SHARPE AND MR. COONEY CAUSED AND ARE SUBSTANTIALLY MORE AT FAULT FOR THE COMMITTEE'S ALLEGED LOSSES

195.    To the extent that the Plans invested in the Trust suffered legally cognizable losses as a result of ERISA violations beyond those engaged in by Allianz, Mr. Sharpe and Mr. Cooney's breaches of fiduciary duty directly caused the Committee's alleged losses.  Both Mr. Sharpe and Mr. Cooney are, at the very least, substantially more at fault than Aon for those alleged losses.

196.    Mr. Sharpe caused and is substantially more at fault for the Committee's alleged losses because he caused the Trust's Structured Alpha investments—and thus the amount of money that could be lost if Structured Alpha performed poorly—to expand from 4.64% at the end of 2013 to 62.01% by the end of 2016.  He publicly claimed credit for the Committee's decision to increase the Trust's Structured Alpha investments.  He drove asset allocation decisions because he treated asset allocation as his responsibility.  In some cases, he made those decisions to increase the Trust's Structured Alpha concentration either against Aon's advice or without seeking Aon's advice or even informing Aon.

197.    Mr. Sharpe also caused and is substantially more at fault for the Committee's alleged losses because he convinced the Committee, the ISC, and the Plans to maintain the Trust's Structured Alpha investments.  He told them that he knew Structured Alpha best—██████████ ███████████████████████████████████—and they believed him.  When Committee members had questions, the first person they turned to was Mr. Sharpe, not Aon.  Instead of acting as a trusted fiduciary, he acted like a salesman. ██████████████████████████████████ ██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ By all measures—other than the Trust's returns—Mr. Sharpe succeeded at this goal.

198.     He told the Committee to trust his ████████████ in the strategy's continued high performance and risk controls.  In fact, Mr. Sharpe told members of the Committee that they were concerned only because they ███████████████████ He told them that the strategy was well-protected from risk by the diversified beta pools and the hedges, that Allianz had put recovery strategies in place, that the strategy was performing as expected, that its concentration complied with the Investment Policy Statement, and that it would continue to generate high returns.  He told them that leaving each Plan to decide its own exposure to Structured Alpha would address any concentration risk.

199.     It was Mr. Sharpe, not Aon, who advised the Committee, the ISC, and the Plans to stay the course.  They relied on his advice and did stay the course in 2018-2019.  And Mr. Sharpe took credit for and boasted about his success in convincing them to do so. ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████

200.     Further, Mr. Sharpe caused and is substantially more at fault for the Committee's alleged losses because he failed to ensure that the Committee, the ISC, the Plans, and his own senior employees understood the nature and risks of the Structured Alpha strategy and actively withheld information about the Structured Alpha strategy from them. ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████ That ignorance was partly by design, and not solely by carelessness. ████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████

201.　　Mr. Sharpe also took steps to restrict the flow of information to the Committee, the ISC, the Plans, and his own senior employees. ██████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████ He blocked Aon from sharing its insights on diversification risk with the Plans.　Further, he terminated a senior NEBA employee for challenging his authority over Structured Alpha and replaced her with more junior subordinates whom he kept in the dark about Structured Alpha and its risks.　To the extent that the Committee, the ISC, and the Plans did not understand the nature and risks of Structured Alpha and would have acted differently if they had so understood, Mr. Sharpe is substantially more at fault and directly caused any losses.

202.     Finally, Mr. Sharpe caused and is substantially more at fault for the Committee's alleged losses because he interfered with Aon's performance of its fiduciary duties and withheld information from Aon.  Mr. Sharpe violated the Committee's understanding that it would seek advice from Aon before acting by expanding the Trust's Structured Alpha investments without even informing Aon.  He cut off Aon's access to performance reporting that Aon wanted to evaluate Allianz's diversification.  He blocked Aon from sharing its insights on diversification risk with the Plans.  He filtered Aon's presentation to the ISC in an attempt to ensure it served his sole priority: to show that Structured Alpha would continue to perform exceedingly well.  And, whether intentionally or unintentionally, he misled Aon about the level of sophistication of the Committee's Vice-Chair and the ISC's Chair when he filtered Aon's presentation to the ISC.

203.     Mr. Cooney also caused and is primarily at fault for the Committee's alleged losses for many of the same reasons.  He supported Mr. Sharpe's expansion of the Trust's investments, and joined Mr. Sharpe's recommendations that the Committee expand those investments, including at times contrary to Aon's advice.  He backed Mr. Sharpe's efforts to convince the Committee, the ISC, and the Plans to maintain those investments, and added his credibility to Mr. Sharpe's credibility.  He personally told the ISC that the Trust's level of risk was appropriate and that Plans should stay invested in Structured Alpha because Allianz had taken steps to ensure the strategy would rebound from downturns.  ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████  He supported Mr. Sharpe's efforts to interfere with Aon's performance of

its fiduciary duties, including by withholding information from Aon. And he supported Mr. Sharpe's efforts to withhold information from the Committee, the ISC, the Plans, and senior NEBA employees, including by working with Mr. Sharpe to force out a senior NEBA employee who questioned Mr. Sharpe's authority over Structured Alpha. ████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████ To the extent that the Committee was overconcentrated in Structured Alpha and did not understand that it was so overconcentrated, and to the extent that the Committee did not understand the risks of Structured Alpha, Mr. Cooney is at fault and directly caused any losses.

204.    Indeed, senior NEBA employees' contemporaneous communications confirm that they viewed Mr. Sharpe and Mr. Cooney as primarily at fault. ███████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

205. ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

206.     Rather than accept responsibility, Mr. Sharpe, Mr. Cooney, and others at BCBSA and the Committee decided to blame Aon for their own fiduciary failings. ████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ The Committee's decision to sue Aon rather than Mr. Sharpe—who had told the Committee that he

knew Structured Alpha best, ████████████████████████████████—and

Mr. Cooney, whose backing, ████████████ Mr. Sharpe depended on to expand and

maintain the Trust's Structured Alpha investments, confirms that the Committee is trying to make

Aon the patsy for Mr. Sharpe and Mr. Cooney's fiduciary failings.

207.     But ERISA's contribution and indemnification rules exist precisely to prevent the

Committee from making Aon the patsy for Mr. Sharpe and Mr. Cooney's fiduciary breaches. *See*

*Chemung Canal Tr. Co.*, 939 F.2d at 16 ("Full [fiduciary] responsibility should not depend on the

fortuity of which fiduciary a plaintiff elects to sue."). Mr. Sharpe and Mr. Cooney's breaches

make them liable for contribution and/or indemnification to Aon for any damages awarded to the

Committee under the allegations of the Complaint, and they are liable to Aon to completely

indemnify any liability suffered by Aon in connection with the claims asserted in the Complaint.

## CAUSES OF ACTION

### CONTRIBUTION & INDEMNIFICATION UNDER ERISA

208.     Aon hereby repeats and realleges as if fully set forth herein each of the allegations

contained in paragraphs 1 through 207.

209.     Aon denies the material allegations of the Complaint. Nevertheless, if there is any

finding that Aon is liable to the Committee, or any award of restitution by Aon to the Committee

for any of the Committee's alleged damages, then, under the facts alleged herein, Aon was not

substantially more at fault than Mr. Sharpe and Mr. Cooney. To the contrary, Mr. Sharpe and

Mr. Cooney's breaches of fiduciary duty make them primarily at fault and, at the very least,

substantially more at fault than Aon for any harm to the Trust and the Plans that invested their

assets in it.

210.     Specifically, at all relevant times Mr. Sharpe and Mr. Cooney were fiduciaries of

the Plans under ERISA.

211.     As ERISA fiduciaries, Mr. Sharpe and Mr. Cooney owed a duty to act with the care, skill, and prudence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character with like aims.  That duty required them to exercise care, skill, and prudence in connection with at least the following decisions:

a.     Recommending investment managers to the Committee and the ISC, as contemplated in Section 13(b) of the Charter;

b.     Monitoring and evaluating investment managers and their continuing appropriateness, as contemplated in the Investment Policy Statement;

c.      Deciding to invest, increasing investments in, and maintaining investments in Structured Alpha funds;

d.     Advising the Committee, the ISC, and the Plans, concerning making, maintaining, and terminating investments in Structured Alpha funds and the appropriate concentration of Structured Alpha investments;

e.     Ensuring that the Committee, the ISC, and the Plans understood the nature and risks of the Structured Alpha strategy.

212.     As ERISA fiduciaries, Mr. Sharpe and Mr. Cooney also owed a duty of loyalty to the Plans, a co-fiduciary duty to provide complete and accurate information to Aon and permit Aon to fulfill its fiduciary responsibilities without interference, a duty to follow Plan documents, and a duty to "diversify[] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."  29 U.S.C. § 1104(a)(1)(C).

213.     Mr. Sharpe breached his duty of care in at least the following ways:

a.  He advised the Committee, the ISC, and the Plans to expand the Trust's Structured Alpha investments and stay invested in Structured Alpha, including by

   i.   assuring them that Structured Alpha was a low risk "risk management" strategy rather than a source of risk;

   ii.  repeating Allianz's assertions about the operation of the Structured Alpha strategy without adequately investigating them;

   iii. assuring them that Allianz was employing hedges to protect Structured Alpha against steep declines;

   iv.  assuring them that the diversification of the Structured Alpha beta investments protected against risk;

   v.   assuring them that the Trust's Structured Alpha concentration complied with the Investment Policy Statement's guidelines; and,

   vi.  assuring the Committee and the ISC that leaving it to the Plans to choose their exposure to Structured Alpha would address any concentration risk;

b.  He failed to ensure that the Committee, the ISC, and the Plans understood the nature and risks of the Structured Alpha strategy;

c.  He actively withheld information about the Structured Alpha strategy from the Committee, the ISC, the Plans, and his own NEBA employees and forced out a senior NEBA employee who disagreed with him; and,

d.      He abdicated his fiduciary responsibility over the Trust's Structured Alpha concentration by leaving it to each Plan to determine how much Structured Alpha exposure it preferred.

214.      Mr. Sharpe breached his duty of diversification by expanding the Trust's concentration of investments in Structured Alpha and maintaining that concentration at its expanded level.

215.      Mr. Sharpe breached his co-fiduciary duty by interfering with Aon's performance of its fiduciary duties and failing to provide complete and accurate information to Aon.

216.      Mr. Sharpe breached his duty of loyalty by (1) actively withholding information about the Structured Alpha strategy from the Committee, the ISC, the Plans, and his own NEBA employees and forcing out a senior NEBA employee who disagreed with him; and (2) abdicating his fiduciary responsibility over the Trust's Structured Alpha concentration by leaving it to each Plan to determine how much Structured Alpha exposure it wanted.

217.      Mr. Sharpe breached his duty to follow Plan documents for at least the reasons stated above, including but not limited to his assurances that the Trust's Structured Alpha concentration complied with the Investment Policy Statement.

218.      Mr. Cooney breached his duty of care in at least the following ways:

a.      He advised the Committee, the ISC, and the Plans to expand the Trust's Structured Alpha investments and stay invested in Structured Alpha, including by:

i.      advising them to stay invested because Allianz had put recovery strategies in place and he had "high conviction in the strategy recovering";

      ii.      assuring them that the diversification of the Structured Alpha beta investments protected against risk;

      iii.     repeating Allianz's assertions about the operation of the Structured Alpha strategy without adequately investigating them; and,

      iv.     assuring the Committee and ISC that leaving it to the Plans to choose their exposure to Structured Alpha would address any concentration risk;

b.     He failed to ensure that the Committee, the ISC, and the Plans understood the nature and risks of the Structured Alpha strategy;

c.     He supported Mr. Sharpe's efforts to withhold information about the Structured Alpha strategy from the Committee, the ISC, the Plans, and his own NEBA employees and he worked jointly with Mr. Sharpe to force out a senior NEBA employee who disagreed with him; and,

d.     He abdicated his fiduciary responsibility over the Trust's Structured Alpha concentration by leaving it to each Plan to determine how much Structured Alpha exposure it preferred.

219.    Mr. Cooney breached his duty of diversification by expanding the Trust's concentration of investments in Structured Alpha and maintaining that concentration at its expanded level, including by supporting and deferring to Mr. Sharpe's efforts to do so.

220.    Mr. Cooney breached his co-fiduciary duty by interfering with Aon's performance of its fiduciary duties and failing to provide complete and accurate information to Aon.

221.    Mr. Cooney breached his duty of loyalty by (1) supporting Mr. Sharpe's efforts to withhold information about the Structured Alpha strategy from the Committee, the ISC, the Plans,

and his own NEBA employees, and working jointly with Mr. Sharpe to force out a senior NEBA employee who disagreed with Mr. Sharpe; and (2) abdicating his fiduciary responsibility over the Trust's Structured Alpha concentration by leaving it to each Plan to determine how much Structured Alpha exposure it wanted.

222. Mr. Cooney breached his duty to follow Plan documents for at least the reasons stated above.

223. As a direct result of Mr. Sharpe and Mr. Cooney's breaches, the Trust sustained investment losses for which Aon is not substantially more at fault, but rather for which Mr. Sharpe and Mr. Cooney are primarily responsible.

224. Mr. Sharpe and Mr. Cooney are therefore liable to Aon for complete indemnification for any liability, including fees and costs, suffered by Aon in connection with the claims asserted in the Complaint.

225. Even if Aon and Mr. Sharpe and Mr. Cooney are jointly liable by virtue of their status as fiduciaries within the meaning of ERISA, both Aon and Mr. Sharpe and Mr. Cooney are obligated to contribute to the payment or repayment of any damages or restitution according to their respective shares of fault, and Mr. Sharpe and Mr. Cooney were substantially more at fault than Aon. Accordingly, Aon will suffer harm to the extent it is required to pay more than its proportionate share of liability on the claims asserted in the Complaint.

226. Mr. Sharpe and Mr. Cooney are liable to Aon for contribution and/or indemnification in the amount of any payment by Aon in excess of its share of liability, including fees and costs, on the claims asserted in the Complaint.

## PRAYER FOR RELIEF

Wherefore, Aon respectfully prays for judgment as follows:

a.    An order finding that Mr. Sharpe and Mr. Cooney breached their respective fiduciary duties under ERISA to the Plans;

b.    An order that any injuries or damages sustained by the Trust were proximately caused, in whole or in part, by the acts or omissions of Mr. Sharpe and Mr. Cooney;

c.    An order that (a) Mr. Sharpe and Mr. Cooney are obligated to completely indemnify Aon for any judgment or award of damages or restitution resulting from the Complaint, or (b) of the amount that Mr. Sharpe and Mr. Cooney are obligated to contribute if Aon is compelled to pay any sum as a result of any judgment or award of damages or restitution resulting from the Main Complaint, and payment of such amounts;

d.    Reasonable attorneys' fees and costs; and

e.    Such other and further relief as the Court deems just and proper.

Respectfully submitted this 13th day of May, 2022.

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

*Richard I. Werder, Jr.*
Richard I. Werder, Jr.
Renita Sharma
Julia Beskin
Sascha Rand
51 Madison Avenue, 22nd Floor,
New York, New York 10010
(212) 849-7000

Michael Liftik
1300 I St NW #900,
Washington, DC 20005
Telephone: (202) 538-8000

*Attorneys for Defendant/Third-Party Plaintiff Aon Investments USA Inc.*